## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **JUDICIAL WATCH, INC.,** | |
| *Plaintiff*, | |
| v. | Case No. 1:24-cv-00700-TJK |
| **U.S. DEPARTMENT OF JUSTICE,** | (Consolidated Cases) |
| *Defendant.* | |

**HERITAGE FOUNDATION,** *et al.*,

    *Plaintiffs,*

v.

**U.S. DEPARTMENT OF JUSTICE,**

    *Defendant.*

**CABLE NEWS NETWORK, INC.,** *et al.*,

    *Plaintiffs,*

v.

**U.S. DEPARTMENT OF JUSTICE,**

    *Defendant.*

## DEFENDANT U.S. DEPARTMENT OF JUSTICE'S
## MEMORANDUM OF LAW IN SUPPORT OF
## MOTION FOR SUMMARY JUDGMENT

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ............................................................................................................. 1

BACKGROUND .............................................................................................................. 2

I.      THE HUR INVESTIGATION. ................................................................................ 2

II.     CONGRESSIONAL REQUESTS FOR THE AUDIO RECORDING ............................ 4

III.    PLAINTIFFS' FOIA REQUESTS. ....................................................................... 4

IV.     PROCEDURAL BACKGROUND ............................................................................ 4

STANDARD OF REVIEW ................................................................................................ 5

ARGUMENT .................................................................................................................. 7

I.      THE AUDIO RECORDING WAS PROPERLY WITHHELD PURSUANT TO
        EXEMPTION 5 BECAUSE THE PRESIDENT ASSERTED EXECUTIVE
        PRIVILEGE ......................................................................................................... 7

        A.    Materials Subject to a Formal Assertion of Executive Privilege are Exempt
              Under Exemption 5. ................................................................................... 7

        B.    The Audio Recording Is Subject to a Formal Assertion of Executive
              Privilege. ................................................................................................. 11

II.     THE DEPARTMENT PROPERLY WITHHELD THE AUDIO RECORDING
        PURSUANT TO EXEMPTIONS 6 AND 7(C) BECAUSE DISCLOSURE
        WOULD RESULT IN AN UNWARRANTED INVASION OF PRIVACY ................. 14

        A.    Under Clear Precedent, Disclosure Would Result in an Unwarranted
              Invasion of Privacy. ................................................................................ 16

        B.    Uncharged Individuals Have a Substantial Privacy Interest in Audio
              Recordings of Interviews with Law Enforcement Officers. ........................ 19

        C.    Any Public Interest in Disclosure of the Audio Recording Does Not
              Outweigh the Privacy Interests at Stake Given the Substantial Amount of
              Information Already Available to the Public .............................................. 24

III.    BECAUSE RELEASE OF THE AUDIO RECORDING CAN REASONABLY
        BE EXPECTED TO INTERFERE WITH LAW ENFORCEMENT
        PROCEEDINGS, THE DEPARTMENT PROPERLY WITHHELD THE AUDIO
        RECORDING PURSUANT TO EXEMPTION 7(A) ................................................. 28

A.    Disclosure of the Audio Recording Can Reasonably Be Expected to
      Interfere With Law Enforcement Proceedings ...................................................... 28

B.    Exemption 7(A) Textually Applies to the Audio Recording Here Because
      Similar Law Enforcement Proceedings are Reasonably Anticipated .................. 30

IV.   DISCLOSURE OF THE AUDIO RECORDING WOULD FORESEEABLY
      HARM INTERESTS PROTECTED BY FOIA EXEMPTIONS ..................................... 36

V.    THERE IS NO REASONABLY SEGREGABLE, NON-EXEMPT
      INFORMATION ................................................................................................................. 37

CONCLUSION ................................................................................................................................ 38

# <u>TABLE OF AUTHORITIES</u>

## <u>Cases</u>

*ACLU v. Department of Justice*,
    750 F.3d 927 (D.C. Cir. 2014) ........................................................................... 17, 20

*Associated Press v. Dep't of Def.*,
    554 F.3d 274 (2d Cir. 2009) ...................................................................................... 26

*August v. FBI*,
    328 F.3d 697 (D.C. Cir. 2003) ..................................................................................... 6

*Bast v. U.S. Dep't of Just.*,
    665 F.2d 1251 (D.C. Cir. 1981) ................................................................................ 20

*Bates v. United States*,
    522 U.S. 23 (1997) ..................................................................................................... 36

*Bevis v. U.S. Dep't of State*,
    801 F.2d 1386 (D.C. Cir. 1986) ................................................................................ 30

*Boyd v. Crim. Div. of U.S. Dep't of Justice*,
    475 F.3d 381 (D.C. Cir. 2007) ............................................................................ 24, 25

*Boyd v. Exec. Office for U.S. Attys.*,
    161 F. Supp. 3d 1 (D.D.C. 2015) .............................................................................. 15

*Brayton v. Off. of the U.S. Trade Rep.*,
    641 F.3d 521 (D.C. Cir. 2011) ..................................................................................... 6

*Cable News Network, Inc. v. U.S. Department of Justice*,
    No. 24-cv-961-RDM (D.D.C. 2024) ........................................................................... 5

*Carson v. U.S. Dep't of Justice*,
    631 F.2d 1008 (D.C. Cir. 1980) ................................................................................ 30

*Cheney v. U.S. Dist. Ct. for D.C.*,
    542 U.S. 367 (2004) ................................................................................................... 10

*Citizens for Responsibility & Ethics in Washington v. U.S. Department of Justice*,
    658 F. Supp. 2d 217 (D.D.C. 2009) .......................................................................... 34

*Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Just.* ("*CREW*"),
    746 F.3d 1082 (D.C. Cir. 2014) ......................................................................... *passim*

*Coastal States Gas Corp. v. Dep't of Energy*,
  617 F.2d 854 (D.C. Cir. 1980) ................................................................ 32

*Ctr. for Nat'l Sec. Studies v. U.S. Dep't of Just.*,
  331 F.3d 918 (D.C. Cir. 2003) ........................................................ *passim*

*Dep't of Air Force v. Rose*,
  425 U.S. 352 (1976) ............................................................................ 14

*Detroit Free Press, Inc. v. U.S. Dep't of Just.*,
  829 F.3d 478 (6th Cir. 2016) ........................................................ 22, 23

*Ecological Rights Found. v. EPA*,
  541 F. Supp. 3d 34 (D.D.C. 2021) ...................................................... 37

*Electronic Privacy Info. Ctr., v. U.S. Department of Justice*,
  18 F.4th 712 (D.C. Cir. 2021) ...................................................... 17, 25

*Encino Motorcars, LLC v. Navarro*,
  584 U.S. 79 (2018) .............................................................................. 6

*FBI v. Abramson*,
  456 U.S. 615 (1982) ............................................................................ 6

*Food Mktg. Inst. v. Argus Leader Media*,
  588 U.S. 427 (2019) ........................................................................ 6, 35

*Forest Serv. Emps. for Env't Ethics v. U.S. Forest Serv.*,
  524 F.3d 1021 (9th Cir. 2008) ............................................................ 26

*FTC v. Grolier, Inc.*,
  462 U.S. 19 (1983) ................................................................... 8, 11, 12

*Fund for Const. Gov't v. Nat'l Archives & Recs. Servs.*,
  656 F.2d 856 (1981) ...................................................................... *passim*

*Gilliam v. U.S. Dep't of Justice*,
  128 F. Supp. 3d 134 (D.D.C. 2015) ...................................................... 6

*Heritage Foundation v. U.S. Department of Justice*,
  No. 24-cv-960-DFL (D.D.C. 2024) ...................................................... 5

*Hunt v. FBI*,
  972 F.2d 286 (9th Cir. 1992) .............................................................. 20

*Illinois v. Lidster*,
  540 U.S. 419 (2004) ............................................................................ 34

*In re Sealed Case (Espy)*,
   121 F.3d 729 (D.C. Cir. 1997) ................................................................. 9, 12

*John Doe Agency v. John Doe Corp.*,
   493 U.S. 146 (1989) .................................................................................. 6

*Jones v. United States*,
   526 U.S. 227 (1999) .................................................................................. 13

*Juarez v. U.S. Dep't of Justice*,
   518 F.3d 54 (D.C. Cir. 2008) ............................................................... 30, 32

*Judicial Watch of Fla., Inc. v. U.S. Dep't of Justice*,
   102 F. Supp. 2d 6 (D.D.C. 2000) ........................................................... 29

*Judicial Watch v. National Archives and Records Administration,*,
   876 F.3d 346 (D.C. Cir. 2017) ........................................................ *passim*

*Judicial Watch v. U.S. Secret Serv.*,
   726 F.3d 208 (D.C. Cir. 2013) ............................................................... 13

*Judicial Watch, Inc. v. U.S. Dep't of Def.*,
   715 F.3d 937 (D.C. Cir. 2013) ............................................................... 7

*Judicial Watch, Inc. v. U.S. Dep't of Justice*,
   57 F. Supp. 3d 48 (D.D.C. 2014) ........................................................... 11

*Karantsalis v. U.S. Dep't of Just.*,
   635 F.3d 497 (11th Cir. 2011) ............................................................... 22

*Kimberlin v. U.S. Dep't of Justice*,
   139 F.3d 944 (D.C. Cir. 1998) ............................................................... 20

*Leopold v. U.S. Dep't of Justice*,
   487 F. Supp. 3d 1 (D.D.C. 2020) ........................................................... 7

*Light v. Dep't of Justice*,
   968 F. Supp. 2d 11 (D.D.C. 2013) ......................................................... 6

*Mapother v. U.S. Dep't of Justice*,
   3 F.3d 1533 (D.C. Cir. 1993) ........................................................ 28, 30, 32

*Martin v. Off. of Special Couns., MSPB*,
   819 F.2d 1181 (D.C. Cir. 1987) ............................................................. 7

*Mil. Audit Project v. Casey*,
   656 F.2d 724 (D.C. Cir. 1981) ............................................................... 7

*Milner v. Dep't of Navy*,
  562 U.S. 562 (2011) ................................................................ 35

*N.L.R.B v. Noel Canning*,
  573 U.S. 513 (2014) ............................................................ 10, 14

*N.Y. Times Co. v. NASA*,
  920 F.2d 1002 (D.C. Cir. 1990), *remanded*, 782 F. Supp. 628 (D.D.C 1991) ........ 18, 21, 22, 27

*Nat'l Archives & Recs. Admin. v. Favish*,
  541 U.S. 157 (2004) ..................................................... *passim*

*Nat'l Ass'n of Crim. Def. Lawyers v. U.S. Dep't of Justice*,
  844 F.3d 246, 256 (D.C. Cir. 2016) ......................................... 37

*Nixon v. Warner Commc'ns, Inc.*,
  435 U.S. 589 (1978) ......................................................... 23

*NLRB v. Robbins Tire & Rubber Co.*,
  437 U.S. 214 (1978) .................................................. 28, 29, 35

*Nova Oculus Partners, LLC v. SEC*,
  486 F. Supp. 3d 280 (D.D.C. 2020) .......................................... 15

*Off. of the Cap. Collateral Couns. v. U.S. Dep't of Justice*,
  331 F.3d 799 (11th Cir. 2003) .............................................. 26

*Parker v. DOJ*,
  214 F. Supp. 3d 79 (D.D.C. 2016) ........................................... 20

*Pike v. U.S. Dep't of Justice*,
  306 F. Supp. 3d. 400 (D.D.C. 2016) ......................................... 22

*Prison Legal News v. Samuels*,
  787 F.3d 1142 (D.C. Cir. 2015) ............................................. 20

*Project on Gov't Oversight, Inc. v. U.S. Off. of Special Couns.*,
  No. 22-cv-3381, 2024 WL 1213324 (D.D.C. Mar. 19, 2024) .................... 19

*Quinon v. FBI*,
  86 F.3d 1222 (D.C. Cir. 1996) .............................................. 24

*Reporters' Comm. for Freedom of the Press v. FBI*,
  3 F.4th 350 (D.C. Cir. 2021) ............................................... 36

*Schiller v. NLRB*,
  964 F.2d 1205 (D.C. Cir. 1992) .............................................. 7

*Schoenman v. FBI*,
    575 F. Supp. 2d 166 (D.D.C. 2008) ........................................................ 15

*Senate Select Comm. on Presidential Campaign Activities v. Nixon*,
    498 F.2d 725 (D.C. Cir. 1974) ........................................................ 9, 12

*Shapiro v. U.S. Dep't of Justice*,
    No. 12-cv-313 (BAH), 2020 WL 3615511 (D.D.C. July 2, 2020) ........................................................ 32

*Sussman v. U.S. Marshals Serv.*,
    494 F.3d 1106 (D.C. Cir. 2007) ........................................................ 28, 31

*Times Picayune Pub. Corp. v. U.S. Dep't of Justice*,
    37 F. Supp. 2d 472 (E.D. La. 1999) ........................................................ 22

*Trump v. Mazars LLP*,
    591 U.S. 848 (2020) ........................................................ *passim*

*Turkiye Halk Bankasi A.S. v. United States*,
    598 U.S. 264 (2023) ........................................................ 34

*U.S. Dep't of Def. v. FLRA*,
    510 U.S. 487 (1994) ........................................................ 15, 25

*U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press*,
    489 U.S. 749 (1989) ........................................................ 15, 20

*U.S. Dep't of State v. Wash. Post Co.*,
    456 U.S. 595 (1982) ........................................................ 14, 15

*U.S. Dep't of State v. Ray*,
    502 U.S. 164 (1991) ........................................................ 25-26

*U.S. Fish & Wildlife Serv. v. Sierra Club, Inc.*,
    592 U.S. 261 (2021) ........................................................ 7

*United States v. AT&T*,
    567 F.2d 121 (D.C. Cir. 1977) ........................................................ 13

*United States v. McDougal*,
    103 F.3d 651 (8th Cir. 1996) ) ........................................................ 23

*United States v. McDougal*,
    940 F. Supp. 224 (E.D. Ark. 1996) ........................................................ 23

*United States v. Nixon*,
    418 U.S. 683 (1974) ........................................................ 8, 10, 12, 13

*United States v. Palomar-Santiago*,
  593 U.S. 321 (2021) .................................................................. 13

*World Publ'g Co. v. U.S. Dep't of Just.*,
  672 F.3d 825 (10th Cir. 2012) ........................................................ 22

**U.S. Constitution**

U.S. Const., Art. II § 3 ..................................................................... 9

**Statute**

5 U.S.C. § 552 ........................................................................ *passim*

**Legislative Materials**

H.R. Rep. No 114-391 (2015) .......................................................... 36

Hearings on S. 2170 et al. before the Subcomm. on Intergovt'l Rels. of the S. Comm. on Gov't
  Ops.,
  94th Cong., 1st Sess., 87 (1975) ....................................................... 14

S. Rep. No. 114-4 (2015) .............................................................. 36

**Administrative and Executive Materials**

28 C.F.R. § 600.8(c) ............................................................... 3, 26

Assertion of Exec. Privilege Concerning the Special Counsel's Interviews of the Vice President
  & Senior White House Staff.,
  32 Op. O.L.C. 7, 10 (2008) .......................................................... *passim*

Cong. Requests for Confidential. Exec. Branch Info.,
  13 Op. O.L.C. 153, 154 (1989) ...................................................... 8, 9

Cong. Requests for Info. from Inspectors Gen. Concerning Open Criminal Investigations,
  13 Op. O.L.C. 77, 80 (1989) .......................................................... 9

Exec. Order No. 12,667, ,
  54 Fed. Reg. 3403, 3403 (Jan. 18, 1989) .............................................. 9

Fed. R. Civ. P. 56(a) ...................................................................... 6

Freedom of Information Act,
  74 Fed. Reg. 4683 (Jan. 21, 2009) .................................................... 36

History of Refusals by Exec. Branch Officials to Provide Info. Demanded by Cong.,
  6 Op. O.L.C. 751 (1982) .............................................................. 8

Position of the Exec. Dep't Regarding Invest. Repts.,
40 Op. Att'y Gen. 45, 46-48 (1941) ............................................................................ 9

Response to Cong. Requests for Info. Regarding Decisions Made Under the Indep. Couns. Act.,
10 Op. O.L.C. 68, 76 (1986) ...................................................................................... 10

## **Other Authorities**

1 Writings of Thomas Jefferson 189 (P. Ford ed. 1892) ............................................... 8

Attorney General Holder's Mem. for Heads of Exec. Dep'ts & Agencies Concerning the FOIA,
(Mar. 19, 2009) ......................................................................................................... 36

Verma & Oremus, *AI voice clones mimic politicians and celebrities, reshaping reality*, Wash.
Post (updated Oct. 15, 2023)..................................................................................... 23

## <u>INDEX OF EXHIBITS</u>

- Declaration of Bradley Weinsheimer
    - Exhibit 1, Biden Interview Transcript (Oct. 8, 2023)
    - Exhibit 2, Biden Interview Transcript (Oct. 9, 2023)
    - Exhibit 3, Order No. 5588-2023, Appointment of Robert K. Hur as Special Counsel
    - Exhibit 4, February 8, 2024 Letter of Attorney General Merrick Garland
    - Exhibit 5, May 15, 2024 Letter of Attorney General Merrick Garland ("Garland Letter")
    - Exhibit 6, May 16, 2024 Letter of Assistant Attorney General Carlos Uriarte
- Statement of Undisputed Facts

## INTRODUCTION

These consolidated cases brought pursuant to the Freedom of Information Act ("FOIA") concern a single law enforcement record: an audio recording of Special Counsel Robert Hur's interview of President Biden. Disclosure of that record is unwarranted. Release of the audio recording would threaten critical law enforcement interests by chilling the potential cooperation of witnesses in current and future sensitive investigations. In addition, disclosure would constitute a significant invasion of privacy. Decades of controlling precedent establish that the privacy interests implicated by disclosure of law enforcement records are at their zenith when the disclosure involves nonpublic information about an uncharged individual. These privacy harms are amplified by the threat of malicious manipulation of audio files that has recently become much more acute.

The Department properly asserted a number of statutory FOIA exemptions to protect these vital law enforcement and privacy interests. First, Exemption 5 permits the government to withhold internal information that would be subject to a claim of privilege in civil litigation. Here, the Attorney General, as the chief law enforcement officer of the United States, determined that release of the audio recording posed an unacceptable risk of impeding future, high-profile law enforcement investigations and therefore requested that the President assert executive privilege in response to a congressional request for the same document. In response, the President formally asserted executive privilege. As a law enforcement record, the disclosure of which would harm the Executive's ability to obtain witness cooperation in future investigations, the audio recording readily fits within the ambit of executive privilege and its historical usage. And the formal assertion of executive privilege means that the audio recording would not ordinarily be discoverable in civil litigation. It is therefore not available under FOIA.

Second, the Department properly withheld the audio recording in full pursuant to Exemptions 6 and 7(C), to protect against an unwarranted invasion of privacy. Significant privacy interests attach to the Special Counsel's investigatory files, including the audio recording, and there is forceful precedent protecting it from disclosure. The President's status as a public figure does not eliminate these significant privacy interests. Further, under the statute, only a substantial public

interest in disclosure could overcome such significant privacy interests. No such interest exists here, including because the Department has already released ample information that provides alternative sources that serve the public interests appropriately cognizable under FOIA. Not only has the Department released Special Counsel Hur's 345-page report detailing his investigation and the conclusions he reached, but the Department has also produced a written transcript of the same interview for which the plaintiffs seek the audio recording. As a result, any marginal increase in the public's understanding of how Special Counsel Hur carried out his investigation (the only public interest cognizable here) is insufficient to overcome the significant privacy interests at stake.

Finally, the audio recording is also exempt under Exemption 7(A), which allows the withholding of law enforcement records when disclosure "could reasonably be expected to interfere with enforcement proceedings." There is no question that the audio recording is a law enforcement record. And the Department is currently engaged in a number of ongoing law enforcement investigations in which it has determined that release of the audio recording would interfere with witness cooperation in those investigations.

For each of these reasons, the Department is entitled to summary judgment.

## BACKGROUND

### I.    The Hur Investigation

On January 12, 2023, Attorney General Merrick Garland appointed Robert Hur as Special Counsel. Weinsheimer Decl. ¶ 4. The Special Counsel's Office ("SCO") was authorized to investigate the possible unauthorized removal and retention of classified documents at various locations associated with President Biden. *See id.* As part of the investigation, President Biden voluntarily agreed to sit for an interview with Mr. Hur. *Id.* ¶ 9. The interview occurred on October 8 and October 9, 2023, and collectively lasted just over approximately five hours. *Id.* The Special Counsel requested that the interview be recorded, and the President voluntarily agreed to that request.

*Id.* ¶ 10. At the interview, the SCO created an audio recording that documented the interview,[1] *id.*
¶¶ 10, 12, and SCO, with the assistance of a court reporter, later made a written transcript of the
interview based on the audio recording, *id.* ¶ 13. The audio recording and transcripts were marked,
maintained, and stored as Top Secret. *Id.* ¶ 15. Copies of both the audio recording and the written
transcript were provided to representatives of the White House Counsel's Office – which also
stored and treated them as Top Secret and made them available as appropriate to President Biden's
personal attorneys. *See id.* ¶¶ 11, 15-16.

At the conclusion of the investigation, Mr. Hur submitted a report to Attorney General
Garland pursuant to Department regulations (the "Hur Report"). *See* 28 C.F.R. § 600.8(c) ("At the
conclusion of the Special Counsel's work, he or she shall provide the Attorney General with a
confidential report explaining the prosecution or declination decisions reached by the Special
Counsel."). The Report stated that Mr. Hur "conclude[d] that no criminal charges are warranted,"
Hur Report, at 1, and provided extensive discussion of the investigation and the decisions he
reached, *see generally* Hur Report. The Department later produced a copy of the Hur Report to
Congress and placed it on the Department's public-facing website.[2] Weinsheimer Decl. ¶ 7. The
Department also produced to Congress and released to FOIA requesters and posted on its public
website a redacted copy of the transcript of President Biden's interview. *Id.* ¶ 17. These public
disclosures were discretionary; the Department did not make all withholdings or apply all redac-
tions available under FOIA. *Id.* ¶ 46. Mr. Hur also testified before Congress concerning his inves-
tigation and his decision to decline prosecution. *See id.*

---

[1] Technically, two redundant audio recordings of the interview were made since SCO personnel
utilized two separate audio recording devices during the interview. Weinsheimer Decl. ¶ 12. For
convenience, this memorandum will refer to a single "audio recording" since both recordings re-
flect the same interview.

[2] The Hur Report is available at: *https://www.justice.gov/sco-hur.*

## II.      Congressional Requests for the Audio Recording

On February 27, 2024, two Committees of the House of Representatives (the Committee on the Judiciary and the Committee on Oversight and Accountability) subpoenaed the audio recording of Special Counsel Hur's interview of President Biden. Weinsheimer Decl. ¶ 18. On May 15, 2024, Attorney General Garland informed President Biden that the Department's Office of Legal Counsel had determined that the audio recording fell within the scope of executive privilege and that executive privilege could properly be asserted in response to the subpoenas. *See id.* ¶ 19; Ex. 5 ("Garland Ltr."). The Attorney General agreed with that conclusion and requested that President Biden assert executive privilege over the audio recording. Weinsheimer Decl. ¶ 19; *see* Garland Ltr., at 6 ("[I]n my view, disclosure of the audio recording[] . . . poses an unacceptable risk of impairing cooperation in future high-profile investigations where voluntary cooperation is exceedingly important, such as those involving White House officials."). The President did so on May 16, 2024. *Id.* ¶ 20. That same day, the Department informed the Chairmen of the relevant Congressional Committees that President Biden had asserted executive privilege over the audio recording. *Id.*; *see* Ex. 6 ("Uriarte Ltr.").

## III.     Plaintiffs' FOIA Requests

On February 8, 2024, Judicial Watch submitted a FOIA request to the Department seeking "all transcripts, audio recordings, and video recordings of all interviews of President Biden conducted during the course of the investigation led by Special Counsel Robert Hur." ECF No. 1, ¶ 5. On February 12, 2024, the Heritage Foundation submitted a FOIA request to the Department seeking "[a]ll recordings in any format whatsoever, of the interview of President Joseph R. Biden, Jr. referenced in [the Hur Report]." ECF No. 25-1, ¶ 15. Thirteen media organizations submitted FOIA requests between February 16, 2024, and April 1, 2024, each of which also sought the audio recording. ECF No. 26, at 11-15, ¶¶ 19, 21-44.

## IV.      Procedural Background

On March 11, 2024, Judicial Watch filed its Complaint, ECF No. 1.  The Heritage Foundation filed its Complaint on April 3, 2024. *See* ECF No. 7-1. One of the media organizations,

CNN, filed its initial Complaint on April 4, 2024, *see* ECF No. 7-2, which CNN later amended (on May 15, 2024) to add twelve additional plaintiffs, *see* ECF No. 26. On April 18, 2024, in light of the overlap of documents sought by Judicial Watch, Heritage, and CNN, the Department moved to consolidate the *Judicial Watch* case with *Heritage Foundation v. U.S. Department of Justice*, No. 24-cv-960 (D.D.C.) and *Cable News Network, Inc. v. U.S. Department of Justice*, No. 24-cv-961 (D.D.C.). ECF No. 7. While that motion was pending, the Department informed the Court that it had withheld the audio recording in full and that there are no video recordings of the interview. ECF No. 12, at 1 & n.1; *see* Weinsheimer Decl. ¶ 3, 8-9. On May 3, 2024, the Court granted the Department's motion to consolidate. *See* May 3, 2024, Minute Order.

Because the Department has already produced a redacted written transcript of the interview, and because there is no video recording of the interview, the only record at issue in this case is the audio recording.[3] *See* Weinsheimer Decl. ¶¶ 3, 8-9, 17. Soon after the Department informed the Court and the parties that it had withheld the audio recording in full, ECF No. 12, at 1, the Court set a summary judgment briefing schedule, *see* May 6, 2024 Minute Order.

## STANDARD OF REVIEW

Under FOIA, federal agencies must make agency records available to the public upon request unless the records fall within one or more statutory exemptions. 5 U.S.C. § 552(a)(3), (b)(1)-

---

[3] Some of the specific statements reflected in the audio recording are exempt under various FOIA exemptions not discussed here. For example, the audio recording contains classified information that would be exempt under Exemption 1. When the government produced the written transcript of the interview, the government redacted those specific statements pursuant to that and other FOIA exemptions. In this case, plaintiffs do not challenge withholdings that the Department would make to the audio recording that correspond to the redactions the Department made to the written transcript. For example, in a joint status report, Judicial Watch "confirm[ed] that it would not challenge any corresponding redactions made to the audio recordings." ECF No. 12, at 1. The Department has also noted its understanding that Heritage does not seek the portions of the audio recording that would correspond to redactions made to the written transcript. *See* ECF No. 15, at 3. Heritage has not contradicted that understanding. *See* ECF No. 18. The media-organization plaintiffs have not contradicted in any filing the Departments' understanding that this case does not involve a challenge to withholdings that would correspond to the Department's redactions of the written transcript. Accordingly, this motion asserts those exemptions that justify the withholding of the audio recording in full.

(9). The statute reflects a "balance struck by Congress between the public's right to know and the government's legitimate interest in keeping certain information confidential," *Ctr. for Nat'l Sec. Studies v. U.S. Dep't of Justice*, 331 F.3d 918, 925 (D.C. Cir. 2003), given the "'legitimate governmental and private interests' that might be 'harmed by release of certain types of information,'" *August v. FBI*, 328 F.3d 697, 699 (D.C. Cir. 2003) (quoting *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 152 (1989)). "FOIA expressly recognizes that important interests are served by its exemptions, and those exemptions are as much a part of FOIA's purposes and policies as the statute's disclosure requirement." *Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427, 439 (2019) (cleaned up) (quoting *FBI v. Abramson*, 456 U.S. 615, 630-31 (1982) and *Encino Motorcars, LLC v. Navarro*, 584 U.S. 79, 89 (2018)). The Department bears the burden of justifying its withholdings of materials responsive to a FOIA request, and this Court reviews the Department's response to that request *de novo*. *See* 5 U.S.C. § 552(a)(4)(B).

"Most FOIA cases are appropriately resolved on motions for summary judgment." *Gilliam v. U.S. Dep't of Justice*, 128 F. Supp. 3d 134, 138 (D.D.C. 2015) (citing *Brayton v. Off. of the U.S. Trade Rep.*, 641 F.3d 521, 527 (D.C. Cir. 2011)). Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The defendant in a FOIA case must show . . . that any exemptions claimed actually apply, and that any reasonably segregable non-exempt parts of records have been disclosed after redaction of exempt information." *Light v. U.S. Dep't of Justice*, 968 F. Supp. 2d 11, 23 (D.D.C. 2013).

A court may award summary judgment in a FOIA action on the basis of information provided by the agency through declarations that describe "the documents and the justifications for nondisclosure with reasonably specific detail," that "demonstrate that the information withheld logically falls within the claimed exemption[s]," and that are "not controverted by either contrary evidence in the record nor by evidence of agency bad faith." *Mil. Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981) (footnote omitted). "Ultimately, an agency's justification for invoking

a FOIA exemption is sufficient if it appears logical or plausible." *Judicial Watch, Inc. v. U.S. Dep't of Def.*, 715 F.3d 937, 941 (D.C. Cir. 2013) (per curiam).

## ARGUMENT

**I.    The Audio Recording Was Properly Withheld Pursuant to Exemption 5 Because the President Asserted Executive Privilege**

The President has formally asserted executive privilege over the audio recording sought by plaintiffs. *See* Uriarte Ltr., at 1; Garland Ltr. at 3-11. The recording facially comes within the scope of executive privilege, which is recognized in civil litigation. The audio recording therefore is properly withheld pursuant to Exemption 5, which exempts records that are "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5).[4]

### A.   Materials Subject to a Formal Assertion of Executive Privilege are Exempt Under Exemption 5

Exemption 5 "ensures that members of the public cannot obtain through FOIA what they could not ordinarily obtain through discovery undertaken in a lawsuit against the agency." *Schiller v. NLRB*, 964 F.2d 1205, 1208 (D.C. Cir. 1992). The exemption incorporates "all civil discovery rules" and exempts documents that are privileged in civil discovery. *Martin v. Off. of Special Couns., MSPB*, 819 F.2d 1181, 1185-87 (D.C. Cir. 1987); *see U.S. Fish & Wildlife Serv. v. Sierra Club, Inc.*, 592 U.S. 261, 267 (2021) (Exemption 5 "incorporates the privileges available to Government agencies in civil litigation."). Because Exemption 5 allows the withholding of material that cannot "ordinarily" be obtained through discovery, information that is subject to a "qualified" privilege remains unqualifiedly exempt under FOIA even if the privilege could be overcome in civil litigation. *FTC v. Grolier, Inc.*, 462 U.S. 19, 27 (1983) ("Whether its immunity from discov-

---

[4] The audio recording easily satisfies the "inter-agency or intra-agency memorandums or letters" threshold.  *See, e.g.*, *Leopold v. U.S. Dep't of Justice*, 487 F. Supp. 3d 1, 15 (D.D.C. 2020). The audio recording has remained at all times within the custody and control of the Executive Branch. Weinsheimer Decl. ¶ 16. The President's counsel were able to review it in a secure storage facility within the Executive Office of the President. *Id.*

7

ery is absolute or qualified, a protected document cannot be said to be subject to 'routine' disclosure."). That is, the balancing tests applicable to qualified privileges in ordinary civil litigation do not apply when privileged information is sought pursuant to FOIA.

"Executive privilege" is a privilege that may be invoked by the President to protect confidential Executive Branch information. *See Cong. Requests for Conf. Exec. Branch Info.*, 13 Op. O.L.C. 153, 154 (1989). The privilege is "constitutionally based," and "[t]he existence of such a privilege . . . is a necessary corollary of the executive function vested in the President by Article II of the Constitution." *Id.* It has been recognized by the Supreme Court, which has declared that the privilege "is fundamental to the operation of Government and inextricably rooted in the separation of powers under the Constitution." *United States v. Nixon*, 418 U.S. 683, 708 (1974). "[I]nformation subject to executive privilege deserves 'the greatest protection consistent with the fair administration of justice.'" *Trump v. Mazars LLP*, 591 U.S. 848, 864 (2020).

The pedigree of the privilege dates to the earliest days of the Republic: its recognition "began with George Washington and the early Congress," when, in 1792, President Washington convened a meeting of his Cabinet to consider how to respond to a congressional inquiry about General St. Clair's campaign, stating that he "wish[ed] to take care that his response be 'rightly conducted' because it could 'become a precedent.'" *Mazars*, 591 U.S. at 859 (quoting 1 Writings of Thomas Jefferson 189 (P. Ford ed. 1892)). Washington's Cabinet unanimously concluded that while Congress "had authority to 'institute inquiries' and 'call for papers,'" "the President could 'exercise a discretion' over disclosures, 'communicating such papers as the public good would permit' and 'refusing' the rest." *Id.* (cleaned up). That "practice of refusing congressional requests for information, on the ground that the national interest would be harmed by the disclosure, was employed by many Presidents in the ensuing years." 13 Op. O.L.C. at 155; *see generally History of Refusals by Exec. Branch Officials to Provide Info. Demanded by Cong.*, 6 Op. O.L.C. 751 (1982).

Executive privilege derives from Article II and separation-of-powers principles, and the Constitution empowers the President to invoke the privilege for a variety of reasons. *See, e.g.*, 13

Op. O.L.C. at 154-55 (noting executive branch assertions over information relating to foreign affairs, military and national security secrets, and deliberations within the Executive Branch); *In re Sealed Case (Espy)*, 121 F.3d 729, 736-38 (D.C. Cir. 1997) (discussing multiple judicially-recognized components of executive privilege); *Senate Select Comm. on Pres. Campaign Activities v. Nixon*, 498 F.2d 725, 729 (D.C. Cir. 1974) (en banc) (describing confidential communications with the President as "one species" of executive privilege); *Mazars*, 591 U.S. at 850 (noting that "executive privilege safeguards the public interest in candid, confidential deliberations within the Executive Branch"). One of the historically recognized areas in which executive privilege is necessary to protect the President's constitutional authority is the law enforcement process. Accordingly, "the law enforcement component of executive privilege" recognizes that "[t]he President may invoke executive privilege to preserve the integrity and independence of criminal investigations and prosecutions." *Assertion of Exec. Priv. Concerning the Special Counsel's Interviews of the Vice Pres. & Senior White House Staff*, 32 Op. O.L.C. 7, 10 (2008); *see* 13 Op. O.L.C. at 154 (noting that "law enforcement" is one of the "generally-recognized components of executive privilege"); U.S. Const., Art. II, § 3 (charging the President to "take care that the laws be faithfully executed").[5] Although there is appropriately limited judicial precedent analyzing a presidential assertion of executive privilege, including over law enforcement files, the Supreme Court has made clear that the "longstanding practice" of the political branches "imposes . . . a duty of care to ensure that [courts] do not needlessly disturb 'the compromises and working arrangements that [those]

---

[5] *See also, e.g.*, *Assertion of Executive Privilege with Respect to Prosecutorial Documents*, 25 Op. O.L.C. 1 (2001);  Exec. Order No. 12,667, 54 Fed. Reg. 3403, 3403 (Jan. 18, 1989) (defining substantial questions of executive privilege as disclosures that would impair (1) "national security (including the conduct of foreign relations)," (2) law enforcement, or (3) "the deliberative process of the Executive branch."); Position of the Exec. Dep't Regarding Invest. Repts., 40 Op. Att'y Gen. 45, 46-48 (1941) (providing historical examples of Attorneys General "who have uniformly taken the . . . view" that "investigative reports are confidential documents of the executive department of the Government, to aid in the duty laid upon the President by the Constitution to 'take care that the laws be faithfully executed,' and that congressional or public access to them would not be in the public interest"); *Cong. Requests for Info. from Inspectors Gen. Concerning Open Criminal Investigations*, 13 Op. O.L.C. 77, 80 (1989) ("There are three generally-recognized components of executive privilege: state secrets, law enforcement, and deliberative process.").

branches . . . themselves have reached.'" *See Mazars*, 591 U.S. at 862 (quoting *Noel Canning*, 573 U.S. at 524-26).

As Attorney General Garland explained in his letter requesting that the President assert executive privilege over the audio recording, the "law enforcement component of executive privilege" can be asserted to avoid "'the potential damage to proper law enforcement' that would be caused by disclosure, including 'the chilling effect' on 'sources of information[.]'" Garland Ltr., at 4 (quoting *Response to Cong. Requests for Info. Regarding Decisions Made Under the Indep. Couns. Act*, 10 Op. O.L.C. 68, 76 (1986)). Because "[t]his chilling effect can extend to future investigations and thus may exist even if disclosure occurs only once an investigation ends," the Department "has long recognized . . . that executive privilege protects materials related to a closed criminal investigation where disclosure might hamper prosecutorial efforts in future cases." *Id.* In 2008, President Bush asserted executive privilege in part for similar reasons to prevent the disclosure of the writeup of a special counsel's interview of Vice President Cheney. *See* 32 Op. O.L.C. at 7. The availability of executive privilege to protect the Executive Branch's law enforcement information and functions, and to maintain the constitutional separation of powers, is therefore well established. *See N.L.R.B v. Noel Canning,* 573 U.S. 513, 524 (2014) *(*stating that "[l]ong settled and established practice is a consideration of great weight in a proper interpretation of constitutional provisions regulating the relationship between" the branches).

Executive privilege is generally a qualified privilege that, when asserted outside the FOIA context, can be overcome by a sufficient showing of need that would further an authorized purpose. *See, e.g.*, *Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367, 389 (2004) ("Once executive privilege is asserted . . . . [t]he Judiciary is forced into the difficult task of balancing the need for information in a judicial proceeding and the Executive's Article II prerogatives."); *Mazars*, 591 U.S. at 864 ("[I]nformation subject to executive privilege deserves 'the greatest protection consistent with the fair administration of justice.'" (quoting *Nixon*, 418 U.S. at 715)). But under Exemption 5, the analysis ends upon the determination that the information is susceptible to a claim of privilege,

and thus judicial balancing is not applicable. "The test under Exemption 5 is whether the documents would be 'routinely' or 'normally' disclosed upon a showing of relevance." *Grolier*, 462 U.S. at 26. Since records subject to a formal assertion of executive privilege may be discovered only when there is sufficient need to overcome the privilege, they are "not 'routinely' or 'normally' available to parties in litigation and hence are exempt under Exemption 5." *Id.* at 27. Thus, "if a document is protected by a valid claim of executive privilege," it "will normally and properly be withheld under Exemption 5." *Judicial Watch, Inc. v. U.S. Dep't of Justice*, 57 F. Supp. 3d 48, 51 (D.D.C. 2014).

### B.  The Audio Recording Is Subject to a Formal Assertion of Executive Privilege

The President has formally asserted executive privilege over the sole record at issue in this case in response to congressional subpoenas. Uriarte Ltr., at 1. For purposes of this litigation – which is governed by FOIA – the assertion is dispositive so long as the record in question is susceptible to a claim of executive privilege. Here, that threshold is clearly established.  The audio recording was created during a law enforcement investigation, and the Attorney General has reasonably determined that its disclosure would cause harm to future investigations.

In his letter requesting that the President assert the privilege, Attorney General Garland provided a detailed accounting of why executive privilege (in its law enforcement component) properly applied to the audio recording; why an assertion would be consistent with historical precedent; and why Congress had not shown an adequate need to overcome that privilege. *See* Garland Ltr., at 3-10. In brief, after noting an "overarching concern . . . 'about the prospect of committees of Congress obtaining confidential records from Justice Department criminal investigative files for the purpose of addressing highly politicized issues in public committee hearings,'" *id.* at 4-5 (quoting 32 Op. O.L.C. at 10-11), the Attorney General noted his "more specific concern" that release of the recording "might affect the Department's ability to obtain vital cooperation in high-profile criminal investigations – in particular, in investigations where the voluntary cooperation of White House officials is exceedingly important." *Id.* at 5. The Attorney General explained that:

> [I]f key witnesses in similar high-profile investigations expected that volunteering
> to sit for an interview and allowing that interview to be recorded would likely result
> in the release of that recording to Congress (and potentially the public), there is a
> significant risk that such witnesses would evaluate the Department's requests for
> cooperation differently in the future.

*Id.* Should that occur, "an inability to secure cooperation, or a diminution in the degree and extent
of cooperation, would significantly impair the Department's ability to conduct similar high-profile
investigations where cooperation is exceedingly important." *Id.* Consequently, the Attorney General concluded that disclosure of the audio recording would pose an "unacceptable risk" of impairing future, high-profile law enforcement investigations. *Id.* at 6; *see also id.* at 4 (noting the Department's "long recogni[tion]" that executive privilege protects information when disclosure would "hamper prosecutorial efforts in future cases"). Given this articulated, reasonable prediction of harm to future law enforcement proceedings, Attorney General Garland requested that the President formally assert executive privilege over the recording, and the President did so. *Id.* at 1, 6; Uriarte Ltr., at 1.

The President's assertion of executive privilege resolves this case. The audio recording is now subject to a formal, particularized assertion of executive privilege made by the President on the basis of an analysis by the Office of Legal Counsel and the recommendation of the Attorney General, the most senior law enforcement officer in the federal government other than the President. If a litigant were hypothetically to seek it in other fora (*e.g.*, in civil or criminal discovery, or in a lawsuit by Congress to enforce a subpoena), that litigant would need to make a substantial showing of need to overcome the privilege. *See, e.g.*, *Senate Select Comm.*, 498 F.2d at 731; *In re Sealed Case*, 121 F.3d 729, 754 (D.C. Cir. 1997). The audio recording therefore is "not 'routinely' or 'normally' available to parties in litigation," and thus is properly withheld under Exemption 5. *Grolier*, 462 U.S. at 26-27.

"[I]nformation subject to executive privilege deserves 'the greatest protection consistent with the fair administration of justice.'" *Mazars*, 591 U.S. at 864 (quoting *Nixon*, 418 U.S. at 715). Requiring disclosure under FOIA of material susceptible to a claim of executive privilege and for which there has been a formal claim of executive privilege would yield inappropriate outcomes.

For example, it would mean that Congress could avoid the constitutionally mandated accommodation process and instead pursue the same information via FOIA litigation. *See United States v. AT&T*, 567 F.2d 121, 127 (D.C. Cir. 1977) (noting the "constitutional mandate" that the Executive Branch and Congress engage in a political accommodation process). As noted above, courts must give great weight to historical practice among the branches in an area where disputes are appropriately resolved through the political process. *Mazars*, 591 U.S. at 862.

Indeed, it would raise significant separation-of-powers concerns to interpret the FOIA to substantially burden the President's constitutional authority to assert executive privilege or limit the effect of such an assertion, such as by compelling the Executive Branch to release under FOIA a record over which the President has asserted executive privilege. That is all the more reason to reject such an interpretation. *See, e.g.*, *United States v. Palomar-Santiago*, 593 U.S. 321, 328-29 (2021) ("Courts should indeed construe statutes 'to avoid not only the conclusion that [they are] unconstitutional, but also grave doubts upon that score.'" (citation omitted)); *Judicial Watch v. U.S. Secret Serv.*, 726 F.3d 208, 225-29 (D.C. Cir. 2013) (applying constitutional avoidance canon to avoid interpretation of FOIA that would raise difficult constitutional questions). As discussed, both executive privilege and the interbranch accommodation process are constitutionally based. *See Nixon*, 418 U.S. at 708 (the President's ability to assert executive privilege is "inextricably rooted in the separation of powers under the Constitution"); *AT&T*, 567 F.2d at 127 (describing the accommodation process as a "constitutional mandate"). To construe the FOIA in a way that would nullify a formal presidential assertion of executive privilege – the invocation of which is an extraordinary occurrence – would therefore raise substantial constitutional questions. Accordingly, so long as Exemption 5 can reasonably be read to allow the government to withhold a record that is subject to a formal invocation of privilege (which indeed is the best interpretation of the statute), that interpretation must be selected. *Jones v. United States*, 526 U.S. 227, 239 (1999) ("'[W]here a statute is susceptible of two constructions, by one of which grave and doubtful constitutional questions arise and by the other of which such questions are avoided, our duty is to adopt the latter.'" (citation omitted)).

13

Furthermore, it would raise constitutional concerns if the FOIA were interpreted to undermine the structure of the constitutionally mandated accommodation process or to expand the judiciary's role in an area where, historically, disputes between Congress and the Executive branch "have been hashed out in the 'hurly-burly, the give-and-take of the political process between the legislative and the executive.'" *Mazars*, 591 U.S. at 858-59 (quoting Hearings on S. 2170 *et al.* before the Subcomm. on Intergov't'l Rels. of the S. Comm. on Gov't Ops., 94th Cong., 1st Sess., 87 (1975) (A. Scalia, Assistant Attorney General, Office of Legal Counsel)). Given the "longstanding practice" of resolving interbranch disputes through constitutionally mandated, political accommodation, courts should "ensure that [they] not needlessly disturb the compromises and working arrangements that those branches themselves have reached." *Mazars,* 591 U.S. at 862 (cleaned up) (quoting *Noel Canning*, 573 U.S. at 524-26). An assertion of executive privilege therefore must be given the due weight that is required to avoid upsetting the centuries-old dynamic between the political branches. *See id.* at 869 ("For more than two centuries, the political branches have resolved information disputes using the wide variety of means that the Constitution puts at their disposal.").

## II.     The Department Properly Withheld the Audio Recording Pursuant to Exemptions 6 and 7(C) Because Disclosure Would Result in an Unwarranted Invasion of Privacy

Because the release of the audio recording would harm substantial privacy interests that are not outweighed by any meaningful public benefit, the Department also properly withheld the audio recording in full under Exemptions 6 and 7(C).

Exemption 6 allows an agency to withhold information about individuals in "personnel and medical files and similar files" when the disclosure of such information "would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). For the exemption to apply, the information at issue must be maintained in a government file and apply to a particular individual. *U.S. Dep't of State v. Wash. Post Co.*, 456 U.S. 595, 602 (1982). Once that threshold requirement is met, Exemption 6 requires the agency to balance the individual's right to privacy against the public's interest in disclosure. *See Dep't of Air Force v. Rose*, 425 U.S. 352, 372 (1976).

14

Similarly, Exemption 7(C) exempts from disclosure "records or information compiled for law enforcement purposes . . . to the extent that the production of such law enforcement records or information . . . could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C). As a threshold matter, for Exemption 7(C) to apply, the records at issue must have been compiled for law enforcement purposes. *Schoenman v. FBI*, 575 F. Supp. 2d 166, 174 (D.D.C. 2008). If a record was compiled for law enforcement purposes, Exemption 7(C) – like Exemption 6 – requires individual privacy rights to be balanced against the public interest in disclosure. *See, e.g.*, *U.S. Dep't of Justice v. Reps. Comm. for Freedom of the Press*, 489 U.S. 749, 762 (1989). Once that threshold is met, however, courts have consistently held that Exemption 7(C) "is more protective of privacy than Exemption 6." *U.S. Dep't of Def. v. FLRA*, 510 U.S. 487, 496 n.6 (1994); *see Nat'l Archives & Recs. Admin. v. Favish*, 541 U.S. 157, 165-66 (2004). Accordingly, "[w]hen an agency invokes both exemptions, courts 'focus' on Exemption 7(C) because it 'establishes a lower bar for withholding material.'" *Nova Oculus Partners, LLC v. SEC*, 486 F. Supp. 3d 280, 288 (D.D.C. 2020) (quoting *Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Justice*, 746 F.3d 1082, 1091 n.2 (D.C. Cir. 2014) (*CREW*)).

The audio recording satisfies the threshold requirements of both Exemption 6 and Exemption 7(C). It qualifies as a "similar file[]" under Exemption 6 because the protected information applies to a particular individual and is contained in government records. *Wash. Post*, 456 U.S. at 602. With respect to Exemption 7(C), the audio recording was "compiled for law enforcement purposes" since it was prepared during Special Counsel Hur's investigation. *See* Weinsheimer Decl. ¶ 10; *see also Boyd v. Exec. Office for U.S. Attys.*, 161 F. Supp. 3d 1, 10 (D.D.C. 2015) ("[I]t is clear that" records of investigative interviews meet the Exemption 7 threshold.). Because, as discussed below, the privacy interests at stake in the audio recording far outweigh the potential public interest in disclosure, the Department's assertions of Exemptions 6 and 7(C) should be upheld. Directly applicable precedent clearly supports that outcome.

**A. Under Clear Precedent, Disclosure Would Result in an Unwarranted Invasion of Privacy**

Two recent D.C. Circuit decisions, both of which analyze Exemption 7(C) in the context of high-profile government investigations of leading public officials, strongly support the Department's withholding decision here.

The first precedent is *Judicial Watch v. National Archives and Records Administration*, 876 F.3d 346 (D.C. Cir. 2017) in which a court in this District upheld the Department's withholdings under Exemption 7(C) and the D.C. Circuit affirmed. The similarities between *Judicial Watch* and this case are striking. Both cases involve FOIA requests for law enforcement records about one of the most prominent political figures of the time (Hillary Clinton in *Judicial Watch*, and President Biden here). In both cases, the subjects of the FOIA requests were major-party candidates for president. *Id.* at 350. Both Secretary Clinton and President Biden had been subjects of a law enforcement investigation but were never charged with a crime. And in both cases, plaintiffs sought a sensitive, law enforcement record (a draft indictment in *Judicial Watch*, and an audio recording of a prosecutor's interview here). In *Judicial Watch*, the plaintiff (also one of the plaintiffs here) argued that Secretary Clinton's highly public career and the public's interest in an Independent Counsel's investigation into her conduct meant that her privacy interests were overcome and that the records should be released. *Id.* at 349-51.

The D.C. Circuit disagreed and held that the records were properly withheld under Exemption 7(C). Judicial Watch had argued that Secretary Clinton's privacy interests were merely "generic" and "minimal," but the court of appeals emphatically rejected that contention given that the information sought was a sensitive law enforcement record. *Judicial Watch*, 876 F.3d at 349. Rather, the court underscored that since Secretary Clinton had "been investigated but not charged with a crime," any "disclosure of material properly exempt under Exemption 7(C) 'represents a severe intrusion on [her] privacy interests." *Id.* The court reiterated longstanding D.C. Circuit precedent that even though Secretary Clinton held a highly public role, that did not mean that she had "surrender[ed] all rights to personal privacy." *Id.* (quoting *CREW*, 746 F.3d at 1092). Indeed, the

Court emphasized that Secretary Clinton's status meant that the "disclosure of the requested information would produce the unwarranted result of placing Mrs. Clinton in the position of having to defend her conduct in the public forum outside of the procedural protections normally afforded the accused in criminal proceedings." *Id.* at 350 (cleaned up). Thus, the court of appeals noted that the "great public attention" to the Independent Counsel's investigation, as well as Secretary Clinton's presidential candidacy, had "augmented" "the potential immediate harm to her." *Id.* at 350.

On the other side of the balance, the D.C. Circuit focused on how any public interest in disclosure "is greatly reduced . . . precisely because of the voluminous information already in the public domain about the Independent Counsel's investigation of . . . Mrs. Clinton." *Judicial Watch*, 876 F.3d at 350. The Court catalogued the substantial amount of material that had already been made public – including a "Final Report" prepared by the Independent Counsel – and held that disclosure was unwarranted given that "Judicial Watch and the public at large" could already "readily assess" the Independent Counsel's conduct. *Id.* at 351. In light of the strong privacy interests that Secretary Clinton retained in the law enforcement files, and the fact that disclosure would likely result in only a "slight" effect on the public's understanding of the Independent Counsel's activities, the Court held that Secretary Clinton was "entitled to move on with her life without having the public reminded of her alleged but never proven transgressions." *Id.* at 350 (quoting *ACLU v. U.S. Dep't of Justice*, 750 F.3d 927, 933 (D.C. Cir. 2014)) (cleaned up).

The D.C. Circuit re-applied many of the same principles in *Electronic Privacy Information Center v. U.S. Department of Justice*, 18 F.4th 712 (D.C. Cir. 2021) (*EPIC*), in which the Court of Appeals considered Exemption 6 and 7(C) withholdings of certain passages in the Mueller Report. That case, like here, involved a Special Counsel's investigation of the sitting President, which had generated substantial public interest. *See id.* at 715-16; *id.* at 716 (noting that individuals implicated by potential disclosure "includ[ed] the President's family, associates, and government officials"). The D.C. Circuit upheld some, but not all, of the challenged redactions, and the court's analysis as to why some of the material could be withheld, while others could not, is instructive. The court of appeals ordered the Department to release some redacted passages, but only those

that (1) "would [] show how the Special Counsel interpreted the relevant law and applied it to already public facts in reaching his declination decisions," and (2) "contain[ed] no new facts" that had not already "been made public elsewhere in [the Mueller] Report." *Id.* at 720-21. Because these passages contained important legal analysis by Special Counsel Mueller that "ha[d] not [already] been released," *id.* at 721, disclosure would "contribute significantly to public understanding," *id.*, without revealing any "new private information," *id.* at 722. Accordingly, the Exemption 7(C) balance tipped in favor of disclosure for those passages only. In contrast, the D.C. Circuit upheld the Department's withholding of other passages when disclosure would have revealed "additional facts about individuals that are not disclosed elsewhere and that would be highly stigmatizing," as that privacy interest outweighed the public's interest in disclosure. *Id.*

The holdings of *Judicial Watch* and *EPIC* control this case. Like here, those cases sought information contained in the law enforcement files of either a Special Counsel or Independent Counsel; they involved very prominent political individuals; the privacy interests were significant; and there was substantial, alternative information available that allowed the public to understand the agency's activities, including voluminous final reports prepared by the Special Counsel or Independent Counsel. As explained in detail in the following sections, the same analysis applies here. President Biden was investigated but not charged. Accordingly, he retains a substantial privacy interest in a law enforcement record that contains the sound of his voice and captures his tone and manner during a particularly sensitive time (an interview with a prosecutor). *See N.Y. Times Co. v. NASA*, 920 F.2d 1002, 1004-05 (D.C. Cir. 1990) (en banc); *see also infra* 19-24. That interest is only enhanced by the substantial risk that the audio would be misused. *See infra* 23-24. On the other side of the balance, disclosure of this single piece of evidence would do little to advance the public's understanding of the Special Counsel's investigation, particularly given that the Special Counsel has produced a voluminous report concerning his investigation and declination decision; he testified for hours about his decisions; and the government has already released a transcript of the same audio recording that plaintiffs seek here. Under these facts, *Judicial Watch* and *EPIC* – and substantial other D.C. Circuit precedent – demonstrate that the government has satisfied its

burden to show that the audio recording "logically" and "plausibly" falls within the protection of Exemptions 6 and 7(C). *See also Project on Gov't Oversight, Inc. v. U.S. Off. of Special Couns.*, No. 22-cv-3381, 2024 WL 1213324, at *4 (D.D.C. Mar. 19, 2024) (upholding Exemption 7(C) assertion after noting that "'general public curiosity' about the conduct of government employees who have been cleared of wrongdoing cannot outrun those employees' 'legitimate and substantial privacy interests,' even when those employees are 'high level government . . . officials'" (quoting *Fund for Const. Gov't*, 656 F.2d at 866, 864)).

### B.  Uncharged Individuals Have a Substantial Privacy Interest in Audio Recordings of Interviews with Law Enforcement Officers

There can be no question that the requested disclosure would implicate substantial privacy interests. The record at issue here is an audio recording of an individual whose conduct was the subject of a criminal investigation and who was not charged. It reflects probing questions from a prosecutor designed to elicit information to help the prosecutor determine whether a crime was committed, and if so, by whom. It also reflects the interviewee's oral responses, including any pauses, hesitations, mannerisms, and intonations that occurred during that sensitive event. Weinsheimer Decl. ¶ 40. The plaintiffs in this matter have made clear in their complaints that they are seeking the audio file as part of their business of disseminating information to the public. *See* ECF No. 1, ¶ 3; ECF No. 7-1, ¶¶ 3, 16, 57-58; ECF No. 26, ¶¶ 3, 6, 8-20. If released, therefore, the recording of this law enforcement interview will be played on national television and be universally available on the Internet. *See* Weinsheimer Decl. ¶ 31. The recorded interview would thus be disseminated worldwide, even though the prosecutor determined that criminal charges were not warranted, and no indictment issued. Public dissemination of a law enforcement interview under circumstances of this sort would be exceedingly harmful.

The privacy implications of disclosing such a record under FOIA are unmistakable. As an initial matter, underlying any analysis of Exemption 7(C) is the important background principle that release of information about individuals contained in *law enforcement files* raises particularly

acute threats to personal privacy.[6] Exemption 7(C) takes those heightened privacy concerns into account by setting a lower bar for the government to withhold information contained in law enforcement files as compared to other types of files. *See Prison Legal News v. Samuels*, 787 F.3d 1142, 1146 n.5 (D.C. Cir. 2015) ("Exemption 7(C) . . . establishes a lower bar for withholding material."). Specifically, while Exemption 6 allows the government to withhold information contained in other types of files only when disclosure "would constitute a clearly unwarranted invasion of personal privacy," Exemption 7(C) allows for withholding when disclosure "could reasonably be expected" to result in "an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6), (7)(C); *see Favish*, 541 U.S. at 165-66 (noting the "marked contrast" between the language of Exemptions 6 and 7(C), and stating that "Exemption 7(C)'s comparative breadth is no mere accident in drafting," and that "[the Court] know[s] Congress gave special consideration to the language in Exemption 7(C) because it was the result of specific amendments to an existing statute"). In setting this lower threshold for withholding, Exemption 7(C) "recognizes the stigma potentially associated with law enforcement investigations and affords broader privacy rights to suspects, witnesses, and investigators." *Bast v. U.S. Dep't of Justice*, 665 F.2d 1251, 1254 (D.C. Cir. 1981).

These privacy interests are at their apex for individuals when prosecutors have decided not to charge. As recognized by the D.C. Circuit, "'where individuals have been investigated but not charged with a crime,' disclosure of material properly exempt under Exemption 7(C) 'represents

---

[6] *See e.g.*, *Reps. Comm.*, 489 U.S. at 770-71; *ACLU*, 750 F.3d at 933; *Favish*, 541 U.S. at 171 (holding that "the fact that other pictures had been made public [does not] detract[] from the weighty privacy interests" in remaining pictures); *Judicial Watch*, 876 F.3d at 349 (determining "distinct" privacy interest in contents of subject's investigation files although existence of Independent Counsel investigation into subject was public knowledge); *Kimberlin v. U.S. Dep't of Justice*, 139 F.3d 944, 949 (D.C. Cir. 1998) (reasoning that merely because subject of investigation acknowledged existence of investigation – thus precluding Glomar response – does not constitute waiver of subject's interest in keeping contents of OPR report confidential); *Hunt v. FBI*, 972 F.2d 286, 288 (9th Cir. 1992) (holding that "public availability" of accused FBI Special Agent's name does not defeat privacy protection in substance of FBI's internal investigation); *Parker v. DOJ*, 214 F. Supp. 3d 79, 88 (D.D.C. 2016) (determining former AUSA and other named individuals retained a substantial privacy interest in undisclosed records related to OPR investigation even if certain other information had been publicly disclosed).

a severe intrusion on the privacy interests of the individual[] in question.'" *Judicial Watch*, 876 F.3d at 349 (quoting *Fund for Const. Gov't v. NARA*, 656 F.2d 856, 866 (D.C. Cir. 1981)). And President Biden, despite being a public figure, retains those privacy interests even though a transcript of his interview has been publicly released, *see supra* 16-17. Individuals "retain[] a second, distinct privacy interest in the *contents* of the investigative files." *CREW*, 746 F.3d at 1092 (emphasis in original). For the same reasons, the fact that President Biden's involvement in the Hur Investigation is already known does not eliminate his privacy interest in the contents of the investigative files. *Judicial Watch*, 876 F.3d at 349. Accordingly, the starting point of the Exemption 7(C) analysis recognizes that where plaintiffs seek law enforcement files containing personal information about an uncharged individual – even of a public official – the privacy interests at stake are among the strongest recognized under FOIA.

The D.C. Circuit, sitting *en banc*, has recognized the substantial harm to privacy that can result specifically from the release of an audio recording, which is separate and distinct from privacy interests in written transcripts of the same conversation. *NASA*, 920 F.2d at 1005-07 (explaining that "voice inflections can contain personal information" and recognizing that an audio recording of individuals' voices could be withheld even when a transcript had already been publicly released); *see also id.* at 1004 (noting that "it was the voice inflections, not the words spoken, that [the agency] was seeking to withhold because such inflections are personal to the [individuals on the recording]"). On remand in *NASA*, the district court held that the sound of an individual's voice in an audio recording constituted "intimate details" that the FOIA privacy exemptions were designed to protect, and that "this privacy interest is substantial." *N.Y. Times Co. v. NASA*, 782 F. Supp. 628, 631-32 (D.D.C. 1991).

The D.C. Circuit's decision in *NASA* stands for the propositions that individuals have an important privacy interest in the sound of their voice, that this interest is distinct from any privacy interest reflected in the words of a written transcript, and that this interest is particularly significant when the recording captures a personal or sensitive conversation. *NASA*, 920 F.2d at 1003-05, *remanded*, 782 F. Supp. at 631-32. The *NASA* case involved a FOIA request for the audio recording

of astronauts aboard the *Challenger* shortly before the space shuttle exploded. 920 F.2d at 1003. A recorded interview of a federal prosecutor interviewing someone whom he is considering whether to formally accuse of a crime plainly reflects an event of extreme sensitivity. *See, e.g.*, *Favish*, 541 U.S. at 165 ("[T]he concept of personal privacy under Exemption 7(C) is not some limited or 'cramped notion' of that idea."). At least one court in this district has applied the reasoning of *NASA* to a law enforcement audio recording where a transcript was disclosed. *Pike v. U.S. Dep't of Justice*, 306 F. Supp. 3d 400, 412 (D.D.C. 2016) ("Under binding precedent, written transcripts of recordings do not contain information that is identical to the audio recorded version" (discussing *NASA*)) (Brown Jackson, J.) (emphasis removed); *see also* Garland Ltr., at 5 (noting the "unique intrusion" that would result from release of an audio recording, which presents independent harms compared to the release of a written transcript).

Substantial precedent supports the proposition that release of files reflecting interactions with law enforcement can reasonably be expected to result in an unwarranted invasion of privacy. Courts have allowed the withholding under Exemption 7(C) of other aspects of law enforcement files that connect individuals with potentially sensitive law enforcement procedures. For example, multiple courts of appeals have allowed the withholding of Marshals Service booking photos or "mug shots" of arrested individuals. *See, e.g.*, *Detroit Free Press, Inc. v. U.S. Dep't of Justice*, 829 F.3d 478, 485 (6th Cir. 2016) (en banc) (holding that "individuals have a privacy interest in preventing disclosure of their booking photos under Exemption 7(C)"); *World Publ'g Co. v. U.S. Dep't of Justice*, 672 F.3d 825, 827-32 (10th Cir. 2012) (finding that agency properly withheld booking photos); *Karantsalis v. U.S. Dep't of Justice*, 635 F.3d 497, 504 (11th Cir. 2011) (*per curiam*) (same); *see also Times Picayune Publ'g Corp. v. U.S. Dep't of Justice*, 37 F. Supp. 2d 472, 477 (E.D. La. 1999) (noting that "a mug shot's stigmatizing effect can last well beyond the actual criminal proceedings," and that "[a] mug shot preserves, in its unique and visually powerful way, the subject individual's brush with the law for posterity").

Analogous reasoning applies to a recording of an individual being interviewed by a federal prosecutor considering whether to file charges. If the audio recording were released, hearing a

prosecutor's probing questions designed to elicit whether information about whether a crime was committed and the interviewee's response, including that interviewee's tone and manner, raises concerns about an unwarranted invasion of privacy. These concerns are heightened where (as here) the interviewee was not charged with a crime and disclosure would lead to instantaneous and widespread dissemination. *See, e.g.*, *Judicial Watch*, 876 F.3d at 349; *Detroit Free Press*, 829 F.3d at 482 ("[M]odern technology only heightens the consequences of disclosure").

Privacy-based concerns have been recognized in refusing to release recordings of other presidents' interactions with law enforcement. For example, a trial court played a video recording of a deposition of President Clinton, but the court refused to order release of the recording. *See United States v. McDougal*, 940 F. Supp. 224, 226-28 (E.D. Ark. 1996). The Eighth Circuit also refused to allow duplication of the video recording of the depositions in part because of the "potential for misuse." *United States v. McDougal*, 103 F.3d 651, 658 (8th Cir. 1996); *see also Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 601, 608 (1978) (denying request for access to White House audiotapes that had been played for a jury, and for which transcripts already had been provided to the press, and noting concerns regarding "distortion through cutting, erasing, and splicing of tapes").

The passage of time and advancements in audio, artificial intelligence, and "deep fake" technologies only amplify concerns about malicious manipulation of audio files. If the audio recording is released here, it is easy to foresee that it could be improperly altered, and that the altered file could be passed off as an authentic recording and widely distributed. *See* Weinsheimer Decl. ¶¶ 43-45. For example, a malicious actor could slow down the speed of the recording or insert words that President Biden did not say or delete words that he did say. *See id.* ¶ 43. That problem is exacerbated by the fact that there is now widely available technology that can be used to create entirely different audio "deepfakes" based on a recording. *See id.* ¶¶ 44-45; *See, e.g.*, Verma & Oremus, *AI voice clones mimic politicians and celebrities, reshaping reality*, Wash. Post (updated Oct. 15, 2023) ("Rapid advances in artificial intelligence have made it easy to generate believable audio, allowing anyone . . . to copy somebody's voice – leading to a flood of faked content on the

web[.]"). To be sure, other raw material to create a deepfake of President Biden's voice is already available, but release of the audio recording presents unique risks: if it were public knowledge that the audio recording has been released, it becomes easier for malicious actors to pass off an altered file as the true recording. Weinsheimer Decl. ¶ 45.

In light of the foregoing, disclosure of the audio recording would harm substantial privacy interests. As discussed above, this remains true even though President Biden is a uniquely public figure. While courts recognize that public officials "may have a somewhat diminished privacy interest" given the nature of their role, they nonetheless emphasize that government officials "'do not surrender all rights to personal privacy when they accept a public appointment.'" *CREW*, 746 F.3d at 1092 (quoting *Quinon v. FBI*, 86 F.3d 1222, 1230 (D.C. Cir. 1996)).  Accordingly, the D.C. Circuit has underscored that even high-ranking public officials who are associated with high-profile investigations retain weighty privacy interests protected by Exemption 7(C). *See, e.g.*, *Judicial Watch*, 876 F.3d at 349-50 (recognizing that Secretary Hillary Clinton retained substantial privacy interests in non-public information from Independent Counsel's Whitewater investigative files); *CREW*, 746 F.3d at 1092 (former Majority Leader of House of Representatives retained substantial privacy interest in the contents of an investigative file); *Fund for Const. Gov't*, 656 F.2d at 864-66 (Watergate prosecution files).

### C. Any Public Interest in Disclosure of the Audio Recording Does Not Outweigh the Privacy Interests at Stake Given the Substantial Amount of Information Already Available to the Public

On the other side of the balance, to overcome a privacy interest under Exemption 7(C), "a FOIA requester must (1) 'show that the public interest sought to be advanced [by disclosure] is a significant one, an interest more specific than having the information for its own sake,' and (2) 'show the information is likely to advance that interest.'" *Boyd v. Crim. Div. of U.S. Dep't of Justice*, 475 F.3d 381, 387 (D.C. Cir. 2007) (quoting *Favish*, 541 U.S. at 172). Where, as here, there is a "significant privacy interest in the contents of the . . . investigative files," disclosure is

warranted "only where exceptional interests militate in favor of disclosure." *Judicial Watch*, 876 F.3d at 350 (quoting *Fund for Const. Gov't*, 656 F.2d at 866).

Critically, only certain public interests are cognizable under FOIA: "the only relevant public interest in the FOIA balancing analysis is the extent to which disclosure of the information sought would 'shed light on an agency's performance of its statutory duties' or otherwise let citizens know 'what their government is up to.'" *CREW*, 746 F.3d at 1093 (cleaned up) (quoting *FLRA*, 510 U.S. at 497). Thus, D.C. Circuit precedent requires that any public interest in disclosure be grounded on how release of the audio recording would inform the public about the activities of *Special Counsel Hur*, not on any conduct of President Biden. *See id.* ("[T]he relevant public interest is *not* to find out what [House Majority Leader] DeLay himself was 'up to' but rather how the FBI and the DOJ carried out their respective statutory duties to investigate and prosecute criminal conduct."); *EPIC*, 18 F.4th at 720-21 (noting this principle "follow[s] decades of United States Supreme Court precedent," and applying it to a FOIA case involving the report of Special Counsel Robert Mueller).

Because a plaintiff must show that disclosure "is likely to advance" a cognizable public interest, *see Boyd*, 475 F.3d at 387, an important consideration in the Exemption 7(C) analysis is whether the public already has access to substantial information about the topic. If fulsome information is already available, further disclosure that only marginally increases public understanding is unlikely to outweigh countervailing privacy interests. For example, as explained above, in *Judicial Watch*, the D.C. Circuit declined to order the production of a draft indictment of former Secretary of State Hillary Clinton, noting that the "[public] interest is greatly reduced . . . because of the voluminous information already in the public domain about the Independent Counsel's investigation of . . . Mrs. Clinton," including a final report by the Independent Counsel, a staff summary of the evidence, and information released by congressional committees. 876 F.3d at 350. "In these circumstances," the court of appeals held that disclosure was inappropriate because "the incremental public interest in learning how the Independent Counsel carried out his investigation . . . by disclosure of a draft indictment appears slight." *Id.*; *see also U.S. Dep't of State v. Ray*, 502

U.S. 164, 178 (1991) (allowing withholding of additional information when the public interest had been "adequately served" by earlier release of redacted summaries of agency interviews).[7]

In light of the voluminous information already available to the public, disclosure of the audio recording would do little to meaningfully advance the public's understanding of Special Counsel Hur's investigation and his declination decision. *See Favish*, 541 U.S. at 175. First, the Department has released a copy of Special Counsel Hur's final report, which explained his decisions and analyses. *See* Hur Report; *see also* 28 C.F.R. § 600.8(c) (requiring that "[a]t the conclusion of the Special Counsel's work, he or she shall provide the Attorney General with a confidential report explaining the prosecution or declination decisions reached by the Special Counsel"). The Hur Report is extensive: it comprises 345 pages of main text, more than 1,300 footnotes, and three appendices. It provides a detailed accounting of Mr. Hur's investigation and decisions, including substantial discussion of the legal framework governing the handling of classified information, discussion of Mr. Hur's investigatory steps and the evidence he uncovered, and detailed discussions of the reasons why Mr. Hur concluded that charges against President Biden would be unwarranted. *See generally* Hur Report, at 1-14 (executive summary). In addition, Mr. Hur publicly testified before Congress for more than five hours concerning his investigation and his decision to decline to recommend charges. Garland Ltr., at 3. Mr. Hur's interview of President Biden is discussed many times in the Report. And, most importantly, the Department has already produced a

---

[7] Courts outside of this Circuit apply a similar analysis. *See, e.g.*, *Forest Serv. Emps. for Env't Ethics v. U.S. Forest Serv.*, 524 F.3d 1021, 1028 (9th Cir. 2008) ("As a result of the substantial information already in the public domain, we must conclude that the release of the identities of the employees who participated in the Forest Service's response to the Cramer Fire would not appreciably further the public's important interest in monitoring the agency's performance[.]"); *Off. of the Cap. Collateral Couns. v. U.S. Dep't of Justice*, 331 F.3d 799, 804 (11th Cir. 2003) (finding that substantial public information was available about AUSA's misconduct and that any "public interest in knowing how DOJ responded to [the AUSA's] misconduct can be satisfied by this other public information"); *Associated Press v. U.S. Dep't of Def.*, 554 F.3d 274, 293 (2d Cir. 2009) ("We conclude that the public interest in evaluating whether DOD properly followed-up on the detainees' claims of mistaken identity have been adequately served by the disclosure of the redacted information[.]").

verbatim written transcript of the interview.[8] In light of this substantial amount of information already available to the public – including a written transcript of the recording that plaintiffs seek here – any additional benefit to the public of the release of the recording would be minimal. *See NASA*, 782 F. Supp. at 633 (upholding withholding of the *Challenger* audio recording given the "extremely speculative and subjective nature" of what additional information could be gleaned from an audio recording where "NASA has provided the public with a transcript of the tape").

While the Report discusses the President's interview and Mr. Hur testified that he relied in part on the audio recordings in reaching his decisions, *see* ECF No. 26, ¶ 18, that does not increase the weight of the public interest. To the contrary, these disclosures reduce the public interest in additional information. The cognizable public interest in the disclosure of the audio recording would be to help the public understand why Mr. Hur declined to recommend criminal charges, but that is already explained at length in other disclosures.

Moreover, the audio recording is only one piece of evidence among many that Mr. Hur considered and discussed in his report. During the course of the investigation, the Special Counsel's Office "conducted 173 interviews of 147 witnesses" and "collected over seven million documents, including e-mails, text messages, photographs, videos, toll records, and other materials from both classified and unclassified sources." Hur Report, at 29. In light of the extensive amount of evidence collected and analyzed by Mr. Hur, release of the audio recording – a single piece of evidence for which a written transcript is already available and that appears irrelevant to many of the asserted bases to decline prosecution – would do little to advance the public's ability to evaluate Mr. Hur's decisions, particularly given the substantial amount of other information available to the public. At bottom, "general public curiosity" about how President Biden sounded during the interview simply "is not enough" to warrant disclosure under Exemption 7(C). *Judicial Watch*, 876 F.3d at 350.

---

[8] The Department applied a small number of redactions to the transcript to withhold specific information that is exempt under FOIA. Those are not challenged here. *See supra* 5 n.3.

**III.    Because Release of the Audio Recording Can Reasonably Be Expected to Interfere With Law Enforcement Proceedings, the Department Properly Withheld the Audio Recording Pursuant to Exemption 7(A)**

The audio recording is also properly withheld under Exemption 7(A). That exemption allows an agency to withhold "records or information compiled for law enforcement purposes," if disclosure "could reasonably be expected to interfere with enforcement proceedings." 5 U.S.C. § 552(b)(7)(A). "Exemption 7(A) reflects the Congress's recognition that 'law enforcement agencies ha[ve] legitimate needs to keep certain records confidential, lest the agencies be hindered in their investigations or placed at a disadvantage when it [comes] time to present their case.'" *CREW*, 746 F.3d at 1096 (quoting *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 224 (1978)). To satisfy Exemption 7(A), an agency must show that disclosure of the requested law enforcement records "(1) could reasonably be expected to interfere with (2) enforcement proceedings that are (3) pending or reasonably anticipated." *Mapother v. U.S. Dep't of Justice*, 3 F.3d 1533, 1540 (D.C. Cir. 1993) (emphasis omitted). An agency may not "simply assert" that production would likely result in interference; rather an agency must "'demonstrate *how* disclosure' will do so." *CREW*, 746 F.3d at 1098 (emphasis in original) (quoting *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1114 (D.C. Cir. 2007)). "Exemption 7(A) explicitly requires a predictive judgment of the harm that will result from disclosure of information, permitting withholding when it 'could reasonably be expected' that the harm will result." *Ctr. for Nat'l Sec. Studies*, 331 F.3d at 928.[9] The Department has met its burden here, and can point to non-speculative, reasonably anticipated circumstances where the negative impact of disclosure would likely have significant adverse reverberations.

**A.    Disclosure of the Audio Recording Can Reasonably Be Expected to Interfere With Law Enforcement Proceedings**

Attorney General Garland concluded, based on his personal consideration as the chief law enforcement officer of the United States, that disclosure of the audio recording "is likely to damage

---

[9] As discussed above with respect to Exemption 7(C), the audio recording constitutes "records or information compiled for law enforcement purposes." *See supra* 15; Weinsheimer Decl. ¶ 10. Accordingly, the threshold requirement for Exemption 7(A) is satisfied.

future law enforcement efforts." Garland Ltr., at 1; *see id.* at 3-4 ("Production of these recordings . . . would raise an unacceptable risk of undermining the Department's ability to conduct similar high-profile criminal investigations – in particular, investigations where the voluntary cooperation of White House officials is exceedingly important."); *see generally id.* at 3-7 (discussing assertion of executive privilege over audio recording based on substantial risk of harm to law enforcement investigations). Courts regularly recognize that the potential to chill cooperation of witnesses is a type of harm that warrants withholding under Exemption 7(A). *See, e.g.*, *Robbins Tire*, 437 U.S. at 225-26 (discussing legislative history regarding concern for premature disclosure of witness statements and resulting intimidation of witnesses); *Ctr. for Nat'l Sec. Studies*, 331 F.3d at 930 (upholding Exemption 7(A) withholding in part because witnesses "would be less likely to cooperate with the investigation" if their identities were disclosed); *Judicial Watch of Fla., Inc. v. U.S. Dep't of Justice*, 102 F. Supp. 2d 6, 20 (D.D.C. 2000) (upholding Exemption 7(A) withholding after noting that the Department had indicated disclosure could, among other things, "discourage the continued cooperation of these witnesses").

As the Attorney General explained, "[r]ecording interviews is a highly useful law enforcement tool." Garland Ltr., at 5. Audio recordings allow investigators to conduct interviews with fewer persons present, "which can facilitate a more candid and robust engagement between investigators and the witness, including when sensitive information may be discussed," they are a means "to ensure that a transcript accurately records the interviewee's testimony," and "they allow investigators and counsel to revisit certain elements of the interview by reviewing the audio recording or the transcript of that recording in light of subsequent investigative developments." *Id.*; *see also* Weinsheimer Decl. ¶ 27. At the same time, "[t]he unique characteristics of audio recordings raise particularly pronounced concerns about chilling future cooperation." Garland Ltr., at 5. The potential release of audio recordings "presents a unique intrusion, even when compared to the significant privacy interests that may be present in transcriptions," and "that intrusion may be particularly severe when the recording is of a law enforcement interview – a consequential interaction conducted under criminal penalty for false statements – in a case where the interviewee has not

been charged with a crime." *Id.*; *see id.* at 6 (recognizing "the disclosure of audio recordings presents a significant opportunity for misuse and possible manipulation").

In light of these considerations, the Attorney General concluded that production of the audio recordings at issue here "poses an unacceptable risk of impairing cooperation in future high-profile investigations." Garland Ltr., at 6. Disclosure could lead critical witnesses in future high-profile investigations to "reasonably fear" that if they sat for a recorded interview, they too might hear their voice – during a moment of intense sensitivity – played on national television or made universally available on the internet. Weinsheimer Decl. ¶ 31. That fear could make them "less likely to cooperate with the Department's investigatory efforts, including by refusing to sit for recorded interviews," "[o]r they might cooperate less fully, such as by being less comprehensive in their answers during interviews." Garland Ltr., at 6. Either circumstance "would significantly impair the Department's ability to investigate and prosecute such important matters." *Id.* These are the same concerns about "chilling . . . cooperation with future Justice Department investigations" that Attorney General Mukasey expressed in his 2008 letter to the President. *See* 32 Op. O.L.C. at 11, 13. Accordingly, release of the audio recording "could reasonably be expected to interfere with enforcement proceedings." 5 U.S.C. § 552(b)(7)(A).

### B.  Exemption 7(A) Textually Applies to the Audio Recording Here Because Similar Law Enforcement Proceedings are Reasonably Anticipated

To invoke Exemption 7(A), the D.C. Circuit requires that the government demonstrate that there are law enforcement proceedings that are either "pending or reasonably anticipated." *Mapother*, 3 F.3d at 1540. In discussing this requirement, the D.C. Circuit has sometimes stated, based upon a statement in the Act's legislative history, that the withheld material should "relate[] to a 'concrete prospective law enforcement proceeding.'" *Carson v. U.S. Dep't of Justice*, 631 F.2d 1008, 1018 & n.47 (D.C. Cir. 1980); *see, e.g.*, *CREW*, 746 F.3d at 1097; *Juarez v. U.S. Dep't of Justice*, 518 F.3d 54, 58 (D.C. Cir. 2008); *Bevis v. U.S. Dep't of State*, 801 F.2d 1386, 1389 (D.C. Cir. 1986). In addition, the D.C. Circuit has held that Exemption 7(A) is "temporal in nature,"

*CREW*, 746 F.3d at 1097, such that "the relevant proceedings must be pending or reasonably anticipated at the time of the district court's eventual decision, not merely at the time of [the] original FOIA request." *Sussman*, 494 F.3d at 1115.

**1.** While Attorney General Garland's letter places particular emphasis on potential harm to *future* investigations, there are also concrete, ongoing law enforcement investigations in which the Department anticipates that release of the audio recording could chill witness participation. Weinsheimer Decl. ¶ 34. In particular, as discussed in the Weinsheimer Declaration, the Department currently is engaged in ongoing matters for which there could be substantial public interest, and release of the audio recording here may make witnesses or potential witnesses in those investigations reasonably fear that if they sat for a recorded interview, audio recordings of their interview would ultimately be released to either Congress or the public. *See id.* ¶¶ 34-35. This fear could reasonably be expected to make witnesses (1) less likely to sit for an interview in the first instance, (2) less likely to consent to recording if they do sit for an interview, or (3) less forthcoming in their responses if they agree to sit for a recorded interview. *Id.* ¶ 35. Any of these results would interfere with ongoing law enforcement investigations. *Id.*

Exemption 7(A) may properly be asserted over the audio recording, even though it comes from a closed investigation, because release of the recording is expected to interfere with separate, ongoing investigations. The D.C. Circuit upheld an analogous Exemption 7(A) argument in *Center for National Security Studies*, in which the court of appeals held that the Department properly withheld the names of individuals who had been detained as part of the government's investigation into the September 11 terrorist attacks. 331 F.3d at 920-21. More than 700 of those individuals had been detained on immigration charges, but at the time of the D.C. Circuit's decision, less than 100 were still in custody. *Id.* at 921; *see id.* at 930 (noting that many detainees had been "released"). Accordingly, while some of those individuals could have still been subject to governmental monitoring, *see id.*, it is nearly certain that any "investigation" into at least some of those individuals had concluded. Yet, the D.C. Circuit held that the names of *all* the detainees was properly withheld

under Exemption 7(A) because release of the names as an aggregate could interfere with the government's ongoing counterterrorism investigations. *Id.* at 928; *see also Shapiro v. U.S. Dep't of Justice*, No. 12-cv-313, 2020 WL 3615511, at *16 (D.D.C. July 2, 2020) (upholding Exemption 7(A) withholding even though "the withheld documents may not have all come from active investigative files" when the agency only withheld information if release could be expected "to interfere with [other] ongoing enforcement proceedings").

**2.** Exemption 7(A) is also properly invoked because disclosure of the audio recordings "poses an unacceptable risk of impairing cooperation in *future* high-profile investigations where voluntary cooperation is exceedingly important, such as those involving White House officials." Garland Ltr., at 6 (italics added). Although, as noted, some D.C. Circuit cases have suggested that the government ordinarily should satisfy Exemption 7(A) by pointing to a "concrete prospective law enforcement proceeding," *see, e.g.*, *Juarez*, 518 F.3d at 58, the text of Exemption 7(A) is not so limited. Indeed, nothing in the text of Exemption 7(A) or in D.C. Circuit precedent should prevent its application to situations where information from a closed investigation would harm a future one that is "reasonably anticipated." As *Juarez* recognized, the call for "a 'concrete prospective law enforcement proceeding' . . . is not quite the formidable hurdle appellant would make it out to be" and is readily satisfied by showings of prospective law enforcement need. *Id.* at 59.

The justification behind the D.C. Circuit's expectation of a "concrete prospective" law enforcement proceeding is the belief that if the government cannot point to a specific ongoing or anticipated proceeding, then the disclosure of files from closed investigations is unlikely to cause harm. As the D.C. Circuit put it, "there [is] 'no reason to protect yellowing documents contained in long-closed files.'" *Mapother*, 3 F.3d at 1541 (quoting *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 870 (D.C. Cir. 1980)). In many circumstances, that makes sense: if an investigation is closed and all resulting proceedings have concluded, then the disclosure of facts contained in documents from the closed investigation will often not cause harm to other investigations, and that may be particularly true when other FOIA exemptions could prevent the release of the types of information that might be most expected to cause harm to future investigations.

But this case presents concerns different than the typical law enforcement investigation and prosecution. Even though Special Counsel Hur's investigation has concluded, the nation's chief law enforcement officer has determined that disclosure of the audio recording "poses an unacceptable risk of impairing cooperation in future high-profile investigations." Garland Ltr., at 6. As the Attorney General noted, a "chilling effect" on potential witnesses "can extend to future investigations and thus may exist even if disclosure occurs only once an investigation ends," and he concluded that this harm to future law enforcement interests justifies an assertion of executive privilege on that ground.[10] *Id.* at 4 (citing 32 Op. O.L.C. at 10-11). As noted above, these concerns are not speculative: the Department is aware of specific, ongoing investigations in which witnesses declined to be audio recorded, suggesting they feared that their interview recording would be publicly disclosed in the future. Weinsheimer Decl. ¶ 34.

The Department reasonably anticipates that it will be called on in the future to engage in sensitive, high-profile investigations, including those that may involve White House or other senior government officials. Weinsheimer Decl. ¶ 32; *see id.* (noting that "[s]uch investigations have arisen in each of the last four administrations"). Release of the audio recording here poses heightened risks to witness cooperation in such investigations. Because of the high-profile nature of the Hur Investigation, disclosure of the audio recording of President Biden would predictably result in its widespread dissemination. Future officials (including in the White House) will be aware of the recording's previous disclosure and any harms to privacy that resulted from that disclosure. Accordingly, if the audio recording is released here, it is reasonable to expect that witnesses in future high-profile investigations might worry that sitting for a recorded interview would result in

---

[10] Because concerns related to potential harm to law enforcement investigations motivated the President's assertion of executive privilege over the audio recording, the reasons supporting the audio recording's withholding under Exemption 5 and Exemption 7(A) are similar, but not identical. Executive privilege is (as its name indicates) a recognized, constitutionally based privilege that would prevent regular disclosure of the audio recording in litigation, so Exemption 5 clearly applies. *See supra* 7-14. However, for the reasons stated here, Exemption 7(A) also applies because release of the audio recording "could reasonably be expected to interfere with enforcement proceedings." 5 U.S.C. § 552(b)(7)(A). Accordingly, both statutory exemptions provide an independent basis to withhold the audio recording.

the recording – which reflects a sensitive interaction with law enforcement – being widely disseminated across television and the internet. *Id.* ¶¶ 31-32; *see* Garland Ltr., at 5 (noting concern regarding future investigations "where the voluntary cooperation of White House officials is exceedingly important"). The fact that the disclosure would occur even though the Special Counsel had determined that no charges were warranted would amplify that risk, allowing future witnesses to reasonably anticipate that even if no charges are filed as a result of the investigation, their recorded interviews with prosecutors might still become highly public. Weinsheimer Decl. ¶ 33. Accordingly, the Department's considered judgment is that release of the audio recording could reasonably be expected to chill cooperation with reasonably anticipated future high-profile law enforcement investigations. *Id.*; Garland Ltr., at 5.

To the government's knowledge, the D.C. Circuit has not yet considered the application of Exemption 7(A) in circumstances such as these. *Cf. Turkiye Halk Bankasi A.S. v. United States*, 598 U.S. 264, 278 (2023) ("This Court has often admonished that 'general language in judicial opinions' should be read 'as referring in context to circumstances similar to the circumstances then before the Court and not referring to quite different circumstances that the Court was not then considering.'" (quoting *Illinois v. Lidster*, 540 U.S. 419, 424 (2004)). The most analogous case is *Citizens for Responsibility and Ethics in Washington v. U.S. Department of Justice*, 658 F. Supp. 2d 217 (D.D.C. 2009). In that case, the Department asserted Exemption 7(A) over law enforcement records relating to an interview of then-Vice President Richard Cheney, raising similar arguments as the Department does here. *Id.* at 219, 225-30. Although the district court ultimately rejected the Department's 7(A) argument in that case due to a lack of concrete, ongoing investigations, *id.* at 230, that decision is not binding on this Court, and for the reasons stated, the case for withholding the audio recording is even stronger.  Accordingly, withholding is proper under Exemption 7(A).

**3.** For the reasons stated above, the audio recording may properly be withheld under Exemption 7(A) in a way that is consistent with D.C. Circuit precedent. However, if that precedent were construed to require the Department to identify a "specific" or "concrete" future law enforcement proceeding – such that reliance on expected harm to reasonably anticipated, future high-

profile investigations involving White House officials is not sufficient – then that precedent was wrongly decided, and the Department preserves its right to seek further review to correct it.

Any requirement that the Department identify a "specific" or "concrete" future law enforcement proceeding before asserting Exemption 7(A) is simply not present in the statutory text. *See Milner v. Dep't of Navy*, 562 U.S. 562, 569-73, 580 (2011) (reversing decades-old interpretation of FOIA Exemption 2 when that interpretation did not comport with statutory text); *Food Mktg. Inst.*, 588 U.S. at 436-38 (similar with respect to interpretation of Exemption 4 that lacked textual basis but relied on legislative history); *see also Robbins Tire*, 437 U.S. at 232 (noting that the phrase "concrete prospective law enforcement proceeding" comes from a Senator's floor statement). Under Exemption 7(A), the Department may withhold information from law enforcement files so long as disclosure "could reasonably be expected to interfere with enforcement proceedings." 5 U.S.C. § 552(b)(7)(A). And the Supreme Court has expressly rejected the assertion that "determinations of 'interference' under Exemption 7(A) can be made only on a case-by-case basis." *Robbins Tire*, 437 U.S. at 223; *see also id.* at 223-24 ("[S]ince subdivision (A) speaks in the plural voice about 'enforcement proceedings,' it appears to contemplate that certain generic determinations might be made."); *id.* at 234 & n.15 ("Although Congress could easily have required in so many words that the Government in each case show a particularized risk to [an] individual 'enforcement proceedin[g],' it did not do so[.]"). Indeed, even the relevant floor statement must be "read in light of [its] primary concern": ensuring that information is withheld only where its disclosure could interfere with prospective law enforcement efforts. *Id.* at 235; *see also id.* at 230 (recognizing that "the thrust of congressional concern in its amendment of Exemption 7 was to make clear that the Exemption did not endlessly protect material simply because it was in an investigatory file" and for which there was no articulated need for confidentiality).

As set out in Attorney General Garland's letter and the Weinsheimer Declaration, release of the audio recording would lead to an unacceptable risk of hindering witness cooperation in future, high-profile investigations. Garland Ltr., at 5; Weinsheimer Decl. ¶¶ 22, 29. Courts regu-

larly recognize that impeding witness cooperation is a harm that justifies an Exemption 7(A) with-holding. *See, e.g.*, *Ctr. for Nat'l Sec. Studies*, 331 F.3d at 930. The Department reasonably expects that it will engage in future, high-profile investigations where the risk of this harm would be acute. Weinsheimer Decl. ¶ 32. The plain text of the statute does not require the Department to show anything more before it may assert Exemption 7(A). *See, e.g.*, *Bates v. United States*, 522 U.S. 23, 29 (1997) ("[W]e ordinarily resist reading words or elements into a statute that do not appear on its face."). Moreover, constitutional avoidance principles apply here for reasons similar to those discussed above. *See supra* 13-14.

## IV.   Disclosure of the Audio Recording Would Foreseeably Harm Interests Protected by FOIA Exemptions

Under the FOIA Improvement Act of 2016, in order to justify the withholding of a respon-sive record, the government must show that "the agency reasonably foresees that disclosure would harm an interest protected by an exemption described in subsection (b) [of FOIA]," or that "dis-closure is prohibited by law." 5 U.S.C. § 552(a)(8)(A)(i); *see Reporters' Comm. for Freedom of the Press v. FBI*, 3 F.4th 350, 369-70 (D.C. Cir. 2021) (discussing foreseeable harm standard). Indeed, the amendment codified existing government policy that had been in place for years. *See id.* at 9 (noting that the policy was established by executive memoranda in 2009); S. Rep. No. 114-4 (2015), at 8 (same); Freedom of Information Act, 74 Fed. Reg. 4683 (Jan. 21, 2009) (presidential memorandum). And the Department already employed this standard when defending agency with-holdings in litigation. *See* H.R. Rep. No. 114-391, at 9; *accord* Attorney General Holder's Mem. for Heads of Exec. Dep'ts & Agencies Concerning the FOIA, at 1-2 (Mar. 19, 2009). As described by the D.C. Circuit, to satisfy the foreseeable harm requirement, the agency must "articulate both the nature of the harm [from release] and the link between the specified harm and specific infor-mation contained in the material withheld." *Reporters' Comm.*, 3 F.4th at 369.

Disclosure of the audio recording would foreseeably harm interests protected by each of the FOIA exemptions asserted here. Because the President formally asserted executive privilege over the audio recording in response to a congressional subpoena, release of the record here would

harm an interest protected by Exemption 5 (which covers material protected by executive privilege) by entirely vitiating the purpose of the privilege assertion, since Congress could have simply sought the record under FOIA rather than by subpoena. Furthermore, the President invoked executive privilege at the request of the Attorney General to prevent foreseeable harm to law enforcement investigations. Garland Ltr., at 1; Weinsheimer Decl. ¶¶ 22, 48-50; *see id.* ¶¶ 23-35. For those reasons, release of the audio recording would harm interests protected by both Exemption 5 (via executive privilege) and Exemption 7(A). Release would also harm interests protected by Exemptions 6 and 7(C), because releasing the audio recording would result in unwarranted harm to privacy interests that an individual maintains in preventing the dissemination of an audio recording of an interview with a prosecutor. *See supra* 16-27; *see also Ecological Rights Found. v. EPA*, 541 F. Supp. 3d 34, 65 (D.D.C. 2021) ("[W]hen invoking Exemption 7(C), an agency need not establish much more than the fact of disclosure to establish foreseeable harm.").

## V.      There Is No Reasonably Segregable, Non-Exempt Information

FOIA requires that "[a]ny reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt." 5 U.S.C. § 552(b). Here, there is one record at issue, and the Department has properly withheld it in full under multiple exemptions. In particular, the entire audio recording is subject to a formal claim of executive privilege, so the entire record is subject to Exemption 5. Moreover, because release of the record would unjustifiably infringe privacy interests related to the sound of an individual during a law enforcement interaction, the entire audio recording is properly withheld under Exemptions 6 and 7(C). Finally, because release of the audio recording could reasonably be expected to interfere with enforcement proceedings given the threat of chilling future witness participation, the record is properly withheld in full pursuant to Exemption 7(A). Accordingly, all information has been appropriately withheld in full, and there is no information to segregate. *See, e.g.*, *Nat'l Ass'n of Crim. Def. Lawyers v. U.S. Dep't of Justice*, 844 F.3d 246, 256 (D.C. Cir. 2016) (noting that

when an exemption applies to an entire record, "there are no non-exempt portions left to segregate").

## CONCLUSION

For the foregoing reasons, the Court should grant Defendant's motion for summary judgment.

DATED:  May 31, 2024

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General
Civil Division

ELIZABETH J. SHAPIRO
Deputy Director

*/s/ Joshua C. Abbuhl*
JOSHUA C. ABBUHL (D.C. Bar No. 1044782)
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W., Room 11518
Washington, D.C. 20005
Telephone: (202) 616-8366
Facsimile: (202) 616-8470
Joshua.Abbuhl@usdoj.gov

*Counsel for the Defendant*