IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON**, <br><br> *Plaintiff,* <br><br> v. <br><br> **U.S. DEPARTMENT OF JUSTICE**, <br><br> *Defendant.* | Case No. 1:24-cv-00700-TJK <br> (Consolidated Cases) |
| **HERITAGE FOUNDATION,** *et al.*, <br><br> *Plaintiffs,* <br><br> v. <br><br> **U.S. DEPARTMENT OF JUSTICE**, <br><br> *Defendant.* | |
| **CABLE NEWS NETWORK, INC.**, *et al.*, <br><br> *Plaintiffs,* <br><br> v. <br><br> **U.S. DEPARTMENT OF JUSTICE**, <br><br> *Defendant.* | |

**DECLARATION OF BRADLEY WEINSHEIMER**

1

I, Bradley Weinsheimer, declare the following to be true and correct:

1. I am an Associate Deputy Attorney General for the Department of Justice ("the Department"). I serve as the highest-ranking career official in the Department. I have held this position since July 2018. Prior to that time, I served in the Department's National Security Division, from March 2016 to July 2018, serving as Acting Chief of Staff to the Assistant Attorney General from May 2016 until approximately February 2018. I have worked at the Department since 1991, including twenty years as an Assistant United States Attorney ("AUSA") in Washington, D.C. As an AUSA, I handled a wide variety of narcotics, violent crime, and public corruption cases, and held numerous supervisory positions, including Chief of the Superior Court Division and Chief of the Grand Jury Section.

2. The statements made in this declaration are based on my personal knowledge as well as information obtained and reviewed in the course of my official duties, including conversations I had with Special Counsel Robert K. Hur (the "Special Counsel") and members of his staff, as well as other individuals in the Department.

3. I understand that the plaintiffs in these consolidated cases all submitted Freedom of Information Act ("FOIA") requests to the Department seeking an audio recording of an interview of President Biden, which is discussed further below. The Department has withheld the audio recording in full pursuant to FOIA Exemptions 5, 6, 7(A), and 7(C). I submit this declaration to provide detail and context concerning the Department's invocation of these FOIA exemptions as they pertain to the audio recording.

### The Hur Investigation and the Interview of President Biden

4. On January 12, 2023, Attorney General Merrick Garland appointed Robert K. Hur as Special Counsel. *See* Ex. 3, Order No. 5588-2023, *Appointment of Robert K. Hur as Special Counsel*. Mr. Hur was "authorized to conduct the investigation of matters that are the subject of the initial investigation . . . led by United States Attorney John R. Lausch, Jr., including possible unauthorized removal and retention of classified documents or other records discovered at the Penn Biden Center for Diplomacy and Global Engagement and the Wilmington, Delaware, private

2

residence of President Joseph R. Biden, Jr., as well as any matters that arose from the initial investigation or may arise directly from the Special Counsel's investigation or that are within the scope of 28 C.F.R. § 600.4(a)." *Id.* ("SCO Investigation").

5. Mr. Hur resigned from his position of Special Counsel and left the Department in March 2024. I did not directly work on or oversee the SCO Investigation. I do, however, work on issues relating to disclosure of SCO Investigation documents both to Congress and pursuant to FOIA requests.

6. On February 5, 2024, Special Counsel Hur informed the Attorney General that Special Counsel Hur had concluded his investigation and furnished to the Attorney General a confidential 345-page report, plus appendices, in accordance with 28 C.F.R. § 600.9(a)(3) ("Hur Report"). As reflected in his report, Special Counsel Hur, "conclude[d] that no criminal charges are warranted[.]" Hur Report at 1.

7. I also participated in the review of the Hur Report to make recommendations as to what material, if any, should be redacted prior to congressional or public release by the Attorney General. President Biden did not assert executive privilege over any portion of the Hur Report or its appendices. *See* Ex. 4, February 8, 2024 Ltr. of Attorney General Merrick Garland, at 2 ("Feb. 8 Letter"). Attorney General Garland released to Congress and the public the Hur Report as it was provided to him by Special Counsel Hur without any further additions, redactions, or other modifications. *Id.* The Department has placed a copy of the Hur Report on its public-facing website. *See* Report of the Special Counsel on the Investigation Into Unauthorized Removal, Retention, and Disclosure of Classified Documents Discovered at Locations Including the Penn Biden Center and the Delaware Private Residence of President Joseph R. Biden, Jr., *available at https://www.justice.gov/sco-hur.*

8. During the course of the SCO Investigation, investigators conducted "173 interviews of 147 witnesses," and "collected over seven million documents, including e-mails, text messages, photographs, videos, toll records, and other materials from both classified and unclassified sources." Hur Report at 29. I understand that the Special Counsel Office's (SCO) standard

3

practice was to make audio recordings of witness interviews. I further understand there were no video recordings of any interview.

9. As part of the SCO Investigation, President Biden voluntarily agreed to sit for an interview with SCO. Special Counsel Hur and his Deputy Counsel conducted that interview ("the interview"). The interview occurred over the course of two days, October 8 and 9, 2023. Collectively, the interview lasted just over approximately five hours. Consistent with SCO's general practice, the interview was recorded by audio, but not video.

10. Mr. Hur determined that it was important for the criminal investigation to have an audio recording of the interview so that the SCO would have a definitive source reflecting what exactly had been said during the interview. Accordingly, the Special Counsel requested that the interview be recorded, and President Biden voluntarily agreed to that request. Because the recording was created for these purposes during the course of a law enforcement investigation, the recording was compiled for law enforcement purposes.

11. The attendees at the interview included President Biden, Special Counsel Hur, the Deputy Special Counsel, representatives from the White House Counsel's Office, President Biden's personal attorneys, and limited Federal Bureau of Investigation ("FBI") personnel. The interview was conducted in a space cleared for discussions up to the Top Secret level of classification. The individuals in attendance had appropriate clearances.

12. During the interview, FBI personnel operated two separate recording devices in the event one device malfunctioned and failed to record, which did not in fact happen. When questioning began, FBI personnel would turn on the recording devices, which would then be turned off during breaks in the interview. Consequently, while two audio recordings were made of the same interview, they are duplicative in that they recorded the same interview at the same time. I have personally listened to the entirety of the interview by listening to all of the audio recordings from both devices. The audio recordings I listened to are composed of several separate digital files. Even though the recordings I listened to are made up of separate digital files, I refer to the digital files collectively as "the audio recording" for simplicity.

4

13. After the interview, SCO created written transcripts of the audio recording with the assistance of a trained professional court reporter – one transcript for each day of the interview. I have read the entirety of the written transcripts of the interview. As I listened to the audio recording, I compared it to the transcripts of the audio recording and specifically listened for differences between the transcripts and audio recording. In a few instances, the transcripts indicate that some words from the audio recording are indiscernible. In listening to the audio recording and reviewing the transcripts, I agree that in those instances the words are indiscernible.

14. The interview transcripts are accurate transcriptions of the words of the interview contained in the audio recording, except for minor instances such as the use of filler words (such as "um" or "uh") when speaking that are not always reflected on the transcripts, or when words may have been repeated when spoken (such as "I, I" or "and, and") but sometimes was only listed a single time in the transcripts. Besides these exceedingly minor differences, based on my simultaneous review of the transcripts while listening to the audio recording, the transcripts accurately capture the words spoken during the interview on the audio recording with no material differences between the audio recording and transcripts. None of the minor differences include any audible substantive exchanges – that is, based on my review, there is no material omission of words between the audio recording and transcripts. Special Counsel Hur and FBI personnel who attended the interview and compared the audio recording to the transcripts also informed me of their determination that the transcripts accurately reflect the words spoken on the audio recording aside from the minor instances I described above. Special Counsel Hur emphasized to me that it was important for purposes of his investigation that the interview transcripts be accurate.

15. The audio files and transcripts were marked, maintained, and stored by SCO as Top Secret classified material. After the President's interview, a copy of both written transcripts and a copy of the audio recording were made available to representatives of the White House Counsel's Office, which made them available as appropriate to President Biden's personal counsel. This enabled counsel to determine the accuracy of the transcripts.

5

16. Because the interview was treated as Top Secret, representatives of the White House Counsel's Office were required to keep the transcripts and the audio recording in a Sensitive Compartmented Information Facility ("SCIF"), which is a facility designed to store classified information. I understand that the interview transcripts and audio recording were maintained in a SCIF within the Executive Office of the President, which is where President Biden's personal counsel was permitted to review the audio recording and transcripts. The audio recording has remained at all times within the custody and control of the Executive Branch.

17. The Department has produced, both to Congress and pursuant to FOIA, redacted versions of the written transcripts of the interview and placed the transcripts on the Department's public-facing website. True and correct copies of the redacted transcripts are attached as Exhibits 1 (for October 8, 2023) and 2 (for October 9, 2023). I am aware of the process by which the transcripts were reviewed to determine what material should be redacted. Some of the redactions were made to remove sensitive information (including classified information) that was revealed during the interview, and the redacted transcripts were determined to contain no classified information. As of the time of this declaration, the audio recording remains a classified record maintained in a SCIF.

## Congressional Subpoenas and Executive Privilege

18. On February 27, 2024, two Committees of the House of Representatives (the Committee on the Judiciary and the Committee on Oversight and Accountability) subpoenaed the audio recording of Special Counsel Hur's interview of President Biden. The Committees also subpoenaed another audio recording that is not at issue in these consolidated FOIA cases.

19. By letter dated May 15, 2024, Attorney General Merrick Garland informed President Biden that, with the advice of the Department's Office of Legal Counsel, he determined that the audio recording fell within the scope of executive privilege. *See* Ex. 5 ("Garland Letter"). The letter contained a detailed analysis discussing why executive privilege applies to the audio recording, *see id.* at 3-10, why the needs articulated by the Committees for the audio are "plainly insufficient to outweigh the deleterious effects that production of the recordings would have on the

integrity and effectiveness of similar law enforcement investigations in the future," see *id.* at 1, and why executive privilege could therefore properly be asserted. Based on that analysis, Attorney General Garland requested that the President assert executive privilege over the audio recording. *Id.* at 1, 11.

20. On May 16, 2024, President Biden asserted executive privilege over the subpoenaed audio recording and instructed that it not be produced to the Committees. By letter dated May 16, 2024, Assistant Attorney General for Legislative Affairs Carlos Uriarte informed Representative Jim Jordan (Chairman of the Committee on the Judiciary) and Representative James Comer (Chairman of the Committee on Oversight and Accountability) that President Biden had done so. A true and correct copy of this letter is attached as Exhibit 6.

21. I understand that FOIA Exemption 5 generally authorizes the withholding of records that are privileged, *i.e.*, "that would not be available by law to a party other than an agency in litigation with the agency." Because the President has asserted executive privilege over the audio recording, the Department would not make the recording available to a party in litigation with the Department.

## Law Enforcement Implications

22. The Attorney General is the head of the Justice Department and the chief law enforcement officer of the federal government. As set out in the Garland Letter, the audio recording falls within the scope of executive privilege and its release presented an unacceptable risk to federal law enforcement interests and outweighed any congressional need for the files. Given that risk, the Attorney General requested that President Biden invoke executive privilege over the audio recording, and the President did so.

23. As the Garland Letter explains, "[m]aterials protected by executive privilege include materials contained in law enforcement files, over which the President 'may invoke executive privilege to preserve the integrity and independence of criminal investigations and prosecutions.'" Garland Ltr., at 4 (quoting 32 Op. O.L.C. 7, 10 (2008)). "The law enforcement component of executive privilege protects against, among other things, 'the potential damage to proper law

7

enforcement' that would be caused by disclosure, including 'the chilling effect' on 'sources of information.'" *Id.* (quoting 10 Op. O.L.C. 68, 76 (1986)). Further, "[t]his chilling effect can extend to future investigations and thus may exist even if disclosure occurs only once an investigation ends," and, accordingly, "[t]he Department has long recognized . . . that executive privilege protects materials related to a closed criminal investigation where disclosure might hamper prosecutorial efforts in future cases." *Id.*

24. Attorney General Garland applied these considerations and precedents to the facts and circumstances surrounding the audio recording of the interview and concluded that release of the audio recording would raise precisely these concerns. *See id.* Notwithstanding that the SCO Investigation had concluded, Attorney General Garland shared an "overarching concern" that animated a past assertion of executive privilege over law enforcement files, regarding "the prospect of committees of Congress obtaining confidential records from Justice Department criminal investigative files for the purpose of addressing highly politicized issues in public committee hearings." *Id.* at 4-5 (quoting 32 Op. O.L.C. at 10-11). The Attorney General also described the "more specific concern" that production of the audio recording "might affect the Department's ability to obtain vital cooperation in high-profile criminal investigations – in particular, in investigations where the voluntary cooperation of White House officials is exceedingly important." *Id.* at 5.

25. In my experience as a prosecutor and Department official, interview subjects and their counsel understand and depend on the Department's well-established and consistent practice of, to the greatest extent possible, maintaining the confidentiality of interviews except when introduced into the public record by official filings or proceedings, such as indictments or trials, or unless otherwise ordered by courts. In my experience and judgment, these considerations, including the expectation of confidentiality, factor into the decisions by an interview subject and their counsel about whether to sit for an interview and under what conditions.

26. The Attorney General also observed that "[t]here 'is an admirable tradition, extending back through Administrations of both political parties, of full cooperation by the White House with criminal investigations,'" and that President Biden voluntarily agreed to the Special Counsel's

8

request for a recorded interview, "[c]onsistent with this tradition." *Id.* (quoting 32 Op. O.L.C. at 11). However, release of the audio recording here could threaten the continuation of that tradition: "if key witnesses in similar high-profile investigations expected that volunteering to sit for an interview and allowing that interview to be recorded would likely result in the release of that recording to Congress (and potentially the public), there is a significant risk that such witnesses would evaluate the Department's request for cooperation differently in the future." *Id.* "And an inability to secure cooperation, or a diminution in the degree and extent of cooperation, would significantly impair the Department's ability to conduct similar high-profile investigations where cooperation is exceedingly important." *Id.* Based on my experience as a career prosecutor and at the Department, I agree with this assessment.

27. As the Attorney General noted, and consistent with my own experience as a prosecutor, "[r]ecording interviews is a highly useful law enforcement tool, especially during high-profile or complex investigations." *Id.* "Audio recordings enable investigators to limit the number of people physically present during interviews, which can facilitate a more candid and robust engagement between investigators and the witness, including when sensitive information may be discussed; they provide a mechanism for investigators and counsel for the witness to ensure that a transcript accurately records the interviewee's testimony, as opposed to relying solely on an investigator's notes; and they allow investigators and counsel to revisit certain elements of the interview by reviewing the audio recording or the transcript of that recording in light of subsequent investigative developments." *Id.*

28. However, the nature of audio recordings during a law enforcement investigation also "raise[s] particularly pronounced concerns about chilling future cooperation" if released publicly. *Id.* As the Attorney General noted, and again consistent with my own experience as a prosecutor, "the disclosure of audio recordings can reveal characteristics that implicate privacy interests." *Id.* "[R]elease of such recordings presents a unique intrusion, even when compared to the significant privacy interests that may be present in transcriptions." *Id.* Furthermore, "that intrusion may be particularly severe when the recording is of a law enforcement interview – a consequential

9

interaction conducted under criminal penalty for false statements – in a case where the interviewee has not been charged with a crime." *Id.* In addition, the disclosure of audio recordings "presents a significant opportunity for misuse and possible manipulation," *id.* at 6, including by improper alteration of the recording, *see id.*

29. In light of those considerations, the Attorney General concluded that, "in [his] view, disclosure of the audio recording[] . . . poses an unacceptable risk of impairing cooperation in future high-profile investigations where voluntary cooperation is exceedingly important, such as those involving White House officials." *Id.* "If witnesses in such investigations reasonably fear that materials like the recordings at issue here would subsequently be released to Congress or the public even when prosecutors declined to charge them with a crime, they may be less likely to cooperate with the Department's investigatory efforts, including by refusing to sit for recorded interviews. Or they might cooperate less fully, such as by being less comprehensive in their answers during interviews." *Id.* Under either circumstance, "this diminished cooperation would significantly impair the Department's ability to investigate and prosecute such important matters." *Id.*

30. I agree with these conclusions based on my experience as a career prosecutor and at the Department – which includes familiarity with the closed special counsel investigations overseen by Robert Mueller, John Durham, and Robert Hur. In each of those investigations, voluntary cooperation, or lack thereof, was exceedingly important.

31. Additional information regarding the Attorney General's determinations regarding how disclosure of the audio recording would risk important law enforcement interests is set out in the Garland Letter. Based on my experience, I agree with those determinations as well. In explaining why executive privilege applied to the audio recording in this case, Attorney General Garland's discussion focused on how disclosure of such a sensitive record could reasonably be expected to chill witness cooperation in future, high-profile investigations. *See* Garland Ltr. at 4-6. I concur that disclosure of the audio recording in this case could reasonably lead critical witnesses in future, high-profile investigations to fear that if they sat for a recorded interview, they too might hear their

10

voice – during a moment fraught with intense personal stress and privacy concerns – played on national television or universally available on the internet. As a result, such witnesses would be far less likely to cooperate by agreeing to an audio recorded interview. I therefore concur that disclosure of the audio recording here could reasonably be expected to interfere with future, high-profile law enforcement proceedings.

32. The Department reasonably anticipates that it will be called on in the future to engage in such sensitive, high-profile investigations, including those that may involve White House personnel or other senior government officials as witnesses. Such investigations have arisen in each of the last four administrations. The Department anticipates that release of the audio recording here would raise particularly acute threats of impeding witness cooperation in those anticipated, high-profile investigations. If the audio recording is released here, the Department expects there is a substantial risk that potential witnesses in these future high-profile investigations would reasonably worry that if they sat for a recorded interview with an investigator, the recording may be publicly released at the conclusion of the investigation even if no charges are brought or the recordings are not otherwise disclosed through official law enforcement proceedings. Given that such a recording would reflect a stressful and potentially difficult interaction with law enforcement, and that the recording likely would be widely disseminated if released, these fears could make potential future witnesses less likely to agree to a recorded interview with investigators. They might decline to sit for any interview, or they may not consent to the interview being recorded, or (even if they consent to a recorded interview) they may be more guarded and less candid in their answers. Any of these results would harm the Department's investigative efforts and ability to gather and rely upon factual information.

33. If the audio recording at issue here were released, that would exacerbate the foregoing concerns, because it would demonstrate to future witnesses that recordings of interviews may be released (and thus become highly public) even for investigations that result in no criminal charges. For these reasons and the reasons set out in the Garland Letter, the Department's

11

considered judgment is that release of the audio recording could reasonably be expected to chill witness cooperation with future high-profile law enforcement investigations.

34. The foregoing discussion, and the Garland Letter, emphasized potential harm to future investigations. In addition, the Department has law enforcement investigations that are currently ongoing for which release of the audio recording could reasonably be expected to chill witness participation in those investigations. This would prevent the government from developing factual information that often is gathered in witness interviews and would thereby interfere with the investigation. Specifically, the Department currently is engaged in ongoing investigations for which there is or could be substantial public interest, and release of the audio recording here could make witnesses or potential witnesses in these investigations reasonably fear that a recording of their interview with law enforcement may become public after the investigation closes. I am aware of ongoing investigations in particular in which witnesses declined to be audio recorded, suggesting they feared their interview recording would be publicly disclosed in the future. Such refusals reasonably would be expected to increase if witnesses believed an audio recording could be released in FOIA.

35. If an individual is asked to sit for an interview in a law enforcement investigation where the witness understands there is substantial public interest (or that there would be substantial public interest in the investigation if the public learned of the investigation's existence), then that individual might reasonably fear that a FOIA requester would be likely to seek the release of the audio recording, and that the recording might be released. Accordingly, this fear could reasonably be expected to make these witnesses or potential witnesses (in proceedings that are currently ongoing) less likely to either: (1) sit for an interview in the first instance; (2) consent to it being recorded; or (3) provide forthcoming and candid answers to questions. Any of these results would interfere with ongoing law enforcement investigations because the government would be prevented from developing factual information that often is important to the effective and efficient resolution of criminal investigations.

36. I understand that FOIA Exemption 7(A) generally authorizes the withholding of "records or information compiled for law enforcement purposes" to the extent that production of such records or information "could reasonably be expected to interfere with enforcement proceedings." For the reasons discussed above, I concur that release of the audio recording could reasonably be expected to interfere with enforcement proceedings.

**Privacy Concerns and Potential Public Interest in Disclosure**

37. The potential release of an audio recording of a law enforcement interview also raises substantial privacy concerns. Those privacy concerns are at their apex when the subject of the audio recording was investigated but never charged with a crime, as is the case for President Biden. It is a bedrock principle of the U.S. justice system that individuals are entitled to a presumption of innocence. Release of law enforcement records that document sensitive interactions between an uncharged individual and law enforcement (such as an audio recording of an uncharged individual) pose substantial threats to that core tenet of American justice. Accordingly, the Department regularly seeks to protect citizens from any unwarranted intrusions of privacy that would occur due to the release of sensitive law enforcement records – particularly for individuals who were never charged with a crime.

38. Law enforcement interviews are highly stressful and consequential events. This is especially true when the person being interviewed is someone whose conduct is the subject of investigation. Such interviews can be wide-ranging and include personal or intensely private information that the witness would not otherwise be willing to share. Because criminal penalties are associated with making false statements to law enforcement personnel during the course of a federal criminal investigation, witnesses may feel compelled to provide more information to ensure their responses are complete and accurate, thus raising particular concern over release of an audio tape of that interview.

39. When a prosecutor conducts an interview as part of a criminal investigation, by its nature, the interview includes probing questions designed to elicit information to help the

prosecutor determine whether a crime was committed and if so, by whom. This was true of the interview of President Biden.

40. An audio recording also reflects the interviewee's verbal responses, including any pauses, hesitations, intonations, and mannerisms that occurred during that stressful and personal event. If released, those aspects of an individual's verbal responses could lead to an undue invasion of privacy and harassment. For example, members of the public who were not present for the interview and are not intimately familiar with details of the law enforcement investigation or the dynamics of the interview might point to speech mannerisms (such as hesitations or pauses) and unfairly speculate that those mannerisms demonstrate that the individual was being evasive or lying.

41. Such speculation would be unwarranted and not grounded in a detailed assessment of the facts and law that underlies the very purpose for recording an interview. That is, chief among the purposes for audio recording an interview is to create a clear record of the words said by the person being interviewed and how the person said them. In light of all the facts revealed during the investigation, and a determination of applicable law, the prosecutor may listen to the audio recording while making final charging decisions.

42. Given this, the release of an audio recording of a law enforcement interview raises especially acute privacy concerns, particularly if the conduct of the witness was the subject of an investigation but the witness was not charged with a crime. In a criminal prosecution, a trial will be public, and evidence developed in the investigation will become public. Defendants are afforded procedural protections to ensure not only due process but to safeguard important privacy and reputational interests. When no charges are filed, however, people interviewed as part of the investigation typically can expect that information they provided during the course of the investigation will be kept confidential, especially when that information may be highly personal. For that reason, the Department takes great care to protect its law enforcement files, consistent with the law, even in closed cases, remaining sensitive to the privacy and reputational interests of uncharged parties. In light of these privacy concerns (as well as other concerns relevant to law enforcement), publicly

14

disseminating through FOIA the audio recording of a law enforcement interview of an uncharged individual in these circumstances would be unprecedented and exceedingly harmful.

43. The possibility of malicious manipulation of audio files increases the risk that release of an audio recording could lead to substantial harm to personal privacy interests. Audio files can be improperly altered, and the altered files can be passed off as authentic recordings. These concerns are particularly apparent in the context of releasing an audio recording of a high-profile individual such as President Biden. If the recording of President Biden's interview were released, there is a substantial risk that malicious actors could alter the recording to (for example) insert words that President Biden did not say or delete words that he did say.

44. In addition, this problem has been substantially exacerbated in recent years given that there is now widely available technology that can be used to create entirely different audio "deepfakes" based on a recording. *See, e.g.*, Verma & Oremus, *AI voice clones mimic politicians and celebrities, reshaping reality*, Wash. Post, Oct. 15, 2023 ("Rapid advances in artificial intelligence have made it easy to generate believable audio, allowing anyone . . . to copy somebody's voice – leading to a flood of faked content on the web[.]"); Leffer, *AI Audio Deepfakes Are Quickly Outpacing Detection*, Scientific American, Jan. 26, 2024 (noting that it is now "trivial" to create a convincing audio deepfake, that there are services that cost "$5 per month" and allow someone to "type and get convincing audio in a few seconds," that "[t]here is no barrier to entry or technical skill involved," and that it is very difficult to detect an audio deepfake); Collier & Cui, *Why AI-Generated Audio Is So Hard To Detect*, NBC News, Feb. 4, 2024 (noting "[t]he technology to produce a convincing audio recording of a person speaking is constantly getting better and has become widely available with a simple online search," and discussing an instance of a faked audio recording of President Biden that was sent as a robocall to Democratic voters in New Hampshire).

45. While the source material to create an audio deepfake of President Biden's voice is already available, release of the recording of his interview with Special Counsel Hur would make it far more likely that malicious actors could pass off a deepfake as the authentic recording. If the audio recording is released, the public would know that the audio recording of the interview

15

is available and malicious actors could create an audio deepfake in which a fake voice of President Biden can be programmed to say anything that the creator of the deepfake wishes. That deepfake could be passed off as an authentic copy of the recording and widely disseminated. In contrast, if the audio recording is *not* released, the Department or others would be much better able to establish the illegitimacy of any malicious deepfake. Accordingly, release of the recording of President Biden's interview with Special Counsel Hur would cause easily foreseeable and heightened privacy concerns.

46. The Department has made substantial information concerning the Hur Report available to the public. Department regulations require that "[a]t the conclusion of [a] Special Counsel's work, he or she shall provide the Attorney General with a confidential report explaining the prosecution or declination decisions reached by the Special Counsel." 28 C.F.R. § 600.8(c). At the conclusion of the SCO investigation, Special Counsel Hur submitted the Hur Report to Attorney General Garland pursuant to that regulation. The Hur Report contains a detailed accounting of the SCO investigation and the reasons why Special Counsel Hur concluded that criminal charges were unwarranted. As mentioned above, the Department has placed a copy of the Hur Report on the Department's public-facing website. The Department has also produced (both to Congress and pursuant to FOIA) the transcripts of the interview of President Biden with limited redactions. These public disclosures were discretionary; the Department did not make all withholdings or apply all redactions available under FOIA. In addition, the Department and Special Counsel Hur agreed that Mr. Hur would testify before Congress about his investigation, and Mr. Hur appeared and answered questions for more than five hours during a public hearing about his investigation and his charging decisions. Disclosing the Hur Report without any added redactions (and the transcripts of President Biden's interview with limited redactions) ensured appropriate transparency without compromising the substantial privacy interests of those who were witnesses, subjects, or targets of the investigation.

47. I understand that FOIA Exemption 7(C) generally authorizes the withholding of "records or information compiled for law enforcement purposes" to the extent that production of

16

such records or information "could reasonably be expected to constitute an unwarranted invasion of personal privacy." In light of the clear harm to privacy interests that would result from release of the audio recording, and given that release of the recording would do very little to advance the public's understanding of Special Counsel Hur's activities given the substantial amount of information already in the public record, I have concluded that release of the audio recording clearly would result in an unwarranted invasion of personal privacy.

48.   I also understand that FOIA generally directs agencies to withhold records only where "the agency reasonably foresees that disclosure would harm an interest protected by" one or more of FOIA's exemptions.

49.   I have concluded that release would result in foreseeable harm to the interests underlying the claimed FOIA exemptions for all the reasons I have described above. There would be foreseeable and concrete harm by release of a document over which the President has asserted executive privilege. Not only would it be contrary to a litigation privilege available to the government, its disclosure in a FOIA case would harm the separation of powers between the Branches by enabling Congress to evade a presidential assertion of executive privilege by submitting a FOIA request. Similarly, I have described at length the law enforcement harms that would result from the disclosure of the audio recording, including the likelihood that such disclosure will chill the cooperation of witnesses in ongoing and future investigations. The foreseeable harm to personal privacy is also apparent, as information about uncharged individuals who cooperate with law enforcement is entitled to the utmost privacy protection.

50.   I also have determined that the audio recording must be withheld in full in order to protect the foreseeable harms identified above. Accordingly, because the entire record is exempt, segregation is not possible.

***

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this __31st__ day of May, 2024.

_____
Bradley Weinsheimer