## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

<table>
<tr><td>

**JUDICIAL WATCH, INC.**

               Plaintiff,

v.

**U.S. DEPARTMENT OF JUSTICE**,

               Defendant.

</td><td>

Case No. 24-cv-700-TJK
  (Consolidated Cases)

Oral Argument Requested

</td></tr>
</table>

<table>
<tr><td>

**THE HERITAGE FOUNDATION, et al.**

               Plaintiffs,

v.

**U.S. DEPARTMENT OF JUSTICE**,

               Defendant.

</td></tr>
</table>

<table>
<tr><td>

**CABLE NEWS NETWORK, INC., et al.**

               Plaintiffs,

v.

**U.S. DEPARTMENT OF JUSTICE**,

               Defendant.

</td></tr>
</table>

### MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
### THE PRESS COALITION'S CROSS-MOTION FOR SUMMARY JUDGMENT
### <u>AND IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT</u>

## **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ................................................................. 1

BACKGROUND AND PROCEDURAL HISTORY ................................................. 4

    I.      The Special Counsel's Investigation ................................................. 4

    II.     The Hur Report ................................................................. 5

    III.    The Interview Transcripts ....................................................... 6

    IV.    The Press Coalition's FOIA Requests And This Lawsuit ....................... 7

ARGUMENT .......................................................................... 8

    I.      STANDARD OF REVIEW ......................................................... 8

    II.     DOJ CANNOT WITHHOLD THE RECORDING UNDER FOIA ...................... 9

          A.     DOJ Cannot Withhold The Recording Under Exemption 5 ................... 9

               1.     DOJ's Exemption 5 claim lacks any supporting authority. ......... 10

               2.     DOJ's Exemption 5 claim ignores the rules of statutory construction. ................................................. 12

               3.     DOJ's Exemption 5 claim violates separation of powers principles. ................................................... 13

          B.     DOJ Cannot Withhold The Recording Under Exemption 7(A) ............... 16

          C.     DOJ Cannot Withhold The Recording Under Exemptions 6 And 7(C) ... 19

               1.     Biden does not have a privacy interest in the Recording. ............ 19

               2.     Any privacy interest Biden might have in the Recording is minimal. ................................................... 22

                3.     The public interest in the Recording is colossal. ................. 23

                4.     Any concern about "deepfakes" favors greater disclosure, not secrecy. ................................................... 26

CONCLUSION ........................................................................ 27

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*100Reporters LLC v. DOJ,*
    248 F. Supp. 3d 115 (D.D.C. 2017) ........................................................................19

*Bartko v. DOJ,*
    898 F.3d 51 (D.C. Cir. 2018) ............................................................................8, 9

*Beck v. DOJ,*
    997 F.2d 1489 (D.C. Cir. 1993) ...........................................................................19

*CREW v. DOJ,*
    658 F. Supp. 2d 217 (D.D.C. 2009) ............................................................ *passim*

*CREW v. DOJ,*
    746 F.3d 1082 (D.C. Cir. 2014) ................................................................. *passim*

*Dean v. FDIC,*
    389 F. Supp. 2d 780 (E.D. Ky. 2005) ....................................................................11

*EPIC v. DOJ,*
    18 F.4th 712 (D.C. Cir. 2021) ..........................................................................22, 23

*Evans v. Fed. Bureau of Prisons,*
    951 F.3d 578 (D.C. Cir. 2020) ............................................................................14

*Genus Med. Techs. LLC v. FDA,*
    994 F.3d 631 (D.C. Cir. 2021) ............................................................................13

*Gray v. U.S. Army Crim. Investigation Command,*
    742 F. Supp. 2d 68 (D.D.C. 2010) .......................................................................17

*Hibbs v. Winn,*
    542 U.S. 88 (2004) ...........................................................................................12

*In Def. of Animals v. NIH,*
    543 F. Supp. 2d 83 (D.D.C. 2008) .........................................................................8

*Juarez v. DOJ,*
    518 F.3d 54 (D.C. Cir. 2008) ......................................................................9, 16, 17

*Judicial Watch v. NARA,*
    876 F.3d 346 (D.C. Cir. 2017) ..........................................................................22, 23

*Larson v. Dep't of State*,
   565 F.3d 857 (D.C. Cir. 2009) ...........................................................................................8

*Mapother v. DOJ*,
   3 F.3d 1533 (D.C. Cir. 1993) ...........................................................................................16

*Marx v. Gen. Revenue Corp.*,
   568 U.S. 371 (2013) .........................................................................................................12

*McGehee v. CIA*,
   697 F.2d 1095 (D.C. Cir. 1983) .........................................................................................2

*Nat'l Ass'n of Retired Fed. Emps. v. Horner*,
   879 F.2d 873 (D.C. Cir. 1989) .........................................................................................22

*New York Times Co. v. NASA*,
   782 F. Supp. 628 (D.D.C. 1991) ................................................................................21, 25

*New York Times Co. v. NASA*,
   852 F.2d 602 (D.C. Cir. 1988) .........................................................................................21

*New York Times Co. v. NASA*,
   920 F.2d 1002 (D.C. Cir. 1990) (en banc) ..............................................................20, 21, 25

*NLRB v. Sears, Roebuck & Co.*,
   421 U.S. 132 (1975) ..............................................................................................14, 17, 18

*Pike v. DOJ*,
   306 F. Supp. 3d 400 (D.D.C. 2016) ............................................................................21, 22

*Prop. of People v. DOJ*,
   310 F. Supp. 3d 57 (D.D.C. 2018) ...................................................................................23

*Pub. Citizen, Inc. v. OMB*,
   598 F.3d 865 (D.C. Cir. 2010) ...........................................................................................8

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
   566 U.S. 639 (2012) .........................................................................................................13

*Reporters Comm. for Freedom of the Press v. FBI*,
   3 F.4th 350 (D.C. Cir. 2021) ...........................................................................................17

*Shapiro v. DOJ*,
   153 F. Supp. 3d 253 (D.D.C. 2016) .................................................................................18

*Stern v. FBI*,
   737 F.2d 84 (D.C. Cir. 1984) ...........................................................................................23

*Trump v. Mazars USA, LLP*,
140 S. Ct. 2019 (2020) ........................................................................................9

*United States v. Alvarez*,
567 U.S. 709 (2012) ......................................................................................26, 27

*United States v. Askew*,
529 F.3d 1119 (D.C. Cir. 2008) (en banc) .............................................................20

*United States v. Criden*,
648 F.2d 814 (3d Cir. 1981) .................................................................................23

*United States v. Dionisio*,
410 U.S. 1 (1973) ...........................................................................................3, 20

*United States v. Mara*,
410 U.S. 19 (1973) .............................................................................................20

*Washington Post Co. v. Dep't of Health & Hum. Servs.*,
690 F.2d 252 (D.C. Cir. 1982) ............................................................................3, 25

*Williams v. Taylor*,
529 U.S. 362 (2000) ............................................................................................12

*Youngstown Sheet & Tube Co. v. Sawyer*,
343 U.S. 579 (1952) ......................................................................................14, 15

*Zivotofsky v. Kerry*,
576 U.S. 1 (2015) ...............................................................................................14

## Statutes and Other Authorities

5 U.S.C. § 552 ...................................................................................... *passim*

28 C.F.R. § 600.8(c) ...............................................................................5

## PRELIMINARY STATEMENT

In February 2024, Special Counsel Robert K. Hur faced one of the weightiest decisions any prosecutor could ever make: whether to file criminal charges against the sitting President of the United States. That decision arrived at the conclusion of the Special Counsel's yearlong investigation into classified documents found at President Joseph R. Biden Jr.'s former office and private residence, which included a five-hour interview of Biden himself. This Freedom of Information Act ("FOIA") suit now seeks the release of the audio recording of that interview (the "Recording") – a historic record of a sitting President answering a federal prosecutor's questions under oath. No purported law enforcement, executive privilege, or privacy interest can outweigh the American public's pressing interest in hearing that interview for ourselves.

Hur ultimately declined to charge Biden in connection with the classified records, and in his official report explaining that decision (the "Hur Report"), Hur wrote that Biden had "present[ed] himself" during the interview "as a sympathetic, well-meaning, elderly man with a poor memory," which Hur claimed would make it "difficult to convince a jury that they should convict him." *See* Decl. of Charles D. Tobin ("Tobin Decl.") Ex. A (Hur Report) at 6. Hur later testified before Congress that this assessment of Biden "was based on all of the evidence, *including the audio recordings*" of the interview. *See id.* Ex. B (*Special Counsel Hur Testifies On Biden Classified Docs Investigation*, CNN (Mar. 12, 2024)) at 4 (emphasis added).

If FOIA is to have any real meaning, it must require the release of Biden's interview recording. The health of our democracy relies on transparency into and trust in our government. That trust in the Special Counsel's weighty decision is best served through public review of the Recording on which the head prosecutor expressly relied. As the D.C. Circuit has made clear, one "specific goal" of FOIA is "to give citizens access to the information on the basis of which government agencies make their decisions, thereby equipping the populace to evaluate and

1

criticize those decisions." *McGehee v. CIA*, 697 F.2d 1095, 1108 (D.C. Cir. 1983), *on reh'g*, 711 F.2d 1076 (D.C. Cir. 1983).

While the Special Counsel has released a redacted written transcript of the President's interview, that alone does not permit the public to "evaluate" and if appropriate "criticize" the Special Counsel's determination of how a jury might assess Biden's culpability.  Release of the audio would allow the public to assess the demeanor of the interview participants, the tenor of their conversation, and their tone of voice, none of which can be discerned from a cold transcript.

Given the Recording's importance to the public, thirteen press organizations (the "Press Coalition") requested a copy of the Recording from the Department of Justice ("DOJ"), but DOJ denied all of those requests.  The Press Coalition now challenges DOJ's withholding as improper under FOIA.  For three principal reasons, DOJ has failed to justify keeping the Recording secret.

**<u>First</u>**, without any precedential support, DOJ claims that it can withhold the Recording under the "law enforcement privilege," which DOJ contends is a subcategory of executive privilege.  No case accepts this argument.  In fact, DOJ concedes that this very argument failed in *CREW v. DOJ*, 658 F. Supp. 2d 217 (D.D.C. 2009), where DOJ tried to assert the same exact combination of "law enforcement privilege" and Exemption 5 to withhold a transcript of Vice President Cheney's Special Counsel interview.  Here, as there, DOJ's argument amounts to an end-run around FOIA – which already includes a robust and established law enforcement exemption – in violation of statutory construction rules and separation of powers principles.  This Court should reach the same conclusion as *CREW* and reject DOJ's Exemption 5 claim.

**<u>Second</u>**, DOJ resorts to a straw-man argument, claiming that it can withhold the recording under Exemption 7(A) because, DOJ speculates, releasing this Recording might lead unknown witnesses in unrelated and unspecified investigations at some future time to worry

more than they already do about sitting for recorded interviews.  This argument stretches Exemption 7(A) beyond reason and well past the clear limits that the D.C. Circuit has long imposed.  DOJ even effectively admits that its arguments on Exemption 7(A) lack support in this Circuit by stating that it has raised them to preserve them for possible future appeals.

**Third**, citing the exact properties of the Recording that make the Recording's release of compelling public interest, DOJ relies on Exemptions 6 and 7(C), claiming the need to protect the President's "privacy interest" in "the sound of his voice" and its "tone and manner" during the interview.  This argument also fails under controlling precedent: the Supreme Court has held that an individual (let alone the President) *does not have* a reasonable expectation of privacy in the "sound of his voice" or "its tone and manner."  *United States v. Dionisio*, 410 U.S. 1, 14 (1973).  Moreover, even if Biden had a cognizable privacy interest in the Recording (he does not), that interest would be modest in these circumstances and easily outweighed by the monumental public interest in assessing the Special Counsel's decision not to bring criminal charges against the sitting President.

Allowing members of the public to hear the President's sworn testimony for themselves fulfills "the purpose of FOIA," which is "to permit the public to decide *for itself* whether government action is proper."  *Washington Post Co. v. Dep't of Health & Hum. Servs.*, 690 F.2d 252, 264 (D.C. Cir. 1982) (emphasis added).  For those reasons, and as set forth in more detail below, the Court should deny DOJ's motion for summary judgment, grant the Press Coalition's cross-motion for summary judgment, order DOJ to release the Recording with only those limited redactions found in the public version of the interview transcript, and allow the Press Coalition to recover the expenses of litigating this FOIA lawsuit.

## BACKGROUND AND PROCEDURAL HISTORY

**I.      The Special Counsel's Investigation**

On January 9, 2023, the public learned that Biden's personal attorneys had found documents marked classified two months earlier while packing up files at the Penn Biden Center for Diplomacy and Global Engagement in Washington, DC.  *See, e.g.*, Tobin Decl. Ex. C (Adriana Diaz et al., *U.S. attorney reviewing documents marked classified from Joe Biden's vice presidency found at Biden think tank*, CBS News (Jan. 10, 2023)).  The public also learned that Attorney General Merrick Garland had initially assigned U.S. Attorney John Lausch "to find out how the material marked classified ended up at the Penn Biden Center."  *Id.* at 3.  Three days later, on January 12, 2023, the White House confirmed that Biden's attorneys had located a second set of documents with classification markings at Biden's private residence in Wilmington.  *See, e.g.*, *id.* Ex. D (Ben Gittleson, *More classified documents found in garage at Biden's Wilmington home, White House says*, ABC News (Jan. 12, 2023)).

That same day, the Attorney General announced that he had appointed U.S. Attorney Robert K. Hur "to serve as Special Counsel" and "conduct the investigation" into the "possible unauthorized removal and retention of classified documents or other records discovered at the Penn Biden Center for Diplomacy and Global Engagement and the Wilmington, Delaware private residence of President Joseph R. Biden, Jr."  *See* ECF 34-5 (Order No. 5588-2023, *Appointment of Robert K. Hur as Special Counsel*, DOJ (Jan. 12, 2023)).

In August 2023, news reports revealed that Hur's office and Biden's attorneys were negotiating "over the terms under which [Biden] would be interviewed," including "whether the interview would be in person and, if so, where it might happen – as well as the range of topics and questions that would be covered."  *See, e.g.*, Tobin Decl. Ex. E (Monica Alba & Carol E. Lee, *Biden attorneys in talks with federal prosecutors over terms of his interview in classified*

*documents case*, NBC News (Aug. 11, 2023)) at 1-2.  Hur ultimately interviewed Biden in person, for approximately five hours, on October 8-9, 2023.  *See id.* Ex. A at 210.

## II.     The Hur Report

On February 5, 2024, Hur transmitted to Garland a "'confidential report explaining the prosecution or declination decisions'" that Hur had reached as to Biden.  *See id.* Ex. A at 1 (quoting 28 C.F.R. § 600.8(c)).  On February 7, 2024, Garland notified House and Senate Judiciary Committee leadership that Hur had concluded his investigation.  *See id.* Ex. F (Ltr. from Att'y Gen. Garland to Sen. Durbin et al. (Feb. 7, 2024)).  Garland stated that he is "committed to making as much of the [Hur Report] public as possible, consistent with legal requirements and Department policy."  *Id.*

On February 8, 2024, the Department of Justice ("DOJ") released the Hur Report, which declined to charge Biden in connection with the classified documents investigation.  A key section of the Hur Report was the description of Biden's interview with Hur and its impact on his office's ultimate decision not to charge the President.  Hur wrote:

> We have also considered that, at trial, Mr. Biden would likely present himself to a jury, as he did during our interview of him, as a sympathetic, well-meaning, elderly man with a poor memory. Based on our direct interactions with and observations of him, he is someone for whom many jurors will want to identify reasonable doubt. It would be difficult to convince a jury that they should convict him—by then a former president well into his eighties—of a serious felony that requires a mental state of willfulness.

*See id.* Ex. A at 6.  In line with this passage, Hur repeatedly characterized Biden's memory as "hazy" and "faulty" and stated that Biden exhibited "diminished faculties in advancing age."  *Id.* at 208, 248, 242.  Hur wrote that Biden "did not remember when he was vice president" and that "[h]e did not remember, even within several years, when his son Beau died."  *Id.* at 208.

In correspondence released with the Hur Report, White House attorneys flatly disputed and put at issue Hur's characterization of Biden's memory, writing that they "do not believe that the report's treatment of President Biden's memory is accurate or appropriate" and that "there is ample evidence from your interview that the President did well in answering your questions about years-old events over the course of five hours." *Id.* at 384.  In remarks to the press, Biden likewise forcefully disputed Hur's characterization of his memory.  *See, e.g.*, Tobin Decl. Ex. G (Justin Gomez & Luke Barr, *Biden rages that 'you think I would ... forget the day my son died?' after special counsel report*, ABC News (Feb. 9, 2024)).

The Special Counsel and the White House clearly have divergent views as to the President's mental acuity during the interview.  But there is no dispute that Biden's perceived acuity was a key factor in Hur's charging decision, nor that Hur's characterization of Biden became a political concern for the White House in this election year.  Without hearing the interview for itself, the public simply has no way of assessing who has the more accurate view.

## III.    The Interview Transcripts

On March 12, 2024, Hur testified before the House Judiciary Committee about his investigation and decision not to charge Biden and "stood steadfastly by the assessments in his 345-page report that questioned Biden's age and mental competence."  *See, e.g.*, *id.* Ex. H (Zeke Miller et al., *Congressional hearing on the Biden classified documents probe turns into a proxy campaign battle*, AP (Mar. 13, 2024)) at 2.

That same day, DOJ and Congress released transcripts of Biden's interview with Hur. *See id.*  Those transcripts "provide[] a fuller picture of the five-hour conversation between the two and context around some of the statements that appeared in the report," including that "[w]hile the president did stumble over some dates and facts, he recalled many others clearly, frequently describing events or details from years ago."  *See, e.g.*, *id.* Ex. I (Kaia Hubbard &

Robert Legare, *Robert Hur defends special counsel report at tense House hearing on Biden documents probe*, CBS News (Mar. 12, 2024)) at 3.

During the hearing, Judiciary Committee Chair Rep. Jim Jordan questioned Hur about "the audio tapes of the people you interviewed during your investigation" and asked, "Is there any reason you can see why the American people and their representatives in the United States Congress should not have access to those tapes?"  Hur responded:

> [W]hat I can tell you is that my assessment that went into my conclusions that I describe in my report was based not solely on the transcript.  It was based on all of the evidence, including the audio recordings. . . . [T]he audio recordings were part of the evidence, of course, that I considered in coming to my conclusions.

*See id.* Ex. B at 4.

## IV.    The Press Coalition's FOIA Requests And This Lawsuit

Between February 16, 2024 and April 1, 2024, each of the Press Coalition plaintiffs submitted a FOIA request to DOJ for the recording of Biden's interview with the Special Counsel.  *See* Am. Compl. Exs. A, C, E, G, I, K, M, O, Q, S, U, W (ECF No. 26-1).  DOJ constructively denied each of those requests.  *See id.* ¶¶ 46-47 (ECF No. 26).

Plaintiff Cable News Network, Inc. ("CNN"), the first of the Press Coalition plaintiffs to submit its request, filed a FOIA lawsuit against DOJ on April 4, 2024, which was docketed as Case No. 24-cv-961-RDM and assigned to the Honorable Randolph D. Moss.  On May 3, 2024, that lawsuit was consolidated with two related lawsuits into the present action.  *See* Reassignment of Civil Case (ECF 7).  Twelve additional Press Coalition plaintiffs then joined CNN in this consolidated action on May 15, 2024.  *See* Am. Compl. (ECF 26).

The following day, in response to congressional subpoenas, Biden asserted executive privilege over the Recording.  *See* ECF No. 34-8 (May 16, 2024 Ltr. from Att'y Gen. Garland to Reps. Jordan and Comer).  In requesting that assertion of privilege, Garland explained that "the

concern at issue here" is that "disclosure might hamper prosecutorial efforts in future cases." *See* ECF No. 34-7 (May 15, 2024 Ltr. from Att'y Gen. Garland to President Biden) at 5.

On May 31, 2024, DOJ moved for summary judgment (ECF 34).  In its Memorandum of Points and Authorities in Support of that Motion ("DOJ Mem."), DOJ argues that it properly withheld the Recording under Exemptions 5, 6, 7(A), and 7(C).  *See generally* ECF 34-1.  The Press Coalition now opposes DOJ's motion for summary judgment and cross-moves for summary judgment on the grounds that DOJ's withholding is improper under FOIA.

## ARGUMENT

### I.   STANDARD OF REVIEW

A court reviewing motions for summary judgment in a FOIA case must conduct a *de novo* review of the record "to ascertain whether the agency has sustained its burden of demonstrating that the documents are not agency records or are exempt from disclosure under the FOIA."  *In Def. of Animals v. NIH*, 543 F. Supp. 2d 83, 92-93 (D.D.C. 2008) (cleaned up).  A court may then grant summary judgment to the government only if the government's filings "describe the justifications for nondisclosure with *reasonably specific* detail, demonstrate that the information withheld *logically* falls within the claimed exemption, and are *not controverted* by either contrary evidence in the record nor by evidence of agency bad faith."  *Larson v. Dep't of State*, 565 F.3d 857, 862 (D.C. Cir. 2009) (emphasis added) (citation omitted).

Underlying this analysis is the principle that FOIA's objective is "to pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny," and that its exemptions should be "construed narrowly in keeping with FOIA's presumption in favor of disclosure."  *Pub. Citizen, Inc. v. OMB*, 598 F.3d 865, 869 (D.C. Cir. 2010) (quoting *Dep't of Air Force v. Rose*, 425 U.S. 352, 360-61 (1976)).  Accordingly, the government "bears the burden of proving that an exemption applies."  *Bartko v. DOJ*, 898 F.3d 51, 62 (D.C. Cir. 2018).

## II.     DOJ CANNOT WITHHOLD THE RECORDING UNDER FOIA

DOJ has not justified withholding the Recording under FOIA.  On Exemption 5, DOJ's executive privilege claim failed in prior cases in which DOJ attempted the same argument, and it fails here once again as a matter of statutory construction and constitutional principles.  On Exemption 7(A), DOJ has failed to show that releasing the Recording would interfere with a "*concrete* prospective law enforcement proceeding."  *Juarez v. DOJ*, 518 F.3d 54, 59 (D.C. Cir. 2008) (emphasis added).  And on Exemptions 6 and 7(C), DOJ fails to acknowledge, let alone distinguish, controlling precedent that individuals have *no* privacy interest in the sound of their voice.  Nor could DOJ possibly identify a privacy interest in this particular Recording – which memorializes a sitting President being questioned as part of a criminal investigation – sufficient to overcome the colossal public interest in oversight of the decision not to charge him.  Any privacy interest in the Recording is vanishingly small, while the public interest is at its zenith.

### A.     DOJ Cannot Withhold The Recording Under Exemption 5

Exemption 5 does not apply to the Recording, and DOJ's attempt to reinvent its reach should fail here just as it has failed previously.  Exemption 5 permits the government to withhold "inter-agency or intra-agency memorandums or letters" that it would not have to produce to a litigation adversary in discovery.  5 U.S.C. § 552(b)(5).  As the D.C. Circuit has noted, "Exemption 5 is most commonly invoked to protect the deliberative-process privilege, the attorney work-product privilege, and the attorney-client privilege."  *Bartko*, 898 F.3d at 70.

But those common Exemption 5 claims are not at issue here.  Instead, in circular fashion, DOJ claims that it can withhold the Recording under Exemption 5 because "[t]he President has formally asserted executive privilege" over it.  DOJ Mem. at 7.  Making this case even more of an outlier, DOJ is not asserting executive privilege in its usual posture, which "safeguards the public interest in candid, confidential deliberations within the Executive Branch."  *Trump v.*

*Mazars USA, LLP*, 140 S. Ct. 2019, 2032 (2020).  The Recording clearly is not a "confidential deliberation" with the President: a transcript of the interview is now public record that anyone can read.  Instead, DOJ invents a new subspecies of executive privilege, the so-called "law enforcement" privilege, which according to DOJ "protects materials related to a closed criminal investigation where disclosure might hamper prosecutorial efforts in future cases."  DOJ Mem. at 10 (internal marks omitted).  This Court should decline to recognize DOJ's self-serving privilege argument, just as another Court in this District has so declined.  *CREW*, 658 F. Supp. 2d at 232.

> 1. **DOJ's Exemption 5 claim lacks any supporting authority.**

*CREW* arose out of another Special Counsel investigation into high-level handling of classified information, there the disclosure that Valerie Plame was "a covert operative for the Central Intelligence Agency."  *Id.* at 219.  The Special Counsel interviewed "a number of senior White House officials" as part of that investigation, including Vice President Cheney.  *Id.* at 220. The House Committee on Oversight and Government Reform also conducted a parallel investigation and issued a subpoena to DOJ for a transcript of Cheney's interview, prompting the Attorney General to ask the President to assert executive privilege over that record.  There, as here, the President asserted the privilege as asked.  *Id.* at 220-21.

At the same time, the *CREW* plaintiff submitted a FOIA request to the FBI for a copy of the Cheney interview transcript and filed suit when that request was denied.  *Id.* at 222.  On summary judgment, the government argued that "the law enforcement privilege," which they described as a subcategory of executive privilege, "shields the entirety of the requested records from disclosure, because release of the documents 'could impair a class of law enforcement investigations, namely investigations involving the conduct of White House officials.'"  *Id.* at 231-32.  The plaintiff responded that "no court has ever recognized the law enforcement privilege within the context of Exemption 5, that the only court that appears to have considered it

expressly rejected the notion," *id.* (cleaned up),[1] and that "any 'privilege' of the sort DOJ seeks to raise here is incorporated into Exemption 7," Mem. in Opp. to Def.'s Mot. for Summ. J. at 14-15, *CREW v. DOJ*, No. 08-cv-1468-EGS (D.D.C. Oct. 30, 2008), ECF 9.  The plaintiff thus criticized DOJ for making Exemption 7 arguments "masquerading as Exemption 5 claims."  *Id.*

When the Court at oral argument pressed the government "to articulate a meaningful distinction between the scope of Exemption 7(A) and the law enforcement privilege that DOJ asserts should be recognized under Exemption 5," DOJ conceded that there was none – instead taking the position that the "the two are 'co-extensive.'"  *CREW*, 658 F. Supp. 2d at 232.  That "concession" allowed the court to avoid directly "reach[ing] the question of whether a law enforcement privilege should be recognized under Exemption 5."  *Id.*  The court explained, however, that "it would not be inclined to" recognize the law enforcement privilege under Exemption 5 because "Exemptions 6 and 7 already protect the law enforcement interests that are traditionally of concern in the civil litigation context."  *Id.* at 232 n.9.

Fifteen years later, history repeats itself.  A Special Counsel has again interviewed a senior White House official (this time the President).  The House of Representatives has again subpoenaed DOJ for a record of that interview (this time the audio recording).  At DOJ's urging, the President has again asserted executive privilege in rejecting that subpoena.  Members of the public (this time including more than a dozen press organizations) have again requested that same interview record under FOIA.  And DOJ has again claimed that an assertion of executive privilege provides the President with unilateral and incontrovertible authority to withhold that

---

[1] The *CREW* plaintiff was referring to *Dean v. FDIC*, 389 F. Supp. 2d 780, 791-92 (E.D. Ky. 2005), where the court stated that it was "unwilling to recognize the 'law enforcement privilege' in the present case" and observed that "if this privilege were to be recognized at all, it should be recognized under Exemption 7, not Exemption 5."

record from the public under Exemption 5.  Despite these striking parallels, DOJ makes no real

effort to distinguish *CREW*.  *See* DOJ Mem. at 34.  Nor can DOJ cite a *single* case rejecting

*CREW* or recognizing an assertion of "law enforcement privilege" under Exemption 5.  This

Court should not be the first to do so – especially not when the government has also asserted

FOIA's law enforcement exemption, 7(A).

>    **2.**    **DOJ's Exemption 5 claim ignores the rules of statutory construction.**

In addition to lacking any supporting authority, DOJ's Exemption 5 claim fails because it

violates two basic rules of statutory construction: the "canon against surplusage" and the

principle that "the specific governs the general."

**First**, construing Exemption 5 as including a law enforcement variant of executive

privilege would violate the "cardinal principle of statutory construction that [courts] must give

effect, if possible, to every clause and word of a statute," *Williams v. Taylor*, 529 U.S. 362, 404

(2000), which is another way of saying that "[a] statute should be construed so that effect is

given to all its provisions, so that no part will be inoperative or superfluous, void or

insignificant," *Hibbs v. Winn*, 542 U.S. 88, 101 (2004) (quoting 2A N. Singer, *Statutes and

Statutory Construction* § 46.06, pp. 181-86).  This canon is strongest when a proposed

interpretation "would render superfluous another part of the same statutory scheme."  *Marx v.

Gen. Revenue Corp.*, 568 U.S. 371, 386 (2013).

Here, DOJ claims that it can assert a "law enforcement privilege" via Exemption 5 to

withhold records "where disclosure *might* hamper prosecutorial efforts in future cases."  DOJ

Mem. at 10 (emphasis added).  But DOJ's claim to such authority under Exemption 5 would

render superfluous Exemption 7(A), because if DOJ could withhold any law enforcement record

under Exemption 5 merely by asserting that its disclosure *might* interfere with unspecified future

prosecutorial efforts, DOJ would have no need *ever* to assert Exemption 7(A).  In future cases

DOJ could simply claim executive privilege over law enforcement records and avoid the heavier, congressionally mandated burden of showing that disclosure could "*reasonably be expected to interfere with enforcement proceedings.*" *See* 5 U.S.C. § 552(b)(7)(A) (emphasis added).

**Second**, DOJ's interpretation of Exemption 5 violates "the old and familiar rule that the specific governs the general." *Genus Med. Techs. LLC v. FDA*, 994 F.3d 631, 638 (D.C. Cir. 2021) (cleaned up). This rule is especially applicable where, as here, "Congress has enacted a comprehensive scheme and has deliberately targeted specific problems with specific solutions." *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012). DOJ cannot dispute that Congress deliberately targeted Exemption 7(A) – and not Exemption 5 – to address the specific problem that disclosure of agency records can potentially cause to law enforcement proceedings. The standard for statutory interpretation thus provides that, since Exemption 7(A) is "a detailed provision that spells out the requirements" for withholding law enforcement records out of concern over interference with enforcement proceedings, while Exemption 5 "is a broadly worded provision that says nothing about such" law enforcement concerns, "[t]he general/specific canon explains that the 'general language' of [Exemption 5] . . . will not be held to apply to a matter specifically dealt with in [Exemption 7(A)]." *Id.* at 646.

Because DOJ's interpretation of Exemption 5 as encompassing a "law enforcement privilege" violates these basic principles of statutory construction, the Court should reject DOJ's argument and conclude that DOJ cannot withhold the Recording under Exemption 5.

### 3.   DOJ's Exemption 5 claim violates separation of powers principles.

DOJ's interpretation of Exemption 5 as including a "law enforcement privilege" also violates constitutional protections for the separation of powers. By enacting Exemption 7 and its six subparts, Congress has enumerated the limited circumstances in which an agency can refuse to release "records or information compiled for law enforcement purposes." 5 U.S.C.

§ 552(b)(7).  That includes subpart 7(A), which provides that withholding is permissible only when disclosure "could reasonably be expected to interfere with enforcement proceedings," *id.* § 552(b)(7)(A), and which further "require[s] a law enforcement agency invoking the exception to show that the material withheld relates to a concrete prospective law enforcement proceeding" that "must remain pending at the time of" the withholding.  *CREW v. DOJ*, 746 F.3d 1082, 1097 (D.C. Cir. 2014) (cleaned up).  Congress thus "establish[ed] a general philosophy of full agency disclosure unless information is exempted under clearly delineated statutory language."  *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 136 (1975) (quoting S. Rep. No. 89-813, at 3 (1965)); *see also Evans v. Fed. Bureau of Prisons*, 951 F.3d 578, 586 (D.C. Cir. 2020) ("[T]he congressional philosophy in the adoption of FOIA favors disclosure, not concealment.").

Now, however, DOJ declares that the President can ignore these statutory requirements and withhold *any* law enforcement record – even one "related to a *closed* criminal investigation" – so long as the President believes that "disclosure *might* hamper prosecutorial efforts" in unspecified "*future* cases."  *See* ECF 34-7 at 5 (emphasis added).  The Supreme Court has long held that where "the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb, for then he can rely only upon his own constitutional powers minus any constitutional powers of Congress over the matter."  *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637-38 (1952) (Jackson, J., concurring); *accord Zivotofsky v. Kerry*, 576 U.S. 1, 10 (2015) (noting that courts follow Justice Jackson's "familiar" concurrence in *Youngstown* when "considering claims of Presidential power").  Claims to such a "conclusive and preclusive" power "must be scrutinized with caution, for what is at stake is the equilibrium established by our constitutional system."  *Youngstown Sheet & Tube Co.*, 343 U.S. at 637-38.

In claiming this inherent executive authority to bypass Congress's adoption of Exemption 7, DOJ relies entirely on prior assertions of the privilege outside the context of FOIA set out in opinions rendered by DOJ's own Office of Legal Counsel.  *See* DOJ Mem. at 8-10 & n.5.  DOJ also suggests that Article II, Section 3 of the Constitution, which provides that the President "shall take Care that the Laws be faithfully executed," somehow justifies *ignoring* the statutory limits on withholding under Exemption 7.  *See id.*  Under the *Youngstown* framework, however, the President's power is at its lowest point in asserting inherent authority to withhold public records in a manner incompatible with Congress's will, as expressed in FOIA.  DOJ's argument for an expansion of Exemption 5, to countermand the result of a claim under Exemption 7(A), thus "represents an exercise of authority *without* law."  *See Youngstown*, 343 U.S. at 655 (emphasis added).  If accepted, this argument would permit President Biden and any future President to withhold law enforcement records at will – even, as is the case here, records of an investigation into potential wrongdoing by the President himself.

These separation of powers principles weigh squarely against adopting DOJ's rudderless interpretation of Exemption 5.[2]  Given those constitutional concerns, the statutory construction issues with DOJ's interpretation, and the lack of any authority supporting that interpretation, this Court should reject DOJ's claim that it can withhold the Recording under Exemption 5.

---

[2] The lasting ramifications of DOJ's executive privilege claim also rebut its "constitutional avoidance" argument.  DOJ claims that not recognizing its claim of law enforcement privilege under Exemption 5 would "nullify a formal presidential assertion of executive privilege" and "raise substantial constitutional questions," such that, under the canon of constitutional avoidance, "so long as Exemption 5 can reasonably be read to allow the government to withhold a record that is subject to a formal invocation of privilege . . . , that interpretation must be selected."  DOJ Mem. at 13.  Setting aside that Exemption 5 *cannot* reasonably be read the way DOJ prefers in light of the statutory construction rules discussed above, DOJ ignores that its view of Exemption 5, which would nullify Congress's enactment of Exemption 7(A), *also* raises substantial constitutional questions.  The constitutional avoidance canon thus offers DOJ no help.

**B.      DOJ Cannot Withhold The Recording Under Exemption 7(A)**

DOJ's assertion that it can withhold the Recording under Exemption 7(A) fails for many

of the same reasons as its Exemption 5 argument.  Under Exemption 7(A), an agency may

withhold law enforcement records only where release of those records "could reasonably be

expected to interfere with enforcement proceedings."  *See* 5 U.S.C. § 552(b)(7)(A).  The D.C.

Circuit has explained that, under this exemption, "[t]o justify withholding," DOJ must show that

releasing the Recording "(1) could reasonably be expected to interfere with (2) enforcement

proceedings that are (3) pending or reasonably anticipated.'"  *CREW*, 746 F.3d at 1096 (quoting

*Mapother v. DOJ*, 3 F.3d 1533, 1540 (D.C. Cir. 1993)).  For four reasons, DOJ cannot and does

not carry this burden here.

**First**, DOJ cannot dispute that the Recording relates to a *closed* investigation, such that

release of the Recording cannot interfere with that investigation as a matter of law.  *See, e.g.*,

*CREW*, 746 F.3d at 1097 ("Exemption 7(A) is temporal in nature.") (cited in DOJ Mem. at 30).

DOJ is not "continu[ing] to gather evidence for a possible future criminal case" such that its

"case would be jeopardized by the premature release of that evidence."  *Juarez*, 518 F.3d at 59.

That Exemption 7(A) rationale is thus inapplicable here.

**Second**, to the extent DOJ claims that release of the Recording will interfere with *other*,

*unrelated* investigations, those claims are too generalized and speculative to justify the

withholding, particularly under FOIA's foreseeable harm standard.  DOJ claims that releasing

the Recording "may make witnesses or potential witnesses in those investigations reasonably

fear that if they sat for a recorded interview, audio recordings of their interview would ultimately

be released to either Congress or the public," which may "make witnesses (1) less likely to sit for

an interview in the first instance, (2) less likely to consent to recording if they do sit for an

interview, or (3) less forthcoming in their responses if they agree to sit for a recorded interview."

16

DOJ Mem. at 31 (citing Weinsheimer Decl. ¶ 35).  But DOJ could make the same argument in

response to *any* request for *any* recorded interviews in *any* closed investigation or case of interest

to the public, which makes DOJ's argument the type of generalized and hypothetical claim that

the D.C. Circuit has rejected as insufficient.  *See Reporters Comm. for Freedom of the Press v.*

*FBI*, 3 F.4th 350, 371 (D.C. Cir. 2021) (rejecting "cookie-cutter formulations [that] nowhere

explain why actual harm would foreseeably result from release of the specific type of material at

issue here" and reaffirming that "boilerplate, unparticularized, and hypothesized assertion[s] of

harm" are "insufficient" to satisfy the foreseeable harm test); *see also, e.g.*, *Gray v. U.S. Army*

*Crim. Investigation Command*, 742 F. Supp. 2d 68, 75 (D.D.C. 2010) (rejecting 7(A) claim

where government's arguments "appear designed to cover every scenario in which a plaintiff

seeks the disclosure of records related to a law enforcement proceeding").

    **Third**, DOJ effectively concedes that its stated concern over impeding "reasonably

anticipated, future high-profile investigations involving White House officials" does not satisfy

the requirement of identifying a "specific" or "concrete" law enforcement proceeding.  DOJ

Mem. at 34-35.  DOJ admits that the D.C. Circuit has recognized this "concreteness"

requirement as a component of Exemption 7(A).  *Id.*; *see also, e.g.*, *CREW*, 746 F.3d at 1097

("We therefore 'require a law enforcement agency invoking the exception to show that the

material withheld 'relates to a concrete prospective law enforcement proceeding.'") (quoting

*Juarez*, 518 F.3d at 58).  But DOJ now claims that this "precedent was wrongly decided," and so

DOJ "preserves its right to seek further review to correct it."  DOJ Mem. at 34-35.  While DOJ is

free to preserve arguments for possible appeal, it bears note that this requirement is not merely a

matter of "D.C. Circuit precedent" as DOJ suggests.  *Id.*  Rather, it comes from the Supreme

Court's ruling in *NLRB*, which quoted the Senator whose amendment to FOIA gave rise to the

modern version of Exemption 7(A).  *See NLRB*, 437 U.S. at 227.  Contrary to DOJ's argument, therefore, the 7(A) test stems from Supreme Court precedent, not just D.C. Circuit case law.

**Fourth**, DOJ never raises a claim under Exemption 7(E), which it could not possibly satisfy.  But its 7(A) claim inappropriately parrots the arguments typically made under 7(E).  Again, the concern under Exemption 7(A) is that "the release of information in investigatory files prior to the completion of an actual, contemplated enforcement proceeding," such that "the Government's case in court—a concrete prospective law enforcement proceeding—would be harmed by the premature release of evidence or information."  *NLRB*, 437 U.S. at 232 (internal marks omitted).  Knowing it cannot establish that the investigation of President Biden is still an "actual, contemplated enforcement proceeding," DOJ instead asserts that "recording interviews is a highly useful law enforcement tool" and that this "tool" will become less "useful" if witnesses or potential witnesses hear the Recording and grasp that the recordings of their interviews, too, may one day become public.  *See* DOJ Mem. at 29-30; *see also* Weinsheimer Decl. ¶¶ 27-31.  That is tantamount to a claim that this law enforcement technique is too sensitive to be released, a classic 7(E) argument.  *See* 5 U.S.C. § 552(b)(7)(E) (permitting agency to withhold law enforcement records that "would disclose techniques and procedures for law enforcement investigations or prosecutions" where that disclosure "could reasonably be expected to risk circumvention of the law.").  Indeed, not only did DOJ never raise a 7(E) claim, it also knows full well that doing so would have been fruitless, as "the purpose of Exemption 7(E) is to prevent the public from learning about the existence of *confidential* law enforcement techniques, not to prevent it from learning about the use of *already-disclosed* law enforcement techniques." *Shapiro v. DOJ*, 153 F. Supp. 3d 253, 273 (D.D.C. 2016) (emphasis added).

Because DOJ cannot show that releasing the Recording could reasonably be expected to interfere with any "actual, contemplated" law enforcement proceeding, DOJ has failed to justify withholding the Recording under Exemption 7(A).

**C.      DOJ Cannot Withhold The Recording Under Exemptions 6 And 7(C)**

DOJ makes the unpersuasive final argument that "the privacy interests at stake in the [Recording] far outweigh the potential public interest in disclosure," such that the agency can withhold the Recording under Exemptions 6 and 7(C).  DOJ Mem. at 15-27; *see also* Weinsheimer Decl. ¶¶ 37-42.  Exemption 6 provides that records may be withheld only if they are "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(6).  Exemption 7(C) similarly authorizes an agency to withhold "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . could reasonably be expected to constitute an unwarranted invasion of personal privacy."  *Id.* § 552(b)(7)(C).  Thus, "[b]oth exemptions require agencies and reviewing courts to 'balance the privacy interests that would be compromised by disclosure against the public interest in the release of the requested information.'" *100Reporters LLC v. DOJ*, 248 F. Supp. 3d 115, 158 (D.D.C. 2017) (quoting *Beck v. DOJ*, 997 F.2d 1489, 1491 (D.C. Cir. 1993))). Here, this balancing test squarely favors disclosure because Biden—the sitting President—has no cognizable privacy interest in the Recording as a matter of law, and because the mammoth public interest in the Recording clearly outweighs any conceivable privacy interest in the Recording.

**1.      Biden does not have a privacy interest in the Recording.**

DOJ's privacy argument fails at the outset because, as a matter of law, Biden does not have a privacy interest in the Recording, especially given the release of the written transcript. Recognizing that there is no justification based on the content of the interview, DOJ instead

19

argues that Biden "retains a substantial privacy interest" in the Recording because it "contains the sound of his voice and captures his tone and manner during a particularly sensitive time (an interview with a prosecutor)."  DOJ Mem. at 18.  The Supreme Court has expressly held, however, that an individual *does not* have a privacy interest in "the sound of his voice" or "its tone and manner" distinct from his privacy interest in "the content of a specific conversation." *Dionisio*, 410 U.S. at 14; *accord United States v. Mara*, 410 U.S. 19, 21 (1973) ("[T]here is no more expectation of privacy in the physical characteristics of a person's script than there is in the tone of his voice."); *United States v. Askew*, 529 F.3d 1119, 1139 (D.C. Cir. 2008) (en banc) (noting that in *Dionisio* and *Mara* the Supreme Court held that "no individual can have a reasonable expectation of privacy in the physical characteristics of his tone of voice").  Because DOJ has already disclosed "the content" of the interview by releasing the transcript, as a matter of settled Supreme Court law, Biden has no separately cognizable privacy interest in the "sound" or "tone and manner" of his voice as expressed during that interview.

DOJ does not even cite, let alone attempt to distinguish, the controlling precedents of *Dionisio*, *Mara*, and *Askew*.  Instead, it attempts to identify a privacy interest in the Recording based on the D.C. Circuit's *en banc* decision in *New York Times Co. v. NASA*, 920 F.2d 1002 (D.C. Cir. 1990), which DOJ rather incredibly claims "stands for the propositions that individuals have an important privacy interest in the sound of their voice, that this interest is distinct from any privacy interest reflected in the words of a written transcript, and that this interest is particularly significant when the recording captures a personal or sensitive conversation."  DOJ Mem. at 21.  Contrary to DOJ's characterization, in *NASA*, The Times requested "a tape of voice communications aboard the brief and tragic flight of the Challenger space shuttle," and the district court initially held that the recording did not fall within the scope

of Exemption 6 at all "because it was not within the category of 'personnel and medical files and similar files' to which the exemption applies."  920 F.2d at 1003.  A panel of the D.C. Circuit affirmed, 852 F.2d 602 (D.C. Cir. 1988), but the *en banc* court reversed, concluding only that "a tape of the voices of the Challenger crew meets the threshold test: it applies to particular individuals."  *Id.* at 1004.  The Court thus remanded to provide NASA "an opportunity to prove its claim that release of the tape would invade the privacy of the deceased astronauts, or of their families," *id.*, and in doing so the Court expressly disclaimed that "[w]hether disclosure of the Challenger tape in this case would constitute a clearly unwarranted invasion of privacy, we do not know and cannot discern on the record before us," *id.* at 1009.

The D.C. Circuit's *en banc* decision in *NASA* thus did not include *any* of the holdings that DOJ claims.  It did not create a blanket rule that there always will be a privacy interest in the recording of someone's voice.  Nor did the district court's decision on remand, which addressed only "the privacy interest asserted on behalf of the Challenger *families*," not any privacy interest of the astronauts *themselves*, let alone the astronauts' privacy interests in their own voices.  *New York Times Co. v. NASA*, 782 F. Supp. 628, 631 (D.D.C. 1991) (emphasis added).  The *NASA* rulings protect only the astronauts' family members' privacy interest in a recording of their loved ones' voices in the singularly intimate and personal moments before their death.  Because those decisions do not recognize a living person's privacy interest in the sound of his own voice, those decisions do not support DOJ's claim that Biden has any cognizable privacy interest in the Recording.[3]  The Court should therefore conclude its analysis under Exemptions 6 and 7(C)

---

[3] Moreover, in relying on *Pike v. DOJ*, 306 F. Supp. 3d 400, 412 (D.D.C. 2016), arguing the court "applied the reasoning of *NASA* to a law enforcement audio recording where a transcript was disclosed[,]"  DOJ Mem. at 22, DOJ fails to mention that the transcript did not reveal "the identity of the individual source who created the recording," and that the court permitted the

without even undertaking the balancing text, because "[i]f no significant privacy interest is implicated (and if no other Exemption applies), FOIA demands disclosure." *Nat'l Ass'n of Retired Fed. Emps. v. Horner*, 879 F.2d 873, 874 (D.C. Cir. 1989).

> ## 2.  Any privacy interest Biden might have in the Recording is minimal.

Even if DOJ could articulate some privacy interest that Biden has in the Recording, that privacy interest would be minimal given the release of the accompanying transcript and the circumstances of this particular interview.  DOJ principally attempts to identify a privacy interest in the Recording by analogizing this case to *Judicial Watch v. NARA*, 876 F.3d 346 (D.C. Cir. 2017), and *EPIC v. DOJ*, 18 F.4th 712 (D.C. Cir. 2021).  In *Judicial Watch*, however, the D.C. Circuit held that Secretary Clinton had a privacy interest in "an unissued draft indictment" because it "contains unproven allegations that were never adopted by the Independent Counsel much less by a grand jury" and that therefore contained previously undisclosed information about the Independent Counsel's investigation.  876 F.3d at 349-50.  Likewise, in *EPIC*, the D.C. Circuit held that the privacy interest in records explaining the Special Counsel's decision not to pursue criminal charges outweighed the public interest in those records *only* where those records contain "facts about individuals that are not disclosed elsewhere," because "individuals have an obvious privacy interest cognizable under Exemption 7(C) in keeping secret the fact that they were subjects of a law enforcement investigation."  18 F.4th at 718.  The privacy interest that the D.C. Circuit identified in those cases thus arose out of the disclosure of *previously non-public* information about uncharged individuals found in law enforcement records.

Here, however, DOJ has already released a transcript of the Biden-Hur interview.  The release of the Recording therefore would not disclose any previously unknown allegations

---

withholding under Exemption 7(A), not the privacy exemptions.  *Pike*, 306 F. Supp. 3d at 412. The case thus says nothing about privacy interests in audio recordings.

against Biden, and it certainly was not unknown that he was under law enforcement investigation.  The *Judicial Watch* and *EPIC* decisions therefore simply do not apply here.  Nor, in light of the release of the interview transcript, can DOJ maintain that it must withhold the Recording of the same exact interview because of the general privacy interest in "information about individuals contained in law enforcement files."  DOJ Mem. at 19 (emphasis removed).

Finally, at the risk of re-stating the obvious, Biden is the sitting President and a candidate for re-election.  The D.C. Circuit has long held that when information in agency records relates to "high-level" government employees, this status "diminishes their privacy interests . . . because of the corresponding public interest in knowing how public employees are performing their jobs."  *Stern v. FBI*, 737 F.2d 84, 92-94 (D.C. Cir. 1984); *see also, e.g.*, *Prop. of People v. DOJ*, 310 F. Supp. 3d 57, 68 (D.D.C. 2018) (the President is "the most public of figures" and "naturally has a diminished expectation of privacy").  Any privacy interest that DOJ could possibly identify in the Recording – and it cannot identify any – must therefore be discounted.

### 3.    The public interest in the Recording is colossal.

The Exemption 6/7(C) balancing test weighs in favor of disclosure not only because the privacy interest in the Recording is minimal if not nonexistent, but also because the public interest in the Recording is massive.  DOJ concedes that, unlike the transcript, the Recording captures Biden's "pauses, hesitations, mannerisms, and intonations" during the interview.  DOJ Mem. at 19; *see also* Weinsheimer Decl. ¶ 14.  That is why transcripts are no substitute for recordings when it comes to public access to testimony: those aspects captured on audio but not on paper amount to "a substantial part of the real record," which is "lost to public scrutiny" when only a transcript is released.  *See United States v. Criden*, 648 F.2d 814, 824 (3d Cir. 1981).

While the mannerisms and tones of voice uniquely captured in audio recordings of testimony are always valuable to the public's understanding of that testimony, they are especially

*invaluable* here in assessing Hur's rationale for deciding not to charge Biden.  Hur has explained that this decision was powerfully influenced by how Biden "present[ed] himself . . . during his interview . . . as a sympathetic, well-meaning, elderly man with a poor memory."  Tobin Decl. Ex. A at 219.  Hur further emphasized that this assessment was "based on [his] direct observations" of Biden, *id.*, which included what Hur perceived as Biden's "diminished faculties in advancing age, and his sympathetic demeanor," *id.* at 242.  And as DOJ concedes, Hur "testified that he relied in part on the audio recordings in reaching his decisions."  DOJ Mem. at 27.  For the public to assess that decision, therefore, it must be able to hear the same "pauses, hesitations, mannerisms, and intonations" in Biden's testimony that Hur was able to consider in reaching the conclusion that "[i]t would be difficult to convince a jury that they should convict [Biden] . . . of a serious felony that requires a mental state of willfulness" and therefore deciding not to charge Biden in the first place.  Tobin Decl., Ex. A at 6.

The D.C. Circuit has expressly recognized the powerful public interest in assessing the "exercise of . . . prosecutorial discretion" in a decision not to bring criminal charges against a high-ranking public official.  *CREW*, 746 F.3d at 1093 (collecting cases).  There, the exercise was DOJ's decision not to charge the former Majority Leader of the House of Representatives, which the court noted "further raises the stakes" of public oversight.  *Id.* at 1094.  Those stakes are surely higher still when the decision at issue is not to charge the sitting President.  As the court put it, the public interest is powerful when disclosure "may show whether prominent and influential public officials are subjected to the same investigative scrutiny and prosecutorial zeal as local aldermen and little-known lobbyists."  *Id.*  When it comes to assessing exercises of prosecutorial discretion regarding the President, therefore, that public interest is at its zenith because there is *no* public official in this country more prominent and influential.

DOJ does not succeed in its effort to play down this public interest.  It argues that "the voluminous information already available to the public" about Hur's decision diminishes the public interest in the audio itself.  DOJ Mem. at 26; *see also* Weinsheimer Decl. ¶ 46.  The problem with this argument is that, by his own account, Hur's assessment of Biden's verbal responses was central to that decision, *and* Hur's "direct observations" of Biden and the audio recording of the interview were central to that assessment.  *See* Tobin Decl. Ex. A at 6, 219, 242. Without the Recording, therefore, the public does not have the means "to decide for itself whether [Hur's] action [was] proper," *Wash. Post*, 690 F.2d at 264, regardless of any other information that the public might review.

DOJ further contends that the Recording is "only one piece of evidence among many that Mr. Hur considered and discussed" such that disclosing the Recording "would do little to advance the public's ability to evaluate [his] decisions."  DOJ Mem. at 27.  But that is effectively the same idea that the D.C. Circuit rejected in *CREW* when it observed that while disclosure of records concerning the decision not to prosecute former Rep. Tom DeLay "may reflect only one data point regarding [DOJ's] performance of its statutory duties, it is a significant one."  746 F.3d at 1094 (citation omitted).  To be sure, the Recording is likewise just one piece of evidence that Hur considered in declining to prosecute Biden, but DOJ cannot credibly deny that it is a critical – if not the most critical – piece of evidence.[4]

Because the public interest in the Recording is powerful and the privacy interest in the Recording is minimal if not nonexistent, DOJ cannot withhold the Recording under Exemption 6 or Exemption 7(C).

---

[4] The colossal public interest in the Recording further distinguishes this case from *NASA*, where the district court concluded that the public interest in audio of the Challenger astronauts' final moments was "very minimal, if it can even be said to exist at all."  782 F. Supp. at 633.

4.    **Any concern about "deepfakes" favors greater disclosure, not secrecy.**

DOJ's final argument on privacy grounds against releasing the Recording is that Biden's privacy interest in the audio is somehow greater because of "advancements in audio, artificial intelligence, and 'deep fake' technologies."  DOJ Mem. at 23.  According to DOJ, if the Recording is released, "it could be improperly altered, and that the altered file could be passed off as an authentic recording and widely distributed."  *Id.*  DOJ concedes that those with the capability "to create a deepfake of President Biden's voice" are already able to do so, yet it asserts that "if it were public knowledge that the audio recording has been released, it becomes easier for malicious actors to pass off an altered file as the true recording."  *Id.* at 23-24; *see also* Weinsheimer Decl. ¶ 45.  In other words, DOJ's position is that even though fake versions of the interview audio may already exist, the real Recording must stay secret so the public does not become confused about its true contents.

DOJ not only presents that argument untethered to any precedent, but it also does not even note that the Supreme Court has squarely rejected this same paternalistic theory in an analogous context.  In *United States v. Alvarez*, 567 U.S. 709 (2012), the Court considered a challenge to the Stolen Valor Act, which criminalized falsely claiming to have received military decorations or medals, particularly the Congressional Medal of Honor.  The government argued that it must be permitted to police such speech in part because "[f]alse claims . . . may sow confusion" among the public.  *See* Br. of the United States at *42, *United States v. Alvarez*, No. 11-210, 2011 WL 6019906, at *42 (U.S. Dec. 1, 2011).  The Court rejected that theory, stating that "[t]he remedy for speech that is false is speech that is true.  This is the ordinary course in a free society.  The response to the unreasoned is the rational; to the uninformed, the enlightened; to the straightout lie, the simple truth."  *Alvarez*, 567 U.S. at 727.  Indeed, "suppression of speech by the government can make exposure of falsity more difficult, not less so."  *Id.* at 728.

So too here.  By suppressing the real Recording, DOJ makes the exposure of a deepfake *more* difficult because members of the public have no way to verify for themselves whether an audio recording being passed off as a leaked copy has been manipulated.  Instead, they must rely on the government's uncheckable characterization of any such possible leak.  *See, e.g.*, Tobin Decl. Ex. J (Jeff Cercone, *Joe Biden-Robert Hur interview audio wasn't leaked; it's a deepfake, DOJ and experts say*, PolitiFact (June 7, 2024) (discussing audio currently circulating on social media purporting to be a leaked clip from the Recording and noting that "[a] Justice Department spokesperson said the department was confident the recording is fake").

The Court did not just identify the problem in *Alvarez*, however, it also recognized the solution.  There, the Court noted that "[a] Government-created database could list Congressional Medal of Honor recipients," observing that "[w]ere a database accessible through the Internet, it would be easy to verify and expose false claims."  *Alvarez*, 567 U.S. at 729.  An official copy of the Recording, released widely through the press and also available for any member of the public to access on an official government website, would likewise provide the press and public with the ability to easily verify and expose "deepfake" versions of the interview audio.

In sum, even if the risk of "deepfake" copies of the interview audio spreading were a factor in the Exemption 6/7(C) balancing test, that factor would further favor disclosing the real Recording rather than keeping it secret and leaving the public to wonder whether any given clip circulating online is real or artificial.

## **CONCLUSION**

For the foregoing reasons, the Press Coalition respectfully requests that its cross-motion for summary judgment be granted, that Defendant's motion for summary judgment be denied, that Defendant be ordered to release the Recording with only those redactions found in the public

version of the interview transcript, and that the Press Coalition be awarded the costs and

attorneys' fees that it has reasonably incurred in this action.

Dated:  June 21, 2024          Respectfully submitted,

                                 BALLARD SPAHR LLP

                                 */s/ Charles D. Tobin*
                                 Charles D. Tobin (#455593)
                                 Maxwell S. Mishkin (#1031356)
                                 Lauren P. Russell (#1697195)
                                 1909 K Street NW, 12th Floor
                                 Washington, DC 20006
                                 Tel: (202) 661-2200
                                 Fax: (202) 661-2299
                                 tobinc@ballardspahr.com
                                 mishkinm@ballardspahr.com
                                 russelll@ballardspahr.com

                                 *Counsel for the Press Coalition*