**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **THE HERITAGE FOUNDATION,** *et al.* | |
| Plaintiffs, | |
| v. | |
| **U.S. DEPARTMENT OF JUSTICE,** | |
| Defendant. | |
| **JUDICIAL WATCH, INC.,** | Case No. 1:24-cv-700 (TJK) |
| Plaintiff, | (Consolidated Cases) |
| v. | |
| **U.S. DEPARTMENT OF JUSTICE,** | |
| Defendant. | |
| **CABLE NEWS NETWORK, INC.,** *et al.*, | |
| Plaintiff, | |
| v. | |
| **U.S. DEPARTMENT OF JUSTICE,** | |
| Defendant. | |

**MEMORANDUM IN SUPPORT OF
PLAINTIFFS' CROSS MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION
TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**
(Oral Argument Requested)

**TABLE OF CONTENTS**

TABLE OF CONTENTS .................................................................................................... i

TABLE OF AUTHORITIES ............................................................................................ iii

INTRODUCTION ............................................................................................................. 1

FACTUAL BACKGROUND ............................................................................................ 3

STANDARD OF REVIEW .............................................................................................. 16

ARGUMENT .................................................................................................................... 16

    I.   EXEMPTION 7(A) DOES NOT APPLY ....................................................... 16

        A. Standard of Review. ................................................................................. 18

        B. The Government Fails to Identify a Pending or Reasonably Anticipated Law
           Enforcement Proceeding. ......................................................................... 18

        C. In Any Event, Release of the Audio Recording Could Not Reasonably be Expected to
           Interfere with Unrelated Future Enforcement Proceedings......................... 24

    II.  THE GOVERNMENT'S CLAIM OF LAW ENFORCEMENT EXECUTIVE
       PRIVILEGE UNDER EXEMPTION 5 MUST BE REJECTED. ................... 27

        A. FOIA Codified All Law Enforcement Privileges Under Exemption 7; Such Claims
           Cannot be Brought Under Exemption 5.................................................... 28

        B. Claims of Executive Privilege Under Exemption 5 Are Fully Reviewable............... 30

        C. Any Constitutional Law Enforcement Privilege is Not Available Here.................... 31

           1.  The Government's Constitutional Claim of Executive Privilege Fails on Its Own
              Terms. .............................................................................................. 31

           2.  Any Constitutional Law Enforcement Privilege is No Broader Than Exemption 7.
              .......................................................................................................... 32

D.  The Government's "Avoidance" Argument Should be Rejected Out of Hand. ......... 34

E.  The Government Waived Its Claim of Executive Privilege on This Record. ............. 36

III. RELEASE OF THE AUDIO RECORDINGS WOULD NOT RESULT IN AN UNWARRANTED INVASION OF PRESIDENT BIDEN'S PRIVACY. ...................... 36

A.  Standard of Review. ................................................................................................. 36

B.  President Biden Has Little, If Any, Privacy Interest Here. .......................................... 37

C.  There Is Overwhelming Public Interests in Disclosure of the Audio Recordings. ...... 41

D.  The Interest in Disclosure is Overwhelming. .............................................................. 45

CONCLUSION .................................................................................................................. 45

# TABLE OF AUTHORITIES

**Cases**

*N.Y. Times Co. v. NASA*, 920 F.2d 1002 (D.C. Cir. 1990) (en banc)............................................. 38

*ACLU v. Dep't of Def.*, 543 F.3d 59 (2d Cir. 2008)................................................. 21, 28

*ACLU v. DOJ*, 655 F.3d 1 (D.C. Cir. 2011) ................................................. 37

*Am. Oversight v. Dep't of State*, 414 F.Supp.3d 182 (D.D.C. 2019)............................................. 44

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986).................................................. 16

*Antonelli v. ATF*, No. 04-cv-1180 (CKK), 2005 WL 3276222 (D.D.C. Aug. 16, 2005) ............. 19

*Appel v. City of Saint St. Louis*, No. 4:05-cv-772 (SNL), 2007 WL 9808048 (E.D. Mo. Mar. 19, 2007).................................................................................................................................. 33

*Baker & Hostetler LLP v. U.S. Dep't of Com.*, 473 F.3d 312 (D.C. Cir. 2006) .......................... 31

*Bartko v. DOJ*, 898 F.3d 51 (D.C. Cir. 2018)................................................................. 37

*Bevis v. U.S. Dep't of State*, 801 F.2d 1386 (D.C. Cir. 1986) ........................................ 19

*Boyd v. DOJ*, 475 F.3d 381 (D.C. Cir. 2007) ................................................................. 20, 37

*Brennan Ctr. for Just. at NYU Sch. of L. v. Dep't of Com.*, 498 F.Supp.3d 87 (D.D.C. 2020) .... 44

*Burka v. Dep't of Health & Human Servs.*, 87 F.3d 508 (D.C. Cir. 1996).................................... 31

*Center for National Security Studies v. DOJ*, 331 F.3d 918 (D.C. Cir. 2003) ....................... 23, 30

*Chinn v. Blackenship*, No. 09-cv-5119 (RJB), 2010 WL 11591399 (W.D. Wash. Feb. 26, 2010) ......................................................................................................................................... 33

*Commonwealth of Puerto Rico v. United States*, 490 F.3d 50 (1st Cir. 2007) ............................ 33

*CREW v. DOJ*, 658 F.Supp.2d 217 (D.D.C. 2009)........................................ 17, 18, 20, 22, 25, 29

*CREW v. DOJ*, 746 F.3d 1082 (D.C. Cir. 2014)................................................. 18, 37, 38, 41, 44

*CREW v. DOJ*, 854 F.3d 675, 682 (D.C. Cir. 2017)................................................................. 41

*CREW v. DOJ*, 978 F.Supp.2d 1 (D.D.C. 2013 ................................................................. 23, 41

*Crooker v. Bureau of Alcohol, Tobacco & Firearms*, 789 F.2d 64 (D.C. Cir. 1986)................. 19

*Ctr. For Investigative Reporting v. USCIS*, No. 18-cv-1964 (CJN), 2019 WL 6498817 (D.D.C. Dec. 3, 2019) ................................................................................................................ 37

*Ctr. for Pub. Integrity v. Dep't of Def.*, 411 F.Supp.3d 5 (D.D.C. 2019) ...................................... 44

*Dean v. F.D.I.C.*, 389 F.Supp.2d. 780 (E.D. Ken. 2005)............................................................... 29

*DOJ v. Reporters Comm. for Freedom of Press*, 489 U.S. 749 (1989) ................................. 30, 37

*Dow Jones & Co., Inc. v. DOJ*, 880 F.Supp. 145 (S.D.N.Y. 1995)............................................... 43

*Durrani v. DOJ*, 607 F.Supp.2d 77 (D.D.C. 2009)...................................................................... 19

*Elkins v. Fed. Aviation Admin.*, 134 F.Supp.3d 1 (D.D.C. 2015) ................................................ 19

*EPIC v. DOJ*, 18 F.4th 712 (D.C. Cir. 2021)......................................................................... 39, 43

*FBI v. Abramson,* 456 U.S. 615 (1982) ............................................................................... 21, 29

*Fitzgibbon v. CIA*, 911 F.2d 755 (D.C. Cir. 1990) ...................................................................... 36

*Hemstreet v. Duncan*, No. 07-cv-732 (ST), 2007 WL 4287602 (D. Ore. Dec. 7, 2007)............. 30

*In Re Sealed Case* (*Espy*), 121 F.3d 729 (D.C. Cir. 1997) ..................................................... 32, 36

*Juarez v. DOJ*, 518 F.3d 54 (D.C. Cir. 2008) ............................................................................. 19

*Judicial Watch of Fla. v. DOJ*, 102 F.Supp.2d 6 (D.D.C. 2000)................................................. 18

*Judicial Watch v. CIA*, No. 17-cv-397 (TSC), 2019 WL 4750245 (D.D.C. Sept. 29, 2019) ....... 19

*Judicial Watch v. Nat'l Archives and Records Admin.*, 876 F.3d 346 (D.C. Cir. 2017) ........ 39, 43

*Judicial Watch, Inc. v. DOJ*, 365 F.3d 1108, 1109, 1113–14 (D.C. Cir. 2004) .......................... 31

*Karantsalis v. U.S. Dep't of Justice,* 635 F.3d 497 (11th Cir. 2011)........................................... 40

*Kimberlin v. Dep't of Justice*, 139 F.3d 944 (D.C. Cir. 1998)..................................................... 38

*Leadership Conf. on C.R. v. Gonzales*, 404 F.Supp.2d 246 (D.D.C. 2005) ................................ 44

*Leopold v. DOJ*, No. 17-cv-2819 (APM), 2022 WL 4598596 (D.D.C. Sept. 30, 2022).............. 19

*Maloney v. Murphy*, 984 F.3d 50 (D.C. Cir. 2020)...................................................................... 35

*Mapother v. DOJ*, 3 F.3d 1533 (D.C. Cir. 1993) .................................................... 18, 22

*Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803) ..................................................... 31

*Maydak v. DOJ*, 218 F.3d 760 (D.C. Cir. 2000) ........................................................ 19

*N.L.R.B. v. Robbins Tire & Rubber Co.*, 437 U.S. 214 (1978) ........................................ 18, 21, 28

*N.Y. Times Co. v. NASA*, 782 F.Supp. 628 (D.D.C. 1991) ............................................. 39

*Nat. Archives & Records Admin. v. Favish*, 541 U.S. 157 (2004) ......................................... 30, 37

*Nat'l. Sec. Counselors v. C.I.A.*, 960 F.Supp.2d 101 (D.D.C. 2013) ...................................... 30

*Nation Mag., Washington Bureau v. U.S. Cust. Serv.*, 71 F.3d 885 (D.C. Cir. 1995) .................. 38

*North v. Walsh*, 881 F.2d 1088 (D.C. Cir. 1989) ......................................................... 35

*Owens v. DOJ*, No. 04-cv-1701 (JDB), 2006 WL 3490790 (D.D.C. Dec. 1, 2006) .................... 19

*Pike v. DOJ*, 306 F.Supp.3d 400 (D.D.C. 2016) ........................................................... 39

*Poitras v. DHS*, 303 F.Supp.3d 136 (D.D.C. 2018) ...................................................... 19

*Protect Democracy Project, Inc. v. DOJ*, 498 F.Supp.3d 132 (D.D.C. 2020) ............................ 44

*Protect Democracy Project, Inc. v. DOJ*, No. 20-cv-172 (RC), 2021 WL 4935540 (D.D.C. May 17, 2021) ................................................................................................... 36

*Public Citizen v. DOJ*, 491 U.S. 440 (1989) .............................................................. 35

*Pulsifer v. United States*, 601 U.S. 124 (2024) .......................................................... 29

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639 (2012) ............................ 29

*Sen. Select. Comm. v. Nixon*, 498 F.2d 725 (D.C. Cir. 1974) (en banc) ............................... 34

*Shem-Tov v. DOJ*, No. 17-cv-2452 (JDM), 2020 WL 2735613 (D.D.C. May 25, 2020) ............. 19

*Stein v. CIA*, 454 F.Supp.3d 1 (D.D.C. 2020) ........................................................... 16

*Summers v. DOJ*, 140 F.3d 1077 (D.C. Cir. 1998) ...................................................... 30

*Sussman v. U.S. Marshalls Serv.*, 494 F.3d 1106 (D.C. Cir. 2007) ...................................... 19

*Tipograph v. Dep't of Just.*, 83 F.Supp.3d 234 (D.D.C. 2015)...................................................... 19

*Trump v. Mazars USA, LLP*, 591 U.S. 848 (2020) ....................................................................... 34

*Ullah v. CIA.*, 435 F.Supp.3d 177 (D.D.C. 2020)......................................................................... 16

*United States v. Lang*, 766 F.Supp. 389 (D. Md. 1991)............................................................... 33

*United States v. Nixon*, 418 U.S. 683 (1974) ............................................................................... 34

*Wash. Post v. DHS*, 459 F.Supp.2d 61 (D.D.C. 2006) ................................................................ 44

*World Pub. Co. v. DOJ*, 672 F.3d 825 (10th Cir. 2012) ............................................................... 40

*Zivotofsky ex rel. Ari Z. v. Sec'y of State*, 444 F.3d 614 (D.C. Cir. 2006)................................... 35

**Statutes**

5 U.S.C. § 552(b)(7)(A) .................................................................................................. 18, 19, 24, 28

**Other Authorities**

*Assertion of Exec. Priv. Concerning the Special Counsel's Interviews of the Vice Pres. & Senior White House Staff*, 32 Op. O.L.C. 7 (2008) ............................................................................... 32

*Assertion of Executive Privilege in Response to Congressional Demands for Law Enforcement Files*, 6 Op. O.L.C. 31 (1982) ..................................................................................................... 31

Declaration of Lanny A. Breuer at ¶¶ 5, 6, 8, *CREW v. DOJ*, 08-cv-01468 (EGS) (Jul. 1, 2009) (ECF No. 17-1)........................................................................................................................... 25

Doris Keans Goodwin, *Team of Rivals* (2005) ............................................................................. 40

Fifth Amendment Integrity Restoration Act, H.R. 1525, 118th Cong. ("FAIR Act")................. 13

George Floyd Justice in Policing Act, H.R. 7120, 116th Cong. .................................................. 13

H.R. 7120, 116th Cong. § 372(b)................................................................................................. 13

*Position of the Executive Department Regarding Investigative Reports*, 40 U.S. Op. Atty. Gen. 45 (1941) ..................................................................................................................................... 33

Settlement Agreement and Release, *CREW v. DOJ*, 08-cv-1468 (EGS) (D.D.C. Nov. 16, 2009) (ECF No. 24)............................................................................................................................... 17

Supplemental Letter Brief of the United States, *Trump v. Mazars USA LLP*, No. 19-715 (May 8, 2020).......................................................................................................................................... 35

**INTRODUCTION**

This is a simple case despite the efforts of the Government to complicate it. Plaintiffs—along with thirteen media co-plaintiffs—are entitled to the audio recordings of President Joseph R. Biden's interviews with Special Counsel Robert K. Hur, especially after the White House voluntarily released an incomplete transcript of the same interview that affirmatively did not contain transcribable indicia of demeanor. While the transcript discloses spoken *words* (the "lexical" portion of the interview), the audio recording is the only source of the "non-lexical" portion that depicts the tone, tenor, cadence, pauses, hesitations, and other demeanor evidence of the interview. As any junior trial lawyer can attest, a witness's live recording speaks volumes more than a cold transcript of the same testimony. Special Counsel Hur testified to Congress that he relied upon this "demeanor" evidence to reach his controversial decision to recommend against criminal charges. President Biden was not charged, in important part because, in Special Counsel Hur's seasoned prosecutorial judgment, the President's "diminished faculties and faulty memory" would cause a jury to see the President as "a sympathetic well-meaning elderly man with a poor memory." *Report of the Special Counsel on the Investigation into Unauthorized Removal, Retention, and Disclosure of Classified Documents Discovered at Locations Including the Penn Biden Center and the Delaware Private Residence of President Joseph R. Biden, Jr.* at 248, 6 (Feb. 2024) (ECF No. 1-5, No. 24-cv-960) ("Hur Report" or "Report"). It is beyond dispute that both Special Counsel Hur's decision—and the demeanor of President Biden—are subjects of great, intense public debate. So too is President Biden's current and future fitness for Office.

Unsurprisingly, the Government is desperate to hide these audio recordings from the American public, and it asserts numerous breath-takingly broad arguments to do so. But the Freedom of Information Act ("FOIA") permits no exemption to withhold information simply because it may be politically embarrassing. And the Government's arguments are squarely foreclosed by well-established law.

1

The Government's lead argument attempts to manufacture a new constitutional "executive privilege" based upon supposed law enforcement concerns.  But the problems here are multiple, beginning with the fact that the argument is foreclosed by binding D.C. Circuit precedent.  Further, the argument is preempted by the statutory framework of FOIA itself.  Finally, the merits of the argument—the Government's parade of horribles that unknown future witnesses will shy away from audibly recorded voluntary interviews—falls apart under its own weight, as demonstrated in part by the Declaration of the Honorable Michael B. Mukasey, who served as the 81st Attorney General of the United States.

The Government asserts FOIA Exemption 7(A) for material that will supposedly impact pending law enforcement investigations, but then wildly expands the exemption.  The fatal problem for the Government, however, is obvious—there is *no pending (or future) investigation* that can be impacted.  The Hur Investigation has ended with no criminal charges.  The Special Counsel's Office has been shut down.  Special Counsel Hur has resigned from government service.  Other than a throw-away line about potential future investigations—unnamed, undefined, and unaccounted—the Government offers no evidence of a future, *concrete* investigation impacted by release.  Such a failure of proof is fatal to the Government's argument under controlling D.C. Circuit precedent.  The Government's argument to the contrary sweeps so broadly that it would do violence to FOIA, and it lacks any limiting principle.

The Government's last-ditch argument relies upon FOIA Exemption 7(C) to claim that President Biden's privacy will be invaded by the audio release.  This argument is eyebrow-raising in the extreme.  For better or for worse, the President of the United States has little privacy, certainly less than the normal citizen.  Moreover, the public already knows that President Biden was the subject of the Special Counsel Investigation.  After all, President Biden's Justice Department appointed Special Counsel Hur, and the White House publicly advertised its involvement with the investigation.  This alone is enough to defeat the Government's privacy argument.  But the coup de grace comes from President Biden's own, voluntary decision to publicly release an incomplete transcript of the same interview.  The President's voluntary political

decision to release the full substance of the words spoken during the interview wipes out the Government's remaining theoretical and hypothetical privacy arguments. At the same time, the public interest in resolving the burning controversy over the Hur Report, flamed by the White House itself, is overwhelming. So too is the interest in providing the electorate information about the salient electoral issue of President Biden's fitness for Office *before* the 2024 General Election.

Despite the Government's voluminous briefing, fanciful arguments, and noteworthy attempts to invent new legal authority, this remains a simple case. FOIA requires release of the audio recording of President Biden's interview with the Special Counsel. The Special Counsel's investigation is over. There is no evidence of concrete, pending or reasonably anticipated investigations to be impacted. Future witness cooperation will not be chilled. The President's privacy will not be invaded. And the President already released a transcript of the same interview. Now, the American people should be able to hear the words of their President—and come to their own conclusions about this raging national debate. This is the very reason for the existence of the Freedom of Information Act in the first place.

## FACTUAL BACKGROUND

On February 5, 2024, the Department of Justice released the Hur Report. The Hur Report prompted immediate reactions from the White House, Congress, and the media for its conclusion that any prosecution of President Biden was unlikely to succeed in significant part because his defense would portray him to a jury as he presented to Special Counsel Hur—as "a sympathetic well-meaning elderly man with a poor memory." Hur Report at 5, 6, 207, 207, 219, 242, 247–48. This conclusion was central to the Special Counsel's decision not to prosecute President Biden— the Special Counsel believed the President's memory was a significant factor in concluding a prosecution would not be successful. *See* Hur Report at 5, 6, 207, 219, 242, 247–48.

Special Counsel Hur maintained this position despite withering criticism from President Biden, his Administration, Administration proxies, Congressional Democrats, and certain

members of the media.  Special Counsel Hur's own words before the House Committee on the Judiciary ("Judiciary Committee") speak volumes:

> There has been a lot of attention paid to language in the report about the President's memory, so let me say a few words about that.  My task was to determine whether the President retained or disclosed national defense information willfully.  That means knowingly and with the intent to do something the law forbids.  I could not make that determination without assessing the President's state of mind.  For that reason, I had to consider the President's memory and overall mental state and how a jury likely would perceive his memory and mental state in a criminal trial.  These are the types of issues that prosecutors analyze every day and because these issues were important to my ultimate decision, I had to include a discussion of them in my report to the Attorney General.
>
> The evidence and the President himself put his memory squarely at issue.  We interviewed the President and asked him about his recorded statement "I just found all the classified stuff downstairs."  He told us that he didn't remember saying that to his ghostwriter.  He also said he didn't remember finding any classified material in his home after his Vice Presidency.  He didn't remember anything about how classified documents about Afghanistan made their way into his garage.
>
> My assessment in the report about the relevance of the President's memory was necessary, accurate, and fair.  Most importantly, what I wrote is what I believe the evidence shows and what I expect jurors would perceive and believe.  I did not sanitize my explanation, nor did I disparage the President unfairly.  I explained to the Attorney General my decision and the reasons for it.  That is what I was required to do.

Second Declaration of Eric Neal Cornett (June 21, 2024) ("2d Cornett Decl.") at Ex. 1 ("Hur Hearing") at 8; *see also* Hur Report at 17, 38, 50, 65, 72.

1.      The Hur Report is clear that despite its conclusion to decline prosecution, there is evidence that the President willfully retained and disclosed classified information.  *See*, *e.g.* Hur Report at 1 ("Our investigation uncovered evidence that President Biden willfully retained and disclosed classified materials after his vice presidency when he was a private citizen."); *id*. at 6–7 ("FBI agents recovered from unlocked drawers in the office and basement den of Mr. Biden's Delaware home a set of notebooks he used as vice president.  Evidence shows that he knew the notebooks contained classified information.").  Under immense criticism from the President himself on down, Special Counsel Hur stood by his conclusion in his testimony before the

4

Judiciary Committee that if the President was charged, there was sufficient evidence to send the

case to the jury:

> Mr. HUR.  As I said in the report, some reasonable jurors may have reached the inferences
> that the government would present in its case-in-chief.
> Mr. KILEY.  So, a reasonable juror could have voted to convict, based on the facts that
> you—
> Mr. HUR.  Correct.

Hur Hearing at 68.

2.      Special Counsel Hur made clear he did not recommend charging President Biden

because of, among other factors, his analysis of how the case would be viewed by a jury.  Critical

to Hur's analyses and conclusions was the issue of President Biden's "diminished faculties and

faulty memory."  Hur Report at 248.  In his seasoned prosecutorial judgment, the Special Counsel

felt those diminished faculties would cause a jury to see the President as "a sympathetic well-

meaning elderly man with a poor memory."  Hur Report at 6.  The Report is replete with similar

references:

- "Mr. Biden's memory was significantly limited both during his recorded interviews with the ghostwriter [Zwonitzer] in 2017, and in his interview with our office in 2023." Hur Report at 5.

- "Mr. Biden's memory also appeared to have significant limitations—both at the time he spoke to Zwonitzer in 2017, as evidenced by their recorded conversations, and today, as evidenced by his recorded interview with our office.  Mr. Biden's recorded conversations with Zwonitzer from 2017 are often painfully slow, with Mr. Biden struggling to remember events and straining at times to read and relay his own notebook entries."  Hur Report at 207.

- "In his interview with our office, Mr. Biden's memory was worse.  He did not remember when he was vice president, forgetting on the first day of the interview when his term ended ('if it was 2013—when did I stop being Vice President?'), and forgetting on the second day of the interview when his term began ('in 2009, am I still Vice President?').  He did not remember, even within several years, when his son Beau died. And his memory appeared hazy when describing the Afghanistan debate that was once so important to him."  Hur Report at 208.

- "[A]s discussed to some extent above, Mr. Biden will likely present himself to the jury, as he did during his interview with our office, as a sympathetic, well-meaning, elderly man with a poor memory."  Hur Report at 219.

5

- "We also believe some of the same evidence that supports reasonable doubt for the classified Afghanistan documents also supports reasonable doubt for the notebooks, including Mr. Biden's cooperation with the investigation, his diminished faculties in advancing age, and his sympathetic demeanor."  Hur Report at 242.

- "For these jurors, Mr. Biden's apparent lapses and failures in February and April 2017 will likely appear consistent with the diminished faculties and faulty memory he showed in Zwonitzer's interview recordings and in our interview of him."  Hur Report at 247–248.

**3.**     The Special Counsel repeatedly explained to the Judiciary Committee that all available demeanor evidence informed his conclusions about President Biden's memory and faculties:

> Mr. HUR.  The totality of the time that I spent with the President during his voluntary interview was something that I certainly considered in framing my assessment and articulating it in the report.  That includes not only the words in the cold record of the transcript of the interview, but also the experience of being there in the room with him and frankly considering how he would present to a jury in a criminal trial if charges were brought.
> Chair JORDAN.  I guess I'm asking specifically.  I know you cite in the report the dates that he couldn't remember when he was Vice President, when he began, when his term ended. You cite that in your report.  Is there anything else specifically that stands out from that interview with the President?
> Mr. HUR.  A number of things stand out.  Again, I'm aware that the transcript has now been made available.  I do provide certain examples in my report of significant personally painful experiences about which the President was unable to recall certain information.  I also took into account the President's overall demeanor in interacting with me during the five-plus hour voluntary interview.  So, it was a wealth of details about being there in the moment with the President, including his inability to recall certain things.  I'll also say, as reflected in the transcript, the fact that he was prompted on numerous occasions by the members of the White House Counsel's Office.

2d Cornett Decl. at Ex. 1 at 65.

The Special Counsel was explicit that the demeanor evidence included the very recordings at issue here:

> Chair JORDAN.  Well, the Justice Department released the transcripts the day of the hearing. . . .  It would be nice if we actually had the audiotapes too.  Again, is there any reason why you can see why the American people and their representatives in the U.S. Congress should not have access to those tapes?

Mr. HUR.  Chair, what I can tell you is that my assessment that went into my conclusions that I described in my report was based not solely on the transcripts.  *It was based on all the evidence, including the audio recordings.*
Chair JORDAN.  Great point.  That is where I was going.  So, this was valuable evidence for you, as the Special Counsel named to investigate this issue, valuable evidence for you to reach your conclusion and the statements you put in your report.  All I am asking is shouldn't the U.S. Congress have access to that same information?
Mr. HUR.  Chair, again, it is not for me to weigh into what information Congress should or should not have.  *What I will tell you is that the audio recordings were part of the evidence, of course, that I considered in coming to my conclusion.*

2d Cornett Decl. at Ex. 1 at 79 (emphasis added); *see also id.* at 50 ("It was based on a number of different sources . . . including various recordings . . . some from our interview with the President in October 2023").  The Government itself has stated in another case that Special Counsel Hur "relied on" the audio recording in drafting certain passages of the Report concerning the President's "memory" and "faculties."  *See* Trans. of Status Conference at 3:2–4, *Heritage Foundation, et al. v. DOJ,* 24-cv-645 (June 10, 2024), Ex. 2 to 2d Cornett Decl.  Critically, the written transcript published by the White House and Justice Department affirmatively omitted transcribable indicia of demeanor, "such as the use of filler words (such as 'um' and 'uh') when speaking that are not always reflected on the transcripts, or when words may have been repeated when spoken (such as 'I, I' or 'and, and') but sometimes was only listed a single time in the transcripts."  Weinsheimer Decl. at ¶ 14.

4.    The White House disputed some of the Hur Report's conclusions even before its public release on February 7, 2024.  Both the White House Counsel and the President's private counsel jointly wrote to Special Counsel Hur on February 5, 2024, to ensure "a final report that is both accurate and consistent with Department of Justice policy and practice."  Hur Report at 384.  The White House requested Special Counsel Hur "revisit [his] descriptions of President Biden's memory and revise them so that they are stated in a manner that is within the bounds of your expertise and remit."  Hur Report at 385.  The White House took umbrage that Special Counsel Hur "refer[red] to President Biden's memory on at least nine occasions—a number that is itself gratuitous."  Hur Report at 386.  The letter also took issue with the Report's use of the phrase "totally irresponsible" to describe President Biden's document storage practices.  Hur Report at

385.   The letter added, "this kind of criticism of an uncharged party violates 'long-standing Department practice and protocol'. . . .   Using President Biden's own words does not make the criticism compliant with Department practice."  Hur Report at 385–86 (citation omitted).  Special Counsel Hur provided no substantive response to the White House Counsel, but attached the White House Counsel's Letter to his Report along with an explanation of minor typographical and factual corrections.  *See* Hur Report at 1–2.

Unable to move the Special Counsel off his evaluation of the evidence, both the White House Counsel and the President's private counsel went over Special Counsel Hur's head and subsequently wrote Attorney General Garland on February 7, 2024, objecting "to the multiple denigrating statements about President Biden's memory[.]"  2d Cornett Decl. at Ex. 3 at 2.  The White House Counsel argued "[t]he Special Counsel can certainly and properly note that the President lacked memory of a specific fact or series of events.  But his report goes further to include allegations that the President has a failing memory in a general sense, an allegation that has no law enforcement purpose."  *Id.* at 2.  The Department of Justice responded on February 8, 2024, writing "the Department concludes that the report as submitted to the Attorney General, and its release, are consistent with legal requirements and *Department policy.*"  2d Cornett Decl. at Ex. 4 at 2 (emphasis added).

**5.**      Following the Hur Report's public release on February 8, 2024, the Administration, from top to bottom, vigorously attacked Special Counsel Hur's characterizations and conclusions.  On February 8, 2024, the President himself vehemently denied Special Counsel Hur's conclusion as to his mental state, insisting to reporters that "[m]y memory is fine."[1]  *See* 2d Cornett Decl. at

---

[1]  The President did not just contest the Special Counsel's assessment of his mental acuity.  The President denied sharing classified information with his ghostwriter, a statement that is inconsistent with the Special Counsel's findings.  *See*  2d Cornett Decl. at Ex. 5.  The President's misstatements were corrected by the Special Counsel during the Hur Hearing.:

> Mr. GAETZ.  February 8th the White House questioned, ''Mr. President, why did you share classified information with your ghost writer?''  The President: ''I did not share classified information.  I did not share it.  I guarantee I did not.''  That is not true, is it, Mr. Hur?

Ex. 5 at 3; *see also* 2d Cornett Decl. at Ex. 6 (collecting similar articles).  Vice President Kamala Harris dismissed the Report's conclusions as to the President's memory as "inaccurate and inappropriate" and "clearly, politically motivated, gratuitous."  *See* 2d Cornett Decl. at Ex. 7 at 2; *see also* 2d Cornett Decl. at Ex. 8 (collecting similar articles).  Spokesman for the White House Counsel's Office, Ian Sams, told reporters the Report "left [one] to wonder why this Report spends time making gratuitous and inappropriate criticisms of the President."  2d Cornett Decl. at Ex. 9 at 6; *see also* 2d Cornett Decl. at Ex. 10 (collecting media coverage).  White House Press Secretary Karine Jean-Pierre said those portions of the Report speaking to the President's memory "don't [] live[] in reality."  2d Cornett Decl. at Ex. 9 at 29; *see also* 2d Cornett Decl. at Ex. 10.

6. Attorney General Garland, in contrast, deferred to Special Counsel Hur's analyses and conclusions, stating "[t]he idea that an attorney general would edit or redact or censor the special counsel's explanation for why the special counsel reached the decision the special counsel did—that's absurd."  *See* 2d Cornett Decl. at Ex. 11 at 2.  In his testimony before the House Judiciary Committee on June 5, 2024, Attorney General Garland repeatedly deferred to the Report when questioned about the Special Counsel's conclusions.  *See, e.g.*, 2d Cornett Decl. at Ex. 12 at *13 ("I have said it before, I'll say it again, I'm not going to comment . . .  I'm not going to comment on Mr. Hur's [report]. Mr. Hur testified for five hours before this committee."); *id.* at *62 ("I would rest on Mr. Hur's report.").

7. White House proxies mirrored the Administration's response—with added energy. Senator John Fetterman called the Report "a smear and cheap shots and just taking things out of context, or even just inventing."  *See* 2d Cornett Decl. at Ex. 13 at 2.  Representative Dan Goldman said, "what I did understand from talking to folks at the White House is . . . part of the frustration with Special Counsel Hur, a Republican appointee, cherry-picking very few remarks from a five-hour interview[.]" *See* 2d Cornett Decl. at Ex. 14 at 2.  Former General Counsel for the Federal Bureau of Investigation, Andrew Weissmann, bemoaned the Report as "a redux of what we saw

---

Mr. HUR.  That is inconsistent with the findings based on the evidence in my report. *See* 2d Cornett Decl. at Ex. 1 at 30–31.

with respect to James Comey at the FBI with respect to Hillary Clinton, in terms of really not adhering to what I think are the highest ideals of the Department of Justice." *See* 2d Cornett Decl. at Ex. 15 at 3.

On social media, former Attorney General Eric Holder wrote: "Special Counsel Hur report on Biden classified documents issues contains way too many gratuitous remarks and is flatly inconsistent with long standing DOJ traditions.  Had this report been subject to a normal DOJ review these remarks would undoubtedly have been excised." *See* 2d Cornett Decl. at Ex. 16.  Jim Messina, a former Deputy Chief of Staff for President Barack Obama, wrote:  "Let's be clear— the special counsel isn't a dummy and we should be very careful not to take the bait after Comey pulled this in 2016.  Hur, a lifelong Republican and creature of DC, didn't have a case against Biden, but he knew exactly how his swipes could hurt Biden politically." *See* 2d Cornett Decl. at Ex. 17.

8.      Special Counsel Hur testified before the House Judiciary Committee on March 12, 2024.  The House Judiciary Committee and the House Oversight Committee had directed compliance with their subpoenas for the transcripts and audio recordings by 3:00 p.m. on March 11, 2024.  The Department of Justice did not produce redacted copies until the day of Special Counsel Hur's testimony, March 12th, at approximately 7:45 a.m.  *See* Letter from Hon. James Comer and Hon. Jim Jordan to Hon. Merrick B. Garland at 2 (Mar. 25, 2024) (ECF No. 29-1). However, in the early morning before Special Counsel Hur's testimony, the White House appears to have leaked redacted transcripts of the President's interview to what the White House perceived as "friendly" media outlets.  *See* Letter from Hon. James Comer and Hon. Jim Jordan to Hon. Merrick B. Garland (Mar. 25, 2024) (ECF No. 29-2); ECF No.29-3.[2]

9.      There was immense public pressure on President Biden from all quarters to release the transcript of his interview with Special Counsel Hur.  This pressure commenced the day the Hur Report was released.

---

[2] The Government's release of the transcripts to media outlets prior to the House Committees occurred under both a subpoena and a warning of contempt proceedings.  ECF No. 1-9, 24-cv-960.

At the February 9, 2024 Press Briefing with Karine Jean-Pierre and Ian Sams, the first following the release of the Hur Report, potential release of the transcripts of President Biden's interview with Special Counsel Hur was a central issue:

> Q:  And just finally, does the President support the release of the entire transcript of his interview to put to rest some of these things that you think are being overlooked?
> MR. SAMS:  And it's a reasonable question.  I think that it's important to know that we're dealing with classified materials in this conversation.  There are classification issues there. I don't have any announcement on, you know, releasing anything today.  But it's a reasonable question, and there were classified stuff, and we'll have to work through all that.
> Q:  So, but once you can work through, like, say, a redacted version, would the President support the release, as long as you can obviously keep what needs to be kept secret secret?
> MR. SAMS:  Well, we'll take a look at that and—and make a determination.

2d Cornett Decl. at Ex. 9 at 7.  Later, Mr. Sams was asked "with respect to the portion of the video and the transcript where he was asked about his time as Vice President and about Beau Biden's death, why not release those parts of the video?"  *Id.* at 23.  These questions continued at subsequent press conferences.  *See, e.g.*, 2d Cornett Decl. at Ex. 18 at 23; 2d Cornett Decl. at Ex. 19 at 21; 2d Cornett Decl. at Ex. 20 at 10–11; 2d Cornett Decl. at Ex. 21 at 25.

A Harvard-Harris poll conducted February 21–22, 2024 found 76% of respondents thought the transcript should be released.  *See* 2d Cornett Decl. at Ex. 22 at 39.  *The Wall Street Journal* Editorial Board published an op-ed on February 13, 2024, titled "*Let's See the Biden-Hur Interview Transcript.*"  *See* 2d Cornett Decl. at Ex. 23.  The *Associated Press* reported "Republicans and Democrats alike are interested in more complete details about what went into the report.  Biden and his allies say a full transcript would show the president is mentally sharp and will prove that Hur cherry-picked moments solely to make him seem feeble."  2d Cornett Decl. at Ex. 24 at 4.

10.    Despite facing a very public pressure campaign from the President himself on down, during his March 12, 2024 House Judiciary Committee Hearing, Special Counsel Hur confirmed his assessments in his opening statement and maintained throughout questioning that he had sufficient evidence to present the case to a jury, but believed that Mr. Biden would prove a sympathetic defendant.  Hur Hearing at 7, 8, 17, 68.  Nevertheless, Democratic members of the

Judiciary Committee repeatedly denigrated the Special Counsel's investigation and Special Counsel Hur personally. *See, e.g.*, *id.* at 37 ("you used your report to trash and smear President Biden because he said in response to questions over a five-hour interview that he didn't recall how he got the documents.  You knew that this would play into the Republicans' narrative that the President is unfit for office because he is senile. . . .You knew that this is what was going to happen, didn't you?"); *id.* at 40 ("You could have written your report with comments about his specific recollection as to documents, a set of documents, or a set of documents, but you chose a general, pejorative reference to the President.  You understood when you made that decision, didn't you, Mr. Hur, that you would ignite a political firestorm with that language, didn't you?").

These attacks have continued to this day.  Minority Members of the House Judiciary Committee mirrored the White House's position in Congressional contempt proceedings.  Despite Special Counsel Hur's statements to the contrary, the Minority begins from the position that "[t]he Hur Report exonerates President Biden of any prosecutable charges[,]" and "President Biden's age was not a material aspect of Hur's decision to decline prosecution[.]"  2d Cornett Decl. at Ex. 25 at 32.  Further, in the Minority's view, Special Counsel Hur's conclusions as to President Biden's memory are "superfluous dicta," "wildly inappropriate," and "unsupported by the actual record[,]" as "[t]he transcript shows that President Biden was in clear command of his cognitive functions[.]"  *Id.* at 34.

**11.**     On May 15, 2023, hours before the House Judiciary Committee was scheduled to mark up a contempt citation of Attorney General Garland, the President of the United States asserted executive privilege in response to subpoenas from the Committees for the audio recordings of Special Counsel Hur's interview with the President.  ECF No. 34-8.  Attached to the Assistant Attorney General for Legislative Affair's letter to the Committee Chairmen was an opinion from the Attorney General justifying the Attorney General's personal request that the President assert executive privilege.  *See* ECF No. 34-7.  The White House Counsel also drafted a letter conveying to the Committees the President's personal decision to assert executive privilege.  *See* ECF No. 29-3.  Later that day, rejecting the assertion of executive privilege, the

Committees both voted to recommend that the House of Representatives hold the Attorney General in contempt of Congress.  2d Cornett Decl. at Ex. 25 at 21; 2d Cornett Decl. at Ex. 26 at 26.

During his June 4, 2024 House Judiciary Committee hearing, Attorney General Garland repeatedly stated that the Government would not produce the audio recordings of the Special Counsel's interview with President Biden and explained why.  *See, e.g.*, 2d Cornett Decl. at Ex. 12 at *3.  Congressman Kelly Armstrong and Attorney General Garland engaged in a colloquy as to legislatively requiring all federal law enforcement interviews to be recorded.[3]  Currently, most non-custodial interviews are not recorded.  Attorney General Garland conceded "[p]ersonally, I think recording interviews is a very good thing to do".  *Id.* at *122.

12.     The Administration's refusal to release the audio recordings was met with considerable public controversy.  Indeed, Democratic Senator Mark Warner of Virginia recognized the concerns of the Government about potential manipulation, but insisted "[y]ou've got to release the audio."  *See* 2d Cornett Decl. at Ex. 27 at 3.

13.     On June 12, 2024, the House of Representatives voted to hold Attorney General Garland in contempt for failing to comply the Judiciary Committee's subpoenas.  *See* H. Res. 1292, 2d Cornett Decl. at Ex. 28.  On June 14, 2024, the Assistant Attorney General for Legislative Affairs wrote to Speaker Johnson and informed him that "the Department has determined that the responses by Attorney General Garland . . . did not constitute a crime, and accordingly the Department will not bring the congressional contempt citation before a grand jury or take any other action to prosecute the Attorney General." *See* 2d Cornett Decl. at Ex. 29 at 3.

14.     The controversy surrounding the audio recording has been heighted by the reality that President Biden's physical and mental fitness was not only central to Special Counsel Hur's investigation and conclusions, but is also one of the central questions in the 2024 Presidential Election.  In a recent poll, seventy-nine percent of voters consider the phrase "too old to be

---

[3]  Representative Armstrong refers to the legislation as the Fifth Amendment Integrity Restoration Act, H.R. 1525, 118th Cong. ("FAIR Act").  However, it appears the Representative misspoke and referenced the George Floyd Justice in Policing Act, H.R. 7120, 116th Cong., which required body cameras for all Federal law enforcement officers.  *See* H.R. 7120, 116th Cong. § 372(b).

president" to describe President Biden very or somewhat well.  *See* 2d Cornett Decl. at Ex. 30 at 12.  An April 2024 poll by Pew Research Center found sixty-two percent of voters were not too or not at all confident that President Biden has the mental fitness needed to be President.  *See* 2d Cornett Decl. at Ex. 31 at 14.  A June 2024 poll by CBS News found sixty-five percent of voters thought President Biden does not have mental and cognitive health to serve as President.  *See* 2d Cornett Decl. at Ex. 32 at 3.

In early June, the *Wall Street Journal* released a long form article entitled "*Behind Closed Doors, Biden Shows Signs of Slipping*" that was "based on interviews with more than 45 people over several months."  2d Cornett Decl. at Ex. 33 at 2.  *The Wall Street Journal's* story prompted a stern rebuke from the White House with Spokesman Andrew Bates telling *Axios* "it's a little surprising that The Wall Street Journal thought it was breaking news when congressional Republicans told them the same false claims they've spouted on Fox News for years, but it's also telling that the only individuals willing to smear the President in this story are political opponents afraid to use their names[.]"  2d Cornett Decl. at Ex. 34 at 2.  Moreover, the White House apparently strong armed at least one prominent congressional Democrat into calling *The Wall Street Journal* back and sitting for a second interview because it was displeased with what he had to say.  2d Cornett Decl. at Ex. 33 at 3 ("The White House kept close tabs on some of The Wall Street Journal's interviews with Democratic lawmakers.  After the offices of several Democrats shared with the White House either a recording of an interview or details about what was asked, some of those lawmakers spoke to the Journal a second time and once again emphasized Biden's strengths.  'They just, you know, said I should give you a call back,' said Rep. Gregory Meeks, a New York Democrat, referring to the White House.").

Allies of the President were quick to note that the absence of their statements in *The Wall Street Journal's* piece.  On X.com, Senator Patty Murray wrote: "I made clear to the @wsj regarding the January meeting on Ukraine that the President was absolutely engaged & ran that meeting in a way that brought everyone together.  I'm not quoted—I wonder why."  2d Cornett Decl. at Ex. 35.  Representative Nancy Pelosi wrote: "Many of us spent time with @wsj to share

14

on the record our first-hand experiences with @POTUS, where we see his wisdom, experience, strength, and strategic thinking.  Instead, the Journal ignored testimony by Democrats, focused on attacks by Republicans and printed a hit piece." 2d Cornett Decl. at Ex. 36. *The Hill* reported that Biden campaign manager Julie Chavez Rodriguez "brushed back the premise of the Journal story" and said of the President, "he is, you know, just one of the strongest leaders that I've been able to engage and to be able to work with and to advise." 2d Cornett Decl. at Ex. 37 at 3.  White House communications director Ben LaBolt described the story as a "[c]omplete and utter editorial fail by the @wsj." 2d Cornett Decl. at Ex. 38. *MSNBC*'s Joe Scarborough said of the President, "[i]f you want to talk about international affairs, if you want to talk about how to get bipartisan legislation, Joe Biden is light-years ahead of all of them." 2d Cornett Decl. at Ex. 37 at 1.  In short, the President's "memory" and "faculties" was an issue in the Hur Investigation, and it remains an issue that the White House has placed firmly before the electorate in the 2024 Election.

15.     It should come as little surprise, then, that numerous parties have sought release of audio recordings of the Special Counsel's interview long before the most recent controversy with Congress came to a head.  Heritage Plaintiffs submitted a FOIA Request on February 12, 2024, seeking "[a]ll recordings in any format whatsoever, of the interview of President Joseph R. Biden, Jr., referenced in [the Hur Report.]"  ECF No. 1-2 at 1 24-cv-960.  When that request was not granted, the Heritage Plaintiffs filed this lawsuit on April 3, 2024. *Id.*  The Government moved to consolidate the three cases on April 18, 2024. *See* ECF No. 7.  The other two cases included the original suit by Judicial Watch, *Judicial Watch v. DOJ*, 24-cv-0700 (TJK) (D.D.C.), and a conglomerate of media organizations, led by Cable News Network ("CNN") ("Media Plaintiffs"), *Cable News Network, Inc. v. DOJ*, No. 24- cv-961-RDM (D.D.C.).  The Court granted the Government's Motion to Consolidate on May 3, 2024. *See* Minute Order, *Judicial Watch et al v. DOJ*, 24-cv-0700 (TJK) (filed May 3, 2024).  While the Motion was pending, the Government notified all parties that it was withholding the audio recordings pursuant to FOIA Exemptions 6 and 7(C) and that no video recordings of the interview exist. *See* ECF No. 12 at 1 & n.1.  The Court entered a summary judgment briefing schedule by Minute Order dated May 6, 2024.

Defendant submitted its Motion for Summary Judgment (ECF No. 34) ("Defendant's Motion" or "Def. Mot.") on May 31, 2024.

## STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56, a court will grant summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. A factual dispute is "genuine" only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute is "material" only when it involves facts that "might affect the outcome of the suit under the governing law." *Id*.

"FOIA cases typically and appropriately are decided on motions for summary judgment." *Ullah v. CIA.*, 435 F.Supp.3d 177, 181 (D.D.C. 2020) (internal quotation marks omitted). "In considering a motion for summary judgment for the Defendant, the court analyzes all underlying facts and inferences in the light most favorable to the FOIA requester." *Stein v. CIA*, 454 F.Supp.3d 1, 15 (D.D.C. 2020) (citing *Unrow Human Rights Impact Litig. Clinic v. U.S. Dep't of State*, 134 F.Supp.3d 263, 271 (D.D.C. 2015)).

## ARGUMENT

## I.   EXEMPTION 7(A) DOES NOT APPLY.

The Government's argument under Exemption 7(A) boils down to its fear that release of the audio recordings "poses an unacceptable risk of impairing cooperation in future high-profile investigations." Def. Mot. at 30 (quoting Garland Ltr. at 6). The sweep of that submission is breathtaking. The Government implicitly admits this fact when it buries its Exemption 7(A) (law enforcement) argument in the back of its brief in a case that is about a (closed) law enforcement proceeding. The Government's argument is squarely foreclosed by D.C. Circuit precedent. Further, the Government's argument lacks any limiting principle. It would allow the Government to withhold any record in any proceeding the Government deems "high-profile" and would create a Mack-truck-sized exemption to the principle that Exemption 7(A) is temporarily limited. This

16

would eviscerate the careful statutory scheme drawn by Congress that balances the intent for maximum disclosure with the defined limited Exemption in 7(A).

The Government made a near identical argument concerning records of an interview of then-Vice President Richard Cheney in the Valerie Plame Special Counsel Investigation. That argument was rejected by Judge Sullivan's well-reasoned opinion in *CREW v. DOJ*, 658 F.Supp.2d 217 (D.D.C. 2009) ("*CREW I*"). The Government acknowledges Judge Sullivan's opinion is the "most analogous case" in one breath, but in the next, submits it was wrongly decided without any explanation. *See* Def. Mot. at 34. While Judge Sullivan's analysis is not technically binding, it is eminently correct. The Government's claim that releasing the audio would discourage senior officials from participating in similar high-profile investigations also rings hollow. After all, the Government made the same exact argument in *CREW I.* Yet, after the Government lost in *CREW I*, it chose *not* to appeal, but instead, settled the case. *See* Settlement Agreement and Release, *CREW v. DOJ*, 08-cv-1468 (EGS) (D.D.C. Nov. 16, 2009) (ECF No. 24). Thirty-eight pages of detailed notes of the Vice President's interview were released. *CREW I*, ECF No. 24 at 33–71. It has been more than 15 years since Judge Sullivan ordered the Government to release the details of Vice President Cheney's interview, and that decision appears to have had no impact on the fulsome voluntary cooperation with investigations offered by a wealth of senior officials from both parties ever since. This history does not just undercut the Government's proffered parade of horribles; it blows them out of the water.

Finally, the Government's basic theory of the case is flawed even on its own terms. Again, the Government loses under the plain application of statutory text and D.C. Circuit law, but even if all of that were wiped away, the Government would *still* lose on its own theory. No one would take the release of the audio recording here as indicative of any expected conduct by the Government in any other case. After all, this case is about audio of the sitting President of the United States, the unitary Executive Branch in physical form—not a garden-variety witness or investigation. He is the only individual in the Nation with complete control over whether he is interviewed, how he is interviewed, and whether his interview will be released. His interview

17

transcript cannot be released without his consent; no one else in the Nation has that absolute veto on release.  And the President already released the transcript here for political reasons.  It can have no real effect on any law enforcement proceedings outside of this case.  For all these reasons, the Government's Exemption 7(A) withholding fails.

### A.      Standard of Review.

Exemption 7(A) exempts "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . could reasonably be expected to interfere with enforcement proceedings."  5 U.S.C. § 552(b)(7)(A). There is no dispute that the audio recordings are law enforcement records—they occurred during a criminal investigation into the President's private conduct.  Under longstanding precedent, the D.C. Circuit analyzes Exemption 7(A) claims under a three-part test:  Whether the release "(1) could reasonably be expected to interfere with (2) enforcement proceedings that are (3) pending or reasonably anticipated."  *Mapother v. DOJ*, 3 F.3d 1533, 1540 (D.C. Cir. 1993) (emphasis omitted).  Importantly, "Exemption 7(A) is temporal in nature," *CREW v. DOJ*, 746 F.3d 1082, 1097 (D.C. Cir. 2014) ("CREW *III*"), whereas the other law enforcement exemptions are not.  *See, e.g.*, *Judicial Watch of Fla. v. DOJ*, 102 F.Supp.2d 6, 19 (D.D.C. 2000) (while 7(A) is temporal, 7(C) is not).

### B.      The Government Fails to Identify a Pending or Reasonably Anticipated Law Enforcement Proceeding.

Judge Sullivan's opinion in *CREW I* reviewed the same argument the Government makes here.  Nothing has changed since 2009, and this Court should follow Judge Sullivan's analysis, which correctly rejected the Government's submissions as contrary to binding Circuit precedent.

**1.**      The D.C. Circuit has long held that, to qualify under Exemption 7(A), the Government must show that disclosing the records at issue would reasonably be expected to interfere with a "*concrete* prospective law enforcement proceeding."  *CREW III*, 746 F.3d at 1097 (quoting *Juarez v. DOJ*, 518 F.3d 54, 58 (D.C. Cir. 2008) (internal citation omitted) (emphasis added)); *accord N.L.R.B. v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 232 (1978); Def. Mot. at

30 (collecting D.C. Circuit authorities); *Leopold v. DOJ*, No. 17-cv-2819 (APM), 2022 WL 4598596, at *9 (D.D.C. Sept. 30, 2022) (Mehta, J.); *Shem-Tov v. DOJ*, No. 17-cv-2452 (JDM), 2020 WL 2735613, at *8 (D.D.C. May 25, 2020) (Moss, J.); *Judicial Watch v. CIA*, No. 17-cv-397 (TSC), 2019 WL 4750245, at *4 (D.D.C. Sept. 29, 2019) (Chutkan, J.); *Poitras v. DHS*, 303 F.Supp.3d 136, 157 (D.D.C. 2018) (Howell, J.); *Elkins v. Fed. Aviation Admin.*, 134 F.Supp.3d 1, 3 (D.D.C. 2015) (Boasberg, J.); *Tipograph v. Dep't of Just.*, 83 F.Supp.3d 234, 239 (D.D.C. 2015) (Cooper, J.); *Durrani v. DOJ*, 607 F.Supp.2d 77, 89 (D.D.C. 2009) (Kollar–Kotelly, J.); *Owens v. DOJ*, No. 04-cv-1701 (JDB), 2006 WL 3490790 at *5 (D.D.C. Dec. 1, 2006) (Bates, J.). The point of Exemption 7(A) is "to prevent disclosures which might prematurely reveal the government's case in court, its evidence and strategies, or the nature, scope, direction, and focus of its investigations, and thereby enable suspects to establish defenses or fraudulent alibis or to destroy or alter evidence." *Maydak v. DOJ*, 218 F.3d 760, 762 (D.C. Cir. 2000).

The D.C. Circuit has thus made clear the text of Exemption 7(A) requires analysis of whether disclosure would "reasonably be expected to interfere with enforcement proceedings" and thus the requirement of concreteness looks not only to whether there is a "concrete" pending or future proceeding, but whether the records at issue would have a *concrete impact* on that proceeding. 5 U.S.C. § 552(b)(7)(A); *see, e.g.*, *Juarez v. DOJ*, 518 F.3d 54, 59 (D.C. Cir. 2008); *Antonelli v. ATF*, No. 04-cv-1180 (CKK), 2005 WL 3276222, at *4 (D.D.C. Aug. 16, 2005) ("'[r]easonably anticipated' means a 'concrete prospective law enforcement proceeding.'") (citation omitted). That analysis is "functional" such that "it allows the court to trace a rational link between the nature of the document and the alleged likely interference." *See, e.g.*, *Crooker v. Bureau of Alcohol, Tobacco & Firearms*, 789 F.2d 64, 67 (D.C. Cir. 1986); *accord Bevis v. U.S. Dep't of State*, 801 F.2d 1386, 1389 (D.C. Cir. 1986). Under that analysis, "it is not sufficient for an agency merely to state that disclosure would reveal the focus of an investigation; it must rather demonstrate *how* disclosure would reveal that focus." *Sussman v. U.S. Marshalls Serv.*, 494 F.3d 1106, 1114 (D.C. Cir. 2007). And that analysis must account for the temporality of Exemption 7(A)—it protects records for a limited time, but not to eternity. *See supra* p. 18. That functional

analysis necessarily requires a concrete "enforcement proceeding[]"—*i.e.*, the investigation being impaired.  Courts have applied the Exemption, for example, when releasing the records would have jeopardized an ongoing criminal investigation (*see, e.g.*, *Juarez*, 518 F.3d at 58-59; *Boyd v. DOJ*, 475 F.3d 381, 386 (D.C. Cir. 2007)); or a potential murder prosecution.  *See, e.g.*, *Bevis*, 801 F.2d 1386 at 1389.

The Government does not seriously claim that releasing the interview recording would interfere with any pending or reasonably anticipated proceeding arising out of the Hur investigation.[4]  After all, the Special Counsel declined to bring any charges, the Special Counsel's Office has been dissolved, and the Government certainly is not encouraging the Special Counsel to reconsider that conclusion.  Instead, the Government advances the exceedingly sweeping theory that "release of the audio recording here may make witnesses or potential witnesses in" other, completely unrelated "investigations reasonably fear that if they sat for a recorded interview, audio recordings of their interview would ultimately be released to either Congress or the public."  Def. Mot. at 31.  But Judge Sullivan rejected that precise argument over a decade ago.  The Government argued in that case that "disclosure of Vice President Cheney's interview could have a chilling effect and deter [senior White House officials] from voluntarily cooperating" in "future law enforcement investigations."  *CREW I*, 658 F.Supp.2d at 226.  In rejecting that argument, Judge Sullivan explained that there is "long line of cases—both prior to and since *Mapother*—that have recognized the necessity of identifying a 'concrete prospective law enforcement proceeding.'"  *Id.* at 229.

---

[4]  The closest the Government comes is when its declarant states that he is "aware of ongoing investigations in particular in which witnesses declined to be audio recorded, suggesting they feared their interview recording would be publicly disclosed in the future," and that "[s]uch refusals reasonably would be expected to increase if witnesses believed an audio recording could be released in FOIA." Weinsheimer Decl. at ¶ 34. But the Weinsheimer Declaration provides little detail. No *actual* concrete proceeding has been identified. Weinsheimer Decl. at ¶ 34. Moreover, most interviews are not recorded. *See* Declaration of the Honorable Michael B. Mukasey ("AG Mukasey Decl.") at ¶ 11 n.2. And "witnesses always have the right to decline the audio recording of an interview, just as they have the right to refuse to be interviewed, and they often decline interviews or audio recording for any number of reasons." *Id.* at ¶ 12. That they have done so, without more, proves nothing. *See id.*

While Judge Sullivan's decision does not bind this Court, this Court should follow it because it is eminently correct. After all, the Government's theory would cover virtually all records of virtually all law enforcement interviews. Anytime the Government is forced to disclose details of an interview taken in the course of a law enforcement investigation, that could theoretically dissuade future subjects from voluntarily cooperating with law enforcement. Moreover, the Government's argument would write Exemption 7(A)'s temporal limitation out of existence. *See* Def. Mot. at 30–31. An FBI FD-302 from the White House Chief of Staff on Iran Contra is still exempt some 37 years later under the Government's theory because its release even now would lead to the putative harm postured by the Government. That is an exceedingly broad sweeping conception of Exemption 7(A) that cannot be squared with the repeated pronouncements of the Supreme Court that "FOIA exemptions are to be narrowly construed," *FBI v. Abramson,* 456 U.S. 615, 630 (1982), or that the current version of Exemption 7 is properly understood as narrowly drafted and carefully calibrated. *See, e.g.*, *Robbins Tire*, 437 U.S. at 235 ("What Congress clearly did have in mind was that Exemption 7 permit nondisclosure only where the Government 'specif[ies]' that one of the six enumerated harms is present." (internal citation omitted)); *ACLU v. Dep't of Def.*, 543 F.3d 59, 77 (2d Cir. 2008) ("The 1974 amendments were intended to reinvigorate FOIA. By eliminating the ability of an agency to place entire law enforcement files out of the public's reach, and then narrowing the withholding authority to the six specified categories of records, they accomplished that goal.") (internal quotation and citation omitted), *vacated and remanded on other grounds*, 558 U.S. 1042 (2009).

Perhaps recognizing that problem, the Government seeks to limit the sweep of its rule to law enforcement records in "high profile" investigations. But the logic of the Government's position sweeps far broader than "high profile" investigations. If releasing interview recordings in "high profile" investigations will dissuade White House officials from voluntarily participating in future "high profile" investigations, there is no reason why releasing interview recordings in more garden-variety investigations would not discourage witnesses from voluntarily participating in similar investigations. If anything, disclosing details of an interview taken in the course of a

21

garden-variety investigation would arguably be even more chilling for future witnesses than disclosing details of an interview taken in the course of a high-profile investigation, where witnesses might reasonably suspect that their participation will receive public attention.

But even if the Government could somehow limit the sweep of its rule to "high profile" investigations, its conception of Exemption 7(A) would still be "breathtakingly broad." *CREW I*, 658 F.Supp.2d at 228 n.5.  As Judge Sullivan explained, the Government's theory would "encompass *any* law enforcement investigation during which law enforcement might wish to interview senior White House officials." *Id.* (emphasis in the original).

> Such proceedings might include an investigation into alleged criminal activity that physically took place in the White House; financial wrongdoing by a White House official that took place before or during his or her tenure in the executive branch; misconduct relating to official responsibilities, such as the breach of national security protocol that formed the basis of the Plame investigation; or even an event occurring outside the White House with only tangential connection to one or more White House officials.

*Id.* at 229.  Taking the Government's theory on its own terms, it would cover all manner of high-profile investigations.  Investigations into Article III judges are high-profile; investigations into major businesses or their officers are high-profile; investigations into celebrities of all casts are high-profile; even investigations of major criminal figures are high-profile.  In effect, the Government's submission would create one rule for the famous, rich, powerful, and notorious, and another for the run-of-the-mill gun-and-drug cases this Court sees every day.  As Judge Sullivan concluded:

> Indeed, the dramatic and far-reaching extension to the current reach of Exemption 7(A) that DOJ urges this Court to adopt is more properly directed to Congress to consider and, in its discretion, to enact if it sees fit.  This Court, however, is bound by the law in its current state, which does not sanction such an expansive reading of the statute.

*Id.* at 230.[5]

---

[5] Tellingly, the Government does not even cite what it argued in 2009 was its best case, *Mapother*, which allowed the Government to withhold files it expected would interfere with its potential defense of challenges to the exclusion of former Nazis from the country.  *See Mapother*, 3 F.3d 1533 at 1542–43.  Perhaps this is because, as Judge Sullivan explained in *CREW I*, *Mapother*'s

**2.**      Tellingly, the Government cannot assert *any* authority in support for its sweeping rule.

First, the Government latches onto language in *Juarez*, that "nothing in the text of Exemption 7(A) or in D.C. Circuit precedent should prevent its application to situations where information from a closed investigation would harm a future one that is 'reasonably anticipated'" and that "a 'concrete prospective law enforcement proceeding' . . . is not quite the formidable hurdle appellant would make it out to be' and is readily satisfied by showings of prospective law enforcement need." Def. Mot. at 32 (quoting *Juarez* at 58–59.). But that language does not do the work the Government would have it do. That language arose in the context of rejecting the requester's argument that "the DEA was no longer actively pursuing its investigation." *Juarez* at 59. There was no dispute as to the concreteness of the proceeding in *Juarez*; all agreed it was an investigation of the requester for money laundering. *See Juarez* at 57–58.

Second, the Government asserts that *Center for National Security Studies v. DOJ*, 331 F.3d 918 (D.C. Cir. 2003), supports its argument that information from a "closed investigation" can nonetheless be withheld if it is "expected to interfere with *separate*, ongoing investigations." Def.

---

elucidation of the D.C. Circuit's most expansive view of a "reasonably expected" law enforcement proceeding undercuts the Government's arguments. Judge Sullivan first explained that "[a]lthough the proceedings in *Mapother* had not yet been commenced, the court could readily identify and articulate the scope and nature of those proceedings, in addition to the form that they would take and the potential harm that disclosure could cause to those future proceedings." *CREW I*, 658 F.Supp.2d at 228. A far field from here, where proceedings could range from the next Watergate, to a sordid Hollywood tale of abuse of power, the excesses of the next substance riddled pop-star or athlete, or to the next cartel king-ping with a good media team. Judge Sullivan also noted that "DOJ's proffered reading of *Mapother* also disregards an important factual predicate underpinning the court's conclusion that the prospective-proceeding requirement had been met in that case: namely, the nexus that existed between the information withheld and the proceedings that were ongoing or anticipated." *Id.* at 229. The same defect applies here. Under DOJ's view, disclosing notes of the interview of then-Vice President H.W. Bush (*See* Exhibit 2 to the Declaration of Max Taylor Matheu (June 21, 2024) ("Matheu Declaration" or "Matheu Decl.")) could be said to impair the criminal investigation into Senator John Ensign for action following his affair with his "former campaign staffer" who was also the wife of his "former chief of staff" (*CREW v. DOJ*, 978 F.Supp.2d 1, 5 (D.D.C. 2013) ("*CREW II*"), which could, in turn, be said to impair the on-going investigation into Sean "Diddy" Combs.

Mot. at 31 (emphasis added).  But the Government misses the point.  The problem here is that the Government does not claim that it has any plans to use the audio recording of the Special Counsel's interview with the President in any way in *any* pending or anticipated proceeding.  Nor does the Government claim that the release could impact any such concrete proceeding.  That readily distinguishes this case from *Center for National Security Studies*, where the Government withheld the names of 700 individuals detained on immigration charges in connection with the September 11 terrorism investigation because the requested information was relevant to *that investigation*, which was still ongoing for a subset of those individuals.  It therefore made no difference whether a particular individual was the direct target of those investigations.  It was enough that *all* "[t]he names ha[d] been compiled for the 'law enforcement purpose' of successfully prosecuting the terrorism investigation" that remained ongoing and was likely to lead to charges, and that disclosing any of those names was "reasonably likely to interfere" with those *particular* proceedings.  *Ctr. Nat. Sec. Studies*, 331 F.3d at 926 (quoting 5 U.S.C. § 552(b)(7)(A)).  Here, by contrast, the Government does not even try to argue that there is any chance of the audio actually being used or directly impacting in any pending or anticipated proceedings.  That suffices to doom its Exemption 7(A) argument under settled D.C. Circuit precedent.

### C.     In Any Event, Release of the Audio Recording Could Not Reasonably be Expected to Interfere with Unrelated Future Enforcement Proceedings.

**1.**     Even assuming generic interference with law enforcement investigations in the abstract (as opposed to concrete ongoing or reasonably anticipated proceedings) could suffice, the Government's arguments are unavailing.  Attorney General Garland claims that disclosure of the Government's audio would cause "diminished cooperation" in "high-profile investigation where voluntary cooperation is exceedingly important" because:

> If witnesses in such investigations reasonably fear that materials like the recordings at issue here would subsequently be released to Congress or the public even when prosecutors declined to charge them with a crime, they may be less likely to cooperate with the Department's investigatory efforts, including by refusing to sit for recorded interviews.  Or they might cooperate less fully, such as by being less comprehensive in their answers during interviews."

Garland Ltr. at 6; *id.* at 5 (similar); *accord* Weinsheimer Decl. at ¶¶ 31–36.

2. The Government's theory eschews learned experience as to how investigations involving high-ranking government officials play out since Judge Sullivan's decision in *CREW I* was not appealed and has been on the books since 2009. Tellingly, then-Assistant Attorney General Lanny Bruer's Declaration claimed that release of the interview notes there would lead to the very harms predicted in the Weinsheimer Declaration. *Compare* Weinsheimer Decl. at ¶¶ 29, 35 *with* Declaration of Lanny A. Breuer at ¶¶ 5, 6, 8, *CREW v. DOJ*, 08-cv-01468 (EGS) (Jul. 1, 2009) (ECF No. 17-1), 2d Cornett Decl. at Ex. 39 at 2–3, 5. But that prediction was wrong, and fifteen years of history have demonstrated that those harms have not come to pass. Indeed, as Attorney General Mukasey notes, "every witness in Special Counsel Hur's investigation—from President Biden on down—chose to sit for a recorded interview with the knowledge that portions of the interview could be released under FOIA pursuant to the *CREW* holding." AG Mukasey Decl. at ¶ 8 n.1. Experience shows that senior officials continue to volunteer to testify even though portions of those interviews are regularly released. *See, e.g.*, Matheu Decl. (collecting authorities). Revealingly, the Weinsheimer Declaration does not even address this widely known fact.

3. Moreover, even spotting the Government its sweeping view of Exemption 7(A)—at odds with Circuit precedent—as Attorney General Mukasey explains, it asks the wrong question. AG Mukasey Decl. at ¶ 9. Again, this case is much more than any "such" high-profile investigation. "The President is unique." *Id.* He is the living, breathing, embodiment of the unitary Executive Branch. He alone among Americans has absolute power to refuse to cooperate with the Department or to dictate the terms of that cooperation. Critically, he "is the only person in the Executive Branch who has the authority to order the Attorney General to release the transcript of an interview." *Id.* And he is the only person with absolute veto power over release. The record here is crystal clear that President Biden released the transcript for political reasons; the pressure to do so was politically unavoidable. *See supra* p. 12; AG Mukasey Decl. at ¶ 10 ("President Biden made the decision to release the transcript of his interview for his own reasons, which to my eye were political, including pressure associated with his campaign for reelection.").

That puts this case in a different dimension.  AG Mukasey Decl. at ¶ 16.  As Attorney General Mukasey explains, "[o]ther witnesses may face similar political pressures, but no other witnesses—not even the Vice President or other senior officials in the White House—would have the ability to make the Department release the transcript of their interviews, regardless of the intensity of pressure or publicity surrounding a criminal investigation."  *Id.*

It follows that even under the Government's sweeping view of Exemption 7(A), no other witness—and certainly no lawyer—will consider this case to have any application to them or their clients.  It applies only to a sitting President who *voluntarily* releases a *prior* transcript. Accordingly, "witnesses in future investigations will continue to place reasonable reliance on the Department's 'well-established and consistent practice' of maintaining the confidentiality of investigative interviews whether or not the Court in this case orders the Government to disclose the audio recording of an interview the substance of which has already been released in written form."  AG Mukasey Decl. at ¶ 12 (citing Garland Ltr. at 5–6).

4.      Attorney General Garland and the Weinsheimer Declaration are also blind to the political reality of Washington, D.C.  As Attorney General Mukasey explains, politics drives cooperation in White House investigations.  *Id.* at ¶ 15 ("But at least since Watergate, the President knows that he will suffer politically if he refuses to cooperate with a Special Counsel investigation. And for similar reasons, a President will direct the Department to put aside its usual policy of protecting confidentiality and release sensitive information when it suits the political interests of the President and his Administration.  President Biden's decision to release his interview transcript is a prime example.").  This political reality makes the mere threat of compulsory process extraordinarily potent.  2d Cornett Decl. at Ex. 40.  Therefore, as Attorney General Mukasey explains:

> Senior officials interviewed in high profile criminal cases are usually represented by experienced counsel who understand the risk that an interview transcript or recording may be released by the President for political reasons.  That is one way political accountability operates in Washington, and it is a particular factor in "investigations where the voluntary cooperation of White House officials is exceedingly important." Garland Letter at 5. White House personnel and other senior officials know (or will be advised by counsel) that any

interview they give may be disclosed if the President deems it expedient.  The Court's decision in this case will not change that reality.

AG Mukasey Decl. at ¶ 13.  For similar reasons, it is absurd to contemplate that witnesses will somehow be "less comprehensive in their answers during interviews."  Weinsheimer Decl. at ¶35.  *See* AG Mukasey Decl. at ¶ 13 n.3 (dismissing Weinsheimer's argument).

## II.   THE GOVERNMENT'S CLAIM OF LAW ENFORCEMENT EXECUTIVE PRIVILEGE UNDER EXEMPTION 5 MUST BE REJECTED.

Perhaps recognizing the uphill battle it faces under Exemption 7(A), the Government leads not with the section of FOIA that actually addresses the release of law enforcement materials, but with an exceedingly broad Exemption 5 argument that would render all of the careful limits Congress put on FOIA exemptions pointless.  The Government asserts a free-standing claim of executive privilege under Exemption 5 that would allow an Administration to withhold *any* material the President sees fit "'to preserve the integrity and independence of criminal investigations and prosecutions.'"  Def. Mot. at 9 (quoting *Assertion of Exec. Priv. Concerning the Special Counsel's Interviews of the Vice Pres. & Senior White House Staff*, 32 Op. O.L.C. 7, 10 (2008)).  This privilege would effectively apply as a "Super Exemption 7," allowing the Government to withhold information for "law enforcement" (and perhaps even other) reasons even when it flunks the requirements of Exemption 7.  *See* Def. Mot. 11–13.  And the Government goes further, strongly implying (but cannot not bring itself to expressly say) that an assertion of executive privilege is effectively unreviewable—once the President invokes executive privilege, the matter is over, and the records cannot be released.  *See e.g.*, Def. Mot. at 11 ("the assertion is dispositive so long as the record in question is susceptible to a claim of executive privilege.").  As shown below, the Government's eyebrow-raising arguments fail for three primary reasons.

First, the Government's argument would make total nonsense out of FOIA.  FOIA is a carefully crafted statutory scheme of disclosure and exemptions.  Exemption 7 codified the previous body of executive common law enforcement privilege.  Pursuant to binding Circuit law, this operates as preemption.  And on-point authority squarely rejects the Government's argument that a law enforcement exemption can be advanced through Exemption 5.

Second, the Government's argument by implication boils down to the Government's principal assertion that is as breath-taking as it is broad:  There is a freestanding, constitutional mandate of executive privilege that eviscerates Congress's carefully drafted Exemption 7.  But the Government provides no caselaw for this expansive claim.

Third, contrary to the Government's suggestion, this Circuit frequently reviews the merits of executive privilege claims.  It should do the same here.

A.   **FOIA Codified All Law Enforcement Privileges Under Exemption 7; Such Claims Cannot be Brought Under Exemption 5.**

The Government's principal argument is that the audio recording is exempt under Exemption 5 because the President asserted executive privilege over it.  But DOJ does not invoke any of the traditional categories of executive privilege.  The recording does not implicate the presidential communications privilege, which protects confidential communications between the President and his advisors that relate to presidential decision making.  Nor does it implicate the deliberative process privilege, which protects pre-decisional and deliberative communications within executive branch agencies.  Instead, DOJ invokes the "law enforcement" privilege, which (according to DOJ) the President may assert "to preserve the integrity and independence of criminal investigations and prosecutions."  Def. Mot. at 32.

This argument is contrary to the basic statutory structure of FOIA.  Congress expressly addressed law enforcement records in Exemption 7 and exempted them from disclosure only in a few narrow circumstances laid out by the statute itself.  *See* 5 U.S.C. § 552(b)(7)(A)–(F).  As previously noted, the Supreme Court and Circuit courts have repeatedly instructed that Exemption 7 is to be read as a narrow, carefully reticulated scheme of disclosure and exemption.  *See, e.g.*, *Robbins Tire*, 437 U.S. at 235 (internal citation omitted); *ACLU*, 543 F.3d 59 at 68.  The Government's interpretation of Exemption 5 would eviscerate those carefully crafted limits, as the Government appears to be arguing that Exemption 5 "allow[s] the government to withhold" any record so long as it is "subject to formal invocation of privilege."  Def. Mot. at 13.  In other words, it does not matter in the Government's view whether disclosure could result in one of the categories

28

of harm specified in Exemption 7; the record is exempt under Exemption 5 so long as the President formally invokes executive privilege over it and so long as the record is "susceptible to a claim of executive privilege." Def. Mot. at 10, 12. But that reading of Exemption 5 would largely render the limits in Exemption 7 a dead letter. Courts do not read statutes in a way that renders other provisions superfluous. *See, e.g.*, *Pulsifer v. United States*, 601 U.S. 124, 143 (2024). The Government's reading, moreover, cannot be squared with the longstanding rule that specific provisions govern the general. *See, e.g.*, *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012). FOIA's statutory structure omits any independent "law enforcement" disclosure privilege lingering under Exemption 5.

Indeed, Judge Sullivan recognized as much in 2009 (albeit in dicta):

> [I]f this Court *were* to consider whether to recognize a law enforcement privilege under Exemption 5, it would not be inclined to do so. In particular, the fact that Exemptions 6 and 7 already protect the law enforcement interests that are traditionally of concern in the civil litigation context weighs heavily against recognizing the law enforcement privilege under Exemption 5." *Cf. Colo. Nurses Ass'n v. Fed. Labor Relations Auth.*, 851 F.2d 1486, 1492 (D.C. Cir. 1988) (reiterating the "basic principle of statutory construction that a statute dealing with a narrow, precise, and specific subject is not submerged by a later enacted statute covering a more generalized spectrum" (internal quotation marks omitted)); *Abramson*, 456 U.S. at 630 ("FOIA exemptions are to be narrowly construed[.]").)

*CREW I*, 658 F.Supp.2d at 232 n.9; *see also Dean v. F.D.I.C.*, 389 F.Supp.2d. 780, 792 (E.D. Ken. 2005) ("The Court is unwilling to recognize the 'law enforcement privilege' in the present case. Neither of the cases cited by the defendants were FOIA cases and a number of the factors to be considered in whether to apply the privilege are already covered in other FOIA exemptions— . . . . Further, the Court is of the opinion that if this privilege were to be recognized at all, it should be recognized under Exemption 7, not Exemption 5.").[6]

This structural reality is confirmed by the fact that Exemption 7 largely codified the existing common law privilege for law enforcement records. As the Supreme Court explained as

---

[6] Indeed, even the Government could not bring itself to make this argument in 2009 where it conceded that there was no "'meaningful difference' between the application of Exemption 7(A) and the law enforcement privilege under Exemption 5." *CREW I*, 658 F.Supp.2d at 232.

regards Exemption 7(C), "[w]e can assume Congress legislated against this background of law, scholarship, and history when it enacted FOIA and when it amended Exemption 7(C) to extend its terms." *Nat. Archives & Records Admin. v. Favish*, 541 U.S. 157, 169 (2004); s*ee also, e.g.*, *DOJ v. Reporters Comm. for Freedom of Press*, 489 U.S. 749, 762, n.13 (1989) (contrasting the scope of the privacy protection under FOIA with the analogous protection under the common law and the Constitution); *Summers v. DOJ*, 140 F.3d 1077, 1085 (D.C. Cir. 1998) (Silberman, J., concurring) (referring to Exemption 7 as "the law enforcement privilege"); *Hemstreet v. Duncan*, No. 07-cv-732 (ST), 2007 WL 4287602, at *2 (D. Ore. Dec. 7, 2007) ("The federal investigatory or law enforcement privilege is not based on any statute, but is 'rooted in common sense as well as common law,' *Black v. Sheraton Corp. of Am.*, 564 F.2d 531, 542 (D.C. Cir. 1977), and has been largely incorporated into the Freedom of Information Act ("FOIA"), 5 USC § 552(b)(7)"). That codification of common law and structure unambiguously preempts any existing common law "law enforcement privilege" right of non-disclosure for the purposes of FOIA. *Cf., e.g.*, *Ctr. for Nat. Sec. Studies*, 331 F.3d at 936–37 ("FOIA provides an extensive statutory regime for plaintiffs to request the information they seek. Not only is it uncontested that the requested information meets the general category of information for which FOIA mandates disclosure, but for the reasons set forth above, we have concluded that it falls within an express statutory exemption as well. It would make no sense for Congress to have enacted the balanced scheme of disclosure and exemption, and for the court to carefully apply that statutory scheme, and then to turn and determine that the statute had no effect on a preexisting common law right of access. Congress has provided a carefully calibrated statutory scheme, balancing the benefits and harms of disclosure. That scheme preempts any preexisting common law right."); *Nat'l. Sec. Counselors v. C.I.A.*, 960 F.Supp.2d 101, 144–45 (D.D.C. 2013) (similar).

**B.     Claims of Executive Privilege Under Exemption 5 Are Fully Reviewable.**

The Government strongly implies that, at least in this case, it is *not* "emphatically the province and duty of the judicial department to say what the law is." *Marbury v. Madison*, 5 U.S.

(1 Cranch) 137, 177 (1803).  Rather, "[t]he President's assertion of executive privilege resolves this case."  Def. Mot. at 12.  That is wrong.  The D.C. Circuit has time and again reviewed claims of Presidential Communications privilege asserted under Exemption 5 on the merits.  *See, e.g.*, *Baker & Hostetler LLP v. U.S. Dep't of Com.*, 473 F.3d 312, 321 (D.C. Cir. 2006) (adjudicating claim of executive privilege on the merits); *Judicial Watch, Inc. v. DOJ*, 365 F.3d 1108, 1109, 1113–14 (D.C. Cir. 2004) (same); *Burka v. Dep't of Health & Human Servs.*, 87 F.3d 508, 516–18 (D.C. Cir. 1996) (same).  Indeed, even the Office of Legal Counsel concedes this point in opinions cited by the Attorney General here.  *See Assertion of Executive Privilege in Response to Congressional Demands for Law Enforcement Files*, 6 Op. O.L.C. 31, 35 (1982).

**C.**  **Any Constitutional Law Enforcement Privilege is Not Available Here.**

**1.**  **The Government's Constitutional Claim of Executive Privilege Fails on Its Own Terms.**

Even if Exemption 5 did implicitly provide broader protection to assertions of a "law enforcement" privilege than Exemption 7 explicitly provides because that privilege originated from the Constitution (and not common law), the Government's privilege claim fails on its own terms.  The Government's central argument boils down to a freestanding claim of Constitutional privilege exempting the audio recording despite the fact that:  (1) it is of a sitting President in an investigation of his *private* conduct; and (2) the President has already released a transcript of that audio.  But again, DOJ does not invoke any of the traditional categories of executive privilege.  The recording does not implicate the presidential communications privilege, which protects confidential communications between the President and his advisors that relate to presidential decision making.  Nor does it implicate the deliberative process privilege, which protects pre-decisional and deliberative communications within executive branch agencies.  Instead, the Government invokes the "law enforcement" privilege, which (according to the Government) the President may assert in a freestanding manner to "to preserve the integrity and independence of criminal investigations and prosecutions."  Def. Mot. at 9.  The Government provides no further definition on this test which, as discussed *supra*, lacks any limiting principle.  Whether there is a

31

Constitutionally based claim of "law enforcement" executive privilege or not, it does not apply here (and in any event it would not sweep any more broadly than Exemption 7).

> **2.    Any Constitutional Law Enforcement Privilege is No Broader Than Exemption 7.**

Any law enforcement privilege that may exist simply does not apply here.  Even if one assumes the Government's own opinions as to the law enforcement executive privilege are correct—the broadest possible conception of law enforcement privilege— they do not reach this case.  Attorney General Garland relies almost exclusively on Attorney General Mukasey's Opinion in *Assertion of Exec. Priv. Concerning the Special Counsel's Interviews of the Vice Pres. & Senior White House Staff*, 32 Op. O.L.C. 7, 10–11 (2008) ("*2008 Special Counsel Assertion*").  *See* Garland Ltr. at 1, 4–5.  But as Attorney General Mukasey *himself* explains, the *2008 Special Counsel Assertion* has no application here.  First, that assertion was carefully tailored and cabined to "official White House actions" (*2008 Special Counsel Assertion* at 11) and arose in the context of interviews about material over which the President asserted "the presidential communications and deliberative process components of executive privilege." *Id.* at 9.  In contrast, the assertion here involves President Biden's private conduct.  *See* AG Mukasey Decl. at ¶¶ 6–7.  Second, the 2008 materials were withheld in their entirety.  *Id.* at ¶ 8.  Here, President Biden has already released the transcript, which makes it hard to see how the Government can nonetheless claim some independent *law enforcement* interest in the audio given that everyone already knows the identity of the witness.  And for the reasons discussed, *supra*, the fact this case is a class of one means it will not have any appreciable impact on law enforcement efforts in the future.

The Government cites no caselaw to establish a privilege of the breadth asserted here—because there is none.  Indeed, the only case the Government cites on law enforcement privilege speaks to the common law government informant privilege and the common law privilege to withhold files in *pending* investigations.  *See In Re Sealed Case* (*Espy*), 121 F.3d 729, 736–37 (D.C. Cir. 1997).  That privilege (whether common law or constitutional) is clearly encompassed within Exemptions 7(D) and 7(A), respectively.  The Government's citation to OLC opinions fairs

little better.  None stand for the broad claim of constitutionally compelled executive privilege the Government asserted here.  Indeed, the vast majority of these opinions merely assert categories of law enforcement privilege steeped in the common law enforcement privileges that fit comfortably within the scope of Exemption 7.  *See Position of the Executive Department Regarding Investigative Reports*, 40 U.S. Op. Atty. Gen. 45, 46–47 (1941) (explaining disclosure of investigative reports would "seriously prejudice law enforcement" by providing "prospective defendants" with "information the Government has, and what witnesses or sources of information it can rely upon;" "prejudice the national defense;" "prejudice confidential sources" and "innocent individuals.").

On the other side of the ledger, there is no reason to read any Constitutional law enforcement privilege more broadly than the common law enforcement privilege.  There is ample authority that the sweep of Exemption 7 is comparable to—if not broader than—the common law enforcement privilege which is largely codified.  *See, e.g.*, *Commonwealth of Puerto Rico v. United States*, 490 F.3d 50, 62–63 (1st Cir. 2007) ("Although Puerto Rico has not made a request for information under the federal Freedom of Information Act (FOIA), 5 U.S.C. § 552, the provisions of this statute also provide guidance in determining the appropriate scope of the privilege.  The law enforcement exemption to FOIA shields from disclosure documents whose production would, *inter alia*, 'interfere with enforcement proceedings' or 'endanger the life or physical safety of any individual.'  *Id.* § 552(b)(7)"); *Appel v. City of Saint St. Louis*, No. 4:05-cv-772 (SNL), 2007 WL 9808048, at *2 (E.D. Mo. Mar. 19, 2007) (adjudicating common law claim of privilege by looking to FOIA precedent and stating "[a]t common law, courts recognize the existence of a law enforcement privilege.  This privilege can be equated to that created by FOIA."); *United States v. Lang*, 766 F.Supp. 389, 404 (D. Md. 1991) (applying FOIA precedent to resolve claim of "law enforcement privilege").  Indeed, elsewhere the Government itself has taken this position.  *See, e.g.*, *Chinn v. Blackenship*, No. 09-cv-5119 (RJB), 2010 WL 11591399, at *2 (W.D. Wash. Feb. 26, 2010) (noting in United States's motion to quash subpoena in civil rights action against local defendant, "[t]he United States supports its law enforcement privilege argument by asserting that

33

courts often look to cases construing the FOIA for guidance on the scope of the law enforcement privilege, including the weight accorded to the government interest in nondisclosure.").

**D.      The Government's "Avoidance" Argument Should be Rejected Out of Hand.**

The Government's avoidance argument makes no sense.  It argues that it would raise "separation of powers concerns" to interpret FOIA to require the disclosure of information subject to a formal claim of executive privilege.  But that cannot possibly be right.

After all, Courts have long adjudicated executive privilege claims raised in valid cases and controversies, and they have made clear that FOIA's statutory right of access requires only a denied request to confer standing and a right to judicial review.

An Act of Congress can unambiguously put a claim of executive privilege before a Court— even when that claim is contested by the political branches.  *See, e.g.*, *United States v. Nixon*, 418 U.S. 683, 692–97 (1974) (exercising jurisdiction over President's motion to quash criminal subpoena); *Sen. Select. Comm. v. Nixon*, 498 F.2d 725, 727–28 (D.C. Cir. 1974) (en banc) (exercising jurisdiction over bespoke statute allowing the Senate to seek judicial enforcement of subpoena seeking Nixon tapes).  Once there is a justiciable case and controversy and cause of action, any implicated claim of executive privilege on the merits is fully subject to judicial resolution.  *See Trump v. Mazars USA, LLP*, 591 U.S. 848, 861 (2020) (stating "the parties agree that this particular controversy is justiciable" and adjudicating validity of third-party subpoenas to sitting President's accountants and bankers).[7]  That is why the courts in this Circuit have *repeatedly* adjudicated claims of executive privilege on the merits.  *See supra* p. 31.  Indeed, the Solicitor General took the exact opposite position in *Mazars* that the Government takes here.  Even though

---

[7]  The Government repeatedly cites language in *Mazars* to support its proposition that the claim of executive privilege here cannot be adjudicated under FOIA.  *See* Def. Mot. at 12–1.  But that misses the point.  The cited and quoted language went to the merits of the separate legal question of Congressional authority to subpoena the President's private information.  *See Mazars*, 591 U.S. at 858–59, 861.  There was no question the Court had power to adjudicate the case under a standard claim of private right and the generic federal questions statute.  *Id.* at 861.

the Solicitor General viewed the Congressional subpoenas there to "third party custodians" as being an "end-run" around the "usual political process," the Solicitor General argued that:

> Like any other litigant, President Trump is entitled to bring suit to vindicate his personal interest in preventing third-party disclosure of his personal records, including on the grounds that respondents exceeded their powers in issuing the subpoenas in light of the public office he holds . . . .  Although resolving the *merits* of that claim requires answering significant constitutional questions about the scope of legislative power under Article I and the protections afforded the Executive under Article II, the suit itself is justiciable because the President has Article III standing . . . and because those questions are amenable to judicially manageable standards and their resolution is not committed to the political branches.

*See* Supplemental Letter Brief of the United States at 2, *Trump v. Mazars USA LLP*, No. 19-715 (May 8, 2020).  So too here, "like any other litigant," Plaintiffs seek to vindicate their informational right under FOIA.  "All that is required to show standing and have a cause of action under FOIA is a denied request." *Public Citizen v. DOJ*, 491 U.S. 440, 449 (1989); *Zivotofsky ex rel. Ari Z. v. Sec'y of State*, 444 F.3d 614, 617–618 (D.C. Cir. 2006).  Indeed, the Government previously conceded in the D.C. Circuit that any Member of Congress can make a FOIA Request; they simply must sit as any individual under that statute, not a coordinate branch of government with special rights and prerogatives.  *See Maloney v. Murphy*, 984 F.3d 50, 62 (D.C. Cir. 2020) (Government concession), *reh'g en banc denied sub nom. Maloney v. Carnahan*, 45 F.4th 215 (D.C. Cir. 2022), *vacated*, 143 S.Ct. 2653 (2023).  The clash between the Executive and Congress simply does not factor into this calculus.  Claims of executive privilege can be raised under FOIA, and courts can adjudicate them as they have always done before.  *See supra* p. 31.[8]

---

[8]  FOIA, of course, can intersect with any number of statutes in ways that allow FOIA to be used at times as an end run around a bar to obtaining the requested records under another procedure. *See, e.g.*, *North v. Walsh*, 881 F.2d 1088, 1097 (D.C. Cir. 1989) (R.B. Ginsburg, J.) (reversing District Court holding that Exemption 7(A) bars release of information that would "undercut" a criminal trial judge's order and "distort criminal discovery mechanisms," and further explaining "[t]he fact that a defendant in an ongoing criminal proceeding may obtain documents via FOIA that he could not procure through discovery, or at least before he could obtain them through discovery, does not in and of itself constitute interference with a law enforcement proceeding. Rather, the government must show that disclosure of those documents would, in some particular, discernible way, disrupt, impede, or otherwise harm the enforcement proceeding.").

E.       **The Government Waived Its Claim of Executive Privilege on This Record.**

Executive privilege is waived if the information is voluntarily disclosed.  *See Protect Democracy Project, Inc. v. DOJ*, No. 20-cv-172 (RC), 2021 WL 4935540, at *1 (D.D.C. May 17, 2021) ("Voluntary disclosure of privileged information waives any applicable privilege.").  Courts only find waiver where the withheld information is the same as the "document or *information* specifically released, and not for related materials."  *In Re Sealed Case* (*Espy*), 121 F.3d at 741 (emphasis added).  Plaintiffs bear the burden of showing:  (1) the record sought "must be as specific as the information previously released;" (2) it "must match the information previously disclosed;" and (3) "the information requested must already have been made public through an official and documented disclosure."  *Fitzgibbon v. CIA*, 911 F.2d 755, 765 (D.C. Cir. 1990).

Here, there is no dispute the Government released the transcript through an official documented disclosure to both the press and Congress.  The audio tape of President Biden's interview with Special Counsel Hur is as specific as the information previously released.  There is little question the same specificity of information is available in both formats; it is merely a different format.  As Plaintiffs have argued elsewhere in this motion, the *value* of the audio tapes is a separate analysis.  As to the issue of waiver, it is the information, not its format that matters.  *See In Re Sealed Case* (*Espy*), 121 F.3d at 741 (requiring the withheld information to be the same as the "document or *information* specifically released, and not for related materials.").

III.   **RELEASE OF THE AUDIO RECORDINGS WOULD NOT RESULT IN AN UNWARRANTED INVASION OF PRESIDENT BIDEN'S PRIVACY.**

Plaintiffs concede that the Exemption 7 threshold applies and therefore that the Court need only analyze President Biden's asserted privacy interests under Exemption 7(C).  *Accord* Def. Mot. at 15.

A.       **Standard of Review.**

Analysis under Exemption 7(C) occurs in three phases in which there is some shift in the usual burdens.

First, *the Government* must demonstrate that a privacy interest protected by a privacy exemption is "present." *Favish*, 541 U.S. 157 at 172; *see also ACLU v. DOJ*, 655 F.3d 1, 6 (D.C. Cir. 2011).

Second, the "FOIA requester must (1) show that the public interest sought to be advanced is a significant one, an interest more specific than having the information for its own sake, and (2) show the information is likely to advance that interest." *Boyd*, 475 F.3d 381 at 386–87 (internal quotation marks and citations omitted). Here, the burden is on the *requester*. *See, e.g.*, *Ctr. For Investigative Reporting v. USCIS*, No. 18-cv-1964 (CJN), 2019 WL 6498817, at *3 (D.D.C. Dec. 3, 2019).

For the purpose of determining what constitutes a "public interest" in the privacy context, the "purposes for which the request for information is made" are irrelevant. *Reporters Comm.*, 489 U.S. at 771. The inquiry "turn[s] on the nature of the requested document and its relationship to 'the basic purpose of the Freedom of Information Act to open agency action to the light of public scrutiny.'" *Id.* at 772 (quoting *Dep't of Air Force v. Rose*, 425 U.S. 352, 372 (1976)). That purpose includes the fact "the Act was designed to create a broad right of access to 'official information'" *Id.* (quoting *EPA v. Mink*, 410 U.S. 73, 80 (1973)), that is to say a "citizens' right to be informed about 'what their government is up to.'" *Id.* at 773 (quoting *Rose*, 425 U.S. at 360–61)).

Third, in the final analysis here, the *Government* bears the burden to show the privacy interests outweigh the public interests in the final balancing analysis. *Bartko v. DOJ*, 898 F.3d 51, 64 (D.C. Cir. 2018); *see also CREW III*, 746 F.3d at 1096.

### B.   President Biden Has Little, If Any, Privacy Interest Here.

**1.**    The Government insists that disclosing the recording would result in an unwarranted invasion of President Biden's privacy. But the principal problem with that argument is that the President has already decided to release the *transcript* of his interview. *See* AG Mukasey Decl. at ¶ 16. Given that disclosure, it is hard to see what additional privacy interests withholding

the audio recording would protect.  It is not simply the President's involvement in the investigation that is public; he has voluntarily released the content of his interview.  *Cf. CREW III*, 746 F.3d at 1090 (noting separate privacy interest in "content").  Moreover, the President did so for political reasons; privacy interests do not operate as a sword and shield.  That release vitiates any privacy interest here.  *See, e.g., CREW III*, 746 F.3d at 1092; *Kimberlin v. Dep't of Justice*, 139 F.3d 944, 949 (D.C. Cir. 1998); *Nation Mag., Washington Bureau v. U.S. Cust. Serv.*, 71 F.3d 885, 896 (D.C. Cir. 1995).  And this is the President acting *politically* from the bully-pulpit.  A public figure has little if any privacy interest in that context.  *Cf., e.g., CREW III*, 746 F.3d at 1092; *Nation Mag.*, 71 F.3d 885 at 894, n.9.

**2.**      The Government insists that the President has a distinct privacy interest in the manner in which he answered the Special Counsel's questions—*i.e.*, the "pauses, hesitations, mannerisms, and intonations that occurred during that sensitive event."  Def. Mot. at 19, 21.  But, the *en banc* D.C. Circuit has made clear that "when the government asserts that only the non-lexical aspect is exempt from disclosure, the court must consider whether the information that would be *newly revealed* by that disclosure is or is not exempt."  *N.Y. Times Co. v. NASA*, 920 F.2d 1002, 1005 (D.C. Cir. 1990) (en banc) (emphasis added); *see also id.* ("The information recorded through the capture of a person's voice is distinct and in addition to the information contained in the words themselves.").  Put differently, the only privacy interest the Government can legitimately assert here is the interest in President Biden's voice against the backdrop that the transcript was already released.  And here, releasing the recording would reveal little new private information about the President's "pauses, hesitations, mannerisms, and intonations."  After all, the public is already quite familiar with how he speaks, as his mannerisms while speaking have been the subject of significant reporting over the course of his Presidency.  But it would provide significant value—by either supporting or undercutting Special Counsel Hur's non-charging decision—to the public debate.

In arguing otherwise, the Government relies heavily on *NASA*, but that case is not remotely on point.  There, the Court declined to order the disclosure of a recording that revealed sensitive

voice communications of NASA astronauts on board the *Challenger* in the final moments before the space shuttle exploded when a transcript of those communications was already public. *N.Y. Times Co. v. NASA*, 782 F.Supp. 628, 633 (D.D.C. 1991).  It hardly goes without saying that revealing a recording of the panicked communications of private individuals moments before their death is not remotely comparable to revealing a recording of an interview with President of the United States during an investigation into potential crimes he committed.  As former Attorney General Mukasey explains, the "Garland Letter illustrates this very point when it compares the President's demeanor evidence—recorded while he was being interviewed in a secure White House location—to the death throes of the Challenger astronauts."  AG Mukasey Decl. at ¶ 22; *see also id.* ("Any reasonable lawyer knows that a release of the audio recording of the President's interview will have significant value to the public's legitimate interest in judging the President's demeanor, candor, and mental acuity (especially when the President is running for reelection), while disclosure of the Challenger recording would have inflicted trauma on the astronauts' families without any significant public interest value.").  The same is true of *Pike v. DOJ*, 306 F.Supp.3d 400 (D.D.C. 2016).  Withholding a recording where the "voice inflection" would reveal the identity of an undercover source is not remotely comparable.  *Id.* at 412.

The Government's other cases are similarly inapt.  It relies heavily on *Judicial Watch v. Nat'l Archives and Records Admin.*, 876 F.3d 346 (D.C. Cir. 2017), in which the D.C. Circuit declined to grant access to records related to the independent counsel's draft indictments against Hillary Clinton.  But that case is plainly distinguishable, as the content of the draft indictments in *Judicial Watch* were never released to the public.  *See id.* at 349 ("Although the *existence* of the Independent Counsel's investigation of her is public knowledge, Mrs. Clinton. . . retains a distinct privacy interest in the *contents* of the investigative files.").  *EPIC v. DOJ*, 18 F.4th 712 (D.C. Cir. 2021), likewise involved records of declination decisions (most of which involved private citizens rather than public officials) that were not otherwise public.  In that context, the privacy interests in keeping the Government's investigatory files and records of uncharged conduct under wraps is undoubtedly significant.  But that reasoning does not begin to translate to this case, where the

substance of the President's interview is already public, and the allegations against him are already well known.

**3.**      Perhaps realizing this fact, the Government argues that there is unique harm from audio recordings because of the "stressful" content of an audio law enforcement interview which is a "unique intrusion." Weinsheimer Decl. at ¶¶ 28, 31, 38. That comparison is inapt in any sort of "high profile" case, as Attorney General Mukasey persuasively explains:

> [A]lthough the type of demeanor evidence provided by an audio recording is essential to evaluating the credibility of a witness and how the witness's testimony may come across to a jury, the recording is typically no more intrusive or revealing of personal information, let alone of the substance of the testimony, than a transcript of the same interview.

AG Mukasey Decl. at ¶ 21. *See also id.* ("[T]he suggestion that witnesses who are represented by sophisticated counsel will be given to emotional outbursts during such interviews seems far-fetched.").

But again, that is not even *this* case. This is "the President of the United States, clothed with immense power," (Doris Keans Goodwin, *Team of Rivals*, at 687 (2005)), in a White House SCIF, surrounded by White House Counsel and the best private counsel money can buy, and being interviewed by individuals serving at his pleasure. Nothing in the Weinsheimer Declaration remotely addresses that issue—and that is dispositive. Merely stating the Government's comparison, equating "the President's demeanor evidence—recorded while he was being interviewed in a secure White House location—to the death throes of the Challenger astronauts" demolishes the argument. AG Mukasey Decl. at ¶ 22.[9]

---

[9]  The Government's analogies to other contexts are similarly inept. For example, a mug shot "captures the subject in the vulnerable and embarrassing moments immediately after being accused, taken into custody, and deprived of most liberties." *Karantsalis v. U.S. Dep't of Justice,* 635 F.3d 497, 503 (11th Cir. 2011). That is not remotely applicable here. And in most cases what information of public interest is contained in a mugshot? It is merely a booking record. *See e.g., World Pub. Co. v. DOJ*, 672 F.3d 825, 831 (10th Cir. 2012). The same goes for cases dealing with common law rights of access to judicial proceedings and protective orders. They deal with different issues over which judges have discretion, not FOIA's statutory scheme. *Cf.* Def. Mot. at 22–23. They are also inapposite here. For example, in *United States v. McDougal*, 940 F.Supp. 224, 226–28 (E.D. Ark. 1996), the press *had* access, albeit limited, to President Clinton's

Finally, the Government resorts to the reddest of herrings:  A concern about deepfakes. *See* Def. Mot. at 23–24.  Just one major problem.  There already are deepfakes.  And there is more than enough audio of President Biden and Special Counsel Hur to use the transcript as a template to create a deepfake.  The answer to the deepfake concern is more transparency, not less, by a mechanism such as that suggested by Senator Mark Warner: a secure watermarked tape on the Department's website.  *See* 2d Cornett Decl. at Ex. 27 at 3.  That is the obvious answer here.  *See* AG Mukasey Decl. at ¶ 23; Declaration of Jerry Hatchett at ¶ 5(f) (June 21, 2024).

### C.     There Is Overwhelming Public Interests in Disclosure of the Audio Recordings.

**1.**     The D.C. Circuit has "repeatedly recognized a public interest in the manner in which the DOJ carries out substantive law enforcement policy."  *CREW III*, 746 F.3d at 1093.  As the D.C. Circuit has explained, relevant to that interest (in the context of a specific criminal investigation) is "the diligence of the FBI's investigation and the DOJ's exercise of its prosecutorial discretion:  whether the government had the evidence but nevertheless pulled its punches."  *Id.*; *accord id.* at 1093–94 (collecting authorities); *CREW v. DOJ*, 854 F.3d 675, 682 (D.C. Cir. 2017) ("*CREW IV*") (same).[10]  That interest may be amplified by "[w]idespread media attention, an ongoing public policy discussion, and the public profile of the subject of the investigation[.]"  *CREW II*, 978 F.Supp.2d 1 at 13.

In a desperate attempt to pretermit the obvious application of that line of authority here, the Government submits that "[i]n light of the voluminous information already available to the public, disclosure of the audio recording would do little to meaningfully advance the public's understanding of Special Counsel Hur's investigation and his declination decision," and incredibly, that "[w]hile the Report discusses the President's interview and Mr. Hur testified that

---

videotaped deposition.  It was played in open court, thus granting the public substantial access.  *Id.* at 225.  That is not the case here.

[10] Necessarily, that interest is applicable even to a specific case, especially a high-profile one.  *See, e.g.*, *CREW III*, 746 F.3d at 1094; *CREW IV*, 854 F.3d at 679; *CREW II*, 978 F.Supp.2d at 13.

he relied in part on the audio recordings in reaching his decisions . . . that does not increase the weight of the public interest" supposedly because Special Counsel Hur already explained why he did not charge President Biden.  Def. Mot. at 26–27.  That explanation ignores reality.

Special Counsel Hur repeatedly testified that President Biden's "diminished faculties and faulty memory" was an important component of his decision not to charge the President because a jury would see him as "a sympathetic well-meaning elderly man with a poor memory."  Hur Report at 248, 6; *see supra* pp. 4–6.  That opinion is immensely controversial, and the American people have the right to judge it for themselves.  To quote Attorney General Mukasey:  "I believe the public has an overwhelming interest in hearing the audio recording and that that interest in disclosure overwhelms any conceivable intrusion on the President's privacy interests."  AG Mukasey Decl. at ¶ 16.  Indeed, it is the height of hubris for the Government to claim the matter is effectively explained and settled when the White House *itself* (and through its numerous proxies and political allies) have vigorously attacked this conclusion since before the Hur Report was made public. *See supra* pp. 9–10.  The President himself felt so strongly about the matter that he disputed these findings from the podium the day the Hur Report was released.  *See supra* p. 8.  How can resolving that controversy, which is emphatically about Special Counsel Hur's Report and the functioning of the Government, *possibly* not be of overwhelmingly public interest when the White House and the President's re-election campaign fan the controversy at every turn?  It cannot.  That the Government does not even *address* that issue speaks volumes.

On that point, the audio recording cannot *possibly* be cumulative.  Special Counsel Hur's contested conclusion was based on demeanor evidence.  *See supra* pp. 9–10.  It is the very type of evidence the Government *admits* is captured by audio recordings.  *See* AG Mukasey Decl. at ¶ 17; Weinsheimer Decl. at ¶ 27; Garland Ltr. at 5.  And as Special Counsel Hur explained in his testimony, a cold transcript is no substitute for live audio.  That is particularly so because the critical point was how, in Special Counsel Hur's seasoned prosecutorial judgment, the President's "diminished faculties and faulty memory" (Hur Report at 248) would cause a jury to see the President as "a sympathetic well-meaning elderly man with a poor memory."  *Id.* at 6.

The Government has stated that the *only* contemporaneous evidence of demeanor is the audio recording.  2d Cornett Decl. at Ex. 2 at 3:2–4.  Special Counsel Hur himself testified he relied upon the tape for demeanor evidence.  *See supra* p. 4.  As Attorney General Mukasey puts it, the Government's "assertion is directly contradicted by the actions and statements of the Special Counsel."  AG Mukasey Decl. at ¶ 18.  The Government does not dispute these facts—it cannot— and that concession is fatal.  *See EPIC*, 18 F.4th at 721 (rejecting similar argument that disclosure was cumulative as to Special Counsel Robert Mueller's Report because the records at issue went to an issue on which information had not been released); Def. Mot. at 17 (summarizing this portion of *EPIC*'s holding); *see also Dow Jones & Co., Inc. v. DOJ*, 880 F.Supp. 145, 152–53 (S.D.N.Y. 1995) (Sotomayor, J.) (ordering disclosure of Vince Foster's suicide note despite prior release of transcript of that note and rejecting DOJ's analogy to *NASA* because "the public not only has an interest in the contents of the Note but also in viewing a photocopy of the actual document. According to statements made at the Press Conference, the Note was torn up by someone, and some of the pieces are missing. . . .  The missing pieces, the 'look' of the handwriting, and the significance to be drawn therefrom, are, as plaintiffs note, matters of public concern. DOJ itself has implicitly recognized the public interest by making a photocopy of the Note available for viewing."), *vacated as moot*, 907 F.Supp. 79 (S.D.N.Y. 1995).[11]

2.     Further, there is immense public interest in President Biden's current and future fitness for Office.  "If the recording reveals information about the President's diminishing memory and mental acuity, as the Special Counsel has related, that would have obvious relevance to any judgment the voters may make about the President's continuing fitness for office."  AG Mukasey

---

[11] The Government's extensive analogy to *Judicial Watch v. NARA*, 876 F.3d 346 (D.C. Cir. 2017) is even more flawed.  *See* Def. Mot. at 16–17.  There, the record sought did not even concern a decision of the Independent Counsel; it was an internal draft.  *Id.* at 350.  Therefore, Judicial Watch only asserted a general interest in the "operations" of the Independent Counsel's Office, and that general information in operations was cumulative.  That is a world removed from a key *finding* by Special Counsel Hur that is the subject of immense controversy and on which only highly limited information has been released.

Decl. at ¶ 19.  The President's fitness for Office is plainly a matter of concern to the American people and a major issue of public debate in the 2024 Election.  *See supra* p. 11.

Yet again, the Government does not address this argument head on, but comes at it indirectly, arguing "D.C. Circuit precedent requires that any public interest in disclosure be grounded on how release of the audio recording would inform the public about the activities of Special Counsel Hur, not on any conduct of President Biden."  Def. Mot. at 25.  That is true, but only insofar as there is no public interest in finding out "what [the official] himself was 'up to.'" *CREW III*, 746 F.3d at 1093.  But there clearly is a compelling separate interest in information that is of electoral salience to the American people, even if it is about a particular candidate.  This Court has so held.  In *Brennan Ctr. for Just. at NYU Sch. of L. v. Dep't of Com.*, this Court found a delayed release of records related to the 2020 Census and reapportionment process until after legislative action on apportionment was likely to result in irreparable harm to the plaintiff, "as this is the rare case where after a date certain, the value of the information sought . . . to inform the public about these matters would be materially lessened or lost."  498 F.Supp.3d 87, 99–100 (D.D.C. 2020); *see also Leadership Conf. on C.R. v. Gonzales*, 404 F.Supp.2d 246, 257 (D.D.C. 2005) (information for vote on Civil Rights Act).

Indeed, this interest is so compelling as to have justified the grant of preliminary injunction prior to the electoral or legislative event in multiple cases.  *See, e.g.*, *Brennan Ctr.*, 498 F.Supp.3d at 100; *Protect Democracy Project, Inc. v. DOJ*, 498 F.Supp.3d 132, 142 (D.D.C. 2020) (records relating to the United States Postal Service's involvement in Department of Justice's voting fraud task force before 2020 election); *Am. Oversight v. Dep't of State*, 414 F.Supp.3d 182, 188 (D.D.C. 2019) (impeachment inquiry); *Ctr. for Pub. Integrity v. Dep't of Def.*, 411 F.Supp.3d 5, 15 (D.D.C. 2019) (same); *Wash. Post v. DHS*, 459 F.Supp.2d 61, 74 (D.D.C. 2006) (records of visitors to White House Complex and Vice President's residence prior to 2006 elections).  That separate interest controls here.

**D.    The Interest in Disclosure is Overwhelming.**

The balance of interests here is not even close.  The President gutted his already diminished privacy interests when he chose to release the transcript for political reasons.  And the public interests in disclosure of a raging political dispute at the center of the election—fanned by the very Administration that resists disclosure—are overwhelming.

## CONCLUSION

Defendant's Motion for Summary Judgment should be denied.  Heritage Plaintiffs' Cross-Motion for Summary Judgment should be granted; Defendant's categorical withholding rejected; and Defendant should be required to produce appropriately redacted audio tapes within 10 days of an order.

Dated: June 21, 2024

Respectfully submitted,

/s/ Samuel Everett Dewey
SAMUEL EVERETT DEWEY
(D.C. Bar No. 999979)
Chambers of Samuel Everett Dewey, LLC
Telephone:   (703) 261-4194
Email:  samueledewey@sedchambers.com

DANIEL D. MAULER
(D.C. Bar No. 977757)
General Counsel
The Heritage Foundation
Telephone:  (202) 617-6975
Email:  Dan.Mauler@heritage.org

ERIC NEAL CORNETT
(D.C. Bar No. 1660201)
Law Office of Eric Neal Cornett
Telephone:  (606) 275-0978
Email:  neal@cornettlegal.com

KYLE BROSNAN
(D.C. Bar No. 90021475)
Chief Counsel, Oversight Project
The Heritage Foundation
Telephone:  (202) 608-6060
Email:  Kyle.Brosnan@heritage.org

MAX TAYLOR MATHEU
(D.C. Bar No. 90019809)
Telephone:  (727) 249-5254
Email:  maxmatheu@outlook.com

*Counsel for Plaintiffs*