**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **JUDICIAL WATCH, INC.,** | |
| *Plaintiff,* | |
| v. | Case No. 1:24-cv-00700-TJK |
| **U.S. DEPARTMENT OF JUSTICE,** | (Consolidated Cases) |
| *Defendant.* | |
| **HERITAGE FOUNDATION,** *et al.*, | |
| *Plaintiffs,* | |
| v. | |
| **U.S. DEPARTMENT OF JUSTICE,** | |
| *Defendant.* | |
| **CABLE NEWS NETWORK, INC.,** *et al.*, | |
| *Plaintiffs,* | |
| v. | |
| **U.S. DEPARTMENT OF JUSTICE,** | |
| *Defendant.* | |

**DEFENDANT U.S. DEPARTMENT OF JUSTICE'S
COMBINED OPPOSITION TO PLAINTIFFS'
MOTIONS FOR SUMMARY JUDGMENT AND
REPLY IN SUPPORT OF DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

## **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 1

ARGUMENT ..................................................................................................................... 2

I.   The Audio Recording Is Properly Withheld Under Exemption 5 Pursuant to the Plain Language of the FOIA ................................................................................... 2

     A.   The Court Should Reject Plaintiffs' Mistaken Reading of the FOIA .................... 3

          1.   Congress Cannot Eliminate the President's Power To Invoke Executive  Privilege When the President Determines Disclosure Would Harm Substantial Law Enforcement Interests ............................... 4

          2.   Plaintiffs Misinterpret the FOIA and Exemption 5 .................................... 6

          3.   The Constitutional Avoidance Canon Confirms the Department's Interpretation ................................................................................. 14

     B.   The Court Should Reject Plaintiffs' Unduly Narrow View of Executive Privilege ...................................................................................... 17

     C.   The Department's Exemption 5 Withholding Is Fully Consistent With Separation-of-Powers Principles .................................................................... 20

     D.   Plaintiffs' Reliance on Dicta in Non-Precedential Decisions Is Misplaced ........ 21

     E.   The Department Has Not Waived Executive Privilege Over the Audio Recording ...................................................................................... 23

II.   Plaintiffs Fail To Rebut the Department's Showing That the Audio Recording Was Properly Withheld Under Exemptions 6 and 7(C) ....................................................... 24

     A.   Plaintiffs Cannot Avoid the Applicability of Clear Precedent Justifying the Department's Assertion of Exemptions 6 and 7(C) .......................................... 25

     B.   Disclosure of an Audio Recording of an Interview With a Prosecutor Would Clearly Infringe Substantial Privacy Interests ...................................... 26

     C.   Plaintiffs Cannot Rebut the Department's Showing That the Privacy Interests at Stake Outweigh the Public Interest in Disclosure Given the Substantial Information Already Available to the Public .......................................... 35

III.   The Department's Exemption 7(A) Withholding Should Be Upheld .............................. 40

     A.   Disclosure of the Audio Recording Could Reasonably Be Expected To Interfere With Ongoing Investigations ................................................. 40

     B.   Disclosure of the Audio Recording Could Reasonably Be Expected To Interfere With Reasonably Anticipated, Future Investigations .......................... 42

     C.   Plaintiffs' Speculation That Disclosure of the Audio Recording Might Not Lead To Chilled Witness Cooperation Is Insufficient To Rebut the Department's Expert, Predictive Judgment of Reasonably Expected Harm ........ 45

IV.     The Department Has Demonstrated That Disclosure Would Foreseeably Harm
        Interests Protected by FOIA Exemptions and Has Satisfied Its Segregability
        Requirements ................................................................................................................ 49

CONCLUSION ............................................................................................................................... 50

# **TABLE OF AUTHORITIES**

<u>Cases</u>

*ACLU v. U.S. Dep't of Def.*,
  628 F.3d 612 (D.C. Cir. 2011) ................................................................................ 46

*Aspin v. U.S. Dep't of Def.*,
  491 F.2d 24 (D.C. Cir. 1973) ................................................................................. 19

*Barney v. IRS*,
  618 F.2d 1268 (8th Cir. 1980) ............................................................................... 41

*Beck v. U.S. Dep't of Justice*,
  997 F.2d 1489 (D.C. Cir. 1993) ............................................................................. 26

*Blackwell v. FBI*,
  680 F. Supp. 2d 79 (D.D.C. 2010) ......................................................................... 41

*Bond v. United States*,
  572 U.S. 844 (2014) ............................................................................................... 15

*Borchers v. Com. Union Assurance Co.*,
  874 F. Supp. 78 (S.D.N.Y. 1995) ........................................................................... 20

*Bostock v. Clayton Cnty.*,
  590 U.S. 644 (2020) ............................................................................................. 7, 9

*Boyd v. Crim. Div. of U.S. Dep't of Justice*,
  475 F.3d 381 (D.C. Cir. 2007) ............................................................................... 35

*Brnovich v. Democratic Nat'l Comm.*,
  594 U.S. 647 (2021) ................................................................................................. 7

*Cheney v. U.S. Dist. Ct. for D.C.*,
  542 U.S. 367 (2004) ........................................................................................... 6, 11

*Conn. Nat'l Bank v. Germain*,
  503 U.S. 249 (1992) ............................................................................................... 11

*Corley v. United States*,
  556 U.S. 303 (2009) ............................................................................................... 10

*Cottone v. Reno*,
  193 F.3d 550 (D.C. Cir. 1999) ............................................................................... 24

*CREW v. U.S. Department of Justice*,
    658 F. Supp. 2d 217 (D.D.C. 2009) ................................................................. *passim*

*CREW v. U.S. Dep't of Justice*,
    746 F.3d 1082 (D.C. Cir. 2014) ................................................................. *passim*

*Ctr. for Nat'l Sec. Studies v. U.S. Dep't of Justice*,
    331 F.3d 918 (D.C. Cir. 2003) ................................................................. 46

*Cuban v. SEC*,
    744 F. Supp. 2d 60 (D.D.C. 2010) ................................................................. 41, 43

*Cummings v. Missouri*,
    4 Wall. 277 (1867) ................................................................. 6

*Dean v. FDIC*,
    389 F. Supp. 2d 780 (E.D. Ky. 2005) ................................................................. 22

*Dellums v. Powell*,
    561 F.2d 242 (D.C. Cir. 1977) ................................................................. 3, 5, 19

*Detroit Free Press, Inc. v. U.S. Dep't of Justice*,
    829 F.3d 478 (6th Cir. 2016) ................................................................. 33

*Edmond v. United States*,
    117 S. Ct. 1573 (1997) ................................................................. 12

*Electronic Privacy Information Center v. U.S. Department of Justice*,
    18 F.4th 712 (D.C. Cir. 2021) ................................................................. 25, 26, 35, 39

*Encino Motorcars, LLC v. Navarro*,
    584 U.S. 79 (2018) ................................................................. 9

*Fitzgibbon v. CIA*,
    911 F.2d 755 (D.C. Cir. 1990) ................................................................. 23, 24

*Food Mktg. Inst. v. Argus Leader Media*,
    588 U.S. 427 (2019) ................................................................. 9, 44, 45

*Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*,
    561 U.S. 477 (2010) ................................................................. 4, 5

*FTC v. Grolier*,
    462 U.S. 19 (1983) ................................................................. 6, 20

*Hodge v. FBI,*
    703 F.3d 575 (D.C. Cir. 2013) ............................................................... 7

*In re Sealed Case,(Espy),*
    121 F.3d 729 (D.C. Cir. 1997) ............................................ 17, 18, 19, 23

*Juarez v. U.S. Dep't of Justice,*
    518 F.3d 54 (D.C. Cir. 2008) ............................................................... 43

*Judicial Watch v. National Archives and Records Administration,*
    876 F.3d 346 (D.C. Cir. 2017) ........................................................ *passim*

*Judicial Watch, Inc. v. U.S. Dep't of Justice,*
    57 F. Supp. 3d 48 (D.D.C. 2014) ..................................................... 2, 8

*Judicial Watch, Inc. v. U.S. Secret Serv.,*
    726 F.3d 208 (D.C. Cir. 2013) ....................................................... 13, 14

*Kampinen v. Individuals of Chi. Police Dep't,*
    2002 WL 238443 (N.D. Ill. Feb. 19, 2002) ...................................... 20

*Kay v. FCC,*
    976 F. Supp. 23 (D.D.C. 1997) .......................................................... 41

*Kimberlin v. U.S. Dep't of Justice,*
    139 F.3d 944 (D.C. Cir. 1988) ........................................................... 29

*Kissinger v. Reps. Comm. for Freedom of the Press,*
    445 U.S. 136 (1980) ........................................................................... 13

*Lazaridis v. U.S. Dep't of State,*
    934 F. Supp. 2d 21 (D.D.C. 2013) .................................................... 41

*Leopold v. CIA,*
    987 F.3d 163 (D.C. Cir. 2021) ........................................................... 29

*Little Sisters of the Poor v. Pennsylvania,*
    591 U.S. 657 (2020) ......................................................................... 7, 9

*Loving v. United States,*
    517 U.S. 748 (1996) ............................................................................. 4

*Mapother v. U.S. Dep't of Justice,*
    3 F.3d 1533 (D.C. Cir. 1993) ....................................................... 40, 42

*Martin v. Off. of Special Counsel, MSPB*,
  819 F.2d 1181 (D.C. Cir. 1987) ........................................................................... 8

*N.Y. Times Co. v. NASA*,
  920 F.2d 1002 (D.C. Cir. 1990) ................................................................. *passim*

*N.Y. Times Co. v. NASA*,
  782 F. Supp. 2d 628 (D.D.C. 1991) ....................................................... 26, 28, 30

*NARA v. Favish*,
  541 U.S. 157 (2004) ............................................................................ 27, 31, 36, 37

*Nat'l Ass'n of Retired Fed. Emps. v. Horner*,
  879 F.2d 873 (D.C. Cir. 1989) ......................................................................... 26

*Nestlé USA, Inc. v. Doe*,
  593 U.S. 628 (2021) ....................................................................................... 15

*Nixon v. GSA*,
  433 U.S. 425 (1977) ............................................................................... *passim*

*Nixon v. Sirica*,
  487 F.2d 700 (D.C. Cir. 1973) ............................................................. 5, 18, 19

*NLRB v. Noel Canning*,
  573 U.S. 513 (2014) ...................................................................................... 6, 14

*Pike v. U.S. Dep't of Justice*,
  306 F. Supp. 3d 400 (D.D.C. 2016) ................................................................ 24

*Pugin v. Garland*,
  599 U.S. 600 (2023) ....................................................................................... 11

*Quinn v. United States*,
  349 U.S. 155 (1955) .......................................................................................... 9

*Quinon v. FBI*,
  86 F.3d 1222 (D.C. Cir. 1996) ........................................................................ 32

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
  566 U.S. 639 (2012) ....................................................................................... 12

*Rimini St., Inc. v. Oracle USA, Inc.*,
  139 S. Ct. 873 (2019) ...................................................................................... 11

*Rotkiske v. Klemm,*
    589 U.S. 8 (2019) ............................................................................................... 7

*SafeCard Servs., Inc. v. SEC,*
    926 F.2d 1197 (1991) ................................................................................. 41, 46

*Schiller v. NLRB,*
    964 F.2d 1205 (D.C. Cir. 1992) ......................................................................... 8

*Senate Select Comm. v. Nixon,*
    498 F.2d 725 (D.C. Cir. 1974) ................................................................ 6, 13, 18

*Shapiro v. U.S. Dep't of Justice,*
    893 F.3d 796 (D.C. Cir. 2018) ......................................................................... 46

*Soucie v. David,*
    448 F.2d 1067 (D.C. Cir. 1971) .................................................................... 5, 13

*Sussman v. U.S. Marshals Serv.,*
    494 F.3d 1106 (D.C. Cir. 2007) .................................................................. 41, 42

*Trump v. Mazars USA, LLP,*
    591 U.S. 848 (2020) ................................................................................. *passim*

*Trump v. Thompson,*
    20 F.4th 10 (D.C. Cir. 2021) .................................................................... *passim*

*Tuite v. Henry,*
    181 F.R.D. 175 (D.D.C. 1998), *aff'd,* 203 F.3d 53 (D.C. Cir. 1999) ...................... 19

*U.S. Dep't of Def. v. FLRA,*
    510 U.S. 487 (1994) ......................................................................................... 39

*U.S. Fish & Wildlife Serv. v. Sierra Club, Inc.,*
    592 U.S. 261 (2021) ........................................................................ 2, 8, 12, 22

*United States v. Alvarez,*
    567 U.S. 709 (2012) ......................................................................................... 34

*United States v. Askew,*
    529 F.3d 1119 (D.C. Cir. 2008) ....................................................................... 28

*United States v. AT&T,*
    567 F.2d 121 (D.C. Cir. 1977) ......................................................................... 17

*United States v. Bormes,*
   568 U.S. 6 (2012) ................................................................. 15

*United States v. Dionisio,*
   410 U.S. 1 (1973) .......................................................... 27, 28

*United States v. Mara,*
   410 U.S. 19 (1973) ............................................................ 28

*United States v. Navarro,*
   No. 22-cr-00200 (APM), 2024 WL 2161418 (D.D.C. Feb. 8, 2024) ................... 19

*United States v. Nixon,*
   418 U.S. 683 (1974) .................................................. 5, 18, 19, 20

*United States v. Palomar-Santiago,*
   593 U.S. 321 (2021) .......................................................... 14

*United States v. Reynolds,*
   345 U.S. 1 (1953) ............................................................ 11

*United States v. Weber Aircraft Corp.,*
   465 U.S. 792 (1984) ...................................................... 10, 12

*West Virginia v. EPA,*
   597 U.S. 697 (2022) .......................................................... 15

*Whitman v. Am. Trucking Ass'ns, Inc.,*
   531 U.S. 457 (2001) .......................................................... 15

*Woods v. United States,*
   16 Pet. 342 (1842) ........................................................... 11

*Youngstown Sheet & Tube Co. v. Sawyer,*
   343 U.S. 579 (1952) .......................................................... 21

*Ysleta Del Sur Pueblo v. Texas,*
   596 U.S. 685 (2022) .......................................................... 10

*Zivotofsky ex rel. Zivotofsky v. Kerry,*
   576 U.S. 1 (2015) ........................................................... 4, 5

<u>Statutes</u>

5 U.S.C. § 552 ............................................................... *passim*

Rules

Fed. R. Civ. P. 56 ................................................................................................. 31, 49

Fed. R. Evid. 702 ................................................................................................. 31, 47

**Executive Orders**

Exec. Order No. 12,667, 54 Fed. Reg. 3403 (Jan. 18, 1989) .................................... 13, 18

**Other Authorities**

1 Annals of Cong., at 463 ........................................................................................... 5

*Cong. Requests for Conf. Exec. Branch Info.*, 13 Op. O.L.C. 153 (1989) ............................. 17, 18

*History of Refusals by Exec. Branch Officials to Provide Info. Demanded by Cong.*,
    6 Op. O.L.C. 751 (1982) (*History of Refusals Op.*) ............................................. 4, 17

Hur Report ................................................................................................. 36, 39

*Position of the Exec. Dep't Regarding Investigative Repts.*,
    40 Op. Att'y Gen. 45 (1941) ........................................................................... 17

Scalia & Garner, *Reading Law: The Interpretation of Legal Texts* (2012) ............................. 10, 12

## INDEX OF EXHIBITS

- Declaration of Bradley Weinsheimer
    - Exhibit 1, Biden Interview Transcript (Oct. 8, 2023)
    - Exhibit 2, Biden Interview Transcript (Oct. 9, 2023)
    - Exhibit 3, Order No. 5588-2023, Appointment of Robert K. Hur as Special Counsel
    - Exhibit 4, February 8, 2024 Letter of Attorney General Merrick Garland
    - Exhibit 5, May 15, 2024 Letter of Attorney General Merrick Garland ("Garland Letter")
    - Exhibit 6, May 16, 2024 Letter of Assistant Attorney General Carlos Uriarte

## INTRODUCTION

There is no basis under the Freedom of Information Act ("FOIA") to require disclosure of the audio recording of Special Counsel Hur's interview of President Biden. As established in the Department's opening memorandum, the audio recording was properly withheld pursuant to multiple statutory exemptions. Because the audio recording is subject to the President's formal assertion of executive privilege, it is covered by a recognized litigation privilege and consequently is exempt under Exemption 5. It is also exempt under Exemptions 6 and 7(C) because of the unwarranted privacy harms that would result from disclosure without any meaningful countervailing public benefit, particularly because a written transcript of the audio recording has already been publicly released. Finally, the audio recording is properly withheld under Exemption 7(A) because its disclosure would risk unjustifiable interference with law enforcement efforts, both in pending investigations and reasonably anticipated future investigations.

Plaintiffs fail to rebut the applicability of any of these exemptions to the audio recording. Plaintiffs argue that Exemption 5 does not extend to an assertion of executive privilege made to protect law enforcement interests. But there is no textually permissible way to read the broad language of Exemption 5, which the Supreme Court and the D.C. Circuit have held to incorporate all civil discovery privileges, to exclude the President's assertion of executive privilege. Plaintiffs' proposed reading, which requires reading into Exemption 5 an implicit limitation that Congress did not enact, would be contrary to historical practice, and would raise substantial constitutional concerns. It must be rejected.

As for Exemptions 6 and 7(C), the D.C. Circuit has decided two strikingly analogous cases in recent years that make clear that where (as here) there is substantial information already available to the public about a Special Counsel's investigation, the government may decline to disclose additional law enforcement files that implicate important privacy interests and would only marginally assist the public's understanding of the Special Counsel's operations. Plaintiffs offer no persuasive reason to distinguish this controlling precedent, and they cannot rebut that the specific

privacy harms identified by the government are plausible and significant (as evidenced by a recent deepfake purporting to be the very audio recording at issue in this case).

With respect to Exemption 7(A), Plaintiffs principally argue that the Department may not rely on expected harm to reasonably anticipated future investigations to justify a withholding. Plaintiffs misread the law on this point, but in any event, they also fail to effectively grapple with the fact that the Department has identified harm to law enforcement investigations that are currently pending. And while Plaintiffs speculate that release of the audio recording might not result in the harm that the government reasonably anticipates, the government is entitled to deference on its predictive judgment regarding potential harm to law enforcement interests.

For any and all of these reasons, the Department is entitled to summary judgment.

## ARGUMENT

## I.    The Audio Recording Is Properly Withheld Under Exemption 5 Pursuant to the Plain Language of the FOIA

The Department properly withheld the audio recording based on a straightforward application of the FOIA's statutory text. While agency records are presumptively subject to disclosure, 5 U.S.C. § 552(a), the FOIA contains multiple statutory exemptions that allow material to be withheld, *id.* § 552(b). Exemption 5 allows the government to withhold a record if it is subject to a civil litigation privilege. *Id.* § 552(b)(5); *U.S. Fish & Wildlife Serv. v. Sierra Club, Inc.*, 592 U.S. 261, 263 (2021) ("Exemption 5 incorporates the privileges available to Government agencies in civil litigation[.]"). Executive privilege is a privilege available to government agencies, *see, e.g.*, *Trump v. Thompson*, 20 F.4th 10, 26 (D.C. Cir. 2021) ("The executive privilege is just that – a privilege held by the Executive Branch[.]"), and the President has formally asserted executive privilege with respect to the audio recording. Accordingly, the Department properly withheld the record pursuant to Exemption 5. *See Judicial Watch, Inc. v. U.S. Dep't of Justice*, 57 F. Supp. 3d 48, 51 (D.D.C. 2014) ("[I]f a document is protected by a valid claim of executive privilege," then "it will normally and properly be withheld under Exemption 5."). That uncomplicated analysis resolves this case.

Plaintiffs' efforts to interject doubt into this straightforward reading of the statutory text are meritless. The same is true for their remaining arguments concerning the scope of executive privilege, separation of powers, the applicability of non-binding dicta, and potential waiver. For the reasons that follow, none of Plaintiffs' arguments displaces the Department's simple and correct application of the statutory text, which shows that the withholding of the audio recording is plainly justified by the text of the FOIA.

### A.  The Court Should Reject Plaintiffs' Mistaken Reading of the FOIA

Plaintiffs' principal argument is that Exemption 5 does not extend to the President's assertion of executive privilege – a recognized privilege available to the government in civil litigation. *See* Heritage Mem. at 27-30, 32-35; Media Mem. at 10-13; Jud. Watch Mem. at 5-7; *see also Dellums v. Powell*, 561 F.2d 242, 244 (D.C. Cir. 1977) (assertion of executive privilege in class action lawsuit). In support of this proposition, Plaintiffs contend that because the President's assertion of executive privilege was based on concerns related to law enforcement interests, the audio recording can be withheld only pursuant to Exemption 7. According to Plaintiffs, because Exemption 7 addresses certain law enforcement records explicitly and Exemption 5 is a general exemption for all litigation privileges, Exemption 5 cannot encompass any litigation privilege based on law enforcement concerns.

Plaintiffs' argument is incorrect for two reasons. First, Plaintiffs mistakenly assume that Congress can limit the types of materials over which a President can assert executive privilege. But executive privilege is a constitutional doctrine derived from Article II and separation-of-powers principles, and the constitutional nature of the privilege constrains Congress' ability to impair its use. Second, the text of the FOIA simply does not purport to restrict the President's ability to assert executive privilege to protect the public interest in effective law enforcement, pursuant to the President's ability to take care that the law be faithfully executed. Rather, the statute's plain text makes clear that all types of records subject to a formal assertion of executive privilege are exempt from disclosure under Exemption 5, regardless of whether they may also potentially be subject to withholding under other provisions. In arguing otherwise, Plaintiffs not only ask the

court to effectively amend the statute by interjecting atextual limitations, but to do so in a way that would raise grave constitutional concerns.

### 1. Congress Cannot Eliminate the President's Power To Invoke Executive Privilege When the President Determines Disclosure Would Harm Substantial Law Enforcement Interests

Plaintiffs' argument hinges on their contention that Congress has implicitly restricted the President's constitutional authority to withhold a sensitive law enforcement record to only those instances where the President can meet the requirements set out by Congress in Exemption 7. *See, e.g.*, Heritage Mem. at 29-30; Media Mem. at 9-13. Under this view, if the President judges that disclosure would cause unjustified harm to federal law enforcement functions, but the President cannot show that the requested records fit within the particular categories defined in Exemption 7, then Congress has effectively nullified the President's ability to invoke executive privilege over that record. In that case, the record would be available to anyone who filed a FOIA request, despite the fact that the President has exercised longstanding authority to decide not to provide the record to Congress. *See History of Refusals by Exec. Branch Officials to Provide Info. Demanded by Cong.*, 6 Op. O.L.C. 751 (1982) (*History of Refusals Op.*). And the record would be made available without any of the accommodation and political "hurly-burly" between the executive and legislative branches that ordinarily resolve such privilege assertions. *See Trump v. Mazars USA, LLP*, 591 U.S. 848, 859-62 (2020). Thus, Plaintiffs' claim depends on the proposition that Congress can restrict the circumstances in which the President can assert executive privilege (and that it did so here *sub silentio*).

That proposition is incorrect. Separation-of-powers principles dictate that Congress "must not 'impair' [the President] in the performance of [his or her] constitutional duties.'" *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 500 (2010) (quoting *Loving v. United States*, 517 U.S. 748, 757 (1996)). Congress cannot "prevent[] the Executive Branch from accomplishing its constitutionally assigned functions." *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 28-29 (2015) (quoting *Nixon v. GSA*, 433 U.S. 425, 443 (1977)). Indeed, even a modest impairment

of powers committed to the President is unconstitutional because "the Constitution vests certain powers in the President that 'the Legislature has no right to diminish or modify.'" *Free Enter. Fund*, 561 U.S. at 500 (quoting 1 Annals of Cong., at 463 (J. Madison)). Thus, when a constitutional power "is the sole prerogative of the President," Congress may not impair that power or countermand the President's exercise of it. *Zivotofsky*, 576 U.S. at 31.

The ability to assert executive privilege is such a power. The privilege is "constitutionally based," *Thompson*, 20 F.4th at 23 n.6, the "President alone holds the privilege," and the President alone can waive it, *Nixon v. Sirica*, 487 F.2d 700, 755-56 (D.C. Cir. 1973) (per curiam). Executive privilege is "held by the Executive Branch, 'not for the benefit of the President as an individual, but for the benefit of the Republic.'" *Thompson*, 20 F.4th at 26 (quoting *Nixon v. GSA*, 433 U.S. at 449). "It is the [] President who has the information and attendant duty of executing the laws . . . and who has the primary, if not the exclusive, responsibility of deciding when presidential privilege must be claimed[.]" *Dellums*, 561 F.2d at 247 (cleaned up). The Supreme Court and D.C. Circuit have recognized that the President's ability to assert the privilege "is vital to the effective operations of the Presidency," *Thompson*, 20 F.4th at 47, and "fundamental to the operation of Government," *United States v. Nixon*, 418 U.S. 683, 705 (1974).

In short, the ability to assert executive privilege is a core (and exclusive) Article II duty of the President, and Congress lacks the power to interfere with this authority or remove the ability to meaningfully assert the privilege from the President's discretion. *See, e.g.*, *Sirica*, 487 F.2d at 755-56; *see also Zivotofsky*, 576 U.S. at 28-32; *Soucie v. David*, 448 F.2d 1067, 1082-83 (D.C. Cir. 1971) (Wilkey, J. concurring) ("[I]f the exemptions to the Freedom of Information Act are found not to permit withholding of the information sought here, the executive may still assert a constitutional privilege on the ground that Congress may not compel by statute disclosure of information which it would not be entitled to receive directly upon request."). This presidential authority is hardly diminished in a law enforcement context, "as it is the Executive who is charged by the Constitution to 'take Care that the Laws be faithfully executed.'" *Heckler v. Chaney*, 470 U.S. 821, 832 (1985). That is not to say that the President has an absolute right to prevent the

disclosure of records in his or her sole discretion. Executive privilege is generally a qualified privilege that, when asserted outside the FOIA context, can be overcome by a sufficient showing of need that would further an authorized purpose. *See, e.g.*, *Thompson*, 20 F.4th at 26; *Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367, 389 (2004) ("Once executive privilege is asserted . . . . [t]he Judiciary is forced into the difficult task of balancing the need for information in a judicial proceeding and the Executive's Article II prerogatives."). But if there is a valid assertion of privilege, such records are not available under the FOIA, where there is no such balancing, and a record subject to a qualified privilege is absolutely exempt. *FTC v. Grolier*, 462 U.S. 19, 27 (1983).

Nor should the FOIA's general public interest standard be interpreted to change or eliminate the long-established requirement that an assertion of executive privilege be overcome only by a demonstrated need for information that specifically would further a constitutionally authorized purpose of Congress or the judiciary. *See, e.g.*, *Senate Select Comm. v. Nixon*, 498 F.2d 725, 730-31 (D.C. Cir. 1974) (en banc); *see also Mazars*, 591 U.S. at 862 ("Longstanding practice . . . imposes on us a duty of care to ensure that we not needlessly disturb 'the compromises and working arrangements that those branches themselves have reached." (quoting *NLRB v. Noel Canning*, 573 U.S. 513, 524-26 (2014) (cleaned up)). To interpret the FOIA otherwise would raise serious constitutional concerns and disrupt established separation-of-powers practices and standards for assessing the specific needs of the other branches regarding information that has been protected by a presidential assertion of executive privilege before that assertion can be overcome. *Id.* at 868 ("The Constitution does not tolerate such ready evasion; it 'deals with substance, not shadows.'" (quoting *Cummings v. Missouri,* 4 Wall. 277, 325 (1867))).

### 2. Plaintiffs Misinterpret the FOIA and Exemption 5

Plaintiffs' Exemption 5 argument also fails because the statute does not operate in the way they contend. Exemption 5 means what it says. If a record "would not be available by law to a party . . . in litigation" – *i.e.*, it is subject to a valid claim of privilege – then it may be withheld

under Exemption 5 regardless of the type of privilege asserted.[1] Plaintiffs' contrary reading would interpret this provision to cover *all* privileges *except* ones relating to law enforcement records. That interpretation is inconsistent with the plain language of the statute and would raise grave constitutional concerns.

Any question of statutory interpretation "start[s] with a careful consideration of the text." *Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 667 (2021). And "when the meaning of the statute's terms is plain, [that] job is at an end." *Bostock v. Clayton Cnty.*, 590 U.S. 644, 674 (2020). "It is a fundamental principle of statutory interpretation that 'absent provision[s] cannot be supplied by the courts.'" *Little Sisters of the Poor v. Pennsylvania*, 591 U.S. 657, 677 (2020) (quoting *Rotkiske v. Klemm*, 589 U.S. 8, 14 (2019)).

A straightforward application of these principles demonstrates that the Department properly withheld the audio recording pursuant to Exemption 5. Although the FOIA provides that agency records are ordinarily subject to disclosure upon request, 5 U.S.C. § 552(a)(3), it also provides a list of nine enumerated – and sometimes overlapping – categories of records that are exempt from disclosure. *Id.* § 552(b)(1)-(9). Those exemptions protect, for example, classified documents (Exemption 1), trade secrets and commercial information (Exemption 4), documents that implicate personal privacy (Exemption 6), certain law enforcement records (Exemption 7), and documents relating to certain aspects of financial institutions (Exemption 8). It is not uncommon for the same information to be covered by multiple exemptions, and the government often defends multiple exemptions over the same records. *See, e.g.*, *Hodge v. FBI*, 703 F.3d 575, 582 (D.C. Cir. 2013) (noting the "multiple exemptions that appl[ied]" to the "sensitive . . . investigative reports at issue"). So long as a court finds that the record meets the requirement of at least one exemption, the government may withhold it regardless of whether or not other exemptions may apply.

In relevant part, Exemption 5 allows the government to withhold agency records "that would not be available by law to a party other than an agency in litigation with the agency." 5

---

[1] Plaintiffs do not contest that the audio recording constitutes an inter-agency or intra-agency record and thus meets Exemption 5's other condition.

U.S.C. § 552(b)(5). Exemption 5 thus is designed to protect records that would be subject to a claim of privilege in civil litigation. *Fish & Wildlife Serv.*, 592 U.S. at 267 ("[Exemption 5] incorporates the privileges available to Government agencies in civil litigation."); *Martin v. Off. of Special Counsel, MSPB*, 819 F.2d 1181, 1185-87 (D.C. Cir. 1987) (Exemption 5 incorporates "all civil discovery rules" and exempts documents that are privileged in civil discovery). Consequently, Exemption 5 "ensures that members of the public cannot obtain through FOIA what they could not ordinarily obtain through discovery undertaken in a lawsuit against the agency." *Schiller v. NLRB*, 964 F.2d 1205, 1208 (D.C. Cir. 1992).

Decades of binding precedent have construed Exemption 5 to extend to *all* privileges that would be available to the government in litigation. That interpretation tracks the plain terms of the statute: regardless of the type of privilege asserted over the record (*e.g.*, the attorney-client privilege, the attorney work product privilege, or executive privilege), if a record is subject to a litigation privilege, it "would not be available by law to a party . . . in litigation with the agency" and is therefore exempt. 5 U.S.C. § 552(b)(5). The President's valid assertion of executive privilege over the audio recording therefore resolves this case. The D.C. Circuit could not have put it any simpler: "The executive privilege is just that – a privilege held by the Executive Branch[.]" *Thompson*, 20 F.4th at 26. Because the audio recording is subject to a formal assertion of a recognized litigation privilege, it "would not be available by law to a party . . . in litigation with the agency," and thus squarely falls within the terms of the exemption. *See Judicial Watch*, 57 F. Supp. 3d at 51 ("[I]f a document is protected by a valid claim of executive privilege," then "it will normally and properly be withheld under Exemption 5."). The government is entitled to summary judgment based on Exemption 5's unambiguous language.

Plaintiffs' contrary arguments are meritless. At bottom, they ask the Court to create a judicial limitation on Exemption 5 that excludes from its scope an otherwise applicable litigation privilege if the privilege claim relates to law enforcement. If anything, the law enforcement context underscores the importance of Exemption 5's availability for records subject to an assertion of privilege by the President, as "those powers are assigned under our Constitution to the Executive

and the Judiciary." *Mazars*, 591 U.S. at 863 (quoting *Quinn v. United States*, 349 U.S. 155, 161 (1955)). Had Congress drafted Exemption 5 to allow the government to withhold records subject to an enumerated list of privileges (e.g., "records subject to a claim of attorney-client privilege, attorney work product, deliberative process privilege, or the presidential communications privilege are exempt"), Plaintiffs' interpretation might have more force. But rather than enumerating a specific list of privileges that are exempt, the text instead creates a broad rule, exempting records that "would not be available by law to a party . . . in litigation." There is not a textually permissible way to read an implicit exception for a certain class of records subject to a formal assertion of executive privilege into that language. As the Supreme Court has instructed:

> Nor is there any such thing as a "canon of donut holes," in which Congress's failure to speak directly to a specific case that falls within a more general statutory rule creates a tacit exception. Instead, when Congress chooses not to include any exceptions to a broad rule, courts apply the broad rule.

*Bostock*, 590 U.S. at 669. Here, the "broad rule" is that records that are not available to a party in litigation (*i.e.*, privileged documents) are exempt from disclosure under the FOIA. Congress did not "include any exception to [that] broad rule" – such as an exception for assertions of executive privilege relating to law enforcement – and so the broad rule applies here. *Id.*; *see also, e.g.*, *Little Sisters of the Poor*, 591 U.S. at 677 ("It is a fundamental principle of statutory interpretation that 'absent provision[s] cannot be supplied by the courts.'"). Courts "normally 'have no license to give [statutory] exemption[s] anything but a fair reading,'" *Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427, 439 (2019) (quoting *Encino Motorcars, LLC v. Navarro*, 584 U.S. 79, 89 (2018)), and the only fair reading of Exemption 5 is that it covers all litigation privileges, including an assertion of executive privilege based on law enforcement interests. Plaintiffs' contrary reading, that Exemption 5 has an implicit exception for privileges relating to law enforcement, would contradict the Supreme Court's explicit instruction that courts "cannot arbitrarily constrict [a FOIA exemption] by adding limitations found nowhere in its terms." *Id.* (emphasis removed). And Plaintiffs' logic would lead to the unlikely (and problematic) result that the President would also be foreclosed from asserting executive privilege to protect sensitive state secrets or national security

materials that were not explicitly covered by the relevant FOIA exemptions, despite the longstanding understanding of the President's authority to protect such materials. *See infra* 18-19.

Plaintiffs' resort to canons of construction is misplaced and, in any event, cannot overcome the plain terms of Exemption 5. First, Plaintiffs invoke the canon against surplusage, *see* Heritage Mem. at 29; Media Mem. at 12-13, which generally holds that a statute should not be interpreted in a way that causes words or provisions to be duplicative or to have no consequence. *See, e.g.*, Scalia & Garner, *Reading Law: The Interpretation of Legal Texts* 174-79 (2012). But that canon has little or no applicability in this case.

Under the surplusage canon, courts "normally seek to construe Congress's work 'so that effect is given to all provisions, so that no part will be inoperative or superfluous, void or insignificant.'" *Ysleta Del Sur Pueblo v. Texas*, 596 U.S. 685, 698-99 (2022) (quoting *Corley v. United States*, 556 U.S. 303, 314 (2009)). Plaintiffs contend that if Exemption 5 extends to assertions of executive privilege based on the President's anticipated harms to law enforcement proceedings, then Exemption 7(A) would become superfluous. *See, e.g.*, Heritage Mem. at 29; Media Mem. at 12-13. But there would be no such surplusage. Each of FOIA's exemptions, including Exemptions 5 and 7, is directed at different purposes and protects against a different type of harm. Exemption 7 protects against various potential harms to law enforcement interests, whether or not there is a formal assertion of executive privilege by the President. Exemption 5 is focused on potential harm to the government's litigation positions: if the government is able to withhold a record in litigation pursuant to a privilege, FOIA should not be an end-run around the privilege to allow a litigant (or any requester) to receive the document by another means. *See, e.g.*, *United States v. Weber Aircraft Corp.*, 465 U.S. 792, 801 (1984) ("[R]espondents' contention that they can obtain through the FOIA material that is normally privileged would create an anomaly in that the FOIA could be used to supplement civil discovery. We have consistently rejected such a construction of the FOIA.").

Plaintiffs also greatly overstate the surplusage concern here. According to Plaintiffs, if an assertion of executive privilege was cognizable under Exemption 5 to protect law enforcement interests, "DOJ would have no need *ever* to assert Exemption 7(A)." Media Mem. at 12 (emphasis

by Plaintiffs); *see* Heritage Mem. at 29 (asserting the Department's "reading of Exemption 5 would largely render the limits in Exemption 7 a dead letter"). That concern is meritless. The basis of the privilege claim in this case is that the President of the United States personally asserted executive privilege over the very record at issue. And he did so after the Department's Office of Legal Counsel as well as the Attorney General concluded that these records were subject to a lawful claim of executive privilege given the harm that would result from their disclosure. Weinsheimer Decl. ¶¶ 19-20. There is no reason to credit Plaintiffs' speculation that if a record could be withheld under Exemption 5 when the President formally asserts executive privilege, Exemption 7 would suddenly be rendered defunct. Exemption 7 does not require personal action of the President. And executive privilege, in turn, "is an extraordinary assertion of power" that is "'not to be lightly invoked,'" *Cheney*, 542 U.S. at 389 (quoting *United States v. Reynolds*, 345 U.S. 1, 7 (1953)), and "[t]here are . . . 'obvious political checks against an incumbent's abuse of the privilege,'" *Thompson*, 20 F.4th at 39 (quoting *Nixon v. GSA*, 433 U.S. at 448). Given how rare presidential assertions are, Plaintiffs simply have not shown that Exemption 7(A) will become "inoperative or superfluous, void or insignificant," *Ysleta Del Sur Pueblo*, 142 S. Ct. at 1939.

In any event, even assuming the Department's interpretation created any surplusage, that would not require Plaintiffs' limiting construction of Exemption 5 to be accepted. "Redundancies across statutes are not unusual events in drafting, and so long as there is no 'positive repugnancy' between two laws, a court must give effect to both." *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253 (1992) (quoting *Woods v. United States*, 16 Pet. 342, 363 (1842)); *see also Rimini St., Inc. v. Oracle USA, Inc.*, 139 S. Ct. 873, 881 (2019) ("Sometimes the better overall reading of the statute contains some redundancy."). That is particularly true in the case of the FOIA, where Congress enacted a list of nine independently sufficient exemptions to make certain that agencies have a valid basis for withholding sensitive records. *See Pugin v. Garland*, 599 U.S. 600, 609 (2023) (noting that "redundancies are common" when there is a "congressional effort to be doubly sure" that particular matters are covered). As discussed above, the plain language of Exemption 5 covers all recognized litigation privileges, among which is a formal assertion of executive privilege, and

its plain text should control even if there is some practical overlap between the coverage of Exemption 5 and Exemption 7.

For similar reasons, Plaintiffs' reliance on the interpretive canon that the "specific governs the general" is also misplaced. *See* Heritage Mem. at 29; Media Mem. at 13. Under this canon, "[o]rdinarily, where a specific provision conflicts with a general one, the specific governs." *Edmond v. United States*, 117 S. Ct. 1573, 1578 (1997). However, "[t]he general/specific canon, like the irreconcilability canon . . . deals with what to do when conflicting provisions simply cannot be reconciled – when the attribution of no permissible meaning can eliminate the conflict." Scalia & Garner, at 183. Here, it is not true that Exemption 5 and Exemption 7(A) "simply cannot be reconciled." As discussed above, Exemption 5 and Exemption 7 are directed at different purposes, and the fact that withholding the audio recording furthers *both* of those purposes does not mean there is a conflict between the two exemptions. While Plaintiffs note that the FOIA represents a "comprehensive scheme" by Congress that "deliberately targeted specific problems with specific solutions," *see* Media Mem. at 13 (quoting *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012)), they too narrowly identify the "specific problems" to which Congress was responding. One of those "specific problems" was the protection of materials that would ordinarily be privileged from disclosure in civil litigation. *See, e.g.*, *Weber Aircraft*, 465 U.S. at 801. The solution to that problem is contained in Exemption 5's broad allowance for the government to withhold a document subject to *any* litigation privilege. *See, e.g.*, *Fish & Wildlife Serv.*, 592 U.S. at 267. Though Exemption 5 and Exemption 7 were enacted to address separate concerns, they may both readily apply when the relevant concerns coexist.

Several other considerations strongly weigh against Plaintiffs' proposed interpretation. The Supreme Court and D.C. Circuit have explained that Congress in enacting the FOIA did not intend to encroach on constitutional prerogatives of the Executive. For instance, the Supreme Court has held that even though the FOIA expressly applies to the "Executive Office of the President," Congress did not intend it to apply to the President's immediate staff or White House units whose sole function is to advise and assist the President. *Kissinger v. Reps. Comm. for Freedom of the Press*,

445 U.S. 136, 156 (1980). As the D.C. Circuit has observed, Congress itself "wished to avoid the serious separation-of-powers questions that too expansive a reading of FOIA would engender." *Judicial Watch, Inc. v. U.S. Secret Serv.*, 726 F.3d 208, 227 (D.C. Cir. 2013). On the FOIA's own terms, there is thus no evidence that Congress sought to displace the President's constitutionally based privilege. Reading the FOIA to do so would also make little sense of the statute's procedures: executive privilege is a constitutional authority that traditionally has been asserted by the President personally. *See, e.g.*, Exec. Order No. 12,667, 54 Fed. Reg. 3403 (Jan. 18, 1989). The FOIA, by contrast, exempts from its requirements materials that satisfy any of the enumerated exemptions; no formal assertion of a governmental privilege is required, let alone an assertion by the President. It defies belief that through these statutory exemptions, Congress sought to displace the constitutional regime by which Presidents have long asserted executive privilege.

Likewise, it has long been understood that an assertion of executive privilege may be overcome only by a demonstrated need for information that would further a constitutionally authorized purpose, *see, e.g.*, *Senate Select Comm.*, 498 F.2d at 730-31, and it therefore would be strange to assume that Congress intended to displace that established principle by making material subject to executive privilege presumptively available to the public under the FOIA, without any showing of need, *see* 5 U.S.C. § 552(a)(3). Indeed, Plaintiffs' interpretation would lead to the absurd result that an individual member of Congress could file a FOIA request for a record subject to an assertion of executive privilege, and that record would be presumptively available under the FOIA (without a showing of need), even though if a congressional Committee sought the same record pursuant to Congress' Article I oversight authority, it would need to meet a heightened standard of need to overcome the assertion of executive privilege. *See Soucie*, 448 F.2d at 1082 (Wilkey, J. concurring) ("[I]t would be an absurdity to contend that a Congressman . . . could not have access to a document in the executive branch, and yet another citizen could gain access on the strength of [the FOIA]."); *see also Senate Select Comm.*, 498 F.2d at 730-31; *Mazars*, 591 U.S. at 862 (noting a "duty of care to ensure that [courts] not needlessly disturb 'the compromises and working arrangements that [the political] branches . . . themselves have reached'" (quoting *Noel Canning*,

573 U.S. at 524-26). Such a result would be particularly surprising to discover hiding in a statute that has existed for decades. Indeed, if such a result were correct, it is hard to see why the House Judiciary Committee would have felt it necessary to file a lawsuit to enforce a subpoena for the audio recording, at it recently did before another Court in this District. *See* Compl., ECF No. 1, *Jud. Comm. of the House of Reps. v. Garland*, No. 1:24-cv-1911 (D.D.C. July 1, 2024).

### 3. The Constitutional Avoidance Canon Confirms the Department's Interpretation

For the reasons stated above, the most natural and straightforward reading of the FOIA recognizes that Exemption 5 extends to records covered by the President's assertion of executive privilege in the law enforcement context. But even if there were some ambiguity, the constitutional avoidance canon would require that the Department's interpretation be selected. *See, e.g.*, *United States v. Palomar-Santiago*, 593 U.S. 321, 328-29 (2021) ("Courts should indeed construe statutes 'to avoid not only the conclusion that [they are] unconstitutional, but also grave doubts upon that score.'" (citation omitted)); *Secret Serv.*, 726 F.3d at 225-29 (applying constitutional avoidance canon to avoid an interpretation of the FOIA that would raise difficult constitutional questions). As discussed above, the ability to assert executive privilege is a core power of the presidency that derives from Article II and the separation of powers. Under Plaintiffs' construction of the FOIA, Congress would have purported to constrain the President's ability to assert executive privilege over records the disclosure of which the President judges would result in unjustifiable harm to the Executive Branch's law enforcement interests.

That is an extraordinary claim, which, at a minimum, raises substantial constitutional questions about the respective authorities of the President and Congress. There also apparently is no limiting principle: if Congress can impose conditions on the circumstances in which the President may assert executive privilege over law enforcement records, then presumably Congress could also impose substantive conditions on when the President could assert executive privilege to protect confidential communications with the President, or with respect to confidential records relating to military, diplomatic, or other sensitive areas.

Even if Congress had the power to impose conditions on the President's assertion of executive privilege, courts should not lightly construe a statutory provision to impair a core constitutional duty of a co-equal Branch. In analogous circumstances, the Supreme Court has insisted on a "clear statement" rule before construing a statute to purport to work a rebalancing of constitutional authorities. For example, the Supreme Court has required clear statements from Congress before altering the balance between state and federal power, *Bond v. United States*, 572 U.S. 844, 858 (2014), before applying a statute extraterritorially, *Nestlé USA, Inc. v. Doe*, 593 U.S. 628, 632-33 (2021), and before finding a waiver of sovereign immunity, *United States v. Bormes*, 568 U.S. 6, 9-10 (2012). In addition, the Supreme Court has often repeated that Congress does not "hide elephants in mouseholes," *Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 468 (2001), and in considering claims of powers from executive agencies, the Court has cautioned that "[e]xtraordinary grants of regulatory authority are rarely accomplished through 'modest words,' 'vague terms,' or 'subtle device[s],'" *West Virginia v. EPA*, 597 U.S. 697, 723 (2022) (quoting *Whitman*, 531 U.S. at 468). It would be similarly surprising for Congress to purport to restrict the President's ability to assert executive privilege via Exemption 5 by an implication drawn from Exemption 7, particularly when Exemption 5 speaks in broad terms and facially applies to all litigation privileges.

Indeed, the Supreme Court has previously suggested that a statute dealing with presidential records would have raised substantial constitutional questions had it *not* explicitly provided adequate protection for the President and former Presidents to raise executive privilege assertions. In *Nixon v. GSA*, former President Nixon raised a facial challenge to a statute directing the Administrator of the General Services Administration to take possession of and archive all of Nixon's presidential records. 433 U.S. at 429. Nixon argued that the statute was unconstitutional because it allowed the Administrator to take custody of all of his papers and to potentially produce them to third parties, which Nixon claimed "offend[ed] the presumptive confidentiality of Presidential communications." *Id.* at 440. The Supreme Court rejected the facial challenge to the statute, but

only after noting that the statute included explicit protections for the ability of the President or a former President to assert executive privilege.

Although the statute contemplated the future right of the public to request access to presidential records, the statute required the Administrator to promulgate regulations relating to the "need to protect any party's opportunity to assert any legally or constitutionally based right or privilege which would prevent or otherwise limit access to [the] recordings and materials[.]" *Id.* at 435, 443. The statute also made the presidential records "available for use in judicial proceedings," but that provision was "expressly qualified by any rights, defense, or privileges that any person may invoke including . . . a valid claim of executive privilege." *Id.* at 444. The Court noted that "[t]hese provisions plainly guard against disclosures barred by any . . . privileges available to [Nixon] or the Executive Branch." *Id.* Thus, Nixon's "right to assert the privilege [was] specifically preserved by the Act," *id.* at 455, and accordingly the Court upheld the statute against Nixon's facial challenge. However, the regulations governing public access to the records had not yet been promulgated at the time of the Court's decision, and the Court noted that "[i]f the broadly written protections of the Act should nevertheless prove inadequate to safeguard [Nixon's] rights or to prevent usurpation of executive powers, there will be time enough to consider that problem in a specific factual context." *Id.* The Court's careful consideration of protections afforded to the President's ability to assert executive privilege before upholding the statute at issue in *Nixon v. GSA* provides further support that the FOIA should not lightly be construed to restrict (by implication) the President's ability to assert a claim of executive privilege.

Separately, the avoidance canon is properly invoked here because of how Plaintiffs' interpretation of the FOIA would affect the inter-Branch accommodation process that has long governed information disputes between Congress and the Executive Branch. *See, e.g.*, *Mazars*, 591 U.S. at 862. If Congress were able to remove the possibility of the President invoking executive privilege over confidential Executive Branch records and to make those records presumptively available under the FOIA, that constitutional rebalancing could work a sea change in the accommodation process, which the D.C. Circuit has held is a "constitutional mandate." *United States v.*

*AT&T*, 567 F.2d 121, 127 (D.C. Cir. 1977); *see Mazars*, 591 U.S. at 862 (cautioning that courts should "ensure that [they] not needlessly disturb the compromises and working arrangements that those branches themselves have reached" (cleaned up)).

**B.  The Court Should Reject Plaintiffs' Unduly Narrow View of Executive Privilege**

Plaintiffs variously suggest that executive privilege does not apply to law enforcement matters, or at least not to records from closed law enforcement files, or that the privilege goes no further than a ceiling set by the common law. *See* Media Mem. at 10; Heritage Mem. at 28, 32; Jud. Watch Mem. at 6. Plaintiffs also hint that the privilege might not go beyond "traditional" uses of executive privilege that are more frequently litigated, such as the presidential communications privilege or the deliberative process privilege. *See, e.g.*, Heritage Mem. at 31. But these cramped views of executive privilege find no basis in the Constitution, judicial precedents, or historical practice. Indeed, Presidents have invoked their authority to protect the confidentiality of investigative files for almost two centuries based on many of the same concerns that motivated the President to act here. This invocation is as "traditional" as any to which Plaintiffs' point. *See generally, e.g.*, *History of Refusals Op.*, 6 Op. O.L.C. at 760-61; *Position of the Exec. Dep't Regarding Investigative Repts.*, 40 Op. Att'y Gen. 45 (1941).

Rather, executive privilege is available for the President to assert when necessary to effectively carry out his or her Article II duties, and when nondisclosure of confidential Executive Branch information is in the public interest. *See Cong. Requests for Conf. Exec. Branch Info.*, 13 Op. O.L.C. 153, 154 (1989). "Since the beginnings of our nation," Executive Branch officials have asserted executive privilege "to resist disclosure of information the confidentiality of which they felt was crucial to fulfillment of the unique role and responsibilities of the executive branch of our government." *In re Sealed Case (Espy)*, 121 F.3d 729, 736 (D.C. Cir. 1997). That is because the privilege "is a necessary corollary of the executive function vested in the President by Article II of the Constitution," *id.*, and "'derives from the supremacy of the Executive Branch within its assigned area of constitutional responsibilities,'" *Thompson*, 20 F.4th at 26 (quoting *Nixon v. GSA*, 433 U.S. at 447); *id.* at 48 ("The interests the privilege protects are those of the Presidency itself.").

17

The privilege has been recognized as "vital to the effective operations of the Presidency," *Thompson*, 20 F.4th at 47, and "fundamental to the operation of Government," *United States v. Nixon*, 418 U.S. at 708.

Accordingly, the privilege is broad, and Plaintiffs are incorrect to suggest that the President may invoke it only for a selective set of justifications. As the Department discussed in its opening brief, the Constitution empowers the President to invoke executive privilege for a variety of reasons, and Presidents have done so with respect to a wide range of subject matters. Gov't Mem. at 8-9. Cases addressing assertions of executive privilege over presidential communications, *see, e.g.*, *United States v. Nixon*, 418 U.S. at 708; *Sirica*, 487 F.2d at 717, do not purport to limit the privilege to that setting. Indeed, *Nixon* itself indicated the privilege extended to other types of materials, *see* 418 U.S. at 706 (discussing potential "need to protect military, diplomatic, or sensitive national security secrets"), and numerous decisions have recognized that executive privilege applies much more broadly, *see, e.g.*, *Espy*, 121 F.3d at 735 n.2 ("'[E]xecutive privilege' is generally used to refer to a wide variety of evidentiary and substantive privileges that courts accord the executive branch."); *Senate Select Comm.*, 498 F.2d at 729 (describing confidential communications with the President as "one species" of executive privilege); *Nixon v. GSA*, 433 U.S. at 447 (indicating privilege extends to, *e.g.*, "military, diplomatic, or sensitive national security secrets") (quoting *United States v. Nixon*, 418 U.S. at 706)). In particular, "law enforcement" is one of the "generally-recognized components of executive privilege." *Cong. Requests for Conf. Exec. Branch Info.*, 13 Op. O.L.C. at 154; *see also* 54 Fed. Reg. at 3403 (executive order defining a "substantial question of Executive privilege" to include instances when disclosure "might impair . . . law enforcement"); Gov't Mem. at 9 & n.5. Plaintiffs offer no plausible explanation why the President cannot invoke executive privilege over confidential Executive Branch documents when the President believes disclosure would improperly interfere with law enforcement efforts, just as the President could assert the privilege to protect other core Article II functions such as diplomacy and military affairs.

Plaintiffs also criticize what they call the "freestanding" nature of the privilege and contend that the government has not offered a "test" to determine when the President can appropriately

assert executive privilege over law enforcement information. Heritage Mem. at 31-32; *see also* Media Mem. at 9-12. But here the President asserted the privilege after concluding that release of certain information would unduly risk the Executive Branch's ability to conduct a core Article II function: effective law enforcement. There is no question that executive privilege is available when the President judges an assertion is necessary to protect other core presidential functions, as in (for example) military and diplomatic affairs. *See, e.g.*, *Nixon v. GSA*, 433 U.S. at 447 (indicating privilege extends to, *e.g.*, "military, diplomatic, or sensitive national security secrets"); *Sirica*, 487 F.2d at 713 (similar); *Dellums*, 561 F.2d at 245-46 & n.8 (similar); *Espy*, 121 F.3d at 736-38. On those rare occasions when the President formally asserts the privilege, the relevant records become "presumptively privileged," *United States v. Nixon*, 418 U.S. at 713. "What the *Nixon* Court meant by 'presumptively privileged' is that courts will assume the privilege applies when invoked, but it is not an absolute privilege and can be overcome by countervailing considerations." *United States v. Navarro*, No. 22-cr-00200 (APM), 2024 WL 2161418, at *3 (D.D.C. Feb. 8, 2024); *see also Nixon v. GSA*, 433 U.S. at 449 (Courts "presume[] that the incumbent President is vitally concerned with and in the best position to assess the present and future needs of the Executive Branch, and to support invocation of the privilege accordingly.").

Because the privilege derives from Article II and the constitutional separation-of-powers, *see, e.g.*, *United States v. Nixon*, 418 U.S. at 708, the scope of the privilege cannot be limited by the common law or by statute. Also contrary to Plaintiffs' suggestion, many courts have recognized that, in appropriate circumstances, a law enforcement privilege (whether under the common law or otherwise) may be applied to records from closed files when disclosure would harm future investigations. *See, e.g.*, *Aspin v. U.S. Dep't of Def.*, 491 F.2d 24, 30 (D.C. Cir. 1973) ("It is clear that if investigatory files were made public subsequent to the termination of enforcement proceedings, the ability of any investigatory body to conduct future investigations would be seriously impaired. Few persons would respond candidly to investigators if they feared that their remarks would become public record after the proceedings."); *Tuite v. Henry*, 181 F.R.D. 175, 181 (D.D.C.

1998) ("[T]he interest in nondisclosure remains strong despite the conclusion of the investiga-tion[.]"), *aff'd*, 203 F.3d 53 (D.C. Cir. 1999); *Borchers v. Com. Union Assurance Co.*, 874 F. Supp. 78, 80 (S.D.N.Y. 1995) (recognizing possibility of law enforcement privilege continuing after in-vestigation closed); *Kampinen v. Individuals of Chi. Police Dep't*, 2002 WL 238443, at *4 (N.D. Ill. Feb. 19, 2002) ("The fact that the investigation is closed has little bearing upon the Agency's need to keep secretive information bearing upon witness profiles, risk assessments, and security plans."). In light of that history of judicial recognition of the availability of a law enforcement privilege for files in closed cases, there can be no question that the President could similarly invoke executive privilege when disclosure of records from a closed investigation poses an unjustifiable risk of impairing future law enforcement investigations. This is consistent with the Department's long-held understanding of the privilege. *See* Ex. 5, Garland Ltr., at 4 ("The Department has long recognized . . . that executive privilege protects materials related to a closed criminal investigation where disclosure might hamper prosecutorial efforts in future cases.").[2]

## C. The Department's Exemption 5 Withholding Is Fully Consistent With Separation-of-Powers Principles

The Media Plaintiffs contend that the Department's reliance on Exemption 5 to withhold the audio recording violates the separation of powers. Media Mem. at 13-15. This contention merely reprises their statutory argument. They assume that Exemption 5 implicitly excludes an

---

[2] Heritage contends that courts review executive privilege claims "on the merits" under FOIA. Heritage Mem. at 30-31. It is not clear what Heritage means by this passing suggestion. It is true that courts may consider in appropriate instances whether a claim of privilege applies in the first instance (*e.g.*, whether under the deliberative process privilege a record is "predecisional" and "deliberative"). But here there can be no question that executive privilege applies: the President formally asserted the privilege and thus courts consider the record "presumptively privileged." *United States v. Nixon*, 418 U.S. at 713. The asserted interference with Article II functions from release of a recording of confidential law enforcement interview is also readily apparent. Accord-ingly, the record is subject to a qualified privilege and can be obtained only in an appropriate forum after a sufficient showing of need. But such balancing does not occur in FOIA, and the fact that a record is subject to a qualified privilege is sufficient to withhold it under Exemption 5. *Grolier*, 462 U.S. at 27. In any event, none of the cases Heritage cites involves a record over which the President formally asserted executive privilege and none of them involves law enforcement con-cerns like those articulated here. Heritage Mem. at 31.

assertion of executive privilege based on law enforcement concerns, and, based on that assumption, they argue that the President's use of executive privilege to protect the audio recording is directly contrary to a statute, such that the President is operating in the lowest tier of executive power in the framework articulated by Justice Jackson's concurring opinion in *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637-38 (1952). *See* Media Mem. at 13-15.

This argument misfires at every step. For the reasons set out above, the Department's withholding of the audio recording falls squarely within Exemption 5. *See supra* 6-8. The Department therefore is acting "pursuant to an express or implied authorization of Congress," and consequently is in the highest tier of the *Youngstown* framework, where the Executive Branch's "authority is at its maximum." *Youngstown Sheet & Tube*, 343 U.S. at 635 (Jackson, J., concurring). But even if Plaintiffs' construction of the statute were accepted, and the Department was in Justice Jackson's lowest tier of power, Congress still could not impair (through FOIA) the President's ability to assert executive privilege to withhold a record to protect critical law enforcement interests. *See supra* 4-6.

### D. Plaintiffs' Reliance on Dicta in Non-Precedential Decisions Is Misplaced

In support of their argument that Exemption 5 does not reach executive privilege claims that are grounded on law enforcement concerns, Plaintiffs heavily rely on dicta from *Citizens for Responsibility and Ethics in Washington v. U.S. Department of Justice*, 658 F. Supp. 2d 217 (D.D.C. 2009) (*CREW I*). *See* Jud. Watch Mem. at 5-6; Heritage Mem. at 29; Media Mem. at 10-12. In *CREW I*, Judge Sullivan explicitly declined to reach the issue of whether Exemption 5 incorporated the "law enforcement privilege." 658 F. Supp. 2d at 232 ("[T]he Court need not reach the question of whether a law enforcement privilege should be recognized under Exemption 5."). The Court nonetheless stated (in a footnote) that if the issue had been squarely presented, the Court would "not be inclined" to hold that Exemption 5 covered "a law enforcement privilege." *Id.* at 232 n.9. In support of that statement, the Court cited two cases, one citing the "specific governs

the general canon" and the other stating that "FOIA exemptions are to be narrowly construed." *Id.* The dicta contained in this footnote should be accorded no weight.

Most importantly, *CREW I* is not binding on this Court, whereas there is substantial precedent from the D.C. Circuit and Supreme Court making clear that Exemption 5 extends to records subject to a formal assertion of executive privilege. *See, e.g.*, *Fish & Wildlife Serv.*, 592 U.S. at 267 (Exemption 5 "incorporates the privileges available to Government agencies in litigation[.]"); *Thompson*, 20 F.4th at 26 ("[E]xecutive privilege is just that – a privilege held by the Executive Branch[.]").

And, critically, *CREW I* did not analyze the Exemption 5 question in the way presented in the instant case. Although President Bush had formally asserted executive privilege over the relevant records in that case, 658 F. Supp. 2d at 221, the Department had not defended its Exemption 5 withholding on that basis. Indeed, the Department's Exemption 5 analysis in its summary judgment motion comprised only three substantive sentences that largely referred back to the same arguments made in support of its Exemption 7(A) analysis. *See* Gov't Mem. in Supp. of Mtn. for Summ. J. at 10, ECF No. 8, *CREW v. U.S. Dep't of Justice*, 08-cv-1468 (Oct. 10, 2008). As a result, the portion of the opinion discussing Exemption 5 did not reference the President's assertion of executive privilege or analyze its significance (though the fact was cited in the opinion's background section). Accordingly, the President's assertion of executive privilege appeared to play no role in the Court's analysis of Exemption 5, and the Court did not analyze in any way the important separation-of-powers principles at play. Similarly, the Department had not included in its *CREW I* papers the detailed statutory interpretation arguments explaining why Exemption 5 would cover a record over which the President formally asserted executive privilege, *see id.*, as the Department does here. In short, the Department did not raise, and the Court's opinion therefore did not consider, several of the critical issues raised in the instant case.[3]

---

[3] For similar reasons, any reliance on *Dean v. FDIC*, 389 F. Supp. 2d 780 (E.D. Ky. 2005), which was cited in *CREW I* and by some of the Plaintiffs here, is also misplaced. The *Dean* Court stated that it was "unwilling to recognize the 'law enforcement privilege' in the present case," and stated without analysis that "if this privilege were to be recognized at all, it should be recognized under

Furthermore, a key aspect of Judge Sullivan's decision was that the Department had stated in *CREW I* that the reach of Exemption 5 and Exemption 7(A) were "co-extensive." 658 F. Supp. 2d at 232. Judge Sullivan characterized that position as a "concession," *id.*, and held that since the Court concluded that the Department could not satisfy the requirements of Exemption 7(A) (because, in the Court's view, the Department had not identified a reasonably anticipated law enforcement investigation with sufficient particularity, *see id.* at 228-30), the Department had not satisfied the requirements of a law enforcement privilege found under Exemption 5, *id.* at 232. But the Department did not concede that Exemptions 5 and 7(A) were "co-extensive" along the lines of the Court's holding. Rather, it argued that the exemptions were "co-extensive" "only if [the Court] agree[d] with [the Department's] . . . interpretation of 7(A)." Hrg. Tr. at 28, ECF No. 25, *CREW v. U.S. Dep't of Justice* (D.D.C. Jan. 29, 2010). If not, the Department argued "then [Exemption] 5 . . . is broader." *Id.* And to be clear in this case, the Department's position is that *both* executive privilege and Exemption 7(A) reach the audio recording. But even if the Court were to hold that one of those theories were incorrect, the audio recording could still appropriately be withheld under the other exemption (*i.e.*, they would *not* be co-extensive).

### E.  The Department Has Not Waived Executive Privilege Over the Audio Recording

Heritage contends that executive privilege over the audio recording has been waived because the Department produced a transcript of the same interview. Heritage Mem. at 36. None of the other plaintiffs makes this argument, which is squarely foreclosed by binding precedent. In the executive privilege context, "waiver should not be lightly inferred." *Espy*, 121 F.3d at 741. For waiver to occur, the requested information must (1) be "as specific as the information previously released," (2) "match the information previously disclosed," and (3) "already have been made public through an official and documented disclosure." *Fitzgibbon v. CIA*, 911 F.2d 755, 765 (D.C. Cir. 1990). To find waiver, a court "must be confident that the information sought is truly public

---

Exemption 7, not Exemption 5." *Id.* at 791-92. The relevant discussion in *Dean* was limited to a few sentences, and as with *CREW I*, it did not grapple with the separation-of-powers and statutory interpretation arguments presented here. Nor was there a formal assertion of executive privilege by the President over the records at issue in *Dean*.

and that the requester receive no more than what is publicly available." *Cottone v. Reno*, 193 F.3d 550, 555 (D.C. Cir. 1999).

There can be no waiver here because the audio recording has never been publicly disclosed, *see* Weinsheimer Decl. ¶ 16, and because Heritage concedes that the audio tape and transcript are different records, *see, e.g.*, Heritage Mem. at 7, 42. While the transcript of the same interview has been released, Weinsheimer Decl. ¶ 17, that transcript does not contain the same information as the audio recording, a point on which Heritage heavily relies, *see, e.g.*, Heritage Mem. at 42. Thus, there is no "match" between the information sought and the information previously disclosed. *Fitzgibbon*, 911 F.2d at 765. As explained by the D.C. Circuit, the "lexical and non-lexical aspects of a file may convey different information," and therefore the government may properly withhold an audio recording even after a transcript is released. *See N.Y. Times Co. v. NASA*, 920 F.2d 1002, 1005 (D.C. Cir. 1990) (en banc). Citing that authority, then-Judge Jackson of this Court recognized that, "[u]nder binding precedent, *written* transcripts of recordings do not contain information that is identical to the *audio* recorded version." *Pike v. U.S. Dep't of Justice*, 306 F. Supp. 3d 400, 412 (D.D.C. 2016) (emphasis in original). Accordingly, because the audio recording is a separate record and contains new information not contained in the written transcript, the disclosure of the transcript does not waive executive privilege over the audio recording.

## II.   Plaintiffs Fail To Rebut the Department's Showing That the Audio Recording Was Properly Withheld Under Exemptions 6 and 7(C)

The FOIA accords heightened privacy protection to individuals who "have been investigated but not charged with a crime.'" *Judicial Watch v. NARA*, 876 F.3d 346, 349 (D.C. Cir. 2017). Here, President Biden has a substantial privacy interest in the nondisclosure of a sensitive law enforcement recording that captures the sound of his voice during an interview with a prosecutor, and that privacy interest far outweighs any cognizable public interest in release of the audio recording, particularly given the substantial amount of information already available to the public

concerning Special Counsel Hur's investigation. The Department has demonstrated that the balance strongly favors withholding, and Plaintiffs can offer no persuasive reason to tip the scales in the other direction.

### A. Plaintiffs Cannot Avoid the Applicability of Clear Precedent Justifying the Department's Assertion of Exemptions 6 and 7(C)

In its opening memorandum, the Department closely analyzed the two D.C. Circuit cases construing Exemption 7(C) that are most analogous to this case: *Judicial Watch v. National Archives and Records Administration*, 876 F.3d 346 (D.C. Cir. 2017), and *Electronic Privacy Information Center v. U.S. Department of Justice*, 18 F.4th 712 (D.C. Cir. 2021) (*EPIC*). *See* Gov't Mem. at 16-19. Both of those cases involved investigations into high-profile political figures and requests to disclose law enforcement information contained in the investigatory files of either a Special Counsel or Independent Counsel. And in both cases, the D.C. Circuit held that the government had properly withheld the requested information under Exemption 7(C), in large part because substantial information about the investigation was already available to the public. *See id.* Given the highly analogous facts in this case – especially that the government has already released a detailed report concerning Special Counsel Hur's investigation and a verbatim transcript of the audio recording sought by Plaintiffs – *Judicial Watch* and *EPIC* demonstrate the propriety of the Department's withholding pursuant to Exemptions 6 and 7(C).

Plaintiffs attempt to distinguish *Judicial Watch* and *EPIC*, but they cannot avoid the conclusion that the similar facts of those cases require the Department's Exemption 7(C) withholding to be affirmed. They argue that those cases do not control because they involved the potential disclosure of information that was not already public. *See* Media Mem. at 22 ("The privacy interest that the D.C. Circuit identified in those cases [] arose out of the disclosure of *previously non-public* information about uncharged individuals found in law enforcement records." (emphasis by Plaintiffs)); Heritage Mem. at 39 (noting "the draft indictments in *Judicial Watch* were never released to the public" and that *EPIC* "likewise involved records of declination decisions . . . that were not otherwise public"); Jud. Watch Mem. at 19-20 (similar).

But that is precisely the case here. The audio recording has never been publicly released. Weinsheimer Decl. ¶ 16. Plaintiffs' express purpose in this FOIA lawsuit is to force the disclosure of this non-public, law enforcement information. And the D.C. Circuit has explained why the release of an audio recording can reveal new and highly personal information that is separate from the information contained in a written transcript of the recording, and that the government accordingly can withhold an audio recording under FOIA even after release of its transcript. *See NASA*, 920 F.2d at 1005-06, *remanded*, 782 F. Supp. 682, 631-32 (D.D.C. 1991) (upholding agency's withholding of audio recording because it revealed "intimate details" in the sound of voices not present in an already-released transcript).[4]

In short, there can be no doubt that disclosure of the audio recording would result in the release of new, non-public information that implicates important privacy interests under controlling precedent. The Court should therefore reject Plaintiffs' attempts to distinguish *Judicial Watch* and *EPIC* on that basis. After that argument is rejected, it is clear that *Judicial Watch* and *EPIC* are on all-fours with the situation here. Release of the audio recording would reveal non-public, sensitive, and personal information from a law enforcement file, and the harm to privacy that would result from that disclosure cannot be outweighed by the public's interest in the Hur investigation given the substantial amount of information already in the public record, including a written transcript of the audio recording. *See Judicial Watch*, 876 F.3d at 350; *EPIC*, 18 F.4th at 720-22.

## B. Disclosure of an Audio Recording of an Interview With a Prosecutor Would Clearly Infringe Substantial Privacy Interests

Plaintiffs attempt to argue that the public disclosure of an audio recording of an interview with a prosecutor, who was trying to determine whether the interviewee committed a federal crime

---

[4] Plaintiffs' argument is also self-defeating. If Plaintiffs were correct that disclosure of the audio recording revealed no "non-public information" that had not previously been disclosed by the Department's release of the transcript, then there would be no cognizable public interest in the release of this law enforcement record and the Department's Exemption 7(C) withholding would undoubtedly be correct. *See Beck v. U.S. Dep't of Justice*, 997 F.2d 1489, 1494 (D.C. Cir. 1993) ("Where we find that the request implicates no public interest at all, 'we need not linger over the balance; something outweighs nothing every time.'") (cleaned up) (quoting *Nat'l Ass'n of Retired Fed. Emps. v. Horner*, 879 F.2d 873, 879 (D.C. Cir. 1989)).

– and who determined that charges were not warranted – would not have a meaningful impact on President Biden's privacy. Some of the Plaintiffs go so far as to suggest that President Biden does not have *any* privacy interest relevant to the publication of such a record. This severely restrictive view of personal privacy finds no support in FOIA precedent, which recognizes the unique harms to privacy that would result from releasing information contained in law enforcement files, particularly for individuals (like President Biden) who were investigated but never charged with a crime.

In the Department's opening memorandum, the Department noted that if the audio recording were ordered disclosed, it would be "disseminated worldwide," "be universally available on the Internet," and "played on national television." Gov't Mem. at 19; *see* Weinsheimer Decl. ¶ 31. None of the Plaintiffs disputes this. Nor could they: it would be the obvious result of a disclosure order. Plaintiffs themselves suggest that the audio recording would be held up to prominent and widespread scrutiny so that the public could try to draw inferences from the sound, tone, and pacing of President Biden's responses to questions from the Special Counsel, and thus to allow public commentary on whether President Biden should have been charged with a crime, even after the prosecutor determined charges were unwarranted and explained why in an exhaustive public report. To say that such a disclosure does not amount to a meaningful intrusion on personal privacy is to suggest that Exemption 7(C)'s supposed emphasis on protecting "privacy" has no meaning at all.

**1.** Some of the Plaintiffs argue that President Biden has no cognizable privacy interest under the FOIA. The Media Plaintiffs cite three cases for the proposition that an "individual *does not* have a privacy interest in 'the sound of his voice' or its 'tone and manner' distinct from his privacy interest in 'the content of a specific conversation.'" Media Mem. at 20 (quoting *United States v. Dionisio*, 410 U.S. 1, 14 (1973)). But the cited cases are not remotely comparable. None is a FOIA case; instead, they all arise out of criminal investigations in which the defendant claimed that a search was unlawful under the Fourth Amendment. They are therefore irrelevant: as the Supreme Court has expressly recognized, "the statutory privacy right protected by Exemption 7(C) goes beyond the common law and the Constitution." *NARA v. Favish*, 541 U.S. 157, 170 (2004).

Furthermore, these cases involved fundamentally different questions than the one at issue here. In *Dionisio*, the question was whether a grand jury could require someone to read a transcript of a conversation intercepted during a law enforcement investigation, 410 U.S. at 3, presumably to help the grand jury identify the person speaking on the intercepted conversation. Because the Court held that an individual did not have a reasonable expectation of privacy in how their voice normally sounds in everyday conversation, the Court concluded that the individuals subject to the subpoenas did not have a reasonable expectation of privacy in how their voice would sound reading that transcript, and therefore requiring them to read the transcript did not constitute an illegal "search" within the meaning of the Fourth Amendment. *Id.* at 14-16. By contrast, the question in this FOIA case is whether someone has a privacy interest in the sound of their voice and the manner in which they spoke during a highly sensitive personal experience – an interview with a prosecutor deciding whether to charge them with a crime – and whether there would be an invasion of privacy if that recording were played on national television and became universally available on the internet. The answer to that question is clearly yes. *See NASA*, 920 F.2d at 1004-07; *NASA*, 782 F. Supp. at 631-33 (emphasizing that the "very sound of [a person's] words . . . constitute[s] a privacy interest" and exempting the audio recording from disclosure). *Dionisio* and the other cases cited by the Media Plaintiffs say nothing of relevance on that point.[5]

Judicial Watch also argues that President Biden does not have any cognizable privacy interest in the sound of his voice. It cites *NASA* for the proposition that "a claim to exemption from disclosure based . . . upon a fear that the taped voice inflections of a person delivering a speech

---

[5] The Media Plaintiffs' second citation, *United States v. Mara*, 410 U.S. 19 (1973), adds nothing to *Dionisio*. *Mara* does not involve the sound of an individual's voice (instead it dealt with a subpoena to produce handwriting and printing exemplars to a grand jury). 410 U.S. at 20-22. Plaintiffs' final citation, *United States v. Askew*, 529 F.3d 1119 (D.C. Cir. 2008) (en banc), is also off-point. The criminal defendant in *Askew* moved to suppress evidence submitted in his prosecution for unlawful possession of a firearm on the ground that the police had conducted an illegal search by unzipping his jacket and finding a gun in his waistband. *Id.* at 1121-22. The *Askew* court briefly described the facts and holdings in *Dionisio* and *Mara* in the context of explaining why those two decisions lent "no support" to the argument for which they were asserted in *Askew*. 529 F.3d at 1128-29, 1137, 1139.

would reveal that person's emotional state, would involve such [a] trivial privacy interest[] that the claim simply could not rise to the level of 'a clearly unwarranted invasion of personal privacy.'" Jud. Watch. Mem. at 14 (quoting *NASA*, 920 F.2d at 1009). Judicial Watch then asserts in a footnote that "[t]he audio recordings here are more like the audio of a speech than the audio of the crew of the Challenger." *Id.* at 14 n.8. But when someone gives a speech, they are by definition attempting to disseminate their views to a larger group. The production from an investigative file of an audio recording that would reveal how someone sounded while responding in private to a prosecutor's probing questions obviously implicates more serious privacy interests.

Heritage suggests that release of the transcript entirely "vitiates any privacy interest here," arguing that privacy interests are being improperly used "as a sword and shield." Heritage Mem. at 38. But the cases Heritage cites do not support its argument. Rather, they make clear that when an individual discloses some information about their involvement with a law enforcement investigation, they nonetheless retain a privacy interest in the confidentiality of other, nondisclosed information. *See, e.g.*, *CREW v. U.S. Dep't of Justice*, 746 F.3d 1082, 1092 (D.C. Cir. 2014) (*CREW II*); *Kimberlin v. U.S. Dep't of Justice*, 139 F.3d 944, 949 (D.C. Cir. 1988).

If the opposite were true, and disclosure of some information relating to an individual's involvement with a law enforcement investigation broadly waived any privacy rights as to other materials in the investigative file concerning that individual, there would be strong incentives to never disclose any such information. The FOIA should not be interpreted to discourage disclosures. Indeed, it is not: The law governing Exemption 7(C) protecting the privacy of the contents of nondisclosed investigative files, *CREW II*, 746 F.3d at 1092, and the tight fit required under the official acknowledgment doctrine, *see Leopold v. CIA*, 987 F.3d 163, 170 (D.C. Cir. 2021), are but two examples.

**2.** Unable to show that President Biden lacks a cognizable privacy interest as a matter of law, Plaintiffs seek to downplay his substantial privacy interests in the audio recording. These arguments are also unavailing. Plaintiffs repeat that any privacy interest in the audio recording is minimal because of the Department's production of a transcript of the recording. But again, the

D.C. Circuit in *NASA* explicitly recognized that the privacy interests in the substantive words spoken are distinct from the privacy interest in *how* the words were spoken (including for example, the tone, pauses, hesitations, or other mannerisms apparent in an audio recording). *See NASA*, 920 F.2d at 1005 ("The lexical and non-lexical aspects of a file may convey different information, however, and when the government asserts that only the non-lexical aspect is exempt from disclosure, the court must consider whether the information that would be newly revealed by [] disclosure [of an audio recording] is or is not exempt."); *id.* (indicating there cannot be "any doubt that voice inflections can contain personal information"); *id.* at 1004 (noting "it was the voice inflections, not the words spoken, that [the agency] was seeking to withhold because such inflections are personal to the [individuals on the recording]"). And on remand, the district court held that the audio recording was properly exempt because the voice intonations in the audio recording constituted "intimate details" that the FOIA privacy exemptions were designed to protect, and that "this privacy interest is substantial." *NASA*, 782 F. Supp. at 631-32.

Heritage contends that President Biden has a minimal privacy interest in the audio recording because "the public is already quite familiar with how he speaks." Heritage Mem. at 38. But the privacy interest at issue here is not based on a generic interest in the way someone speaks in everyday conversation. The fact that the recording sought by Plaintiffs reflects the sound of an individual's voice during a sensitive law enforcement interaction magnifies the privacy interests at stake. That principle – that individuals have substantial privacy interests in the sound of their voices during sensitive moments – was recognized in *NASA*. *See* 920 F.2d at 1004-05; *NASA*, 782 F. Supp. at 631-32. Plaintiffs note that the circumstances of *NASA* were different than the circumstances here. *E.g.*, Heritage Mem. at 39. That is obviously correct. But *NASA* is not confined to its unique facts: its basic proposition is that for certain, sensitive recordings, the sound of someone's voice and the manner in which they speak will implicate important privacy interests that go beyond a written transcript. 920 F.2d at 1004-05. Nothing in *NASA* could be read to prevent the principles

of that case from being applied to other sensitive circumstances, such as a law enforcement interview. *See Favish*, 541 U.S. at 165 ("[T]he concept of personal privacy under Exemption 7(C) is not some limited or 'cramped notion' of that idea.").[6]

The Department's declaration demonstrates the implications to personal privacy that would result from a release of an audio recording of a law enforcement interview. "Law enforcement interviews are highly stressful and consequential events." Weinsheimer Decl. ¶ 38; *see also id.* ¶ 31 (characterizing such interviews as "fraught with intense personal stress and privacy concerns"). The topics at such interviews "can be wide-ranging and include personal or intensely private information that the witness would not otherwise be willing to share," and such interviews include "probing questions designed to elicit information to help the prosecutor determine whether a crime was committed and if so, by whom." *Id.* ¶¶ 38-39. An audio recording of a law enforcement interview will "reflect[] the interviewee's verbal responses, including any pauses, hesitations, intonations, and mannerisms that occurred during that stressful and personal event," and if that information is publicly released, then "members of the public . . . might point to speech mannerisms (such as hesitations or pauses) and unfairly speculate that those mannerisms demonstrate that the individual was being evasive or lying." *Id.* ¶ 40; *see also id.* ¶ 41 ("Such speculation would be unwarranted."). Consequently, "the release of an audio recording of a law enforcement interview raises especially acute privacy concerns," which is particularly true when "the witness was the subject of an investigation but the witness was not charged with a crime." *Id.* ¶ 42. In light of these

---

[6] In a declaration attached to Heritage's summary judgment motion, former Attorney General Michael Mukasey opines that an "[audio] recording is typically no more intrusive or revealing of personal information . . . than a transcript of the same interview." ECF No. 40-3, ¶ 21. While that may be Mr. Mukasey's view, the distinction between a transcript and an audio recording was not at issue when President Bush asserted executive privilege in 2008, and Mr. Mukasey's personal view on this matter is not based on any particular authority or expertise. Furthermore, this opinion testimony is not in a form that would be admissible in evidence, so the Court should not credit it. *See* Fed. R. Evid. 702; Fed. R. Civ. P. 56(c)(2)(4). In any event, the D.C. Circuit has recognized that audio recordings can contain privacy-sensitive information separate from a transcript, and the Department has explained in a detailed declaration why that is particularly true for a law enforcement interview. *See, e.g.*, Weinsheimer Decl. ¶¶ 31, 38-42.

considerations, "publicly disseminating through FOIA the audio recording of a law enforcement interview of an uncharged individual in these circumstances would be unprecedented and exceedingly harmful." *Id.*[7]

Finally, Plaintiffs argue that because Mr. Biden is the President, his privacy interests are diminished. *See, e.g.*, Media Mem. at 23. It is true that public officials "may have a somewhat diminished privacy interest," *CREW II*, 746 F.3d at 1092, but Plaintiffs ignore the many precedents emphasizing that government officials nonetheless "'do not surrender all rights to personal privacy when they accept a public appointment,'" *id.* (quoting *Quinon v. FBI*, 86 F.3d 1222, 1230 (D.C. Cir. 1996)). As some examples, the D.C. Circuit has applied that principle in FOIA cases concerning the Majority Leader of the House of Representatives (*CREW II*, 746 F.3d at 1092), as well as to Hillary Clinton in a case that spanned her time as a major-party candidate for President (*Judicial Watch*, 876 F.3d at 349). Indeed, the D.C. Circuit indicated that Secretary Clinton's privacy interests were "augmented" given her status as a public figure and the substantial public attention to the investigation. *Judicial Watch*, 876 F.3d. at 350. The fact that President Biden is a widely known public figure does not eliminate his privacy rights, particularly with respect to records from a law enforcement file reflecting an investigation in which President Biden was not charged.

**3.** In its opening brief and supporting declaration, the Department also explained how advancements in technology, including recent "deepfake" technology, exacerbate the privacy harms that would result from release of the audio recording. Gov't Mem. at 23-24; *see* Weinsheimer Decl.

---

[7] Many courts have recognized that disclosure of records reflecting interactions with law enforcement (such as booking photos) can reasonably be expected to result in an unwarranted invasion of privacy. Gov't Mem. at 22 (discussing cases). Heritage suggests in a footnote that booking photos pose greater risks to privacy than audio recordings. Heritage Mem. at 40 n.9. Whatever an individual might feel about the relative harm to privacy from release of a booking photo compared to a recording of an interview with a prosecutor, both reflect sensitive law enforcement interactions and both implicate privacy interests. And in this case Plaintiffs cannot contest that if the audio recording were released, it would be universally available on television and the Internet, amplifying the privacy concerns at issue here compared to the release of a booking photo from a less publicized investigation. *See, e.g.*, *Judicial Watch*, 876 F.3d at 350 (noting the "great public attention" to an investigation concerning Hillary Clinton "augmented" "the potential immediate harm to her").

¶¶ 43-45. Notwithstanding Plaintiffs' attempts to downplay these new threats to privacy, they cannot alter the fact that modern technology would substantially exacerbate the reasonably expected harm to privacy that would result from the disclosure of the audio recording. *See Detroit Free Press, Inc. v. U.S. Dep't of Justice*, 829 F.3d 478, 482 (6th Cir. 2016) ("[M]odern technology only heightens the consequences of disclosure[.]").

Plaintiffs contend that the Department should simply release the audio recording, accept any technology-driven harms that would result, and try to ameliorate those harms. For example, Plaintiffs propose that the Department might first alter the audio recording by embedding it with a "secure watermark[]," Heritage Mem. at 41, or by placing an official copy of the audio recording on the Department's website, so that "the press and public" would be able to access that official copy in order "to easily verify and expose 'deepfake' versions of the interview audio," Media Mem. at 27. These proposals would do little or nothing to ameliorate the privacy harms at issue. It likely would provide little comfort to the subject of a deepfake to know that a "watermarked" or "official" copy of the authentic recording was available, if only all viewers would seek it out. It is not reasonable to expect that someone listening to a version of the audio recording online would take it upon themselves to validate that they were listening to the authentic copy rather than a deepfake.

Furthermore, by withholding the recording, the government makes it easier to counteract any deepfakes as they arise. With the audio recording withheld from disclosure, if any audio file surfaces purporting to be a copy of President Biden's interview, it is easier to promptly confirm it is a deepfake and to issue a statement denying its authenticity and reiterating that the true copy has never left the government's custody. Indeed, recent experience demonstrates the wisdom of this approach. After the Department filed its summary judgment motion, a deepfake purporting to be a copy of the audio recording surfaced on TikTok. That deepfake was the subject of a news article.

After consulting with experts and confirming that the Department had not disclosed the audio recording, the author of the article confirmed that the recording was fake.[8] In contrast, consider the alternative where the Department discloses the audio recording and both authentic and manipulated versions of the recording are widely circulating on the Internet. In that case, it would be substantially harder to identify, track, and counteract the manipulated versions.

Judicial Watch next argues that these technology-based concerns should not be an allowable basis to withhold under Exemption 7(C) because the argument would supposedly "apply to any record" and there would be "no limiting principle." Jud. Watch Mem. at 15. That is not correct. Exemption 7(C) allows withholding of law enforcement files when release "could reasonably be expected to constitute an unwarranted invasion of personal privacy," 5 U.S.C. § 552(b)(7)(C), and whether the Department can meet that test will vary based on the requested record and the circumstances of the case. Here, it is reasonable to expect that malicious actors would create fake versions of *this* record because Mr. Biden is the current President and is running for re-election. Indeed, the Department identified this risk in its summary judgment filings, *see* Weinsheimer Decl. ¶¶ 43-45, and it has already materialized within the weeks thereafter. Presumably many other law enforcement records sought under FOIA would not pose the same concerns.

For their part, the Media Plaintiffs argue that the Department's privacy-based concerns have been held invalid by Supreme Court precedent. *See* Media Mem. at 26-27. But the case they cite – *United States v. Alvarez*, 567 U.S. 709 (2012) – is far off-point. In that case, the government had prosecuted the respondent under a criminal statute prohibiting individuals from lying about receiving the Medal of Honor. *Id.* at 713-14. The Supreme Court found the criminal statute to be a content-based restriction on speech, meaning it was subject to the "most exacting scrutiny" under First Amendment doctrine. *Id.* at 724. The question of whether a statute criminalizing certain speech is unconstitutional under strict scrutiny has no relevance to the question at issue here, which

---

[8] *See* "Joe Biden-Robert Hur interview audio wasn't leaked; it's a deepfake, DOJ and experts say," *PolitiFact*, Jun. 7, 2024 (https://www.politifact.com/factchecks/2024/jun/07/tiktok-posts/joe-biden-robert-hur-interview-audio-wasnt-leaked/). A copy of the article is attached as Exhibit J to the Media Plaintiffs' memorandum. ECF No. 37-13.

is whether the release of a confidential law enforcement record reflecting an interview with a prosecutor "could reasonably be expected to constitute an unwarranted invasion of privacy." 5 U.S.C. § 552(b)(7)(C).

### C.   Plaintiffs Cannot Rebut the Department's Showing That the Privacy Interests at Stake Outweigh the Public Interest in Disclosure Given the Substantial Information Already Available to the Public

With privacy interests identified, only a significant public interest that is cognizable under the FOIA can outweigh the invasion of privacy. *See Boyd v. Crim. Div. of U.S. Dep't of Justice*, 475 F.3d 381, 387 (D.C. Cir. 2007). Plaintiffs contend that withholding the audio recording is unjustified because the public needs to be able to hear the audio recording to evaluate Special Counsel Hur's decision not to charge President Biden. *See* Media Mem. at 23-25; Heritage Mem. at 41-43; Jud. Watch Mem. at 15-17. But controlling precedent recognizes that, in applying the balancing tests of Exemptions 6 and 7(C), the public interest in the requested information depends on how much other information is already available about the relevant topic. Gov't Mem. at 25-26; *see, e.g.*, *Judicial Watch*, 876 F.3d at 350 ("[Public] interest is greatly reduced . . . because of the voluminous information already in the public domain about the Independent Counsel's investigation of . . . Mrs. Clinton[.]"). And just as in *Judicial Watch*, that information here is voluminous. Not only is there a comprehensive 345-page report explaining the details of the investigation and the reasons to decline prosecution, but the Department released the very transcript of the audio recording being sought. *See* Gov't Mem. at 26. As explained in detail in the Department's opening memorandum, in highly analogous cases involving high-profile investigations, courts have upheld Exemption 7(C) withholdings when further disclosure of sensitive records and information from investigative files would do little to increase the public understanding of the prosecutor's decisionmaking but would result in substantial harm to the privacy interest of the subject of the file. Gov't Mem. at 16-19, 25-27; *see, e.g.*, *Judicial Watch*, 876 F.3d at 349-51; *EPIC*, 18 F.4th at 720-21. That is precisely the case here.

Plaintiffs try to evade this precedent by arguing that the audio recording is a particularly important piece of evidence and noting that Special Counsel Hur stated that he relied on the audio recording in his decisionmaking. *See, e.g.*, Media Mem. at 24. But the fact that Mr. Hur relied in part on this piece of evidence in declining prosecution only goes so far. How Mr. Biden presented himself during his interview is already reflected in part in the transcript. This fact weighs against further invasions of privacy. *See, e.g.*, *Favish*, 541 U.S. at 175. Moreover, the Hur Report made clear that there were multiple other, independent reasons to decline prosecution. *See* Hur Report at 4 ("[W]e do not believe this evidence is sufficient, as jurors would likely find reasonable doubt for one or more of several reasons."); *id.* ("Several defenses are likely to create reasonable doubt as to such charges."); *id.* at 5 ("[H]is cooperation with our investigation . . . will likely convince some jurors that he made an innocent mistake, rather than acting willfully . . . as the statute requires."); *id.* ("Another viable defense is that Mr. Biden might not have retained the classified Afghanistan documents in his Virginia home at all. . . . This would rebut charges that he willfully retained the documents in Virginia."); *id.* at 6 ("In addition to this shortage of evidence, there are other innocent explanations for the documents that we cannot refute."); *id.* at 1 ("Prosecution of Mr. Biden is also unwarranted based on our consideration of the aggravating and mitigating factors set forth in the Department of Justice's Principles of Federal Prosecution."). And Mr. Hur publicly testified about the reasons for his declination, which itself provided the public ample basis on which to assess the investigation.

Plaintiffs' claim that disclosure of the audio recording is appropriate to help the public in evaluating the Special Counsel's declination decision also proves too much. It is likely true in many cases that specific pieces of evidence play a role in a prosecutor's decision to decline charges, but that does not mean there is a public entitlement to hold such evidence up to public scrutiny in a bid to second-guess the prosecutor's decision, regardless of the privacy interests at stake. Such a result would eviscerate the well-established principle that the privacy rights of uncharged individuals are among the most protected under FOIA. *See Judicial Watch*, 876 F.3d at

349 ("Where individuals have been investigated but not charged with a crime, disclosure of material properly exempt under Exemption 7(C) represents a severe intrusion on the privacy interests of the individuals in question." (cleaned up)).

Indeed, Plaintiffs' contention that disclosure of the audio recording is warranted to allow the public to second-guess Mr. Hur's decision to decline charges is tantamount to saying there is a public interest in determining whether Mr. Hur acted improperly. But when the claimed public interest is premised on the possibility of government misconduct, the Supreme Court requires plaintiffs to make a heightened evidentiary showing. In such cases, "the requester must produce evidence that would warrant a belief by a reasonable person that the alleged Government impropriety might have occurred." *Favish*, 541 U.S. at 174-75; *see also id.* ("Allegations of misconduct are 'easy to allege and hard to disprove,'" thus a FOIA requester relying on such a public interest must do more than assert a "bare suspicion" before there will "exist a counterweight on the FOIA scale for the court to balance against the cognizable privacy interests in the requested records."). Here, Plaintiffs do not even attempt to meet the *Favish* standard; consequently, their Exemption 7(C) claim fails.

Plaintiffs suggest the *Favish* standard is inapplicable because they are not alleging government impropriety, but rather are seeking records to better understand "substantive law enforcement policy," which is a valid public interest recognized in *CREW II*. *See* Heritage Mem. at 41; *CREW II*, 746 F.3d at 1093. But the circumstances here are more akin to *Favish* than *CREW II*. In *CREW II*, rather than seeking a single piece of evidence, the requester sought a broad set of records from a high-profile investigation over which the public had very little insight, and the FBI had categorically rejected production of any of those records under Exemption 7(C). *See* 746 F.3d at 1087-90. Given the limited information available to the public about the investigation and its high-profile nature, the D.C. Circuit concluded that release of the set of records in that case "would likely reveal much about the diligence of the FBI's investigation and the DOJ's exercise of its prosecutorial discretion: whether the government had the evidence but nevertheless pulled its punches," and the

court of appeals accordingly concluded that disclosure could meaningfully assist the public's understanding of how "DOJ carries out substantive law enforcement policy." *Id.* at 1093.

That would not be the case here. Unlike in *CREW II*, the public already has extensive information about the scope of Mr. Hur's investigation and the basis of his decision. The grounds for declining charges are discussed in an exhaustive report; Mr. Hur publicly testified about his decision; and the government released a transcript of the audio recording that Plaintiffs seek. Any public interest in understanding "substantive law enforcement policy" has been fully served by those disclosures. In seeking a specific piece of evidence from the investigation for the stated purpose of allowing the public to determine whether the prosecutor made an appropriate decision on whether to decline charges, Plaintiffs are not seeking to advance a general interest in understanding "substantive law enforcement policy," but rather to determine whether a government decision was improper. And when that is the basis of a FOIA request, a requester must satisfy the heightened evidentiary showing required by *Favish*. Plaintiffs have not attempted to meet that standard and cannot do so.

Indeed, a reason the public already has such a high volume of information about Mr. Hur's investigation and decisionmaking is because of the extraordinary cooperation of the Department with Congress, consistent with the constitutionally mandated accommodation process. If such cooperation rendered the Executive Branch unable to protect remaining information, or rendered the President unable to effectively assert executive privilege to prevent disclosure, that would create a perverse incentive against cooperation that could undermine Congress's ability to access information and heighten conflict between the branches.

The Court should also reject Plaintiffs' argument that President Biden's privacy rights are diminished because he and others disputed some of Mr. Hur's characterizations of his demeanor. *See* Heritage Mem. at 42. It cannot be the case that if an individual disputes a characterization contained in a law enforcement report, then the individual thereby waives his privacy interest as to specific pieces of evidence, and Plaintiffs offer no authority in support of that proposition.

Judicial Watch alone argues that disclosure is warranted to allow the public to determine whether the Department has provided similar treatment in its decisions regarding potential prosecution of President Biden and former President Trump. Jud. Watch Mem. at 17-18. But the Hur Report itself makes clear why disclosure would not shine a light on this topic. Hur Report, at 11 ("It is not our role to assess the criminal charges pending against Mr. Trump, but several material distinctions between Mr. Trump's case and Mr. Biden's are clear. Unlike the evidence involving Mr. Biden, the allegations set forth in the indictment of Mr. Trump, if proven, would present serious aggravating facts."). Judicial Watch does not explain how disclosure of the audio recording would further this asserted public interest.

Finally, Heritage asserts a public interest in providing information that they suggest may be relevant to President Biden's "memory and mental acuity." Heritage Mem. at 43-44. None of the other Plaintiffs raises this argument, likely because it is foreclosed by controlling precedent. As the Department explained, "the only relevant public interest in the FOIA balancing analysis is the extent to which disclosure of the information sought would 'shed light on *an agency's* performance of its statutory duties' or otherwise let citizens know 'what *their government* is up to.'" *CREW II*, 746 F.3d at 1093 (emphasis added; cleaned up) (quoting *U.S. Dep't of Def. v. FLRA*, 510 U.S. 487, 497 (1994)). That is, D.C. Circuit precedent requires that any public interest in disclosure must be based on how disclosure would shine a light on the activities of Special Counsel Hur, not on President Biden. Gov't Mem. at 25. That principle was expressly recognized in *CREW II*, where the court of appeals held that "the relevant public interest is *not* to find out what [House Majority Leader] Delay himself was 'up to' but rather how the FBI and the DOJ carried out their respective statutory duties to investigate and prosecute criminal conduct.'" 746 F.3d at 1093; *see EPIC*, 18 F.4th at 720-21 (applying the same principle in a FOIA case concerning the Mueller Report). Heritage then cites various cases where courts ordered rapid FOIA processing of records that might be relevant to an upcoming election or legislative event, Heritage Mem. at 44, but those cases say nothing about what public interests are cognizable under Exemption 7(C).

**III.    The Department's Exemption 7(A) Withholding Should Be Upheld**

Exemption 7(A) allows the government to withhold information or records in law enforcement files if disclosure "could reasonably be expected to interfere with enforcement proceedings." 5 U.S.C. § 552(b)(7)(A). Records are properly withheld under this exemption when disclosure of the requested law enforcement records "(1) could reasonably be expected to interfere with (2) enforcement proceedings that are (3) pending or reasonably anticipated." *Mapother v. U.S. Dep't of Justice*, 3 F.3d 1533, 1540 (D.C. Cir. 1993) (emphasis removed). In the Department's declaration and opening memorandum, the Department explained how disclosure of the audio recording could reasonably be expected to interfere with witness cooperation, for example by making it more likely that witnesses in high-profile investigations would decline to sit for a voluntarily interview, refuse to allow an interview to be audio recorded, or to be less forthcoming in an interview. Gov't Mem. at 28-30; *see* Weinsheimer Decl. ¶¶ 25-36. Plaintiffs do not question that those types of harms are cognizable under Exemption 7(A). Rather, they dispute only whether the Department has adequately shown that production of the audio recording can reasonably be expected to result in those types of harms, and whether those harms would affect a proceeding that is "pending or reasonably anticipated." For the following reasons, the Department has carried its burden and the audio recording is properly withheld under Exemption 7(A).

**A.    Disclosure of the Audio Recording Could Reasonably Be Expected To Interfere With Ongoing Investigations**

Plaintiffs assert that the Court should reject the Department's Exemption 7(A) arguments for substantially the same reasons as did Judge Sullivan in *CREW I. See* Heritage Mem. at 21-22; Jud. Watch Mem. at 9, 11-12. *CREW I* is not binding, and, as discussed below, its Exemption 7(A) analysis is incorrect. But the Court has no need to opine on the correctness of that decision because there is a critical factual difference between that case and the present matter. In *CREW I*, the Department had "concede[d] that there is neither a pending enforcement proceeding with which the disclosure of the records could interfere, nor an ongoing investigation that is likely to lead to such proceedings." 658 F. Supp. 2d at 226. The opposite is true here: as described in the Department's

declaration, "the Department has law enforcement investigations that are currently ongoing for which release of the audio recording could reasonably be expected to chill witness participation in those investigations." Weinsheimer Decl. ¶ 34; *see also id.* (explaining the expected harm to these investigations). Because a pending investigation makes a law enforcement proceeding "reasonably anticipated," *see, e.g.*, *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1113-14 (D.C. Cir. 2007), the government satisfies this element of the *Mapother* test regardless of whether Exemption 7(A) may extend to reasonably anticipated future investigations.

Plaintiffs resist this conclusion by arguing that the Department has not identified the ongoing investigations with sufficient specificity. *See* Jud. Watch Mem. at 10; Heritage Mem. at 20 n.4; Media Mem. at 16. But such specificity is not required: an agency "need not submit declarations that reveal the exact nature and purpose of its investigations in order to satisfy FOIA – Exemption 7(A) exists precisely to shield that sort of revelation." *Blackwell v. FBI*, 680 F. Supp. 2d 79, 94 (D.D.C. 2010); *see also SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1200 (1991) (noting in context of declarations regarding an agency's search for responsive records, "[a]gency affidavits are accorded a presumption of good faith").

Moreover, "[u]nder exemption 7(A) the government is not required to make a specific factual showing with respect to each withheld document that disclosure would actually interfere with a particular enforcement proceeding"; rather, "courts may make generic determinations that [disclosure of certain kinds of records] would generally 'interfere with enforcement proceedings.'" *Lazaridis v. U.S. Dep't of State*, 934 F. Supp. 2d 21, 37 (D.D.C. 2013) (quoting *Barney v. IRS*, 618 F.2d 1268, 1273 (8th Cir. 1980)); *see Cuban v. SEC*, 744 F. Supp. 2d 60, 86 (D.D.C. 2010) ("[E]xtensive specificity is not required for Exemption 7(A) where providing such detail would undermine the precise reason for the non-disclosure."). As relevant here, courts uphold Exemption 7(A) withholdings when the government can show that release of a record could reasonably be expected to chill witness cooperation. *See, e.g.*, *Kay v. FCC*, 976 F. Supp. 23, 39 (D.D.C. 1997) (stating an agency "need not establish that witness intimidation is certain to occur, only that it is a possibility").

41

The Department has explained that the audio recording is a type of record that could reasonably be expected to interfere with certain high-profile law enforcement proceedings by chilling witness cooperation, *see* Weinsheimer Decl. ¶¶ 23-36, that there are ongoing investigations of that type, *id.* ¶ 34, and that disclosure of the audio recording could reasonably be expected to interfere with those investigations by chilling witness cooperation, *id.* ¶¶ 34-35. Indeed, Mr. Weinsheimer states that he is aware of witnesses in ongoing investigations who have declined to be audio recorded. *Id.* ¶ 34. The Department therefore satisfies the requirements of Exemption 7(A) by articulating expected harm to ongoing law enforcement investigations. *See Mapother*, 3 F.3d at 1540; *Sussman*, 494 F.3d at 1113-14.

### B. Disclosure of the Audio Recording Could Reasonably Be Expected To Interfere With Reasonably Anticipated, Future Investigations

The Department has independently satisfied the *Mapother* test by explaining in detail why disclosure of the audio recording "poses an unacceptable risk of impairing cooperation in *future* high-profile investigations where voluntary cooperation is exceedingly important, such as those involving White House officials." Garland Ltr., at 6 (italics added); *see* Gov't Mem. at 32-34. Plaintiffs argue that reliance on such future investigations is not sufficient to satisfy Exemption 7(A) – even though no one disputes that they can be reasonably anticipated. *See* Jud. Watch Mem. at 9-12; Heritage Mem. at 18-24; Media Mem. at 16-17. Plaintiffs' argument finds no support in the statutory text and is not required by D.C. Circuit precedent.

It is true that the D.C. Circuit has sometimes stated that material withheld under Exemption 7(A) should relate to a "concrete prospective law enforcement proceeding." *See, e.g.*, Heritage Mem. at 18; *see also* Gov't Mem. at 30. Plaintiffs contend that even if the Department can show that disclosure of the audio recording could be expected to chill witness cooperation in future high-profile law enforcement investigations, the Department still cannot satisfy Exemption 7(A) because such investigations are not sufficiently "concrete" – even though one of the Plaintiffs concedes it is "obvious" such investigations will occur, Jud. Watch Mem. at 11. However, none of the Plaintiffs cites a D.C. Circuit case that explains what is required to be sufficiently "concrete" within

the meaning of Exemption 7(A), and certainly no case that purports to carve out future investigations that will "obviously" occur. What the D.C. Circuit *has* said is that the requirement of "a 'concrete prospective law enforcement proceeding' . . . is not quite the formidable hurdle appellant would make it out to be," and it can be satisfied with showings of law enforcement need. *Juarez v. U.S. Dep't of Justice*, 518 F.3d 54, 59 (D.C. Cir. 2008).

All that the text of Exemption 7(A) requires is that the government show that disclosure "could reasonably be expected to interfere with enforcement proceedings." The Department has done so. As the Department explained, audio recordings implicate substantial privacy interests and accordingly their release "presents a unique intrusion, even when compared to the significant privacy interests that may be present in transcriptions." Weinsheimer Decl. ¶ 28 (quoting Garland Ltr., at 5). Thus, if the audio recording were disclosed, it is reasonable to expect that "critical witnesses in future, high-profile investigations [may] fear that if they sat for a recorded interview, they too might hear their voice – during a moment fraught with intense personal stress and privacy concerns – played on national television or universally available on the internet." *Id.* ¶ 31. It is reasonable to expect that these types of high-profile investigations (including those involving White House personnel or other senior government officials as witnesses) will occur, and in fact they "have arisen in each of the last four administrations." *Id.* ¶ 32. Accordingly, given the substantial privacy intrusions that would result from the release and widespread dissemination of the audio recording, the Department reasonably expects that disclosure would chill witness cooperation in these reasonably anticipated future proceedings. *See id.* ¶¶ 26-36; *see also Cuban*, 744 F. Supp. 2d at 86-87.

As with their Exemption 5 argument, Plaintiffs heavily rely on *CREW I* to support their Exemption 7(A) claims. Again, however, *CREW I* should be given little weight. In ruling against the government, the *CREW I* district court effectively inserted a limitation into Exemption 7(A) (that the exemption does not apply to reasonably anticipated future investigations) that does not appear in the statutory text. Because the FOIA's exemptions are to be read "fair[ly]" rather than "narrowly," and courts "cannot arbitrarily constrict [a FOIA exemption] . . . by adding limitations

found nowhere in its terms," *Food Mktg. Inst.*, 588 U.S. at 439, the decision in *CREW I* was based on an incorrect reading of the exemption.

But even if the Court concludes that *CREW I* was correct on its facts, the facts of this case are distinguishable. The records at issue in *CREW I* were a summary of an FBI interview and contemporaneous handwritten notes. 658 F. Supp. 2d at 222-23. Those written documents, drafted by someone besides the witness, do not implicate the same privacy interests as would the disclosure of an audio recording of the witness's voice during the interview. As the Department explained, audio recordings present a "unique intrusion" that goes beyond a written transcript. Garland Ltr., at 5. Plaintiffs do not dispute that if the audio recording were released, it would be rapidly and universally available online and on television. It is also easier for a future witness to merely decline to allow his or her interview to be recorded, rather than decline to be interviewed at all. If a future witness (such as a White House official or other government official) knew that the audio recording in this case was released shortly after the interview, even when the investigation did not result in any charges, it is eminently reasonable to conclude that such a witness would hesitate to agree to a recorded interview. *See* Weinsheimer Decl. ¶ 32. Release of the written records at issue in *CREW I* thus did not present the same risk that future witnesses might "fear that if they sat for a recorded interview, they too might hear their voice – during a moment fraught with intense personal stress and privacy concerns – played on national television or universally available on the internet." Weinsheimer Decl. ¶ 31. In short, the circumstances of this case present a tighter connection than did *CREW I* to reasonably anticipated harm with a class of investigations that the Department reasonably expects to pursue.

The court should also reject Plaintiffs' argument that under the Department's theory, there is no "limiting principle" to Exemption 7(A), *see* Heritage Mem. at 16; Jud. Watch Mem. at 10, and that the Department's construction of Exemption 7(A) "would cover virtually all records of virtually all law enforcement interviews," Heritage Mem. at 21. Again, the limiting principle is set by the text of Exemption 7(A): the government must show that disclosure "could reasonably be expected to interfere with enforcement proceedings." Here, the Department meets that test by

showing that there is a specific class of enforcement proceedings (reasonably anticipated high-profile investigations) for which future witnesses might hesitate to agree to full cooperation if they know that doing so might result in audio of their interview being disclosed. The circumstances of this case, where no one disputes that disclosure would result in widespread and prominent distribution of the audio recording, clearly demonstrate why future witness chilling can reasonably be expected, which likely would not be the case (as Heritage sweepingly asserts) for "virtually all records of virtually all law enforcement interviews," Heritage Mem. at 21. Plaintiffs' argument that allowing a withholding here would "write Exemption 7(A)'s temporal limitation out of existence," *id.*, is also meritless. So long as the Department can demonstrate – as it has done here – that disclosure could reasonably be expected to cause harm to enforcement proceedings, the Department may properly invoke Exemption 7(A). This case does not present the question about whether a law enforcement record would remain "exempt some 37 years later." *Id.*

Finally, Plaintiffs contend that the Department's Exemption 7(A) withholding should be rejected by repeating the argument that FOIA exemptions must be "narrowly construed." Jud. Watch Mem. at 3; Heritage Mem. at 21; Media Mem. at 8. But the cases cited by Plaintiffs predate the Supreme Court's decision in *Food Marketing Institute*, where the Court expressly rejected the argument that FOIA exemptions should be construed more "narrowly" than a "fair reading" of their text would allow. 588 U.S. at 439.[9]

### C. Plaintiffs' Speculation That Disclosure of the Audio Recording Might Not Lead To Chilled Witness Cooperation Is Insufficient To Rebut the Department's Expert, Predictive Judgment of Reasonably Expected Harm

Heritage and Judicial Watch contend that the Department's Exemption 7(A) withholding should be rejected on the ground that they think disclosure of the audio recording would be unlikely to chill future witness cooperation. Heritage Mem. at 24-26; Jud. Watch Mem. at 11. However, the Court should not credit Plaintiffs' speculation. Both the Department's declarant (the most

---

[9] If D.C. Circuit precedent were construed so that the Department could not rely on harm to reasonably anticipated future investigations to invoke Exemption 7(A), the Department has preserved its right to argue that this precedent was wrongly decided. Gov't Mem. at 34-36.

senior career official within the Department) and Attorney General Garland (the nation's chief law enforcement officer) have explained why the Department reasonably believes that disclosure of the audio recording could be expected to impair witness cooperation in future high-profile investigations. Garland Ltr., at 4-7; Weinsheimer Decl. ¶¶ 1, 22-36. The text of Exemption 7(A) "explicitly requires a predictive judgment of the harm that will result from disclosure of information," and the D.C. Circuit has held that courts should defer to the government on its prediction of harms when national security issues are at stake, *Ctr. for Nat'l Sec. Studies v. U.S. Dep't of Justice*, 331 F.3d 918, 928 (D.C. Cir. 2003), which may often be the case in high-profile Department investigations, particularly those (as here) that involve investigations of White House officials relating to national security information. *See SafeCard*, 926 F.2d at 1200 (noting presumption of good faith given to agency declarations in FOIA cases). Moreover, the statutory test for Exemption 7(A) is not formidable: all that is required is for the Department to show that harm to law enforcement proceedings "could reasonably be expected."

Because the Department's declaration demonstrates why disclosure of the audio recording could reasonably be expected to chill future witness cooperation, and that expert prediction is entitled to deference, the Court need not and should not look beyond the Department's declaration and its exhibits in order to conclude that the Department has carried its burden at summary judgment. *See, e.g.*, *Shapiro v. U.S. Dep't of Justice*, 893 F.3d 796, 799 (D.C. Cir. 2018) ("If an agency's affidavit describes the justifications for withholding the information with specific detail, demonstrates that the information withheld logically falls within the claimed exemption, and is not contradicted by contrary evidence in the record or by evidence of the agency's bad faith, then summary judgment is warranted on the basis of the affidavit alone." (quoting *ACLU v. U.S. Dep't of Def.*, 628 F.3d 612, 619 (D.C. Cir. 2011)). Accordingly, the Court should not credit Plaintiffs' speculation, either in their briefs or in the expressions of Mr. Mukasey's opinions contained in his declaration.

Even if they were considered, Plaintiffs' arguments should be rejected. Plaintiffs contend that because White House officials have continued to sit for law enforcement interviews since

*CREW I* was decided, the Department's assertions of potential future harm are unfounded. Jud. Watch Mem. at 11; Heritage Mem. at 25. But as described above, the harms from disclosure of an audio recording that will immediately be widely circulated are likely more substantial than the harm that resulted from the disclosure of the written interview summary in *CREW I*. Moreover, the government fought release in *CREW I* and does so again here: if the government is required to regularly disclose such records under the FOIA, witnesses will recognize that release of records related to their law-enforcement interviews are likely to become public, which could exacerbate concerns related to witness chilling.

The Court should also reject Heritage's bald assertion that even if the President's audio recording is released, "no other witness – and certainly no lawyer – will consider this case to have any application to them or their clients," Heritage Mem. at 26. This argument rings hollow when Heritage itself has filed a FOIA lawsuit seeking the audio recording of Special Counsel Hur's interview of Mark Zwonitzer, a biographer of President Biden and a private citizen. *See* Compl. ¶ 17, ECF No. 2, *Heritage Found. v. U.S. Dep't of Justice*, 24-cv-958 (Apr. 4, 2024). Moreover, because the Department's Exemption 7(A) assertion rests on anticipated harms to high-profile investigations like this one, it is not reasonable to assume that a decision requiring disclosure in this case would be limited to its facts.

Heritage's speculative assertion that disclosure of the transcript of the audio recording was based on "political reasons," also provides no basis to deny the Department's Exemption 7(A) withholding. *See* Heritage Mem. at 25-27. Heritage bases this argument on the Mukasey Declaration, but Mr. Mukasey provides no reason to believe he has personal knowledge regarding the reasons the Department disclosed the transcript of the Biden interview or any other basis to assume he could provide admissible evidence relevant to that question.[10] Accordingly, the Court should not consider those portions of his declaration. Fed. R. Civ. Proc. 56(c)(2), (4); Fed. R. Evid. 702. The argument also can be rejected on its own terms. Mr. Mukasey opines that "[s]enior officials

---

[10] The same is true for many other statements in Mr. Mukasey's declaration, and they also should not be considered for the same reason.

interviewed in high profile criminal cases are usually represented by experienced counsel who understand the risk that an interview transcript or recording may be released by the President for political reasons." Heritage Mem. at 26 (quoting Mukasey Decl. ¶ 13). But Mr. Mukasey offers nothing to support his suggestion that President Biden ordered the release of law enforcement files, let alone that he did so solely for "political reasons." The transcript here was released in response to subpoenas from Congress as part of the constitutionally mandated accommodation process and to provide transparency. There is no basis to claim that the disclosure was for "political purposes." And in any event, here the Attorney General has determined that a recording of an interview should *not* be disclosed, and the Department is opposing Heritage's efforts to force its disclosure through FOIA. If Heritage is successful, that means witnesses will reasonably fear that their voice recordings could similarly be made available to any member of the public who files a FOIA request. That chill is what the Department fears could reasonably be expected to cause witnesses in future high-profile investigations to withhold voluntary cooperation. *See* Weinsheimer Decl. ¶¶ 31-36. There would be substantial harm to law enforcement investigations if witnesses were chilled from voluntary cooperation in this way and the government instead had to resort to coercive measures (such as grand jury subpoenas) to gather information otherwise available by voluntary interview. Among other benefits, the use of voluntary interviews allows investigators to efficiently gather information early in an investigation, even before a grand jury is impaneled, helping concentrate the investigation at its outset, and perhaps even avoiding the need for a grand jury altogether.

Finally, with respect to the Department's reliance on harm to currently ongoing investigations, Heritage asserts that "witnesses always have the right to decline the audio recording of an interview . . . and that they often decline interviews or audio recording for any number of reasons," Heritage Mem. at 20 n.4 (quoting Mukasey Decl. ¶ 12). On that basis, Heritage contends that the fact that the Department's declarant states that he is aware that witnesses have declined to be audio recorded in ongoing investigations, Weinsheimer Decl. ¶ 34, "proves nothing," Heritage Mem. at 20 n.4. The Court should reject this argument as well. As explained above, there is a significant law enforcement interest in being able to make and use audio recordings, and it is the very fact

that such recordings are voluntary (rather than compelled) that creates the risk that an adverse ruling by this court would add to witnesses' incentives to decline to fully cooperate. In any event, the argument relies on generic and conclusory speculation from the Mukasey Declaration, and Mr. Mukasey does not indicate he has personal knowledge about these interviews or could otherwise provide admissible evidence about why these particular witnesses declined to be audio recorded. Mukasey Decl. ¶ 12; *see* Fed. R. Civ. P. 56(c)(4); Fed. R. Evid. 702. With respect, Mr. Mukasey was Attorney General more than 15 years ago, and the landscape of personal privacy protection and technology has changed dramatically in the interim. His (inadmissible) opinion in this matter is entitled to little weight.

In sum, the Department has amply supported its expert judgment that forced disclosure of the audio recording through FOIA could reasonably be expected to interfere with law enforcement proceedings, that judgment is entitled to deference, and the Department's assertion of Exemption 7(A) should be upheld.[11]

## IV.  The Department Has Demonstrated That Disclosure Would Foreseeably Harm Interests Protected by FOIA Exemptions and Has Satisfied Its Segregability Requirements

Heritage and the Media Plaintiffs do not challenge the Department's segregability and foreseeable harm obligations. Judicial Watch contends that the Department has not satisfied these requirements because the Department failed to demonstrate that its asserted exemptions apply. Jud. Watch Mem. at 21. Because the Department has demonstrated here and in its opening memorandum that the audio recordings may be withheld under Exemptions 5, 6, 7(A), and 7(C), Judicial Watch's argument should be rejected. Judicial Watch also disagrees with one of the Department's asserted foreseeable harms relating to Exemption 5. But Exemption 5 is designed to protect the government's litigation privileges, and the government asserted executive privilege in response to

---

[11] The Media Plaintiffs claim that the Department's Exemption 7(A) assertion uses arguments that are similar to ones that might be made under Exemption 7(E). Media Mem. at 18. But as the Media Plaintiffs correctly note, the Department has not asserted Exemption 7(E). The Department has explained why it has satisfied the requirements of Exemption 7(A), and whether or not similar arguments might be made under Exemption 7(E) is irrelevant.

a congressional subpoena. Requiring the production of the audio recording here would indisputably vitiate the government's ability to assert a privilege, so the foreseeable harm standard is clearly met for that and other reasons. Nor would upholding the Department's Exemption 5 assertion "ignore the mandatory disclosure requirements" of FOIA, *see id.*, because, for the reasons stated herein, the audio recording is exempt from disclosure under FOIA.

## CONCLUSION

For the foregoing reasons, the Court should grant Defendant's motion for summary judgment and deny Plaintiffs' motions for summary judgment.

DATED:  July 18, 2024                  Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General
Civil Division

ELIZABETH J. SHAPIRO
Deputy Director

*/s/ Joshua C. Abbuhl*
JOSHUA C. ABBUHL (D.C. Bar No. 1044782)
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W., Room 11518
Washington, D.C. 20005
Telephone: (202) 616-8366
Facsimile: (202) 616-8470
Joshua.Abbuhl@usdoj.gov

*Counsel for the Defendant*