# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **THE HERITAGE FOUNDATION,** *et al.*, | |
|   Plaintiffs, | |
| v. | |
| **U.S. DEPARTMENT OF JUSTICE,** | |
|   Defendant. | |
| **JUDICIAL WATCH, INC.,** | Case No. 1:24-cv-700 (TJK) |
|   Plaintiff, | (Consolidated Cases) |
| v. | |
| **U.S. DEPARTMENT OF JUSTICE,** | |
|   Defendant. | |
| **CABLE NEWS NETWORK, INC.,** *et al.*, | |
|   Plaintiff, | |
| v. | |
| **U.S. DEPARTMENT OF JUSTICE,** | |
|   Defendant. | |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF HERITAGE PLAINTIFFS' MOTION FOR AND ATTORNEYS' FEES AND COSTS

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................. 2

LEGAL STANDARD.......................................................................................................... 2

ARGUMENT ...................................................................................................................... 3

    I.  Heritage Plaintiffs Are Eligible for Attorney's Fees. .......................................... 3

        A.  Standard of Review.................................................................................... 3

        B.  Heritage Plaintiffs' Lawsuit "Substantially" Caused the Release of Records. ............ 5

    II.  Heritage Plaintiffs Are Entitled Attorney's Fees. ............................................... 10

        A.  Standard of Review.................................................................................. 10

        B.  Application of the Four Factor Test Entitles Heritage to Attorney's Fees. ................ 10

    III. Heritage Plaintiffs Seek Reasonable Attorneys' Fees. ....................................... 17

    IV. The Court Should Award "Fees on Fees."........................................................... 20

CONCLUSION.................................................................................................................. 20

## TABLE OF AUTHORITIES

**Cases**

*ACLU v. DHS*, 810 F.Supp.2d 267 (D.D.C. 2011) ........................................................ 5

*Am. Lands Alliance v. Norton*, 525 F.Supp.2d 135 (D.D.C. 2007) ............................. 18

*Bd. of Trs. Of Hotel & Rest. Emps. Local 25 v. JPR, Inc.*, 136 F.3d 794 (D.C. Cir. 1998).......... 17

*Bloomgarden v. DOJ*, 253 F.Supp.3d 166 (D.D.C. 2017)....................................... 14, 15

*Blum v. Stenson*, 465 U.S. 886 (1984) .................................................................. 2, 18

*Brayton v. Off. of U.S. Trade Rep.*, 641 F.3d 521 (D.C. Cir. 2011) ........................... 2, 3

*Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Hum. Res.*, 532 U.S. 598 (2001) ................................................................................................. 3

*Burka v. U.S. Dep't of Health & Hum. Servs.*, 142 F.3d 1286 (D.C. Cir. 1988) ....................... 4, 6

*Chesapeake Bay Found. v. USDA ("Chesapeake I")*, 11 F.3d 211 (D.C.Cir.1993) .................... 10

*Chesapeake Bay Found. v. USDA ("Chesapeake II")*, 108 F.3d 375 (D.C.Cir.1997)................ 10

*Church of Scientology of California v. Harris*, 653 F.2d 584 (D.C. Cir. 1981)............................ 5

*Communist Party of the United States v. Department of Justice*, No. 75-1770, Slip op. (D.D.C. March 23, 1976)................................................................................................. 4

*Cotton v. Heyman,* 63 F.3d 1115 (D.C.Cir.1995) ....................................................... 10

*Covington v. District of Columbia*, 57 F.3d 1101 (D.C. Cir. 1995) ......................... 2, 18

*Cuneo v. Rumsfeld*, 553 F.2d 1360 (D.C. Cir. 1977)................................................. 4, 5

*Davis v. DOJ,* 610 F.3d 750 (D.C. Cir. 2010) ............................................................. 4

*Davy v. C.I.A.*, 550 F.3d 1155 (D.C. Cir. 2008) ........................... 10, 11, 12, 13, 14, 15

*Dorsen v. SEC*, 15 F.Supp.3d 112 (D.D.C. 2014) .................................................... 5, 8

*EPIC v. DHS,* 811 F.Supp.2d 216 (D.D.C. 2011).................................................. 12, 20

*EPIC v. FBI ("EPIC")*, 72 F.Supp.3d 338 (D.D.C. 2014) ..................................... 10, 11

*EPIC v. NSA*, 87 F.Supp.3d 223 (D.D.C. 2015) ............................................................ 12

Grand Canyon Tr. v. Bernhardt, 947 F.3d 94 (D.C. Cir. 2020)...................................... 3, 5

*J.T. v. District of Columbia*, 652 F. Supp. 3d 11 (D.D.C. 2023) .................................... 18

*Judicial Watch, Inc. v. DOJ* ("*Judicial Watch II*"), 774 F.Supp.2d 225 (D.D.C. 2011) ............. 17

*Judicial Watch, Inc. v. DOJ*, 878 F.Supp.2d 225 (D.D.C. 2022) ......................... 4, 5, 20

*Judicial Watch, Inc. v. FBI*, 522 F.3d 364 (D.C. Cir. 2008)........................................... 4

Mobley v. DHS, 908 F.Supp.2d 42 (D.D.C. 2012) ............................................. 3, 4, 13

*Morley v. C.I.A.*, 894 F.3d 389 (D.C. Cir. 2018) ............................................................ 2

*Nat'l Ass'n of Concerned Veterans v. Sec'y of Def.*, 675 F.2d 1319 (D.C. Cir. 1982)................. 18

*Negley v. FBI*, 818 F.Supp.2d 69 (D.D.C. 2011)............................................................ 12

*Read v. FAA*, 252 F.Supp.2d 1108 (W.D. Wash. 2003) ......................................... 14, 15

*Short v. Army Corps of Eng'rs*, 613 F.Supp.2d 103 (D.D.C. 2009) ................................ 8

*Tax Analysts v. DOJ*, 965 F.2d 1092 (D.C.Cir.1992) ............................................. 10, 12

*Weisberg v. DOJ*, 848 F.2d 1265 (D.C. Cir. 1988)......................................................... 3

**Statutes**

5 U.S.C. § 552(a)(4)(E)(i)............................................................................................... 2

5 U.S.C. § 552(a)(4)(E)(ii).............................................................................................. 3

OPEN Government Act of 2007, 5 U.S.C. § 552(a)(4)(E)(ii) (Supp. III 2009) ........................... 4

**Other Authorities**

DOJ FOIA Guide, *Attorney Fees* (2022) ...................................................................... 5

Memorandum from Ronald Regan (1982)......................................................................... 6

S.Rep. No. 93–854 ......................................................................................................... 10

U.S. Att'y's Off. for the Dist. of Columbia, *The Fitzpatrick Matrix* (July 25, 2025) ................. 18

## INTRODUCTION

For almost a year, the Department of Justice fought tooth and nail to oppose disclosure in this matter. Every opportunity for delay was taken; every argument no matter how tenuous pressed to the hilt by Department attorneys. On February 12, 2025, the Court directed the new Trump Administration to state whether it changed its position by February 19. Minute Order, 24-cv-700 (TJK) (D.D.C. filed Feb. 12, 2025). The Department sought and was granted an additional 90 days to respond. The Department claimed it needed this additional time to consider the merits of *this* case. The authentic tapes were released to Plaintiffs on May 19, 2025—one day before the Government was required to report its position to the Court.

Heritage Plaintiffs negotiated in good faith with the Department to secure both the release of the recordings and the settlement of disputes in this matter; that is why the tapes were produced on May 19, 2025. The causal nexus here is obvious. However, the Government effectively reneged on those discussions, and instead, apparently made an "authorized leak" without acknowledgement or attribution to *Axios*. The Government cannot require Heritage Plaintiffs to fully brief and litigate the underlying request in this matter, and then at the last minute, release the withheld records while also forestalling the availability of fees in this case. Doubly so when the release here was not discretionary; it required President Donald J. Trump to personally reverse President Joseph R. Biden's claim of Executive Privilege. That action violates FOIA and this Circuit's case law concerning unilateral and voluntary changes in position. Heritage Plaintiffs are both eligible and entitled to attorney's costs and fees, Heritage Plaintiffs' costs are reasonable, and fees on fees should be awarded. Respectfully, this Court should enter an order granting Heritage Plaintiffs motion for attorneys' fees and costs in the amount of $422,147.54, with additional fees on fees to be calculated after Heritage Plaintiffs' reply.

## BACKGROUND

This case was fully briefed on August 1, 2024.  In February of this year, this Court entered a Minute Order requiring the Department to file a joint status report outlining any change to the new Administration's position on their Motion for Summary judgement. Minute Order, 24-cv-700 (TJK) (D.D.C. filed Feb. 12, 2025).  After that one-week deadline, the Department moved for an extension, ECF No. 59, and this Court granted the extension over opposition from the other Plaintiffs and ordered the Department to respond in three months and simultaneously stayed the case.  Minute Order, 24-cv-700 (TJK) (D.D.C. filed Feb. 19, 2025).

Following this extension, Heritage Plaintiffs negotiated with the Department to secure the release of the tapes and to address settlement of this case.

## LEGAL STANDARD

Under FOIA, the district court "may assess against the United States reasonable attorney fees and other litigation costs reasonably incurred in any case under this section in which the complainant has substantially prevailed." 5 U.S.C. § 552(a)(4)(E)(i).  *Morley v. C.I.A.*, 894 F.3d 389, 391 (D.C. Cir. 2018).

Fee awards are analyzed in two prongs:  fee eligibility and fee entitlement. *Brayton v. Off. of U.S. Trade Rep.*, 641 F.3d 521, 524 (D.C. Cir. 2011).  If both are established, a plaintiff must then show the reasonableness of its fee request.  *See Covington v. District of Columbia*, 57 F.3d 1101, 1107 (D.C. Cir. 1995); *Blum v. Stenson*, 465 U.S. 886, 902 n.19 (1984).

**ARGUMENT**

**I.    Heritage Plaintiffs Are Eligible for Attorney's Fees.**

**A.    Standard of Review.**

To establish eligibility for fees, a plaintiff must show that it "substantially prevailed" in the underlying FOIA action by gaining relief from either:  "(I) a judicial order, or an enforceable written agreement or consent decree; or (II) a voluntary or unilateral change in position by the agency, if the complainant's claim is not insubstantial." 5 U.S.C. § 552(a)(4)(E)(ii).  Under either prong, "[t]he question of whether a litigant substantially prevailed is one of fact." *Weisberg v. DOJ.*, 848 F.2d 1265, 1268 (D.C. Cir. 1988), *overruled on other grounds by King v. Palmer*, 950 F.2d 771 (D.C. Cir. 1991)).  Here, Plaintiffs are moving for fees solely under the second prong, also known as the catalyst theory.[1]

Under the catalyst theory, "a plaintiff can prove fee eligibility by showing that its lawsuit 'substantially caused the government to release the requested documents before final judgment.'" *Grand Canyon Tr. v. Bernhardt*, 947 F.3d 94, 96 (D.C. Cir. 2020) (quoting *Brayton*, 641 F.3d at 524–25); *Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Hum. Res.*, 532 U.S. 598, 610 (2001) (explaining that the test under this "catalyst theory" is "whether the lawsuit was a substantial . . . cause of the defendant's change in conduct").

A plaintiff must show "that it is more probable than not that the government would not have performed the desired act absent the lawsuit." *Grand Canyon Tr.*, 947 F.3d at 97 (citation omitted).    "A    FOIA    case    must    be    viewed    in    its    totality in determining whether a plaintiff has 'substantially prevailed.'" *Mobley v. DHS*, 908 F.Supp.2d 42, 48 (D.D.C. 2012).  This totality includes demonstrating "that the lawsuit was reasonably

---

[1] Heritage Plaintiffs further note that this Court has not issued a dispositive order.

necessary and the litigation substantially caused the requested records to be released." *Burka v. U.S. Dep't of Health & Hum. Servs.*, 142 F.3d 1286, 1288 (D.C. Cir. 1988).

Where an agency provides "interim relief to a plaintiff by way of a voluntary and unilateral change in the agency's position, then it could be reasonable to conclude that, under the catalyst theory, that plaintiff has 'substantially prevailed.'" *Mobley*, 908 F. Supp. 2d 42, 47–48. To reaffirm this position, the congressional history of the OPEN Government Act of 2007, 5 U.S.C. § 552(a)(4)(E)(ii) (Supp. III 2009), explicitly amended the convoluted fee provision case law that diminished the incentive for, and congressional intent of, the catalyst theory. *See Davis v. DOJ*, 610 F.3d 750, 752 (D.C. Cir. 2010); *see also Judicial Watch, Inc. v. FBI*, 522 F.3d 364, 370 (D.C. Cir. 2008). For eligibility, even an "insubstantial" release establishes eligibility— "substantially" comes into play under the "entitlement prong of the fee analysis, not the eligibility prong." *Judicial Watch, Inc. v. DOJ*, 878 F.Supp.2d 225, 233 (D.D.C. 2022).

The unilateral release of the withheld records after briefing but before judgement circumvents both the 2007 Amendments and the original 1974 Amendments to FOIA. This Circuit's prior holdings on fee eligibility where the government moots the action by releasing the records after a fully briefed litigation explicitly forestalls the argument that unilateral release makes plaintiffs ineligible for fees. *Cuneo v. Rumsfeld*, 553 F.2d 1360, 1365 (D.C. Cir. 1977) *overruled on other grounds, Burka v. HHS*, 142 F.3d 1286 (D.C. Cir. 1988). There the D.C. Circuit examined several district court cases, and out-of-circuit case law to hold that mooting through unilateral action before a judicial order does not make plaintiffs ineligible for fees. *Cuneo*, 553 F.2d at 1365. *Cuneo* cited *Communist Party of the United States v. Department of Justice*, No. 75-1770, Slip op. at 3 (D.D.C. March 23, 1976), for the proposition that:

> (i)f the government could avoid liability for fees merely by conceding the cases
> before final judgment, the impact of the fee provision would be greatly reduced.

> The government would remain free to assert boilerplate defenses, and private parties who served the public interest by enforcing the Act's mandates would be deprived of compensation for the undertaking.

*Id.*

Indeed, the Departments' own FOIA Guide states, "the District Court for the District of Columbia has found on multiple occasions that discretionary disclosures made during litigation create eligibility for a plaintiff seeking attorney fees and costs."  DOJ FOIA Guide, *Attorney Fees* at 15 (2022).  Thus, for example, Judge Howell found eligibility for attorney's fees when records were released "one day" after service of a complaint, concluding that while even if release following suit was not itself "dispositive, the timing of a release of responsive records after the filing of a FOIA lawsuit 'is certainly a salient factor in the analysis.'"  *Dorsen v. SEC*, 15 F.Supp.3d 112, 118–19 (D.D.C. 2014) (internal citation omitted).   As the Government had no plausible explanation for the timing eligibility was established.  *Dorsen*, 15 F.Supp.3d 112 at 119.  Similarly, in *Judicial Watch*, releases based on preparation of documents identified in litigation sufficed. *Judicial Watch Inc.*, 878 F.Supp.2d 225 at 232-33; *ACLU v. DHS*, 810 F.Supp.2d 267, 275–276 (D.D.C. 2011).  That logic holds even if the release flows from the adoption of a new policy so long as "the commencement of the litigation was the 'direct cause' of the document's disclosure because without the litigation, the documents would not have been identified or evaluated to determine whether they should be released under the new guidelines."  *ACLU*, 810 F.Supp.2d 267 at 276 (quoting *Church of Scientology of California v. Harris*, 653 F.2d 584, 589 (D.C. Cir. 1981)).

**B.  Heritage Plaintiffs' Lawsuit "Substantially" Caused the Release of Records.**

Here, Plaintiffs' lawsuit "'substantially caused the government to release the requested documents before final judgment[,]'" *Grand Canyon Tr.*, 947 F.3d at 96, in at least three ways: (1) on the present record, the litigation caused the reversal of President Biden's claim of Executive

Privilege; (2) the litigation caused the release of both recordings of the interview; and (3) release of the Declaration of Bradley Weinsheimer to defend the withholdings revealed the highly newsworthy information that the transcripts of the Biden-Hur audio were not complete.

1.     Start with the fact that the previous administration invoked Executive Privilege to prevent the release of the Biden-Hur interview tapes.  That invocation could only be overcome by a judicial order or a personal decision by President Trump to reverse his predecessor's assertion of privilege.  So long as President Biden's privilege assertion remained it was an *absolute* bar to disclosure by the Executive Branch.  Put differently, so called "discretionary" disclosure simply was not possible; only the President could personally authorize release.  *See* Memorandum from Ronald Reagan at 2–3 (1982) ("Regan Memo").  In the end the Department released the tapes—confirming they were official copies—in this litigation on May 19, 2025.  The causal nexus is the underlying action that attempted to lift the improper invocation of Executive Privilege—the highest litigation privilege in our common law system.  The causal inquiry is a fact determination, and the facts on the present record amply support Heritage Plaintiffs.

Heritage Plaintiffs' lawsuit was "reasonably necessary and the litigation substantially caused the requested records to be released," *Burka*, 142 F.3d at 1288, because without the action there was no meaningful way to procure the release of the tapes that were guarded by assertion of Executive Privilege by President Biden himself.  Heritage Plaintiffs provided several declarations to overcome the Executive Privilege invocation, including one by former Attorney General Michael Mukasey who drafted the opinion relied upon by Attorney General Garland and distinguished Attorney General Garland's privilege invocation.  ECF No. 40-3 at ¶¶ 4–10. No other party in this action challenged the invocation to the extent that Heritage Plaintiffs did, nor with the authoritative manner.  Again, the invocation precluded release of the tapes without a

judicial order, and for this reason alone, the litigation was reasonably necessary to secure their release.

Even affording the Government the benefit of the doubt and recognizing that President Trump could himself reverse the claim of Executive Privilege and authorize the release of the tapes, this litigation substantially caused the Government to release the tapes. After all, the Government sought an additional 90-days to consider its position in this litigation precisely because of those complexities and the need to consult:

> Good cause exists for the extension. In light of the change in Administration, Defendant's counsel seeks additional time to confer with new leadership within the Department about this matter, and this leadership is still in the process of being installed. Additional time for consideration is further warranted because of the significant workload that the Department and its leadership is currently experiencing, much of which is time-sensitive and resource-demanding.

ECF No. 59 at 2. Indeed, that is part of why Heritage Plaintiffs did not oppose the 90-day request. *See* Second Declaration of Samuel Everett Dewey at ¶¶ 4–5 (July 25, 2025) ("2d Dewey Decl."). And that extension was granted over objection. It would be passing strange for the Government to assert a need for additional time to review this matter and yet claim that the release of the audio was somehow entirely divorced from it.

In several negotiations with political leaders at the Department, Heritage Plaintiffs repeatedly discussed the fact that any negotiated resolution was controlled by President Trump's willingness to personally revoke the privilege assertion. *Id.* at ¶¶ 5, 10(b). Presumably, the tapes were moved from a SCIF in the White House and processed in an effort to resolve this litigation; surely that is the logical conclusion on this record where Heritage Plaintiffs had been in repeated communications with the Department and even with White House Counsel concerning resolving this matter and were assured that the Department and White House Counsel were working towards a resolution. *Id.* at 1¶ 10(b). Heritage Plaintiffs also made clear that General Mukasey's

Declaration provided a reasoned basis for reversal of the Executive Privilege claim as patently erroneous. *Id.* at ¶¶ 4, 5, 10(b). Indeed, on May 9, numerous senior political appointees at the Department participated in a videoconference where Heritage Plaintiffs were told release of the recordings was likely on May 20, 2025—again, presumably they were being processed for release in this litigation. *Id.* at ¶13. Again, the Executive Privilege invocation could only be overcome by a judicial order, explicit overturning by the Trump Administration, or an unauthorized leak.

And at the end of the day, the timing is important. The Department produced the tapes just days before it was required to inform the Court whether it stood by the Biden Administration's position. That causal linkage is telling as the clear nexus between this action and the release of the audio recording. *See, e.g.*, *Dorsen*, 15 F.Supp.3d at 118–19; *Short v. Army Corps of Eng'rs*, 613 F.Supp.2d 103, 106 (D.D.C. 2009).

Even an authorized disclosure affords plaintiffs an opportunity to have "substantially prevailed." The entire purpose of the fee provision is to afford plaintiffs acting in the public interest to recover fees in their endeavor to request records from the Government. Heritage Plaintiffs did just that. Any decision to release the tapes before a final order, or even before this Court's mandated status report, has no bearing on fee eligibility.

**2.** The Department just released additional records at Plaintiffs insistence. *See* ECF No. 66. There were two separate tapes of the Biden-Hur audio recordings which the Department (appears) to concede were not forensically identical. *See* Declaration of Bradley Weinsheimer at ¶ 12 (May 31, 2025) (ECF No. 34-2) ("Weinsheimer Decl."). Only one recording was originally released to Plaintiffs. When Heritage Plaintiffs made clear their position that they were entitled to *both* recordings and would litigate the issue, if necessary, the Department produced

the original recordings in lieu of litigation. *See* ECF No. 67. Thus, both recordings were released only at Plaintiffs' insistence.

**3.**    During the briefing in this matter, this litigation compelled the Department to make significant disclosures that were matters of intense public interest. For example, the Biden Administration repeatedly claimed that production of the audio recordings at issue were not necessary because the transcript was public. The Biden Administration said that the transcript definitively put to bed the raging public controversy over whether the Special Counsel was correct that President Biden should not be charged in significant part because he would "likely present himself to the jury, as he did during his interview with our office, as a sympathetic, well-meaning, elderly man with a poor memory" as well as with "diminished faculties" because it showed Special Counsel Hur was wrong. *See* ECF No. 39 at 5–6, 11. But by forcing the Plaintiffs to process the tapes in litigation and to defend their withholding, Plaintiffs obtained the Declaration of Bradley Weinsheimer which made clear that the transcripts *were incomplete*. *See* Weinsheimer Decl. at ¶ 14 ("The interview transcripts are accurate transcriptions of the words of the interview contained in the audio recording, except for minor instances such as the use of filler words (such as 'um' or 'uh') when speaking that are not always reflected on the transcripts, or when words may have been repeated when spoken (such as 'I, I' or 'and, and') but sometimes was only listed a single time in the transcripts."). That was a significant disclosure itself; news reporting bears that out. Ex. 9 to the 2d Dewey Decl. at ¶ 19.

For the foregoing reasons, Heritage Plaintiffs are eligible for fees, and under this Circuit's four factor test, are entitled to them as well.

**II.    Heritage Plaintiffs Are Entitled Attorney's Fees.**

    **A.    Standard of Review**.

After clearing the threshold issue of eligibility, courts "consider at least four criteria in determining whether a substantially prevailing FOIA litigant is entitled to attorney's fees . . . ." *Davy v. C.I.A.*, 550 F.3d 1155, 1159 (D.C. Cir. 2008).  Those factors include:  "(1) the public benefit derived from the case; (2) the commercial benefit to the plaintiff; (3) the nature of the plaintiff's interest in the records; and (4) the reasonableness of the agency's withholding of the requested documents."  *Davy*, 550 F.3d at 1159 (quoting *Tax Analysts v. DOJ*, 965 F.2d 1092, 1093–94 (D.C.Cir.1992); S.Rep. No. 93–854 at 19.).  "No one factor is dispositive, although the court will not assess fees when the agency has demonstrated that it had a lawful right to withhold disclosure."  *Davy*, 550 F.3d 1155 at 1159 (citing *Chesapeake Bay Found. v. USDA ("Chesapeake I"),* 11 F.3d 211, 216 (D.C.Cir.1993), *abrogated in part on other grounds by Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Resources*, 532 U.S. 598, 601–02 (2001)).  Plaintiffs meet all four factors, and as is demonstrated below in relevant part, are entitled to fees.

    **B.    Application of the Four Factor Test Entitles Heritage to Attorney's Fees.**

    **1.**    The first factor assesses "the public benefit derived from the case," *Tax Analysts,* 965 F.2d at 1093, and requires courts to consider two issues, "the effect of the litigation for which fees are requested and the potential public value of the information sought," *Davy*, 550 F.3d at 1159 (citing *Chesapeake Bay Found. v. USDA ("Chesapeake II"),* 108 F.3d 375, 377 (D.C. Cir. 1997)); *Cotton v. Heyman,* 63 F.3d 1115, 1120 (D.C. Cir. 1995); *Tax Analysts,* 965 F.2d at 1093–94.).  The public benefit factor should not be read narrowly, "the relevant inquiry is whether EPIC's success 'is *likely* to add to the fund of public information that citizens may use in making vital political choices.'"  *EPIC v. FBI ("EPIC")*, 72 F.Supp.3d 338, 346 (D.D.C. 2014).

Consider the unprecedented nature of the Hur investigation.  Heritage Plaintiffs' Request for the audio recordings of former-President Biden's interview with Special Counsel Hur is a definitive public benefit.  President Biden was engrossed in a political scandal.  The Biden Department of Justice weaponized the Presidential Records Act to attack President Trump and authorized an unprecedented raid on a former president's personal residence.  And at the same time, found that sitting President Biden committed a similar violation and it was determined that although there was a case to answer, a jury likely would not convict President Biden because the President's "diminished faculties and faulty memory" would cause a jury to see the President as "a sympathetic well-meaning elderly man with a poor memory."  ECF No. 40-1 at 1, 4–6.  Incredibly, the Biden Administration attacked this conclusion and set up a dispute between Special Counsel Hur and his boss's boss.  Who was right?  The tapes had the answer.  And as the tapes revealed Special Counsel Hur was correct, the tapes put the lie to one of the most sordid coverups in our Nation's history.  This is not hypocrisy, it is an overt attempt to attack a political opponent for the same conduct committed by the accuser.  There is an enormous public benefit from this case.

The same is true for "the effect of the litigation . . . and the potential public value of the information sought."  *Davy*, 550 F.3d at 1159.  Additionally, the potential public value was exponential, and Plaintiffs only need to show that their "success 'is *likely* to add to the fund of public information that citizens may use in making vital political choices.'"  *EPIC*, 72 F.Supp.3d 338 at 346.  If the audio recordings showed the extent of President Biden's mental decline, the Biden Administration's narrative would have collapsed right before the upcoming election.  There would have been direct evidence of a constitutional crisis, where the sitting president was unable to perform his duties mandating an invocation of the 25th Amendment.  This context furthers Heritage Plaintiffs' argument that there was public benefit derived from this litigation which was the direct cause of those records being released.  Indeed, there was public benefit from the very

11

releases in the conduct of the litigation—namely the recognition that the transcript of the interview was not accurate. *See* 2d Dewey Decl. at ¶ 19. That was a substantial and cognizable public benefit in its own right. *See Negley v. FBI*, 818 F.Supp.2d 69, 75 (D.D.C. 2011) (revelation of how FBI processes FOIA requests supports fee award under first factor).

**2.**    The second and third factors, which are often considered together, assess whether a plaintiff has "sufficient private incentive to seek disclosure" without attorney's fees. *Tax Analysts*, 965 F.2d at 1095. The second factor considers the commercial benefit to the plaintiff, while the third factor considers the plaintiff's interest in the records. *Davy*, 550 F.3d at 1160. "Judges in this District have determined that these two factors distinctly favor this plaintiff, since it is a 'non-profit public interest research center . . . [that] derived no commercial benefit from its FOIA request or lawsuit,' and its stated aims are the public dissemination of information." *EPIC v. NSA*, 87 F.Supp.3d 223, 234 (D.D.C. 2015) (citing *EPIC v. DHS*, 811 F.Supp.2d 216, 235 (D.D.C. 2011)).

The Heritage Foundation is a non-profit educational institution that derived no commercial benefit from its FOIA request or lawsuit. The Oversight Project's (at the time of this lawsuit a subdivision of The Heritage Foundation), purpose is to publicly disseminate information gathered through FOIA requests and litigation. Moreover, consider the unprecedented nature of the case. Because (as we now know) the tapes showed that President Biden had cognitive decline, Special Counsel Hur was correct, and the entire Biden Administration was covering up President Biden's decline—in part by attacking Special Counsel Hur. The resources of the entire Department were brought to bear to prevent pre-election disclosure and disclosure while President Biden was in office because of the devastating political consequences. Plaintiffs in these sorts of FOIA cases are necessarily forced to devote hundreds upon hundreds of attorney hours to cut through the

thicket of Department delay tactics and meritless arguments.  Without fees, even a well-funded organization is hard pressed to litigate against the entire might of the Department.  The caselaw on this point weighs in Heritage Plaintiffs' favor.

**3.**    The fourth factor considers whether the agency's opposition to disclosure "had a reasonable basis in law," and whether the agency "had not been recalcitrant in its opposition to a valid claim or otherwise engaged in obdurate behavior."  *Davy*, 550 F.3d at 1162; *see also Mobley*, 908 F. Supp. 2d 42, 48 (stating "dilatory litigation tactics" would qualify as obdurate behavior).  "If the Government's position is correct as a matter of law, that will be dispositive.  If the Government's position is founded on a colorable basis in law, that will be weighed along with other relevant considerations in the entitlement calculus."  *Davy*, 550 F.3d at 1162.  It specifically exists to counter a situation where "'[i]f the government could avoid liability for fees merely by conceding the cases before final judgment, the impact of the fee provision would be greatly reduced.'"  *Id.* at 1166 (Tatel, J., concurring) (internation citation omitted).

Heritage Plaintiffs argue that the Department engaged in obdurate behavior for several reasons.

**a.**    To start, the Biden Administration's legal position was extraordinarily weak.  To take one example, the Department relied on an application of 7(A) even more tenuous than that rejected in the 2013 litigation.  To argue for a massive expansion of existing law that was previously decisively rejected is simply not reasonable.  *See* ECF No. 39 18–27; ECF No. 49 at 13–17.  Take another, "Attorney General Garland relies almost exclusively on Attorney General Mukasey's Opinion in *Assertion of Exec. Priv. Concerning the Special Counsel's Interviews of the Vice Pres. & Senior White House Staff*, 32 Op. O.L.C. 7, 10–11 (2008) ("*2008 Special Counsel Assertion*").  *See* Garland Ltr. at 1, 4–5" (ECF No. 39 at 32), in asserting his claim of Executive

Privilege.  But General Mukasey himself demolished that assertion and explained his prior opinion was inapplicable.  ECF No. 39 at 32; ECF No. 49 at 10–11, 10 n.3.  If that were not enough as Heritage Plaintiffs explained, Attorney General Garland's opinion appears to have overruled prior OLC opinions *sub silentio* to reach what some may feel was a preordained result.  *See* ECF. No. 39. at 31, 32–33; ECF No 49 at 4–7, 11.  And if all that was not enough, what takes the cake is the claim that the sitting President of the United States's privacy interest in the sound of his own voice (for material where the transcript was already public) outweighs the massive public interest in determining whether Special Counsel Hur or the Biden Administration was correct as concerns President Biden's cognitive facilities.  It is no exaggeration to say that the Department argued that this privacy interest outweighed informing the public about *whether the President was fit for Office*.  That is absurd.  *See* ECF No. 39 at 41–44; ECF No. 21–25.

b.      Continuing on, Defendant engaged in obduracy as concerns the conduct of the litigation and the withholding of the records.  "Obduracy" is fluid and fact specific.  Thus, in *Davy*, it was held obdurate that Plaintiff never received the basis for withholding until he brought his action.  *Davy*, 550 F.3d at 1163.  Similarly, in another matter obduracy was found where an agency claimed to have sufficient information but took some two years to make a production.  *See Read v. FAA*, 252 F.Supp.2d 1108, 1112 (W.D. Wash. 2003).

The Government's litigation conduct can also lead to a finding of obduracy.  In *Bloomgarden v. DOJ*, Judge Huvelle found this factor met where the "litigation was plagued by the government's obdurate and recalcitrant behavior."  253 F.Supp.3d 166, 173–74 (D.D.C. 2017).  Specifically, she found:

> The government initially refused to release any documents, including public documents. When the government first attempted to create a *Vaughn* index, it was "woefully inadequate," so the Court was unable to evaluate the government's invocation of FOIA exemptions. (Mem. Op. & Order, April 13, 2016, at 2.)  Further, the government neglected

14

its duty to produce any reasonably segregable materials from documents otherwise protected from disclosure, requiring the Court to order it to do so. As the Court noted when the government sought to raise new legal bases for withholding documents, in violation of *Maydak v. U.S. Dep't of Justice*, 218 F.3d 760 (D.C. Cir. 2000), the government "needlessly complicated and prolonged this litigation." (Mem. Op. and Order, April 13, 2016, at 4.) For the above reasons, the Court finds that the fourth factor weighs heavily in favor of awarding fees.

*Id.* at 174.

Like *in Bloomgarden*, the Government's litigation conduct here was obdurate and weighs heavily in favor of fees.

  **i.**  To start, the Government engaged in impermissible gamesmanship as regards the timing of this case. At the outset the Government refused to agree to a highly expedited schedule designed to ensure that the Government would have time for emergency stay litigation as concerned any order of disclosure. But then as time went on, the Government cited the time needed to obtain appellate review as ground to deny Plaintiffs' Motion to Expedite. *See* ECF No. 55 at 1. The Government cannot have it both ways and that reveals the Government's true intent: Delay at any cost to avoid damaging the Democratic ticket. That is not a permissible rationale for delay. *See, e.g.*, *Davy*, 550 F.3d at 1163; *Read*, 252 F.Supp.2d 1108, 1112 (W.D. Wash. 2003).

  **ii.**  But the Government's obduracy reached new levels as concerns the events leading up to the May 19, 2025 production.

The timeline tells the tale. Start with the fact that the Government was insistent in seeking its 90-day extension that time was required to review *this case*. ECF No. 59 at 2. Continue then from February to May 9, during which Heritage Plaintiffs repeatedly discussed resolution of this case with the Department and White House Counsel to achieve a settlement. 2d Dewey Decl. at ¶¶ 4–10. Recall then, that on May 9, 2025 numerous senior Department officials made clear to

Heritage Plaintiffs that release of the tape in this litigation was expected on May 20, 2025. *Id.* at ¶ 13.

With that backdrop move to May 15. By that date, senior Department officials were aware that *Axios* purported to have a copy of the tapes and was asking for comment. *Id.* at ¶ 15(d). But the Department made only a half-hearted effort to inform Heritage Plaintiffs of this hugely significant development and made no effort to inform the Court. *Id.* at ¶¶ 14, 15(a)–(b). Indeed, Defendant affirmatively failed to disclose this fact when two of the undersigned counsel were at Main Justice at the Department's request performing a significant favor for the Department at which numerous senior Department officials were present. *Id.* at ¶ 15(b). That is not standard delay or litigation tactics, that is a failure of greater magnitude.

Move on to May 16 when *Axios* publishes excerpts of the Biden-Hur tapes. As an initial matter, the Department refused to accelerate production of the full tapes it planned to produce on May 20, 2025, *despite* believing that someone had released authentic tapes to *Axios*. It did not justify this decision to continue withholding despite planning to release the tapes in a few days' time. *Id.* at ¶ 15(e), 15(g). While there may be a neutral reason for this action, the implication is obvious—the Department was acting on instructions to delay release to play out an "authorized leak" without attribution or admission of authenticity.

Continuing on to May 16 and 17, the Department opposed Heritage Plaintiffs' Emergency Motion (ECF No. 64) and stated that the Department did not consider the *Axios* release to have been "authorized" and that it did not come from the *Department*. 2d Dewey Decl. at ¶ 15(j). It maintained this position even after *Axios stated they were given the Biden-Hur audio by both the White House and the Department. Id.* at ¶¶ 16(e)–(f), 17(b). *Axios* has no incentive to lie about how they obtained the recordings—it was a coup. While Heritage Plaintiffs do not doubt the

accuracy of the representations from those in the Department it spoke to, the tension in the statements cannot be reconciled.  Was someone else in the Department aware of an authorized release without attribution or acknowledgement of authenticity?

In any event, even more concerning is the fact that the Department has *maintained* its position before this Court that the *Axios* release was not authorized.  Heritage Plaintiffs have repeatedly sought correction or clarification of the record, but it has not been forthcoming.  *Id.* at ¶¶ 16(e)–(f), 17(b), 18.  The failure to correct an (apparent) inaccurate representation to the Court on a highly material point (however innocently made) is patent litigation misconduct and obduracy.

The Government cannot fight tooth and nail to prevent release of a recording, obtain a significant additional delay to consider its position, and then be rewarded for an "authorized leak" that all in all was immensely poor behavior by the Government as a whole.  To the contrary that demands fees.

In sum all factors support a fee award here.

### III.    Heritage Plaintiffs Seek Reasonable Attorneys' Fees.

To determine whether fees are reasonable, courts focus on two questions:  (1) whether the attorneys charged a reasonable hourly rate and (2) whether the time attorneys logged on the case was reasonable—*i.e.,* did the attorneys waste or otherwise unnecessarily spend time on the matter. *Judicial Watch, Inc. v. DOJ* ("*Judicial Watch II"*), 774 F.Supp.2d 225, 232 (D.D.C. 2011) (quoting *Bd. of Trs. of Hotel & Rest. Emps. Local 25 v. JPR, Inc.*, 136 F.3d 794, 801 (D.C. Cir. 1998)).

Attorney fees are calculated based on the "lodestar," which is the number of hours the lawyers reasonably spent on the case multiplied by the lawyers' hourly rates.  *Id*.  A lawyer's hourly rate is measured by its fair market value, "regardless of whether plaintiff is represented by

private or non-profit counsel." *Blum v. Stenson*, 465 U.S. 886, 895 (1984). Courts in this Circuit have recognized the *Fitzpatrick* Matrix, a schedule of fees derived from recent, market-based data on attorney rates in the District of Columbia federal courts, as a reliable benchmark for complex federal litigation. *See J.T. v. District of Columbia*, 652 F.Supp.3d 11, 24–27 (D.D.C. 2023). Accordingly, Heritage Plaintiffs billed time for this matter using the *Fitzpatrick* Matrix as the basis for its calculations.[2] *See* U.S. Att'y's Off. for the Dist. of Columbia, *The Fitzpatrick Matrix*, https://www.justice.gov/usao-dc/page/file/1504361/dl (July 25, 2025).

The D.C. Circuit has held that "the second prong of the equation for calculating a fee award—the reasonableness of hourly rates awarded under fee-shifting statutes—consists of 'at least three elements: the attorneys' billing practices; the attorneys' skill, experience, and reputation; and the prevailing market rates in the relevant community.'" *Am. Lands Alliance v. Norton*, 525 F.Supp.2d 135 (D.D.C. 2007) (*citing Covington v. D.C.*, 57 F.3d 1101, 1107 (D.C. Cir. 1995)). To recover, the movant must provide "contemporaneous, complete, and standardized time records which accurately reflect the work done by each attorney." *Nat'l Ass'n of Concerned Veterans v. Sec'y of Def.*, 675 F.2d 1319, 1327 (D.C. Cir. 1982).

As to the Clement & Murphy fees, those fees reflect the extraordinary and sought after appellate expertise of that firm. *See* Declaration of Daniel D. Mauler at Ex. 1 (July 25, 2025) ("Mauler Decl."). It is common to bring appellate counsel into District Court proceedings when emergency appellate proceedings are contemplated. *Id.* at 11. Here, given the extraordinary importance of the case to informing voters in the 2024 General Election it was reasonable to expect prompt rulings and emergency stay litigation. *Id.* at 12. Moreover, the choice of appellate counsel

---

[2] Heritage Plaintiffs reserve the right to argue the *Laffey* Matrix as a benchmark for attorneys' fees in case the *Fitzpatrick* Matrix is held inapplicable.

was also necessary given the fact that the Department poured every possible resource into preventing the release of the tapes to defend the position of President Biden and Vice President Harris. If the Department was entitled to deploy senior attorneys such as the Assistant Attorney General of the Office of Legal Counsel, Plaintiffs reasonably were entitled to deploy a former Solicitor General. *Id.* at 15. It would be rich by half for the Department to object to senior attorneys advising on this matter when it availed itself of personal legal work *by the Attorney General of the United States himself.*

Heritage Plaintiffs have provided complete detailed billing records which were contemporaneously recorded and accurately reflect the work done by each attorney.[3] *See id.* at Ex. 1. The records reflect the date, time, and nature of each activity, and include details about specific work performed. *Id.* Each entry is labeled with the name of the attorney performing the work, the attorney's rate, the hours of work performed on the activity, and the total amount charged for the activity. *Id.*

To be sure, Heritage Plaintiffs spent substantial time on this matter. But that was necessary despite the unjustified claims of withholding and the assertion of Executive Privilege. The Department clearly was throwing immense resources at the case to stop the truth from coming out prior to the 2024 Election—President Biden was not fit to perform his duties and his senior officials (likely including the then-Vice President) engaged in an unprecedented cover-up. Heritage

---

[3] Heritage Plaintiffs' did not submit and thus discounted substantial time spent by Heritage's General Counsel, an attorney with over 10 years litigation experience who served in the Federal Programs Branch. Similarly, Heritage did not submit for the time of the Hon. Stephen G. Bradbury, former Acting Assistant Attorney General of the Office of Legal Counsel, former Acting Secretary of Transportation and current Deputy Secretary of Transportation. Needleless to say Mr. Bradbury's experience would entitle him to a billing rate comparable to Mr. Clement's. *See* Mauler Decl. at ¶ 9.

Plaintiffs note that they already reduced their fee figures for internal timekeepers to account for any residual inefficiency and relative experience.

Moreover, Heritage Plaintiffs are entitled to aggressively litigate their case. A case involving a personal opinion from the Attorney General—however badly flawed—is entitled to be met by the extraordinary work that goes into obtaining a declaration from former-Attorney General Mukasey; namely hours of historical legal research and substantial hours billed by General Mukasey's former OLC head (time for which Heritage Plaintiffs do not even claim here in an effort at reasonableness). Therefore, Heritage has provided satisfactory billing records in this matter.

## IV.    The Court Should Award "Fees on Fees."

In addition to recovering fees for the time it spent on this litigation, Heritage Plaintiffs are entitled to recover fees for its work on this motion and prior fee negotiations. "It is settled in this circuit that hours reasonably devoted to a request for fees are compensable." *Judicial Watch II*, 878 F. Supp. 2d at 240 (citations omitted); *see also EPIC v. DHS*, 811 F.Supp.2d 216, 237 (D.D.C. 2011) ("It is a common practice in this jurisdiction to award fees on fees in FOIA cases."). Heritage Plaintiffs will incur appreciable fees in litigating this fee petition. Heritage Plaintiffs request permission to file a full accounting on those fees in their reply as Heritage Plaintiffs are not yet aware of the total incurred costs and expect to perform significant work replying to the Government's opposition in this matter. If Heritage Plaintiffs prevail in its Motion for Attorneys' Fees and Costs, this Court should award fees on fees.

## CONCLUSION

Heritage Plaintiffs substantially prevailed in this case and are both eligible and entitled to attorney's fees under FOIA. The award Heritage Plaintiffs seek is reasonable and supported by the attached affidavits, billing records, and receipts. Heritage Plaintiffs request that the Court award it $422,147.54 in fees and costs in addition to fees litigating this fee petition.

Dated:  July 25, 2025

Respectfully submitted,

/s/ Samuel Everett Dewey

DANIEL D. MAULER
(No. 977757)
The Heritage Foundation
Telephone:  (202) 617-6975
Email:  Dan.Mauler@heritage.org

SAMUEL EVERETT DEWEY
(No. 999979)
Chambers of Samuel Everett Dewey, LLC
Telephone:  (703) 261-4194
Email:  samueledewey@sedchambers.com

KYLE BROSNAN
(No. 90021475)
The Oversight Project
Telephone:  (845) 674-5589
Email:  Kyle@itsyourgov.org

ERIC NEAL CORNETT
(No. 1660201)
Law Office of Eric Neal Cornett
Telephone:  (606) 275-0978
Email:  neal@cornettlegal.com

MAX TAYLOR MATHEU
(No. 90019809)
Telephone:  (727) 249-5254
Email:  maxmatheu@outlook.com

*Counsel for Plaintiffs*