# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **HERITAGE FOUNDATION,** *et al.*, <br><br> *Plaintiffs,* <br><br> v. <br><br> **U.S. DEPARTMENT OF JUSTICE**, <br><br> *Defendant*. | Case No. 1:24-cv-00700-TJK <br> (Consolidated Cases) |
| **CABLE NEWS NETWORK, INC.**, *et al.*, <br><br> *Plaintiffs,* <br><br> v. <br><br> **U.S. DEPARTMENT OF JUSTICE**, <br><br> *Defendant*. | |

## DEFENDANT'S RESPONSE TO PLAINTIFFS' MOTION FOR A DETERMINATION OF ELIGIBILITY FOR AND ENTITLEMENT TO ATTORNEY FEES

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................. ii

TABLE OF AUTHORITIES .......................................................................................... iv

INDEX OF EXHIBITS ................................................................................................ viii

INTRODUCTION .......................................................................................................... 1

FACTUAL AND PROCEDURAL BACKGROUND ..................................................... 2

LEGAL STANDARD ..................................................................................................... 4

ARGUMENT .................................................................................................................. 5

   I.   Plaintiffs Are Not Eligible for Fees. .................................................................... 5

   II.   Plaintiffs Are Not Entitled to Fees. ................................................................... 12

      A.   Plaintiffs Are Not Entitled to Fees Under Their Main Theory of Eligibility ............... 13

      B.   Heritage Is Not Entitled to Fees Under Heritage's Alternative Eligibility Theories .... 16

   III.   If the Court Awards Plaintiffs Fees, Which it Should Not, Those Fees Must Be Limited to Those "Reasonably Incurred" .......................................................... 18

      A.   Reasonable Fees for Heritage ..................................................................... 19

          1.   Heritage is not entitled to fees for "nonproductive" time like time spent on unsuccessful issues or other cases .................................................................. 20

          2.   Heritage is entitled to no fees for the excessive and unnecessary hours billed by "appellate counsel" at Clement & Murphy. ................................................. 22

          3.   Any fee award to Heritage should be reduced given its speculative level of success on the merits. ................................................................................... 25

          4.   Heritage's non-Clement & Murphy fees are likewise excessive. .............................. 26

          5.   Heritage should be denied fees entirely because of its outrageous fee demand. ....... 27

      B.   Reasonable Fees for the Press Coalition ...................................................... 28

          1.   The Press Coalition is not entitled to fees for administrative-stage FOIA work. ...... 29

2.    The Press Coalition is not entitled to fees for "nonproductive" time like time spent on unsuccessful issues or other cases ................................................................................. 29

3.    The Press Coalition is not entitled to fees for vague or redacted narratives that do not permit the Department or the Court to assess the entries' reasonableness. ...................... 30

4.    Any fee award to the Press Coalition should be reduced given its speculative level of success on the merits. ............................................................................................................ 31

5.    The Press Coalition's fees are excessive overall. ...................................................... 32

C.    Reasonable Fees for Heritage Under Heritage's Alternative Eligibility Theories ....... 34

CONCLUSION ..................................................................................................................... 36

# TABLE OF AUTHORITIES

**Cases**

*ACLU v. U.S. Dep't of Homeland Sec.*,
  810 F. Supp. 2d 267 (D.D.C. 2011) ................................................. 8, 21

*Am. First Legal Found. v. U.S. Dep't of Energy*,
  No. 22-cv-1888, 2025 WL 1276808 (D.D.C. Mar. 28, 2025) ................................. 7

*Am. Oversight v. U.S. Dep't of Just.*,
  375 F. Supp. 3d 50 (D.D.C. 2019) ..................................... 21, 23, 25, 30

*Baker v. John Morell & Co.*,
  263 F. Supp. 2d 1161 (N.D. Iowa 2003) ........................................ 26, 33

*Baylor v. Mitchell Rubenstein & Assocs., PC*,
  857 F.3d 939 (D.C. Cir. 2017) .................................................... 28

*Brayton v. Off. of the U.S. Trade Representative*,
  641 F.3d 521 (D.C. Cir. 2011) ............................................. 4, 5, 12

*Campaign for Responsible Transplantation v. Food & Drug Admin.*,
  511 F.3d 187 (D.C. Cir. 2007) ................................................... 12

*Church of Scientology of Cal. v. Harris*,
  653 F.2d 584 (D.C. Cir. 1981) .............................................. 4, 11

*Citizens for Resp. & Ethics in Wash. v. Dep't of Just.*,
  142 F. Supp. 3d 1 (D.D.C. 2015) ................................... 24, 25, 34, 35

*Cobell v. Jewell*,
  234 F. Supp. 3d 126 (D.D.C. 2017)..............................................22, 26, 32

*Conservation Force v. Jewell*,
  160 F. Supp. 3d 194 (D.D.C. 2016) ........................................ 5, 9, 12

*Copeland v. Marshall*,
  641 F.2d 880 (D.C. Cir. 1980)) ................................................... 21

*Davis Cnty. Solid Waste Mgmt. & Energy Recovery Special Serv. Dist. v. EPA*,
  169 F.3d 755 (D.C. Cir. 1999) .............................................. *passim*

*Davy v. CIA*,
  550 F.3d 1155 (D.C. Cir. 2008) ............................................ *passim*

*Doe I v. Exxon Mobile Corp.*,
  No. 01-cv-1357, 2022 WL 1124902 (D.D.C. Apr. 14, 2022) ............................... 20

iv

*Dorsen v. SEC*,
   15 F. Supp. 3d 112 (D.D.C. 2014) ...................................................................... 8

*Edelman v. SEC*,
   356 F. Supp. 3d 97 (D.D.C. 2019) ................................................... 13, 14, 17

*Elec. Priv. Info. Ctr. v. Dep't of Homeland Sec.*,
   197 F. Supp. 3d 290 (D.D.C. 2016) ................................. 25, 27, 31, 33

*Elec. Priv. Info. Ctr. v. Dep't of Homeland Sec.*,
   218 F. Supp. 3d 27 (D.D.C. 2016) ................................. 5, 7, 34, 35

*Elec. Priv. Info. Ctr. v. Dep't of Homeland Sec.*,
   811 F. Supp. 2d 216 (D.D.C. 2011) ...................................................... 32

*Elec. Priv. Info. Ctr. v. Dep't of Homeland Sec.*,
   982 F. Supp. 2d 56 (D.D.C. 2013) ................................................ 21, 29

*Elec. Priv. Info. Ctr. v. Dep't of Homeland Sec.*,
   999 F. Supp. 2d 61 (D.D.C. 2013) ...................................................... 20

*Elec. Priv. Info. Ctr. v. FBI*,
   72 F. Supp. 3d 338 (D.D.C. 2014) ...................................................... 17

*Elec. Priv. Info. Ctr. v. FBI*,
   80 F. Supp. 3d 149 (D.D.C. 2015) .............................. 26, 31, 32, 33

*Eley v. District of Columbia.*,
   793 F.3d 97 (D.C. Cir. 2015) ........................................................ 23, 24

*Env't Integrity Project v. EPA*,
   316 F. Supp. 3d 320 (D.D.C. 2018) ...................................................... 4

*Env't. Def. Fund, Inc. v. Reilly*,
   1 F.3d 1254 (D.C. Cir. 1993) ................................................ 18, 19, 28

*Fenster v. Brown*,
   617 F.2d 740 (D.C. Cir. 1979) ................................................ 13, 14, 15

*Firestine v. Parkview Health Sys., Inc.*,
   374 F. Supp. 2d 658 (N.D. Ind. 2005) ................................................ 26, 33

*Grand Canyon Tr. v. Bernhardt*,
   947 F.3d 94 (D.C. Cir. 2020) .................................................................. 5, 6

*In re Tun*,
   26 A.3d 313 (D.C. 2011) ....................................................................... 21, 29

*J.T. v. District of Columbia,*
   652 F. Supp. 3d 11 (D.D.C. 2023) ................................................. 23, 25

*J.T.F. v. District of Columbia,*
   No. 21-cv-1453, 2025 WL 843281 (D.D.C. Mar. 18, 2025) ..................................... 22, 26, 32

*Judicial Watch, Inc. v. Dep't of Comm.,*
   470 F.3d 363 (D.C. Cir. 2006) .................................................4, 5, 26, 31

*Judicial Watch, Inc. v. Dep't of Just.,*
   774 F. Supp. 2d 225, 232 (D.D.C. 2011)....................................................18

*Judicial Watch, Inc. v. Dep't of Just.,*
   878 F. Supp. 2d 225 (D.D.C. 2012) .................................................. 8

*Leopold v. Dep't of Just.,*
   No. 21-cv-00942, 2023 WL 1875229 (D.D.C. Jan. 26, 2023) ........................................ 19, 28

*Leopold v. Dep't of Homeland Sec.,*
   No. 22-cv-1923, 2025 WL 2177912 (D.D.C. Aug. 1, 2025) ........................................... 26, 33

*Merrick v. District of Columbia.,*
   316 F. Supp. 3d 498 (D.D.C. 2018) ................................................. 19, 34

*Mobley v. Dep't of Homeland Sec.,*
   908 F. Supp. 2d 42 (D.D.C. 2012) ................................................. 11, 18

*Morley v. CIA,*
   894 F.3d 389 (D.C. Cir. 2018) ................................................. 13, 15

*Negley v. Fed. Bureau of Investigation,*
   No. 03-cv-2126, 2013 WL 12404697 (D.D.C. May 29, 2013) ................................. 20, 29, 30

*Nw. Coal. for Alternatives to Pesticides v. Browner,*
   965 F. Supp. 59 (D.D.C. 1997) ................................................. 29, 30

*Pub. L. Educ. Inst. v. U.S. Dep't of Just.,*
   744 F.2d 181 (D.C. Cir. 1984) ................................................. 9

*SafeCard Servs., Inc. v. SEC,*
   926 F.2d 1197 (D.C. Cir. 1991) ................................................. 7

*Schoenman v. FBI,*
   575 F. Supp. 2d 166 (D.D.C. 2008) ................................................. 11, 17

*Urb. Air Initiative, Inc. v. EPA,*
   442 F. Supp. 3d 301 (D.D.C. 2020) ................................................. 26, 31

*Weisberg v. Dep't of Justice*,
    745 F.2d 1476 (D.C. Cir. 1984) .................................................................................. *passim*

**Statutes**

5 U.S.C. § 552 ............................................................................................................ *passim*

**Executive Orders**

Exec. Order No. 14176,
    Declassification of Records Concerning the Assassinations of President John F. Kennedy,
    Senator Robert F. Kennedy, and the Reverend Dr. Martin Luther King, Jr.,
    90 Fed. Reg. 8641 (Jan. 23, 2025). ....................................................................... 4, 7

**Other Authorities**

*EPA Announces Relaunch of Comprehensive Guidance Document Website, Advances Total
    Transparency of Trump Administration*, *Env't Prot. Agency* (Aug. 13, 2025),
    https://www.epa.gov/newsreleases/epa-announces-relaunch-comprehensive-guidance-
    document-website-advances-total .............................................................................3

*Fact Sheet: President Donald J. Trump Requires Transparency for the American People About
    Wasteful Spending* (Feb. 18, 2025), https://www.whitehouse.gov/fact-sheets/2025/02/fact-
    sheet-president-donald-j-trump-requires-transparency-for-the-american-people-about-
    wasteful-spending/ ................................................................................................ 4

*Immediate Declassification of Materials Related to the Federal Bureau of Investigation's
    Crossfire Hurricane Investigation*, Memorandum for the Attorney General, the Director of
    National Intelligence, and the Director of the Central Intelligence Agency (March 25, 2025),
    https://www.whitehouse.gov/presidential-actions/2025/03/immediate-declassification-of-
    materials-related-to-the-federal-bureau-of-investigations-crossfire-hurricane-investigation/
    (White House Mem.) ....................................................................................... 4, 7

Marc Caputo & Alex Thompson, *Exclusive: Prosecutor's Audio Shows Biden's Memory Lapses*,
    Axios (May 16, 2025), https://www.axios.com/2025/05/16/biden-hur-tape-special-counsel-
    audio ............................................................................................................ 15

# INDEX OF EXHIBITS

- Declaration of Jonathan M. Breyan
  - Exhibit 1, Order No. 5588-2023, Appointment of Robert K. Hur as Special Counsel
  - Exhibit 2, Letter from Committee Chairmen to Attorney General Merrick Garland
  - Exhibit 3, February 27, 2024 Subpoena to Attorney General Merrick Garland
  - Exhibit 4, May 15, 2024 Letter of Attorney General Merrick Garland
  - Exhibit 5, May 16, 2024 Letter of Assistant Attorney General Carlos Uriarte
  - Exhibit 6, January 6, 2025 Renewed Subpoena to Attorney General Merrick Garland
  - Exhibit 7, FOIA Request Submitted by Judicial Watch, Inc.
  - Exhibit 8, Acknowledgement of FOIA Request Submitted by Judicial Watch, Inc.
  - Exhibit 9, FOIA Request Submitted by Heritage Foundation, *et al.*
  - Exhibit 10, FOIA Expedition Request Submitted by Heritage Foundation, *et al.*
  - Exhibit 11, Grant of Expedition for FOIA Request Submitted by Heritage Foundation, *et al.*
  - Exhibit 12, FOIA Request Submitted by CNN
  - Exhibit 13, Acknowledgement of FOIA Request Submitted by CNN
- Exhibit of Reasonable Attorney's Fees for Plaintiffs

## INTRODUCTION

Defendant the Department of Justice (the Department) respectfully submits this response to the motions by Plaintiffs Cable News Network, Inc., *et al.* (the Press Coalition) and Heritage Foundation, *et al.* (Heritage) (collectively, Plaintiffs[1]) for attorney's fees and costs. *See generally* Press Coal.'s Mot. For an Award of Att'y's Fees & Costs, ECF No. 72 (Press Coalition Mot.); Heritage Pls.' Mot. For Atty'y's Fees & Costs, ECF No. 73 (Heritage Mot.).

In this Freedom of Information Act (FOIA) case, the government withheld the audio recording of former President Biden's interview with Special Counsel Robert K. Hur based on a number of statutory exemptions, including former President Biden's assertion of executive privilege to withhold the same recordings from Congress. The parties briefed summary judgment between May and August of 2024, but the Administration changed before the Court decided the motion. The new Administration determined not to maintain the Executive Privilege assertion and to instead comply with the newly re-authorized Congressional subpoena demanding production of the recordings. Moreover, this Administration promised the American people that it would be transparent, and it should come as no surprise that the release of documents withheld by the prior administration would be a priority. In short, this litigation played no role in the Administration's decision to provide to Congress, and subsequently the public, the audiotapes of the Biden interview.

The remaining plaintiffs in this action nevertheless demand that taxpayers pay them hundreds of thousands of dollars in attorney fees. For the reasons below, neither the Press Coalition nor Heritage is eligible for or entitled to attorney's fees under the FOIA provisions

---

[1] Plaintiff Judicial Watch, Inc. has dismissed all its claims in this case. *See* Stipulation of Dismissal with Prejudice, ECF No. 71 (July 31, 2025).

governing those fees. And even if either party were eligible for and entitled to fees—which they are not—they would only be owed fees that are reasonable, contemporaneously documented, necessary, and non-duplicative, and so would be owed sums far lower than they have requested.

## FACTUAL AND PROCEDURAL BACKGROUND

At issue in this case are the audio recordings of an interview of then-President Joseph Biden, conducted by Special Counsel Hur, who was investigating the possible removal and retention of classified document at locations associated with then-President Biden. *See* Declaration of Jonathan M. Breyan (Breyan Decl.) ¶ 4.

The respective chairmen of two Committees of the United States House of Representatives (the Committees on the Judiciary and on Oversight and Accountability) sent a letter to then-Attorney General Merrick Garland on February 12, 2024, with a request for the audio recordings. *See id.* ¶ 6. About two weeks later, on February 27, 2024, those two Committees of the United States House of Representatives (the Committees on the Judiciary and on Oversight and Accountability) subpoenaed the audio recordings of Special Counsel Hur's interview of President Biden. *See id.* ¶ 7.

On May 15, 2024, Attorney General Merrick Garland informed President Biden that, with the advice of the Department's Office of Legal Counsel, he determined that the audio recordings fell within the scope of executive privilege, and the next day on May 16, 2024, President Biden asserted executive privilege over the subpoenaed audio recordings and instructed that they not be produced to Congress. *See id.* ¶¶ 8-9. On July 1, 2024, the House of Representatives Committee on the Judiciary responded by filing a lawsuit to attempt to compel disclosure of the audio recordings to Congress. *See generally* Compl. for Declaratory & Injunctive Relief, *Comm. on the*

*Judiciary v. Garland*, ECF No. 1, No. 24-cv-1911 (July 1, 2024).

Around the time of the Congressional subpoena, all three Plaintiffs in this consolidated lawsuit submitted FOIA requests for the audio recordings, on February 8, 2024 (Judicial Watch), February 12, 2024 (Heritage), and February 16, 2024 (the Press Coalition).  *See* Breyan Decl. ¶¶ 13-15.  All Plaintiffs subsequently filed lawsuits concerning those FOIA requests, on March 11, 2024 (Judicial Watch), April 3, 2024 (Heritage), and April 4, 2024 (the Press Coalition).  *See id.*

The Department moved for summary judgment on May 31, 2024, arguing that the audio recordings were fully exempt from disclosure under the FOIA, including because of President Biden's assertion of executive privilege.  *See generally* Def. U.S. Dep't of Just. Memo. of Law in Supp. of Mot. for Summ. J., ECF No. 34-1 (May 31, 2024) (DOJ MSJ Mem.).  Briefing on this motion was complete on August 1, 2024.  *See, e.g.*, Reply Memo. in Supp. of Heritage Pltfs' Cross Mot. for Summ. J., ECF No. 49 (August 1, 2024).

On January 20, 2025, Donald J. Trump was sworn in as the 47th President of the United States.  His new Administration has decided to process and release a wide variety of records and information that the previous Administration had withheld.  *See, e.g.*, *EPA Announces Relaunch of Comprehensive Guidance Document Website, Advances Total Transparency of Trump Administration*, Env't Prot. Agency (Aug. 13, 2025), https://www.epa.gov/newsreleases/epa-announces-relaunch-comprehensive-guidance-document-website-advances-total; *Immediate Declassification of Materials Related to the Federal Bureau of Investigation's Crossfire Hurricane Investigation*, Memorandum for the Attorney General, the Director of National Intelligence, and the Director of the Central Intelligence Agency (March 25, 2025),

3

https://www.whitehouse.gov/presidential-actions/2025/03/immediate-declassification-of-

materials-related-to-the-federal-bureau-of-investigations-crossfire-hurricane-investigation/; *Fact*

*Sheet: President Donald J. Trump Requires Transparency for the American People About Wasteful*

*Spending* (Feb. 18, 2025) https://www.whitehouse.gov/fact-sheets/2025/02/fact-sheet-president-

donald-j-trump-requires-transparency-for-the-american-people-about-wasteful-spending/;   Exec.

Order No. 14176, Declassification of Records Concerning the Assassinations of President John F.

Kennedy, Senator Robert F. Kennedy, and the Reverend Dr. Martin Luther King, Jr., 90 Fed. Reg.

8641 (Jan. 23, 2025).

On May 19, 2025, nearly nine months after briefing in this case was completed, the

Department released the audio recordings to Congress.  Breyan Decl. ¶ 18.  Later that same day,

the Department released the audio recordings to the public by posting the recordings on the

Department's public website.  *Id.* ¶ 19.  The Department also notified Plaintiffs in this case that

the Department had done so.  *See id.*

## LEGAL STANDARD

FOIA provides that a court "may assess against the United States reasonable attorney fees

and other litigation costs reasonably incurred in any case . . . in which the complainant has

substantially prevailed."  5 U.S.C. § 552(a)(4)(E)(i).  "Whether an award of attorney[] fees" under

FOIA "is proper depends on a two-step inquiry of (1) eligibility and (2) entitlement."  *Env't*

*Integrity Project v. EPA*, 316 F. Supp. 3d 320, 325 (D.D.C. 2018) (citing *Church of Scientology*

*of Cal. v. Harris*, 653 F.2d 584, 587 (D.C. Cir. 1981)).  "The eligibility prong asks whether a

plaintiff has 'substantially prevailed' and thus 'may' receive fees."  *Brayton v. Off. of the U.S.*

*Trade Representative*, 641 F.3d 521, 524 (D.C. Cir. 2011) (quoting *Judicial Watch, Inc. v. Dep't*

*of Comm.*, 470 F.3d 363, 368 (D.C. Cir. 2006)).    "If so," a court must then "proceed[] to the entitlement prong and consider[] a variety of factors to determine whether the plaintiff *should* receive fees." *Id.*; *see Judicial Watch, Inc.*, 470 F.3d at 369 ("Eligibility for fees does not necessarily mean that a party is *entitled* to attorney fees under FOIA.").    "[E]ven after finding eligibility and entitlement, district courts retain the discretion to modify a fee award based on the reasonableness of the request and the particular facts of the case." *Conservation Force v. Jewell*, 160 F. Supp. 3d 194, 203 (D.D.C. 2016).

## ARGUMENT

### I.    Plaintiffs Are Not Eligible for Fees.

A FOIA plaintiff is eligible for attorney fees only if that plaintiff "has substantially prevailed on the merits of [his] claim." *Judicial Watch*, 470 F.3d at 368; *see* 5 U.S.C. § 552(a)(4)(E)(i).  A plaintiff "has substantially prevailed" under the FOIA if he "obtained relief through either" (1) "a judicial order, or an enforceable written agreement or consent decree" or (2) "a voluntary or unilateral change in position by the agency, if the complainant's claim is not insubstantial." 5 U.S.C. § 552(a)(4)(E)(ii).

Plaintiffs assert that they are eligible for attorney's fees based on a change in position by the Department, *see* Press Coalition Mot. at 5; Heritage Mot. at 5, which is known as the "catalyst theory," *Grand Canyon Tr. v. Bernhardt*, 947 F.3d 94, 96 (D.C. Cir. 2020).  As the name suggests, to succeed under the catalyst theory a plaintiff must show not just that the agency changed its position but that the plaintiff's "lawsuit 'substantially caused the government to release the requested documents.'"  *Id.* (quoting *Brayton*, 641 F.3d at 524-25).  Importantly, "the mere filing of the complaint and the subsequent release of the documents is insufficient to establish causation." *Id.* at 97(quoting *Weisberg v. Dep't of Justice*, 745 F.2d 1476, 1496 (D.C. Cir. 1984)).  If a

"disclosure is triggered by events unrelated to the pending lawsuit, the causal nexus is missing and the plaintiff cannot be deemed a 'prevailing party'" that is eligible for fees under the FOIA. *Elec. Priv. Info. Ctr. v. Dep't of Homeland Sec.*, 218 F. Supp. 3d 27, 41 (D.D.C. 2016) (citation omitted). At bottom, a plaintiff must thus establish that "it is more probable than not that the government would not have performed the desired act absent the lawsuit." *Bernhardt*, 947 F.3d at 97 (quoting *Pub. Citizen Health Res. Grp. v. Young*, 909 F.2d 546, 550 (D.C. Cir. 1990)).

Here, Plaintiffs cannot establish that the Department would not have released the audio recordings "absent" Plaintiffs' "lawsuit." *Id.*  First, the audio recordings were produced to Congress because of the Congressional subpoena for the recordings, a release that the Department determined in its discretion meant that the audio recordings should also be released to the public. Breyan Decl. ¶. 20.  Because of this Congressional subpoena, "whether or not this lawsuit was filed pursuant to FOIA requests for the audio recordings, the Department still would have released the audio recordings to the public." *Id.*

Second, the audio recordings were released to the public because "the Department also independently determined that the audio recordings should be released to the public as a matter of discretion." *Id.* ¶ 21.  The Administration's commitment to transparency would have caused the discretionary release of the audio recordings "even if the audio recordings had not been released to Congress, and even had this case was never filed." *Id.*  Indeed, the Administration has disclosed as a matter of discretion other records unrelated to the SCO investigation and this consolidated lawsuit. *See, e.g.*, *Immediate Declassification of Materials Related to the Federal Bureau of Investigation's Crossfire Hurricane Investigation*, Memorandum for the Attorney General, the Director of National Intelligence, and the Director of the Central Intelligence Agency (March 25,

6

2025), https://www.whitehouse.gov/presidential-actions/2025/03/immediate-declassification-of-materials-related-to-the-federal-bureau-of-investigations-crossfire-hurricane-investigation/; Exec. Order No. 14176, Declassification of Records Concerning the Assassinations of President John F. Kennedy, Senator Robert F. Kennedy, and the Reverend Dr. Martin Luther King, Jr., 90 Fed. Reg. 8641 (January 23, 2025).  Accordingly, these two "events"—the Congressional subpoena and the Department's discretionary decision—that were "unrelated" to this lawsuit "triggered" the audio recordings' disclosure.  *Elec. Priv. Info. Ctr.*, 218 F. Supp. 3d at 41.

And third, the FOIA requests filed by Heritage and the Press Coalition were filed after the FOIA request filed by Judicial Watch, and the lawsuits filed by Heritage and the Press Coalition were likewise filed after the lawsuit filed by Judicial Watch.  *See* Breyan Decl. ¶¶ 13-16.  The subsequent FOIA requests and lawsuits submitted and filed by Heritage and by the Press Coalition "neither accelerated or otherwise impacted" the Department's evaluation of the audio recordings. *Id.* ¶ 16.  So even if this consolidated lawsuit did cause the discretionary release of the audio recordings (which the lawsuit did not), that discretionary release was caused by Judicial Watch's first-in-time decision to submit a FOIA request and file a lawsuit.  Plaintiffs "cannot piggy back off" Judicial Watch's lawsuit and claim, without any evidence, that it was their own lawsuit instead that caused the recordings' release.  *Elec. Priv. Info. Ctr.*, 218 F. Supp. 3d at 51.

The Breyan Declaration is "accorded a presumption of good faith, which cannot be rebutted by 'purely speculative claims.'"  *SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991).  As that declaration explains, for the reasons given above "this consolidated lawsuit did not cause the Department to release the audio recordings at issue."  Breyan Decl. ¶ 22.  The Breyan Declaration thus "shows that 'events independent of the lawsuit' caused the Department to" release

the audio recordings. *Am. First Legal Found. v. U.S. Dep't of Energy*, No. 22-cv-1888, 2025 WL 1276808, at *4 (D.D.C. Mar. 28, 2025).

The Department's position is particularly strong here because of stark factual differences between this case and cases that have previously found that a discretionary release of records did not displace a lawsuit as the cause of the records' release. For instance, one case found that an agency policy change that prompted the release of the at-issue records did not displace litigation as "substantial cause" because policy change only applied to records that were "already in litigation." *ACLU v. U.S. Dep't of Homeland Sec.*, 810 F. Supp. 2d 267, 276 (D.D.C. 2011). But unlike the policy in *ACLU*, this Administration's discretionary decision to release documents and information previously withheld is not limited to "records for which a FOIA request has been submitted or a lawsuit has been filed." *See* Breyan Decl. ¶ 21.

Similarly inapplicable here is another case finding that a discretionary release of documents was still caused by the FOIA lawsuit because the discretionary release resulted from a review of records that the agency conducted "'in the course of preparing' litigation documents." *Judicial Watch, Inc. v. U.S. Dep't of Just.*, 878 F. Supp. 2d 225, 233 (D.D.C. 2012). Unlike the discretionary release in *Judicial Watch*, the discretionary release here concerned records that were reviewed and processed for release in the course of preparing to respond to a Congressional subpoena. *See* Breyan Decl. ¶¶ 16, 19. The lawsuit here "neither accelerated or otherwise impacted in any way the Department's evaluation of the FOIA requests for the audio recordings," and the audio recordings were not further processed after the recordings' release to Congress and before the recordings' release to the public. *Id.*

Plaintiffs point to a separate detail, the "timing of DOJ's release" of the audio recordings,

to support their causation theory.  Press Coalition Mot. at 6; Heritage Mot. at 8.  "[T]he timing of a release of responsive records after the filing of a FOIA lawsuit 'is certainly a salient factor in the analysis.'" *Dorsen v. SEC*, 15 F. Supp. 3d 112, 118–19 (D.D.C. 2014) (citation omitted).  But "the Court cannot make an 'inference purely from the timing of the release.'" *Pub. L. Educ. Inst. v. U.S. Dep't of Just.*, 744 F.2d 181, 184 n.5 (D.C. Cir. 1984).  Plaintiffs must offer "hard evidence— beyond temporal proximity—support[ing] the inference that [their] lawsuit caused the document release." *Conservation Force*, 160 F. Supp. 3d at 206.  And Plaintiffs offer no other evidence— besides timing—to support their theory.[2]

In fact, the timing of the audio recordings' discretionary release supports the Department's position.  The Department filed its motion for summary judgment in this case on May 31, 2024— over a year ago.  *See generally* DOJ MSJ Mem.  This case was fully briefed as of August 1, 2024. *See* Reply Memorandum in Support of Heritage Plaintiffs' Cross Motion for Summary Judgment, ECF No. 49.  The Department did not release the audio recordings until May 2025, nine months later.  It is thus wholly implausible to suggest that this lawsuit and the briefing in it caused the audio recordings' release.

True, the Department's discretionary release of the audio recordings occurred close to the deadline set by the Court for the Department to "confirm[] that its position" that the audio recordings remain exempt under the FOIA" "remains unchanged."  Minute Order, Feb. 12, 2025;

---

[2] Heritage speculates that because then-President Biden asserted executive privilege over the audio recordings, the recordings could only be released after that privilege assertion was "explicit[ly] overturn[ed] by the Trump Administration."  Heritage Mot. at 8.  But this sidesteps the key issue: If the Trump administration overturned that privilege assertion, was the decision to do so caused by this lawsuit?  And Heritage can only hypothesize that "presumably" the Department's decision to discretionarily release the audio recordings was caused by this lawsuit.  *Id.*  As the Breyan Declaration makes clear, that hypothesis is incorrect.  *See* Breyan Decl. ¶¶ 20-22.

*see also* Minute Order, Feb. 19, 2025 (granting extension of this deadline until May 20, 2025). But if Plaintiffs' lawsuit motivated the audio recordings release—again, the case was fully briefed as of August 2024—there would have been no need for the Department to request an extension of its deadline to make that determination from February 19 to May 20. *See* Amended Motion for Extension of Time to File Status Report, ECF No. 59 (Feb. 16, 2025). And in fact, the Department released the audio recordings to the public the same day as, but shortly after, the Department released the recordings to Congress. *See* Breyan Decl. ¶¶ 18-19. The "timing" of this release thus supports the Department's position: "[T]his consolidated case did not cause the Department to release the audio recordings at issue," and the recordings' public release was instead caused by the Department's decision to first release the recordings to Congress in satisfaction of a Congressional subpoena and then to the public to further the goal of transparency. *See id.* ¶¶ 20-22.

Perhaps recognizing the weakness of Plaintiffs' main eligibility argument, Heritage raises two additional eligibility arguments. Neither is persuasive. Heritage first argues that the Department's decision to release a second, duplicate copy of the audio recordings justifies fees. The Department did have a second set of audio recordings that was "duplicative in that they recorded the same interview at the same time" as did the first set of audio recordings. Declaration of Bradley Weinsheimer ¶ 12 (Weinsheimer Decl.), ECF No. 34-2 (May 31, 2024). And the Department did indeed release the duplicate recordings at Heritage's request. *See* Joint Status Rep. at 2, ECF No. 70 (July 7, 2025). But the causes of this release are the same as the causes of the initial release of the audio recordings: the Congressional subpoena and the Department's discretionary decision to release previously withheld records. This eligibility theory thus suffers from the same flaws as Plaintiffs' main theory. And even if Plaintiffs' lawsuit did cause the release

of these duplicate records (which it did not), a FOIA plaintiff is only eligible for fees if they "substantially prevail." 5 U.S.C. § 552(a)(4)(E)(i). And "if a plaintiff obtains only one small piece of the relief it seeks in its complaint, such as the plaintiffs did here, calling such prevalence 'substantial' is clearly incorrect." *Mobley v. Dep't of Homeland Sec.*, 908 F. Supp. 2d 42, 48 (D.D.C. 2012). Causing the release solely of records that substantively duplicate already-public records is the definition of prevailing only insubstantially, and so this release does not render Heritage eligible for fees.[3]

Second, Heritage points to the declaration that the Department provided in support of its summary judgment motion in this case and claims that the disclosure of information from that declaration makes Heritage eligible for fees. *See* Heritage Mot. at 9 (discussing the Weinsheimer Declaration). But the D.C. Circuit has held that a FOIA plaintiff succeeds (and is thus eligible for fees) if their "litigation cause[s] the agency to release [] *documents*." *Harris*, 653 F.2d at 587 (emphasis added); *see also Mobley*, 908 F. Supp. 2d at 47 (noting that "a FOIA plaintiff relying on the catalyst theory must *receive records responsive to its request* in order for that plaintiff to have 'substantially prevailed'" (emphasis added)).

As may be obvious, an agency filing a declaration in litigation is not a release of documents. Rather, filing a declaration is a routine step in FOIA summary judgment briefing. *See Schoenman v. FBI.*, 575 F. Supp. 2d 166, 171 (D.D.C. 2008) ("Summary judgment may be granted on the basis of accompanying agency affidavits or declarations . . . ."). A plaintiff does not "prevail" simply by getting to motions practice. Heritage's novel theory would justify fees even

---

[3] Even if the "substantiality" of a release goes to Plaintiffs' entitlement rather than eligibility, *see* Heritage Mot. at 4, as explained below the insubstantial nature of releasing duplicate recordings renders Plaintiffs ineligible for fees under this theory, *see infra* pp. 17-18.

in cases when an agency files a declaration to support its withholdings and ultimately prevails on its asserted exemptions. That absurd result disproves Heritage's theory.

Indeed, in comparable circumstances, the D.C. Circuit has held that the production of a "*Vaughn* index" does not entitle a plaintiff to attorney's fees, noting that "[t]he principal purpose of a Vaughn index is to facilitate the litigation process." *Campaign for Responsible Transplantation v. Food & Drug Admin.*, 511 F.3d 187, 196 (D.C. Cir. 2007); *see also Conservation Force*, 160 F. Supp. 3d at 207 (rejecting the argument that a plaintiff's mere receipt of a *Vaughn* index made it eligible for attorney fees under the catalyst theory). Likewise here, the purpose of an agency's declarations is to "facilitate the litigation process" and the filing of the Weinsheimer Declaration does not make Heritage eligible for fees. A ruling otherwise would "prod government agencies to be less rather than more transparent," *Brayton*, 641 F.3d at 528, and discourage candid agency declarations that aid courts and plaintiffs in understanding the records at issue in FOIA matters.

At bottom, Heritage claims fees under a provision of the FOIA authorizing fees only after "a voluntary or unilateral change in position by the agency." 5 U.S.C. § 552(a)(4)(E)(ii); *see* Heritage Mot. at 3. An agency does not change its position by filing a declaration to support its position.

## II.    Plaintiffs Are Not Entitled to Fees.

Because Plaintiffs have not carried their burden of showing that they are eligible for fees, their motion for attorney's fees should be denied on that basis alone. *See Brayton*, 641 F.3d at 524. But on the facts of this case, Plaintiffs are not entitled to fees either.

District courts look to "at least four criteria in determining whether a substantially prevailing FOIA litigant is entitled to attorneys' fees: (1) the public benefit derived from the case;

(2) the commercial benefit to the plaintiff; (3) the nature of the plaintiff's interest in the records; and (4) the reasonableness of the agency's withholding of the requested documents." *Davy v. CIA*, 550 F.3d 1155, 1159 (D.C. Cir. 2008).  No single factor is dispositive.  *Id.*  And "when the four factors point in different directions, the district court has very broad discretion in deciding how to balance those factors and whether to award attorney's fees."  *Morley v. CIA*, 894 F.3d 389, 391 (D.C. Cir. 2018).  These four factors comprise a "mechanism for testing whether fees in a particular case are consistent with the purposes for which Congress subsidized FOIA litigation." *Edelman v. SEC*, 356 F. Supp. 3d 97, 104 (D.D.C. 2019) (quoting *Davy*, 550 F.3d at 1166 (Tatel, J., concurring)).

### A.  Plaintiffs Are Not Entitled to Fees Under Their Main Theory of Eligibility

Even assuming (but not conceding) that under Plaintiffs' main theory of eligibility the first three entitlement factors favor Plaintiffs, the fourth factor weighs heavily against Plaintiffs' entitlement to fees.  This fourth factor "requires the Court to evaluate whether the [agency] 'had a reasonable basis in law'" for its position, and whether the [agency] was 'recalcitrant in its opposition to a valid claim or otherwise engaged in obdurate behavior.'"  *Edelman*, 356 F. Supp. 3d at 108 (quoting *McKinley v. FHFA*, 739 F.3d 707, 712 (D.C. Cir. 2014) (internal citations omitted).  Importantly, "[t]o satisfy the 'reasonable basis in law' requirement it is not necessary for the court to find that the information the government chose to withhold was in fact exempt." *Fenster v. Brown*, 617 F.2d 740, 744 (D.C. Cir. 1979) (citation omitted).

As set out at length in the Department's merits briefing in this case, the Department had a reasonable basis in law for the asserted exemptions.  *See generally* DOJ MSJ Mem.; Def. U.S. Dep't of Just.'s Combined Opp'n to Pls.' Mots. For Summ. J. & Reply in Supp. of Def.'s Mot. for Summ. J., ECF No. 45.   The Department's briefing makes clear the reasonable basis for

13

withholding the audio recordings under FOIA Exemptions 5, 6, 7(A), and 7(C).  With respect to the executive privilege argument in particular, it is entirely unremarkable—and seemingly self-evident—that when a President asserts executive privilege in response to a Congressional subpoena, that privilege assertion cannot be undone by a routine FOIA request.  Otherwise, "Congress could avoid the constitutionally mandated accommodation process and instead pursue the same information [sought by subpoena] via FOIA litigation."  DOJ MSJ Mem. at 14.  The Department's positions thus at the very least "had a reasonable basis in law," even if the Court would not have ultimately determined that the audio recordings were "in fact exempt."  *Fenster*, 617 F.2d at 744.

Nor has the Department engaged in any "recalcitrant" or "obdurate" conduct.  *Edelman*, 356 F. Supp. 3d at 108.  The Press Coalition makes no argument otherwise.  *See* Press Coalition Mot. at 8.  And Heritage's accusations prove the opposite of what it suggests.

Heritage nonsensically suggests that the Department engaged in "gamesmanship" by declining to agree to Heritage's proposed merits briefing schedule and by later opposing Heritage's motion to expedite.  *See* Heritage Mot. at 15 (discussing Def.'s Resp. to Heritage Found.'s Notice on Mot. to Consolidate, ECF No. 15 (May 3, 2024), and citing Def.'s Opp'n to Heritage Found.'s Mot. to Expedite, ECF No. 55 (October 28, 2024)).  But this difference of opinion on scheduling hardly constitutes "gamesmanship," and the Department's consistent opposition to Heritage's unreasonable motions is far from trying to "have it both ways."  Heritage Mot. at 15.  In any event, the Court itself has set all deadlines in this case and the Department has complied with each one.

Heritage also refers to a series of communications between Heritage's attorneys and Department officials, and references an article in the online publication *Axios*, which on May 19,

14

2025, published an article describing the contents of some of the audio recordings at issue in this case.  *See* Heritage Mot. at 14-17; *see also* Marc Caputo & Alex Thompson, *Exclusive: Prosecutor's Audio Shows Biden's Memory Lapses*, Axios (May 16, 2025), https://www.axios.com/2025/05/16/biden-hur-tape-special-counsel-audio.  It is not clear what Heritage believes the Department did wrong.  But in any event, what Heritage's materials actually show is that: 1) Heritage's counsel corresponded, spoke, or met numerous times with at least 8 different Department officials regarding this case, *see, e.g.*, Declaration of Samuel Everett Dewey (Dewey Decl.) ECF No. 75, ¶¶ 4-5, 8, 10.b., 11-13, 14.a, 15.b-e, g, i, j; 2) the Department affirmatively reached out to Heritage's counsel to attempt to discuss the *Axios* article, *see id.* ¶¶ 14.a, 15.d; and 3) the Department unequivocally told Heritage that the audio recordings obtained by *Axios* "did not come from the Department," *id.* ¶ 15.d (emphasis omitted).  The Department was thus proactively and highly engaged with Heritage's counsel throughout this case, the exact opposite of obdurate conduct.

At bottom, "under the fourth criterion a court would not award fees where the government's withholding had a colorable basis in law."  *Fenster*, 617 F.2d 740, 742 n.4 (D.C. Cir. 1979) (quoting S. Rep. No. 854, 93d Cong., 2d Sess. 19 (1974)).  Here, the Department's withholdings had such a colorable basis in law.   In exercising its broad discretion, therefore, the Court should "not award fees" because "the government's withholding had a colorable basis in law."  *Id.*; *see also Morley*, 894 F.3d at 396 (concluding that the district court did not abuse its discretion in denying attorney fees where "factor four heavily favor[ed] the agency and the other three factors only slightly favor[ed]" the plaintiff).

### B.  Heritage Is Not Entitled to Fees Under Heritage's Alternative Eligibility Theories

While Heritage is not entitled to fees under Plaintiffs' main theory of eligibility, it is certainly not entitled to fees if the Court finds Heritage eligible only under Heritage's "alternative" eligibility theories.[4]

For the Court to determine whether Heritage is entitled to fees under Heritage's alternative theories, it must have determined that Heritage is not eligible for fees under Plaintiffs' main theory. So, in this hypothetical, Plaintiffs did not prevail by causing the release of the initial copies of the audio recordings and Heritage prevailed only by causing the release of the duplicate audio recordings and/or the Weinsheimer Declaration.  The same four factors apply here to an analysis of whether those events entitle Heritage to fees: "(1) the public benefit derived from the case; (2) the commercial benefit to the plaintiff; (3) the nature of the plaintiff's interest in the records; and (4) the reasonableness of the agency's withholding of the requested documents."  *Davy*, 550 F.3d at 1159.  Even assuming, as before, that factors two and three favor Heritage, *see supra* Section II.A, here factors one and four strongly favor the Department.  More, any release under Heritage's alternative theories would be insubstantial and not entitle Heritage to fees at all.

There is no "public benefit" to the release of the duplicate set of the audio recordings or the declaration that the Department filed in support of its withholdings.  For the duplicate audio recordings, even accepting that there may be a public benefit to a release of the initial audio recordings, there is no public benefit to releasing another copy of those same recordings.  Even if (as Heritage claims) the duplicates are "not forensically identical" to the initial recording released,

---

[4] Heritage is the only plaintiff to raise these alternative theories so the Department does not address Press Coalition's entitlement to fees, or what reasonable fees would be for the Press Coalition, under these alternative theories.

Heritage Mot. at 8, the Department's merits declarant "personally listened to . . . all of the audio recordings" and determined that the two sets of audio recordings "are duplicative in that they recorded the same interview at the same time." Weinsheimer Decl. ¶ 12. The release of duplicate recordings thus does not "add to the fund of public information that citizens may use." *Elec. Priv. Info. Ctr. v. FBI*, 72 F. Supp. 3d 338, 346 (D.D.C. 2014) (quoting *Cotton v. Heyman*, 63 F.3d 1115, 1120 (D.C. Cir. 1995)). Indeed, the Department is aware of no media coverage related to the duplicate recordings, reinforcing that their release brought no public benefit.

Likewise with the Weinsheimer Declaration. There is no "public benefit" to forcing an agency to produce a declaration defending exemptions. Were the rule otherwise, a FOIA plaintiff could be entitled to attorney's fees just by forcing a federal agency to move for or defend against summary judgment—even if the plaintiff loses at summary judgment or declines even to file an opposition to the agency's motion.

Nor was the Department "unreasonable" as to either the duplicate audio or the Weinsheimer Declaration. *Edelman*, 356 F. Supp. 3d at 108 (quoting *McKinley*, 739 F.3d at 712). As explained above, the Department reasonably withheld the audio recordings as exempt—the duplicates no less so. The Department likewise was reasonable both in not processing "duplicative" records as a matter of course, Weinsheimer Decl. ¶ 12, and in processing them promptly after Plaintiffs requested that the Department do so. As for the filing of the Weinsheimer Declaration, there is nothing unreasonable about the Department making the routine decision to file a declaration at summary judgment in support of its decision to withhold records. Indeed, that is how FOIA summary judgment briefing works. *See Schoenman*, 575 F. Supp. 2d at 171

17

("Summary judgment may be granted on the basis of accompanying agency affidavits or declarations . . . .").

Finally, even if Heritage did cause the release of the duplicate audio recordings or the filing of the Weinsheimer Declaration, it must "substantially prevail" to receive attorney's fees. 5 U.S.C. § 552(a)(4)(E)(i). And "if a plaintiff obtains only one small piece of the relief it seeks in its complaint, such as the plaintiffs did here, calling such prevalence 'substantial' is clearly incorrect." *Mobley*, 908 F. Supp. 2d at 48. Heritage here thus did not "substantially prevail" if it only caused the release of records that duplicate already-public records or caused the Department to file a declaration supporting its withholdings. To the extent the substantiality of a release goes to a plaintiff's entitlement to fees, the insubstantiality of the duplicate recordings and the filing of an agency declaration weighs strongly against Plaintiffs' entitlement to fees under Heritage's alternative theories of eligibility.

### III.    If the Court Awards Plaintiffs Fees, Which it Should Not, Those Fees Must Be Limited to Those "Reasonably Incurred"

A FOIA plaintiff may only recover fees that are "reasonably incurred." *Davy*, 550 F.3d at 1158 n.1 (quoting 5 U.S.C. § 552(a)(4)(E)(i)). "The usual method of calculating a reasonable fee amount is to 'multiply the hours reasonably expended in the litigation by a reasonable hourly fee, producing the 'lodestar' amount.'" *Judicial Watch, Inc. v. Dep't of Just.,* 774 F. Supp. 2d 225, 232 (D.D.C. 2011) (citation omitted).

But a decision to award fees is discretionary. A court "may deny in its entirety a request for an 'outrageously unreasonable' amount, lest claimants feel free to make 'unreasonable demands, knowing that the only unfavorable consequence of such misconduct would be reduction of their fee to what they should have asked for in the first place.'" *Env't. Def. Fund, Inc. v. Reilly*,

1 F.3d 1254, 1258 (D.C. Cir. 1993) (quoting *Brown v. Stackler*, 612 F.2d 1057, 1059 (7th Cir. 1980)), as supplemented (Sept. 10, 1993). If overbilling is less egregious but still unreasonable, the Court "may impose a lesser sanction, such as awarding a fee below what a 'reasonable' fee would have been in order to discourage fee petitioners from submitting an excessive request." *Id.* (citation omitted).

Even if the Court finds that Plaintiffs are both eligible for and entitled to fees, which it should not, it should reduce their fees for the reasons given below. The Department has attached its calculations regarding the reasonable fees for Heritage and the Press Coalition as the Exhibit of Reasonable Attorney's Fees for Plaintiffs, assuming Plaintiffs' eligibility and entitlement.

### A. Reasonable Fees for Heritage

If Heritage were awarded any fees, it may only be awarded fees "reasonably incurred." *Davy*, 550 F.3d at 1158 (quoting 5 U.S.C. § 552(a)(4)(E)(i)). After the corrections and adjustments set out below, Heritage should be awarded no more than $27,710.71, with any reasonable fees-on-fees to be determined later.[5]

But as explained in detail below, Heritage's fee demand of $442,147.54 is "outrageously unreasonable." *Reilly*, 1 F.3d at 1258. The Department respectfully requests that the Court "punish[] this intolerably excessive fee request by denying any award at all." *Leopold v. Dep't of Just.*, No. 21-cv-00942, 2023 WL 1875229, at *8 (D.D.C. Jan. 26, 2023) (quoting *Baylor v. Mitchell, Rubenstein & Assocs., PC*, 735 F. App'x 733, 736 (D.C. Cir. 2018) (per curiam)), *R. & R. adopted*, 2023 WL 1875209 (D.D.C. Feb. 10, 2023).

---

[5] The Department notes that fees on fees may not be "disproportionate and excessive" relative to the fees on the merits of a case. *Merrick v. District of Columbia.*, 316 F. Supp. 3d 498, 518 (D.D.C. 2018).

**1. Heritage is not entitled to fees for "nonproductive" time like time spent on unsuccessful issues or other cases.**

A FOIA plaintiff may recover fees only for time that contributed to the plaintiff's eligibility. A FOIA plaintiff is not entitled to fees for "nonproductive time or for time expended on issues on which plaintiff ultimately did not prevail." *Weisberg*, 745 F.2d at 1499; *see also Elec. Priv. Info. Ctr. v. U.S. Dep't of Homeland Sec.*, 999 F. Supp. 2d 61, 76 (D.D.C. 2013) (refusing to award time to an unsuccessful opposition to an extension). Heritage has demanded fees for a wide array of nonproductive time and unsuccessful or never-filed motions. None of this time is compensable.[6]

Heritage may not recover for time billed spent on "issues on which [Heritage] ultimately did not prevail," *Weisberg*, 745 F.2d at 1499, which rules out time spent on Heritage's emergency motion for a hearing that the Court denied, *see, e.g.*, Declaration of Daniel D. Mauler (Mauler Decl.), ECF No. 74, Ex 1, at 2 line 9.

Time spent on motions or documents not ultimately filed is likewise "nonproductive" because those never-filed documents could not have contributed to the outcome of this case. *Weisberg*, 745 F.2d at 1499. This rules out Heritage's time spent on a never-filed motion for a preliminary injunction, *see* Mauler Decl. Ex. 1 at 11 lines 2-3; *id.* at 17 line 24; or on a "Barr Declaration" that was apparently never filed either, *see id.* at 5 line 9.

---

[6] In some places, due to Heritage's block billing it was not possible to tell how much of a given entry was spent on these tasks or on other tasks. In such cases, the full time should be non-compensable because Heritage's block billing "makes it impossible for the court to determine, with any degree of exactitude, the amount of time billed for a discrete activity." *Doe I v. Exxon Mobile Corp.*, No. 01-cv-1357, 2022 WL 1124902, at *5 (D.D.C. Apr. 14, 2022). The block billing thus "do[es] not permit the [Department] and the Court to discover whether the various entries in the revised billing records were performed for this litigation or whether the time expended reflects the exercise of billing judgment." *Negley v. Fed. Bureau of Investigation*, No. 03-cv-2126, 2013 WL 12404697, at *1 (D.D.C. May 29, 2013).

Heritage also may not recover for time spent on "tasks relating to press communications," *ACLU*, 810 F. Supp. 2d at 280, a particularly galling set of entries that also have nothing to do with the outcome of this case, *see, e.g.*, Mauler Decl. Ex. 1 at 3, line 2; *id.* at 4 lines 5, 8.

Nor may Heritage recover for time spent on other cases or reviewing material from other cases. Plainly, an attorney cannot bill two clients for the same time. *In re Tun*, 26 A.3d 313, 314 (D.C. 2011) (per curiam) (suspending attorney's license because "[a] review of the vouchers revealed that respondent sought payment for the same time period for two or more clients (a practice known as "double billing") on 162 occasions"). And "[h]ours that are not properly billed to one's client also are not properly billed to one's adversary pursuant to statutory authority." *Elec. Priv. Info. Ctr. v. Dep't of Homeland Sec.*, 982 F. Supp. 2d 56, 62 (D.D.C. 2013) (quoting *Copeland v. Marshall,* 641 F.2d 880, 891 (D.C. Cir. 1980)). Heritage, therefore, may not recover for time spent on cases seeking other material related to the Hur Report, *see, e.g.*, Mauler Decl. Ex. 1 at 2 lines 4, 11, or time spent reviewing material from other cases, *see, e.g., id.* at 16 lines 19-20; *id.* at 17 lines 1-8, 10-14. To the extent Heritage argues that time spent reviewing material from other cases was reasonably necessary for this case, the Department disagrees.[7] Heritage seeks fees for significant time billed for communications regarding the separate "House lawsuit" even though the lawsuit was tertiary to the legal issues in this case. *See, e.g., id.* at 17 lines 1-8, 10-14. The taxpayer "should not be required to foot the bill for preparation above and beyond what was reasonably necessary." *Am. Oversight v. U.S. Dep't of Just.*, 375 F. Supp. 3d 50, 71 (D.D.C. 2019).

---

[7] Indeed, if Heritage continues to argue that it was reasonable to spend time reviewing materials from the House of Representatives' separate lawsuit seeking the audio recordings, Heritage would just be conceding that it was the Congressional subpoena which drove the Department's decisions to withholding and then disclose the audio recordings.

21

2.  **Heritage is entitled to no fees for the excessive and unnecessary hours billed by "appellate counsel" at Clement & Murphy.**

FOIA plaintiffs may recover only fees that are "reasonably incurred." *Davy*, 550 F.3d at 1158 (quoting 5 U.S.C. § 552(a)(4)(E)(i)). A reasonable fee "requires that legal matters are 'appropriately staffed to do the work required efficiently and without duplicative billing.'" *J.T.F. v. District of Columbia*, No. 21-cv-1453, 2025 WL 843281, at *8 (D.D.C. Mar. 18, 2025) (quoting *Cobell v. Jewell*, 234 F. Supp. 3d 126, 175 (D.D.C. 2017)).

It is not reasonable for Heritage to demand fees of $135,650 for 93 hours of work done by Clement & Murphy, PLLC. Heritage acknowledges that Clement & Murphy was hired as "appellate counsel," Mauler Decl. ¶ 14, but this case was never even scheduled for oral argument in district court and never reached final judgment, let alone appeal. Indeed, Heritage appears to recognize that its fees request is a bridge too far and devotes nearly half of the Mauler Declaration to defending the Clement & Murphy bill. But nothing in this case justified that work. Perhaps as a general matter, it may be "common to bring appellate counsel into District Court proceedings when emergency appellate proceedings are contemplated." *Id.* ¶ 11. But to let appellate counsel bill the eye-watering sum of $135,650 in a FOIA lawsuit before any appellate proceedings are on the horizon, let alone have commenced, is not "common."

More, the tasks that Clement & Murphy billed for and for which Heritage demands fees do not even appear essential to the case. *See Weisberg*, 745 F.2d at 1499 (holding that "a prevailing FOIA plaintiff is not entitled to an attorneys' fees award for 'nonproductive time'"). Clement & Murphy billed thousands of dollars in fees for an assortment of phone calls and emails, but their actual contribution to Heritage's work was "[r]eview[ing] and revis[ing]" Heritage's motion for summary judgment and reply in support of that motion. *See generally* Mauler Decl. Ex 1 at 16-

17.  Clement & Murphy did not even draft Heritage's motions—the firm just revised them. Spending over $135,650 on outside counsel to edit Heritage's summary judgment briefing is not reasonable.  Indeed, the D.C. Circuit has in the past significantly reduced fee demands due to "an unusually high number of attorneys reviewing and editing briefs." *Davis Cnty. Solid Waste Mgmt. & Energy Recovery Special Serv. Dist. v. EPA,* 169 F.3d 755, 761 (D.C. Cir. 1999) (*per curiam*). While Heritage is entitled to retain legal services as it sees fit, it is not entitled to have the taxpayer pay for those choices.  The American people "should not be required to foot the bill for preparation above and beyond what was reasonably necessary." *Am. Oversight*, 375 F. Supp. 3d at 71.

Second, even if it were reasonable to hire Clement & Murphy and permit them to bill 93 hours on a case that already had four attorneys who collectively billed 527 hours, the appropriate hourly rates would be the Fitzpatrick Matrix rates, not the sky-high rates that Heritage demands. The "Fitzpatrick Matrix offers a superior measure of the prevailing market rate for complex federal litigation in the District." *J.T. v. District of Columbia*, 652 F. Supp. 3d 11, 32 (D.D.C. 2023).  To justify any departure from those rates, a plaintiff must "produce satisfactory evidence—in addition to [its] attorney's own affidavits"—that the plaintiff's "requested rates are in line with those prevailing in the community for *similar services*." *Eley v. District of Columbia.*, 793 F.3d 97, 104 (D.C. Cir. 2015) (quoting *Covington v. District of Columbia*, 57 F.3d 11101, 1109 (D.C. Cir. 1995)).  In *Eley*, for instance, the "similar services" were "IDEA litigation," *id.* (quoting *Covington*, 57 F.3d at 1109); here, the services are FOIA litigation.

As is apparent, the hourly rates that Heritage claims for Clement & Murphy are more than double the equivalent rates in the Fitzpatrick Matrix.  *Compare* Mauler Decl. Ex 1 at 17-18 *with* Declaration of Charles D. Tobin (Tobin Decl.), ECF No. 72-3, Ex. 3 (the Fitzpatrick Matrix).  This

overcharge is unjustified.  Heritage suggests that the staggering hourly rates that Heritage claims for these attorneys are the "typical hourly rates necessary" to hire lawyers with "unique appellate experience—in Paul Clement's case as a former Solicitor General."  Mauler Decl. ¶ 14; *see* Heritage Mot. at 18.  But again, Heritage must produce evidence "*in addition* to [its] attorney's own affidavits" that the rates charged are reasonable.  *Eley*, 793 F.3d at 104 (quoting *Covington*, 57 F.3d at 1109).  Heritage has supplied only its attorney's own affidavits, so Heritage has for that reason alone failed to meet its burden.

But it gets worse.  Heritage must produce evidence that its requested reimbursement rates are "in line with those prevailing in the community for *similar services*."  *Id.* (quoting *Covington*, 57 F.3d at 1109).  In *Eley*, the market for similar services was "IDEA litigation," *id.*; here, the market is FOIA litigation, *see also Citizens for Resp. & Ethics in Wash. v. Dep't of Just.*, 142 F. Supp. 3d 1, 18 (D.D.C. 2015) (noting that a FOIA plaintiff must offer "evidence that [it's requested reimbursement] rate is the prevailing rate for FOIA litigation in the Washington, D.C. market").  So when Heritage says that the hourly rates it demands are the "typical hourly rates necessary to obtain individuals with unique appellate experience," Mauler Decl. ¶ 14, Heritage answers the wrong question.  This case never went on appeal.  Indeed, it was never set for oral argument in district court and it never reached final judgment.  And the billing entries for Clement & Murphy reveal that the firm performed tasks typical in district-court FOIA work: emails and calls with the client; reviewing the government's summary judgment brief; and revising Heritage's own summary judgment filings.  *See generally* Mauler Decl. Ex 1 at pp. 17-18.  No Supreme Court briefing or argument.  No appellate brief.  Not even a district court argument.  So Heritage would be entitled only to fees at the "prevailing rate for FOIA litigation in the Washington, D.C. market,"

*Citizens for Resp. & Ethics in Wash.*, 142 F. Supp. 3d at 18, not rates commanded by those with "unique appellate experience," Mauler Decl. ¶ 14.  Accordingly, even were Heritage eligible and entitled to fees—which it is not—and were the hours billed by Clement & Murphy reasonably incurred—which they were not—Heritage would recover only at the Fitzpatrick Matrix rates, the "superior measure of the prevailing market rate for complex federal litigation in the District." *J.T.*, 652 F. Supp. 3d at 32.

Under other circumstances, Heritage's own excess at hiring and paying for such high-priced outside counsel merely to edit its main counsels' work might be easily dismissed as overzealous.  But not here, where Heritage has demanded that U.S. taxpayers foot the bill.  Courts routinely impose significant discounts to "address overstaffing" by FOIA plaintiffs.  *Am. Oversight*, 375 F. Supp. 3d at 71; *see also Davis Cnty.*, 169 F.3d at 761 (reducing sought fees significantly because of the "unusually high number of attorneys reviewing and editing briefs").  For these reasons, Heritage should recover no fees for hours billed by Clement & Murphy.  And if Heritage does recover for those hours, the hours should be severely reduced and compensated only at the rates provided in the Fitzpatrick matrix.

### 3. Any fee award to Heritage should be reduced given its speculative level of success on the merits.

"A plaintiff's overall success on the merits also must be considered in determining the reasonableness of a fee award." *Judicial Watch*, 470 F.3d at 369.  For example, a court in this district has "reduce[d] [a p]laintiff's fees . . . by 76%" to account for a plaintiff's level of success. *Elec. Priv. Info. Ctr. v. Dep't of Homeland Sec.*, 197 F. Supp. 3d 290, 297 (D.D.C. 2016).

Here, and even assuming that Heritage is eligible for and entitled to fees (which it is not), Heritage has not established any significant level of success on the merits.  This Court never ruled

on this case and so never accepted any of Heritage's arguments.  The Department's decision to release the audio recordings to Congress and then the public was discretionary, and Heritage was just one of three Plaintiffs—and not even the first—to submit a FOIA request or file a lawsuit.  So even assuming eligibility and entitlement, the degree to which Heritage and its advocacy actually contributed to the Department's discretionary decision to release the audio is entirely speculative. Awarding Heritage full fees in this circumstance would be the sort of "windfall for the attorneys" that the FOIA does not permit.  *Urb. Air Initiative, Inc. v. EPA*, 442 F. Supp. 3d 301, 327 (D.D.C. 2020) (quoting *Elec. Priv. Info. Ctr. v. FBI*, 80 F. Supp. 3d 149, 162 (D.D.C. 2015).  Heritage's fees should thus be reduced by 50% to account for their speculative level of success on the merits.

### 4.  Heritage's non-Clement & Murphy fees are likewise excessive.

Even setting aside the billing by Clement & Murphy, PLLC, the billing by Heritage's other lawyers was unreasonable.  Reasonable fees "require[] that legal matters are 'appropriately staffed to do the work required efficiently and without duplicative billing.'"  *J.T.F.*, 2025 WL 843281 at *8 (quoting *Cobell*, 234 F. Supp. 3d at 175).  Applying this logic, this district has considered a request for "88.7 hours spent on summary judgment litigation" in a FOIA case to be "unreasonable."  *Leopold v. Dep't of Homeland Sec..*, No. 22-cv-1923, 2025 WL 2177912, at *6 (D.D.C. Aug. 1, 2025) (report and recommendation); *see also Firestine v. Parkview Health Sys., Inc.*, 374 F. Supp. 2d 658, 664 (N.D. Ind. 2005) (finding it unreasonable for attorneys to spend 78 hours on responding to summary judgment).  In fact, "25 hours would probably be sufficient to prepare a resistance to a summary judgment motion."  *Baker v. John Morell & Co.*, 263 F. Supp. 2d 1161, 1197 (N.D. Iowa 2003).

Even accounting for the number of issues involved in this case, Heritage's billing wildly exceeds these benchmarks.  Between Heritage's four attorneys, Heritage billed 527 hours between

filing its complaint and filing its reply brief and claims $286,497.54 for those hours.[8]  *See* Mauler Decl. Ex. 1 at 18.  Even excluding the impermissible hours discussed above, *see supra* Section III.A.1, Heritage still billed over 466 hours.  These hours and this fee demand exceed the guideposts set in *Leopold*, *Firestine*, and *Baker* by a wide margin.  Given the unusually high and plainly excessive number of hours that Heritage claims, Heritage's fees (should any be awarded) should be reduced by 80% due to excessive billing.  *See Davis Cnty.,* 169 F.3d at 761 (significantly reducing sought fees because of the "unusually high number of attorneys reviewing and editing briefs").

Incorporating the 50% reduction justified above for Heritage's speculative level of success on the merits, *see supra* Section III.A.3, Heritage's fees (should any be awarded) should be reduced by a total of 90%, to $27,710.71, with any fees-on-fees to be determined later.[9]

### 5.  Heritage should be denied fees entirely because of its outrageous fee demand.

For all the reasons set out above, Heritage's fee demand in this case is outrageous. Heritage: 1) demands over $135,000 in fees at excessive rates incurred by "Supreme Court counsel" in a case that never left the district court and was never argued; 2) even excluding

---

[8] The hours listed comprise all of Heritage's billing entries through August 1, 2024, the date briefing finished on the parties' cross-motions for summary judgment.  Heritage demands fees for only two billing entries after that date, but those entries are not compensable for the reasons provided in Section III.A.1.  The fee amount demanded reflects two errors in Heritage's billing entries which failed to include certain hours purportedly billed by Neal Cornett and Kyle Brosnan.

[9] Heritage applies discounts of between 5% and 10% to its attorney's billing for "residual inefficiency."  *See* Mauler Decl. Ex 1 at 7, 10, 12, 15.  But given the unreasonably high number of hours that the attorneys billed and high monetary amount that Heritage demands, these discounts are woefully inadequate.  *See, e.g.*, *Davis Cnty.*, 169 F.3d at 761 (applying an approximately 50% discount); *Elec. Priv. Info. Ctr.*, 197 F. Supp. 3d at 296 (applying a "35% discount" to "counteract . . . overstaffing").

Supreme Court counsel, billed over 500 hours on this FOIA matter; and 3) inappropriately billed for media appearances, unsuccessful motions, and work done for other cases.

In such a situation, the Court "may deny in its entirety a request for an 'outrageously unreasonable' amount, lest claimants feel free to make 'unreasonable demands, knowing that the only unfavorable consequence of such misconduct would be reduction of their fee to what they should have asked for in the first place.'" *Reilly*, 1 F.3d at 1258 (quoting *Brown*, 612 F.2d at 1059). Courts may thus "punish[] . . . intolerably excessive fee request[s] by denying any award at all." *Leopold*, 2023 WL 1875229 at *8. After all, an excessive "fee request is not victimless: the money has to come from someone." *Baylor v. Mitchell Rubenstein & Assocs., PC*, 857 F.3d 939, 960 (D.C. Cir. 2017) (Henderson, J., concurring).

This is such a case. The Department thus respectfully requests that even if the Court deems Heritage both eligible for and entitled to fees (which it should not), Heritage should be denied fees entirely due to Heritage's outrageous fee demand. At a minimum, the Department respectfully requests that any fees awarded to Heritage be reduced by an amount the Court determines appropriate to deter this type of unreasonable behavior by FOIA fee applicants in the future. *See Reilly*, 1 F.3d at 1258; *Baylor*, 857 F.3d at 960 (Henderson, J., concurring). Permitting plaintiffs to submit unreasonable fee demands without consequence will only increase the number of fee disputes that must be submitted to the Court for adjudication, as federal agencies, particularly during these difficult financial times, are constrained not to yield to such unreasonable demands.

### B. Reasonable Fees for the Press Coalition

If the Press Coalition is awarded any fees, it may only be awarded fees "reasonably incurred." *Davy*, 550 F.3d at 1158 n.1 (quoting 5 U.S.C. § 552(a)(4)(E)(i)). After the corrections and adjustments set out below, the Press Coalition should be awarded at most $24,758.14 in fees

plus $741.55 in costs, with any reasonable fees-on-fees (including fees related to attorney's fees research and negotiation) to be determined later.

### 1. The Press Coalition is not entitled to fees for administrative-stage FOIA work.

"FOIA does not authorize fees for work performed at the administrative stage." *Nw. Coal. for Alternatives to Pesticides v. Browner*, 965 F. Supp. 59, 65 (D.D.C. 1997). This rules out the Press Coalition's billing entries pertaining to filing or preparing to file administrative stage FOIA requests. *See, e.g.*, Tobin Decl. Ex. 4 at 2, lines 3, 4, 6, 8, 9.

### 2. The Press Coalition is not entitled to fees for "nonproductive" time like time spent on unsuccessful issues or other cases.

As noted above, a FOIA plaintiff is not entitled to fees for "nonproductive time or for time expended on issues on which plaintiff ultimately did not prevail." *Weisberg*, 745 F.2d at 1499. Just as Heritage's entries relating to Heritage's own unsuccessful motions are not compensable, so are Press Coalition's entries relating to unsuccessful motions. This includes, for instance, entries pertaining to Press Coalition's unsuccessful opposition to the Department's Motion for an Extension. *See* Tobin Decl. Ex. 4 at 6, lines 7-11.

And as with Heritage, reasonable fees plainly includes only fees incurred in this case. *See In re Tun*, 26 A.3d at 314; *Elec. Priv. Info. Ctr.*, 982 F. Supp. 2d 56, 62 (D.D.C. 2013) (noting that "[h]ours that are not properly billed to one's client also are not properly billed to one's adversary pursuant to statutory authority"). But Press Coalition billed for numerous entries recounting tasks relating to the separate lawsuit brought by the House Committee on the Judiciary. *See, e.g.*, Tobin Decl. Ex 4 at 5, lines 11, 15; *id.* at 6, lines 3, 4, 12. As another example, the entry on March 30, 2024, refers to "review[ing a ] status report on the other claims," Tobin Decl. Ex. 4 at 2, line 11, but Press Coalition's complaint contains only one claim and as of that date no status report had

been filed in this case and Press Coalition's complaint had yet to be filed.  And to the extent the Press Coalition argues that the significant time its lawyers spent reviewing material from the totally separate Congressional lawsuit regarding the audio recordings reasonably necessary for this case, the Department disagrees.[10]   The Press Coalition already billed a high number of hours for researching and preparing summary judgment briefing for this case, and so it is unreasonable to also demand fees for reviewing material tertiary to the legal issues in this case.  The American people "should not be required to foot the bill for preparation above and beyond what was reasonably necessary." *Am. Oversight*, 375 F. Supp. 3d at 71.

### 3. The Press Coalition is not entitled to fees for vague or redacted narratives that do not permit the Department or the Court to assess the entries' reasonableness.

Due to block-billing, unclear narratives, and/or redaction of the narratives, certain of Press Coalition's billing entries are too vague to permit the Court to assess their reasonableness.  These entries should not be compensable.  Take the first billing entry, a $1,010.88 charge from March 24, 2024, for "Discussions with several clients regarding [REDACTED]; prepare email to coalition regarding [REDACTED]." *Id.* at 2, line 1.  These "redacted entries do not permit the [Department] and the Court to discover whether the various entries in the revised billing records were performed for this litigation or whether the time expended reflects the exercise of billing judgment." *Negley v. Fed. Bureau of Investigation*, No. 03-cv-2126, 2013 WL 12404697, at *1 (D.D.C. May 29, 2013). What these "discussions" or the "email" concerned is unknown, as is whether the "discussions" and "email" were productive, reasonable, or related to this case.  This is particularly troubling

---

[10] Indeed, if the Press Coalition continues to argue that it was reasonable to spend time reviewing materials from the House of Representatives' separate lawsuit seeking the audio recordings, the Press Coalition would just be conceding that just be conceding that it was the Congressional subpoena which drove the Department's decisions to withholding and then disclose the audio recordings.

given that the entry predates the filing of Press Coalition's complaint by over a week, even though (as noted above) "FOIA does not authorize fees for work performed at the administrative stage." *Browner*, 965 F. Supp. at 65. Other of the Press Coalition's billing entries are similarly deficient.

### 4. Any fee award to the Press Coalition should be reduced given its speculative level of success on the merits.

"A plaintiff's overall success on the merits also must be considered in determining the reasonableness of a fee award." *Judicial Watch*, 470 F.3d at 369. For example, a court in this district has "reduce[d] [a p]laintiff's fees . . . by 76%" to account for a plaintiff's level of success. *Elec. Priv. Info. Ctr.*, 197 F. Supp. 3d at 297.

Here, and even assuming that the Press Coalition is eligible for and entitled to fees (which it is not), the Press Coalition has not established any significant level of success on the merits. This Court never ruled on this case and so never accepted any of the Press Coalition's arguments. The Department's decision to release the audio recordings to Congress, and then to the public, was discretionary, and the Press Coalition was just one of three Plaintiffs—and not even the first—to submit a FOIA request or file a lawsuit for the recordings. So, even assuming eligibility and entitlement, the degree to which the Press Coalition and its advocacy actually contributed to the Department's discretionary decision to release the audio to Congress and then the public is entirely speculative. Awarding the Press Coalition full fees in this circumstance would be the sort of "windfall for the attorneys" that the FOIA does not permit. *Urb. Air Initiative*, 442 F. Supp. 3d at 327 (quoting *Elec. Priv. Info. Ctr.*, 80 F. Supp. 3d at 162). The Press Coalition's fees should thus be reduced by 50% to account for their speculative level of success on the merits.

5.      **The Press Coalition's fees are excessive overall.**

Even setting aside the specific deficiencies identified above, Press Coalition's fee demand is excessive overall.  Reasonable fees "requires that legal matters are 'appropriately staffed to do the work required efficiently and without duplicative billing.'"  *J.T.F.*, 2025 WL 843281 at *8 (quoting *Cobell*, 234 F. Supp. 3d at 175).   Applying this logic, this district has found it "unreasonable" for a FOIA plaintiff to demand $5,308.50, based on a "18.4 hours—more than two full days of work—over three different attorneys for the preparation and filing" of a "straightforward, nine-page FOIA complaint." *Elec. Priv. Info. Ctr.*, 80 F. Supp. 3d at 158.  There, the court awarded the plaintiffs less than half of what they claimed for the complaint.  *See id.*

Here, the Press Coalition likewise filed a "straightforward" FOIA complaint totaling just 10 pages.  *See generally* Complaint, *Cable News Network, Inc. v. Dep't of Just.*, No. 24-cv-961, ECF No. 1 (Apr. 4, 2024).  The Press Coalition did file an amended complaint adding additional coalition members, but this district has found that even in a case with two complaints, when "both complaints in this case consist largely of boilerplate language and an uncomplicated factual history, . . . twenty hours spent between them is unreasonable." *Elec. Priv. Info. Ctr. v. Dep't of Homeland Sec.*, 811 F. Supp. 2d 216, 238 (D.D.C. 2011).  The Press Coalition's demand for filing two complaints and "addressing case consolidation" totals $37,5050.39 across over 56 hours of work, an unreasonable sum.  Tobin Decl. ¶ 32.  Even excluding the impermissible hours identified above, *see supra* Section III.B.1-3, the Press Coalition has billed $27,174.03 across over 42 hours for two complaints and "case consolidation," a routine process that should require little work.  This case may ultimately have been complex, but the Press Coalition's complaints were not.  If less than $6,000 was "unreasonable" to file a single complaint in *Elec. Priv. Info. Ctr.*, 80 F. Supp. 3d at 158, then $27,174 to file two here is even more so.  Because of this excessive billing, the Press

Coalition's fees for its complaint filing work should be reduced by 75%. *See id.* (awarding less than half of a $5,308.50 fee demand for filing a comparable FOIA complaint).

Incorporating the 50% reduction justified above for the Press Coalition's speculative level of success on the merits, *see supra* Section III.B.4, the Press Coalition's fee amount for its complaint filing work should be reduced by a total of 87.5% to $3,396.76.

The Press Coalition's summary judgment billing was similarly unreasonable. This district has considered a request for "88.7 hours spent on summary judgment litigation" in a FOIA case to be "unreasonable." *Leopold*, 2025 WL 2177912 at *6; *see also Firestine*, 374 F. Supp. 2d at 664 (finding it unreasonable for attorneys to spend 78 hours on responding to summary judgment). In fact, "25 hours would probably be sufficient to prepare a resistance to a summary judgment motion." *Baker*, 263 F. Supp. 2d at 1197. Even accounting for the number of issues involved in this case, the Press Coalition's billing for summary judgment briefing—over 123 hours totaling $83,646.88 in fees (over 122 hours and $82,877.18 excluding the impermissible hours discussed above)—is excessive by those cases' standards. Because of this excessive billing, the Press Coalition's fees for its summary judgment work should be reduced by 50%. *See, e.g.*, *Davis Cnty.*, 169 F.3d at 761 (applying an approximately 50% discount because of "an unusually high number of attorneys reviewing and editing briefs."); *Elec. Priv. Info. Ctr.*, 197 F. Supp. 3d at 296 (applying a "35% discount" to "counteract . . . overstaffing").

Incorporating the 50% reduction justified above for the Press Coalition's speculative level of success on the merits, *see supra* Section III.B.4, the Press Coalition's fee amount for summary judgment briefing should be reduced by a total of 75% to $20,694.30.

To summarize, incorporating the corrections and adjustments above and assuming the Press Coalition is eligible for and entitled to fees (which it is not), the Press Coalition should be awarded at most: $3,396.75 for its pre-summary judgment work, $20,694.30 for its summary judgment work, and $667.10 for its miscellaneous work post-summary judgment, for a total of $24,758.14 in fees plus $741.55 in costs.[11]

### C.  Reasonable Fees for Heritage Under Heritage's Alternative Eligibility Theories

Finally, if the Court finds that Heritage is eligible for and entitled to fees only under Heritage's alternative eligibility theories (which it should not), then Heritage is entitled only to reasonable fees "substantively []related to the instances in which [it] succeeded." *Elec. Priv. Info. Ctr.*, 218 F. Supp. 3d at 51.  In other words, Heritage "cannot piggy back off [its] success . . . to collect fees for work done" that did not contribute to that success.  *Id.*

For the Court to analyze the reasonable fees for Heritage under its alternative eligibility theories, the Court must have rejected Plaintiffs' main eligibility theory and found that Heritage prevailed only by causing the release of the duplicate audio recordings and/or the Weinsheimer Declaration.  Under Heritage's first alternative theory, Heritage claims it succeeded by causing the release of the duplicate audio recordings.  Under that theory, reasonable fees would be only fees for steps "substantively []related" to the release of those duplicate recordings, not other work.  *Id.* Thus, Heritage should reach recover fees only for emailing the Department to request those

---

[11] The Department does not address the fees that the Press Coalition attributes to "[a]ttorneys' fees research and negotiations," Tobin Decl. ¶ 32, because those are fees on fees.  The Department reserves the right to address that part of Press Coalition's fee demand later, during any proceedings concerning fees-on-fees, if the Court finds (as it should not) that the Press Coalition is eligible for and entitled to fees in the first instance.  Separately, the Department notes that fees on fees may not be "disproportionate and excessive" relative to the fees on the merits of a case.  *Merrick*, 316 F. Supp. 3d at 518.

recordings, as it did on May 27, 2025.  *See* Tobin Decl. Ex 2 at 9-11.  However, fee application must "include contemporaneous time records of hours worked."  *Citizens for Resp. & Ethics in Wash.*, 142 F. Supp. 3d at 10 (D.D.C. 2015) (quoting *In re Donovan*, 877 F.2d 982, 994 (D.C. Cir. 1989) (per curiam)).  So because Heritage did not provide billing entries for the time its attorney Samuel Dewey took to send the email requesting the duplicate recordings, Heritage should recover no fees for that email.

Under Heritage's second alternative theory, Heritage supposedly succeeded by causing the Department to file the Weinsheimer Declaration in support of the Department's motion for summary judgment.  That declaration was filed as an attachment to the Department's motion for summary judgment, and the information in the declaration was public before Plaintiffs' own summary judgment filings.  Thus, to the extent Heritage "substantially prevailed" by causing the Department to file the declaration, Heritage "cannot piggy back off [its] success prior to summary judgment to collect fees for work done preparing its opposition and cross-motion for summary judgment," given that Heritage's oppositions and cross-motions for summary judgment post-dated the Weinsheimer Declaration's filing.  *Elec. Priv. Info. Ctr.*, 218 F. Supp. 3d at 51.  Under this theory of eligibility, reasonable fees for Heritage would be only for work necessary to draft its complaint, thus causing the Department to move for summary judgment.  However, fee application must "include contemporaneous time records of hours worked." *Citizens for Resp. & Ethics in Wash.*, 142 F. Supp. 3d at 10 (D.D.C. 2015) (quoting *In re Donovan*, 877 F.2d at 994).  So because Heritage did not provide billing entries for the time it took to draft its complaint in this case, Heritage should recover no fees for drafting that complaint.

## CONCLUSION

For all these reasons, the Court should hold that Plaintiffs are neither entitled to nor eligible for attorneys' fees in this matter. And if the Court does hold that Plaintiffs are entitled to or eligible for fees, which it should not, the Department requests that the fees be reduced for the reasons and in the amounts given above.

Dated: August 15, 2025

Respectfully submitted,

YAAKOV M. ROTH
Principal Deputy Assistant Attorney General
Civil Division

ELIZABETH J. SHAPIRO
Deputy Director
Federal Programs Branch

*/s/ Robert W. Meyer*
ROBERT W. MEYER (NY Bar No. 5942842)
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20005
Tel: 202-305-0872
Robert.W.Meyer@usdoj.gov

*Counsel for Defendant*