**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| **JUDICIAL WATCH,** *et al.*, | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **No. 1:24-cv-700 (TJK/GMH)** |
| | ) | **(Consolidated Cases)** |
| **U.S. DEPARTMENT OF JUSTICE,** | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

The requests that prompted this consolidated case under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552—from Judicial Watch, Inc.; The Heritage Foundation and the leader of its Oversight Project (together, the "Heritage Foundation"); and Cable News Network, Inc. ("CNN") and a number of other press outlets (together, the "Press Coalition)—sought release of audio recordings of former President Joseph R. Biden, Jr.'s interview with Special Counsel Robert K. Hur. The Department of Justice ("DOJ," the "Department," or the "government") withheld the material based on several exemptions to disclosure, including President Biden's assertion of executive privilege over the recordings. Plaintiffs sued,[1] and while motions for summary judgment were pending, the presidential election occurred in November 2024 and Donald J. Trump was inaugurated as President in January 2025. In May 2025, with those motions still pending, DOJ released a recording of the interview to the public. Thereafter, the Heritage Foundation (as well as the Press Coalition) filed a motion contending it was eligible for an award of attorney's fees

---

[1] Judicial Watch, the Heritage Foundation, and CNN filed separate FOIA actions seeking release of the recordings. Those actions were consolidated, *see* Minute Order (May 3, 2024), after which the additional press outlets comprising the Press Coalition joined the case as Plaintiffs, *see* ECF No. 26.

under the so-called "catalyst theory" because its lawsuit substantially caused the release of the recordings. The government opposed the motion and filed a declaration supporting its opposition from Jonathan M. Breyan, the Senior Supervisory Attorney in the DOJ office responsible for handling FOIA requests subject to litigation. The Heritage Foundation has now filed a motion—the motion at issue here—to strike that declaration and for leave to engage in discovery regarding whether its lawsuit caused the release of the recordings.[2] For the following reasons, the motion is denied in its entirety.

## I.    BACKGROUND

On January 12, 2023, then-Attorney General Merrick Garland appointed Hur as Special Counsel and authorized him to investigate "possible unauthorized removal and retention of classified documents" discovered at locations associated with President Biden. ECF No. 76-2 at 2. As part of that investigation, President Biden sat for an interview on October 8–9, 2023 (the "Biden-Hur Interview"). *See* ECF No. 34-2, ¶ 9; *see also* ECF No. 40-2 at 2, ¶ 3. According to a declaration from DOJ Associate Deputy Attorney General Bradley Weinsheimer submitted in connection with the government's motion for summary judgment in this case (the "Weinsheimer Declaration"), the audio of that interview, which comprises several "separate digital files," was recorded by two separate recording devices operated by FBI personnel. *See* ECF No. 34-2, ¶¶ 10, 12. In early February 2024, Hur issued his report on the investigation, finding prosecution "unwarranted" and declining to bring criminal charges in part because President Biden "would likely present himself to a jury, as he did during [the] interview . . . , as a sympathetic, well-

---

[2] The documents most relevant to this Memorandum Opinion and Order are: (1) the declaration of Jonathan M. Breyan, ECF No. 76-1; (2) the Heritage Foundation's memorandum in support of its motion to strike the declaration of Jonathan M. Breyan and to take limited discovery, along with the declaration of Samuel Everett Dewey and its attached exhibits, ECF Nos. 80 and 81 through 81-4; (3) the government's opposition to the Heritage Foundation's motion to strike and to take limited discovery, ECF No. 83; and (4) the Heritage Foundation's reply in further support of its motion to strike and to take limited discovery, ECF No. 84. All page numbers cited herein are those assigned by the Court's CM/ECF system.

meaning, elderly man with a poor memory." ECF No. 38-4 at 6, 11. That report, which referred to the Biden-Hur Interview, was made public on February 8, 2024. *See* ECF No. 76-3 at 3. Pursuant to FOIA, between February 8 and February 16, 2024, Judicial Watch, the Heritage Foundation, and CNN requested from DOJ copies of the audio recordings of that interview. *See* ECF No. 76-8; ECF No. 76-10; ECF No. 76-13. DOJ granted Judicial Watch's request for expedited processing on February 13, 2024; the Heritage Foundation's request for expedited processing on February 26, 2024; and acknowledged CNN's FOIA request on March 15, 2024. *See* ECF No. 76-9; ECF No. 76-12; ECF No. 76-14. Meanwhile, on February 12, 2024, the chairpersons of the House Committees on Oversight and Accountability, the Judiciary, and Ways and Means sent a letter to Garland requesting, among other things, the "transcript and any other records" of that interview as well as of an interview Hur had with Mark Zwonitzer (the "Zwonitzer-Hur Interview"), characterized in the letter as the President's "ghostwriter."[3] ECF No. 76-3 at 3–4. On February 27, 2024, the chairman of the House Committee on the Judiciary subpoenaed those materials. *See* ECF No. 76-4. The transcript of the Biden-Hur Interview, which was created from the "best quality audio files" from the two recording devices, ECF No. 81-4 at 12, was released to the public on March 12, 2024. *See* Biden Interview with Special Counsel Hur, *The New York Times* (Mar. 12, 2024), https://www.nytimes.com/interactive/2024/03/12/us/biden-hur-transcript-both-days.html [https://perma.cc/989P-F8K3]; *see also* ECF No. 34-2, ¶ 17.

On March 11, 2024, Judicial Watch filed a FOIA action against DOJ alleging that the Department had constructively denied its request for the recordings of the Biden-Hur Interview. *See* ECF No. 1, ¶ 8. On April 3 and 4, 2024, the Heritage Foundation and CNN filed similar FOIA

---

[3] The recording of the Zwonitzer-Hur Interview, which no Plaintiff sought in this litigation, is nevertheless tangentially related to the Heritage Foundation's dispute over the Breyan Declaration because the Heritage Foundation charges the Breyan Declaration with including misstatements of fact related to that recording. *See* Section II.B.2.b, *infra*.

actions against DOJ.[4]  *See* Complaint, ¶¶ 21–28, *Heritage Found. v. U.S. Dep't of Just.*, No. 24-cv-960 (D.D.C. Apr. 3, 2024), ECF No. 1; Complaint, ¶¶ 27–32, *Cable News Network, Inc. v. U.S. Dep't of Just.*, No. 24-cv-961 (D.D.C. Apr. 4, 2024), ECF No. 1.  The FOIA cases were then consolidated with the consent of the parties.  Minute Order (May 3, 2024).

On May 15, 2024, Garland sent a letter to President Biden stating that it was the opinion of the Attorney General and DOJ's Office of Legal Counsel that the audio recordings of the Biden-Hur Interview and the Zwonitzer-Hur Interview "fall within the scope of executive privilege and that [the President] may assert privilege with respect to the recordings" because they are "related to a closed criminal investigation where disclosure is likely to damage future law enforcement efforts."  ECF No. 76-5 at 2.  The letter explained that the "law enforcement component of executive privilege" protects materials the disclosure of which "would raise an unacceptable risk of undermining the Department's ability to conduct similar high-profile criminal investigations— in particular, investigations where the voluntary cooperation of White House officials is exceedingly important."  *Id.* at 4–5.  President Biden thereafter asserted executive privilege over the audio recordings, as reflected in a May 16, 2024, letter from Assistant Attorney General Carlos Uriarte to the chairpersons of the House Committees on Oversight and Accountability and on the Judiciary.  *See* ECF No. 76-6 at 2.

The government filed its motion for summary judgment on May 31, 2024, asserting that the recordings were being withheld pursuant to four separate FOIA exemptions.  *See* ECF No. 34-1 at 12–13.  DOJ maintained that the audio recordings were appropriately withheld under Exemptions 6 and 7(C), which protect from disclosure, respectively, "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of

---

[4] Again, no Plaintiff sought recordings of the Zwonitzer-Hur interview.

personal privacy" and "records or information compiled for law enforcement purposes" that "could reasonably be expected to constitute an unwarranted invasion of personal privacy," 5 U.S.C. § 552(b)(6), (7)(C), reasoning that "[s]ignificant privacy interests attach to the Special Counsel's investigatory files" and the Special Counsel's "345-page report detailing his investigation" and a written transcript of the interview at issue had already been released, ECF No. 34-1 at 12; under Exemption 7(A), which protects "records or information compiled for law enforcement purposes" that "could reasonably be expected to interfere with enforcement proceedings," 5 U.S.C. § 552 (b)(7)(A), because DOJ was "engaged in a number of ongoing law enforcement investigations in which it has determined that release of the audio recording would interfere with witness cooperation in those investigations," ECF No. 34-1 at 13; and under Exemption 5, which exempts material that is privileged in civil discovery and "incorporates the privileges available to Government agencies in civil litigation," *U.S. Fish & Wildlife Serv. v. Sierra Club, Inc.*, 592 U.S. 261, 267 (2021); *see also* 5 U.S.C. § 552(b)(5)), because the recordings were then subject to a claim of executive privilege, ECF No. 34-1 at 12. As noted, to support its motion, the government filed the Weinsheimer Declaration, which, among other things, asserted that the written transcripts of the Hur interview "are accurate transcriptions of the words of the interview contained in the audio recording," except that sometimes "filler words (such as 'uh' or 'um')" and repeated words "such as 'I, I' or 'and, and'" are not included. ECF No. 34-2, ¶ 14. All Plaintiffs cross-moved for summary judgment, arguing that none of the claimed FOIA exemptions protected the recordings from disclosure. *See generally* ECF No. 36-1 (Judicial Watch); ECF No. 38-1 (the Press Coalition); ECF No. 40-1 (the Heritage Foundation).

On January 6, 2025, (three days after the 119th Congress was sworn in), the chairman of the House Committee on the Judiciary issued a renewed subpoena for the recordings of the Biden-

Hur Interview and the Zwonitzer-Hur Interview.  *See* ECF No. 76-7.  President Trump was inaugurated on January 20, 2025.  On February 12, 2025, Judge Kelly entered a Minute Order in this case requiring the government, "in light of the recent change in administration," to file a status report within seven days "confirming that its position" taken in the summary judgment briefing— that the recordings of the Biden-Hur Interview were exempt from disclosure under FOIA— "remains unchanged."  Minute Order (Feb. 12, 2025).  The government sought a 90-day extension of time to respond, citing counsel's need to confer with new leadership in the Department, which was in the process of being installed, and the "significant workload" the Department was experiencing, "much of which [was] time-sensitive and resource-demanding."  ECF No. 59 at 2. The Court granted the motion, setting May 20, 2025, as the deadline for the status report.  Minute Order (Feb. 19, 2025).

On May 16, 2025, news website Axios published excerpts of one of the audio recordings of the October 8–9, 2023, interview.[5]  *See* Marc Caputo & Alex Thompson, *Exclusive: Prosecutor's Audio Shows Biden's Memory Lapses*, Axios (May 16, 2025), https://www.axios.com/2025/05/16/biden-hur-tape-special-counsel-audio.  In its May 20, 2025, status report, the government asserted that, "[o]n May 19, 2025, the Department of Justice made a discretionary release of the Biden audio tape at issue in this case by posting the audio files in the Office of Information Privacy's FOIA reading room."  ECF No. 66 at 1.  The recordings released were those used to create the transcript of the Biden-Hur Interview, rather than all the audio files from both recording devices.  *See* ECF No. 81-4 at 12.  On May 28, 2025, the parties filed a joint status report asserting that, in light of the public release of the recording, only "[t]wo issues

---

[5] DOJ has denied that it provided the audio to Axios but the Heritage Foundation is not convinced.  *See* ECF No. 73-1 at 22 (Heritage Foundation asserting that Axios stated the White House and DOJ gave it the audio); ECF No. 76 at 23 (the government asserting that DOJ did not provide the audio to Axios).

remain[ed] outstanding" in this case: (1) Plaintiffs had requested that the government process and release the second audio recording of the interview—that is, the audio files *not* used to create the transcript of the Biden-Hur Interview (sometimes referred to herein as the "second recording"), which it had agreed to do and (2) Plaintiffs' entitlement to attorney's fees, which the government contested. ECF No. 67. The government pledged to release those audio files by July 7, 2025, and the parties proposed a briefing schedule for motions for attorney's fees, which the Court granted. *See* ECF No. 68 at 2; ECF No. 69. The second recording was released on or about July 7, 2025. *See* ECF No. 70 at 2.

On July 25, 2025, Judicial Watch voluntarily dismissed its claim, *see* ECF No. 71, but the Heritage Foundation and the Press Coalition sought awards of attorney's fees, *see* ECF No. 72; ECF No. 73. As relevant here, the Heritage Foundation's brief argues that it is eligible for fees under FOIA's Section 552(a)(4)(E)(ii)(II), which allows a plaintiff that pressed a "not insubstantial" claim under the statute to recover its attorney's fees where it "obtained relief through . . . a voluntary or unilateral change in position by the agency." 5 U.S.C. § 552(a)(4)(E)(ii)(II); *see* ECF No. 76 at 7–13. The D.C. Circuit has interpreted the relevant provision to allow a plaintiff to "prove fee eligibility by showing that its lawsuit 'substantially caused the government to release the requested documents before final judgment.'" *Grand Canyon Tr. v. Bernhard*, 947 F.3d 94, 96 (D.C. Cir. 2020) (quoting *Brayton v. Off. of the U.S. Trade Representative*, 641 F.3d 521, 524–25 (D.C. Cir. 2011)). The Heritage Foundation contends that this litigation substantially caused the release of the recordings

> in at least three ways: (1) on the present record, the litigation caused the reversal of President Biden's claim of Executive Privilege; (2) the litigation caused the release of both recordings of the interview; and (3) release of the Declaration of Bradley Weinsheimer to defend the withholdings revealed the highly newsworthy information that the transcripts of the Biden-Hur audio were not complete.

7

ECF No. 73-1 at 9–10.

The government's opposition to the Heritage Foundation's request for fees is supported by, among other things, a declaration from Jonathan M. Breyan (the "Breyan Declaration"), a "Senior Supervisory Attorney in the Office of Information Policy" at DOJ, who is "responsible for supervising the handling of [FOIA] requests subject to litigation." ECF No. 76-1, ¶ 1. The Breyan Declaration states that it is based on Breyan's "personal knowledge as well as information obtained and reviewed in the course of [his] official duties, including conversations [he] had with Department leadership and officials elsewhere in [the] Department." *Id.*, ¶ 2. Among the assertions included in that declaration are the following:

(1)  "[T]he Department's determination to withhold the audio recordings was made before the lawsuits were filed by [the] Heritage [Foundation] and by the Press Coalition. Therefore, those lawsuits neither accelerated or otherwise impacted in any way the Department's evaluation of the FOIA requests for the audio recordings at issue in this case, nor the Department's determination to withhold them." *Id.*, ¶ 16.

(2)  "After January 20, 2025, the Department determined that it would comply with the renewed Congressional subpoena of January 6, 2025. The Department accordingly began to process the audio recordings for release to Congress." *Id.*, ¶ 17.

(3)  "On May 19, 2025, the Department released to the House of Representatives Committee on the Judiciary the audio recordings requested by the renewed subpoena." *Id.*, ¶ 18.

(4)  "Later that same day, and after releasing the audio recordings to the House of Representatives Committee on the Judiciary, the Department released to the public the same audio recordings that had been released to Congress by posting the recordings online in OIP's FOIA Library. The Department, via counsel, also notified Plaintiffs in this case (including Judicial Watch) that the Department had done so." *Id.*, ¶ 19.

(5)  "I have been advised that, before the Department released the audio recordings to Congress or to the public, the Department determined that because it would release the audio recordings to Congress, the Department should also release the audio recordings to the public as a matter of discretion. This decision was made notwithstanding the FOIA requests submitted by Plaintiffs or the subsequent lawsuits filed. The decision was made because the Department independently

determined that release of the recordings to Congress justified their release to the public. In other words, whether or not this lawsuit was filed pursuant to FOIA requests for the audio recordings, the Department still would have released the audio recordings to the public as a matter of discretion." *Id.*, ¶ 20.

(6) "I have further been advised that the Department also independently determined that the audio recordings should be released to the public as a matter of discretion. The records that this Administration has released as a matter of discretion include, but are not limited to, records relating to the SCO Investigation, and include, but are not limited to, records for which a FOIA request has been submitted or a lawsuit has been filed. *See, e.g.*, Immediate Declassification of Materials Related to the Federal Bureau of Investigation's Crossfire Hurricane Investigation,[6] Memorandum for the Attorney General, the Director of National Intelligence, and the Director of the Central Intelligence Agency (March 25, 2025), https://www.whitehouse.gov/presidential-actions/2025/03/immediate-declassification-of-materials-related-to-the-federal-bureau-of-investigations-crossfire-hurricane-investigation/; Exec. Order No. 14176, Declassification of Records Concerning the Assassinations of President John F. Kennedy, Senator Robert F. Kennedy, and the Reverend Dr. Martin Luther King, Jr., 90 Fed. Reg. 8641 (January 23, 2025). In this case, the Department determined that, even though the audio recordings were exempt from disclosure pursuant to the FOIA, the audio recordings should be released to the public as a matter of discretion once they were produced in response to the Congressional subpoena. This determination was neither related to nor caused by the existence of this consolidated case seeking the audio recordings. In other words, even if the audio recordings had not been released to Congress, and even if this case was never filed, the Department still would have released the audio recordings to the public as a matter of discretion." *Id.*, ¶ 21.

The Heritage Foundation filed its reply brief in further support of its fee request on August 29, 2025. *See* ECF No. 79. That same day, it filed the motion at issue here, seeking to strike the Breyan Declaration and leave to take discovery. *See* ECF No. 80. The Heritage Foundation maintains that the Breyan Declaration violates "even FOIA's relaxed rules regarding personal knowledge and hearsay" and is "conclusory," as well as that it "contains material inaccuracies that raise clear issues of bad faith" and "fails to account for contrary record evidence," specifically in

---

[6] "Crossfire Hurricane" was the code name for the FBI's investigation, beginning in August 2016, "into the Trump campaign's ties to Russia." Matt Apuzzo, et al., Code Name Crossfire Hurricane: The Secret Origins of the Trump Investigation, N.Y. Times, May 16, 2018, https://www.nytimes.com/2018/05/16/us/politics/crossfire-hurricane-trump-russia-fbi-mueller-investigation.html.

the paragraphs identified above.  ECF No. 80 at 5, 12–20.  Those "flaws," the Heritage Foundation

maintains, "require that the operative portions of the Declaration be struck" and "require[]" that

the undersigned grant it leave to depose

> (1) Chad Mizzelle, Chief of Staff [for] the Attorney General & Acting Associate
> Attorney General; (2) Paul Perkins, Associate Deputy Attorney General with
> responsibility for Hur related matters; (3) Brian Nieves, Deputy Chief of Staff &
> Senior Policy Counsel for the Deputy Attorney General, with responsibility for
> advising on Hill related matters; (4) Elizabeth Shapiro, the Deputy Director of
> Federal Programs with first level responsibility for this case[]; and (5) Jonathan M.
> Breyan.

*Id.* at 5–6.  Alternatively, the Heritage Foundation would be content with deposing the Deputy

Attorney General of the United States.  *Id.* at 6.

## II.      DISCUSSION

As noted above, the Heritage Foundation has made two requests.  First, it asks the Court to

strike "in substantive part" the Breyan Declaration, which supports the government's opposition

to both the Heritage Foundation's and the Press Coalition's fee petitions.  ECF No. 80 at 22.

Second, it seeks leave to conduct discovery into the "high-level decisions regarding reversing an

Executive Privilege claim" and releasing the recordings to the public.  *Id*. at 5.

### A.      Motion to Strike

The motion to strike is procedurally improper and the Heritage Foundation has not

provided a sufficient basis for it.  The Heritage Foundation ostensibly relies on Rule 12(f) of the

Federal Rules of Civil Procedure, asserting at the outset that pursuant to that Rule, "courts 'may

strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or

scandalous matter.'"  *See* ECF No. 80 at 6 (quoting Fed. R. Civ. P. 12(f)).  The plain language of

that provision makes clear that a Rule 12(f) motion must satisfy two substantive requirements: (1)

it must be directed at a pleading and (2) it must target "an insufficient defense or any redundant,

10

immaterial, impertinent, or scandalous matter." The Heritage Foundation makes no serious attempt to show that its motion meets either of those mandates.

First, Rule 7 of the Federal Rules of Civil Procedure states, "Only these pleadings are allowed": a complaint, a counterclaim, a crossclaim, and a third-party complaint; an answer to each of those filings; and, if ordered by the court, a reply to an answer. Fed. R. Civ. P. 7(a)(1)–(7). Numerous courts, as well as two well-respected treatises of federal practice, have concluded that filings not enumerated in Rule 7 cannot be stricken under Rule 12(f). *See, e.g.*, *True the Vote, Inc. v. IRS*, No. 13-cv-734, 2020 WL 5656694, at *7 (D.D.C. Sep. 23, 2020) (finding that the court was without power to grant a motion to strike that was directed at a filing not enumerated in Rule 7); *McFadden v. Ballard, Spahr, Andrews, & Ingersoll, LLP*, No. 05-cv-2401, 2008 WL 2569418, at *1 (D.D.C. June 24, 2008) (collecting cases); *In re Apollo Group, Inc. Sec. Litig.*, No. 06-mc-558, 2007 WL 778653, at *4 (D.D.C. Mar. 12, 2007) (collecting cases); 5C Wright & Miller's Federal Practice and Procedure § 1380 (3d ed.) ("[A]s the cases make clear, [Rule 12(f)] is neither an authorized nor a proper way . . . to strike an opponent's affidavits."); 2 Moore's Federal Practice § 12.37[2] ("Only material included in a 'pleading' may be the subject of a motion to strike, and courts have been unwilling to construe the term broadly . . . . Motions, briefs or memoranda, objections, or affidavits may not be attacked by the motion to strike." (footnotes omitted)). Because the affidavit at issue is not a pleading, it cannot be stricken under Rule 12(f).[7]

Second, the Heritage Foundation's motion is not directed at "an insufficient defense" or "redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). The affidavit

---

[7] In a footnote the Heritage Foundation asserts that a "'[p]leading' for the purposes of Rule 12 includes affidavits and declarations," citing *Judicial Watch, Inc. v. U.S. Department of Commerce*, 224 F.R.D. 261, n.1 (D.D.C. 2004). The undersigned has previously explained that the cited assertion in *Judicial Watch* rests on shaky ground—not least that it ignores the plain language of the rule—and has refused to follow it; that discussion need not be repeated here. *See Meyer v. Panera Bread Co.*, No. 17-cv-2565, 2018 WL 5017747, at *3 & n.2 (D.D.C. Oct. 16, 2018).

is not a "defense"—insufficient or not—which, as used in the rule, refers to a defense to a claim for relief in a pleading. *See* 5C Wright & Miller's Federal Practice and Procedure § 1381 (3d ed.) ("What constitutes an insufficient defense within the meaning of the rule depends, of course, upon the nature of the affirmative pleader's claim for relief and the particular defense that is in question."). As for "redundant, immaterial, impertinent, or scandalous matter," Fed. R. Civ. P. 12(f), "the extensive case law on the subject[]" reflects that, to fall within the rule, the movant must show that the material to be stricken "ha[s] no possible relation or logical connection to the subject matter of the controversy" and is likely to "cause some form of significant prejudice to one or more of the parties to the action." 5C Wright & Miller's Federal Practice and Procedure § 1382 (3d ed.). The Heritage Foundation argues that the affidavit contains inaccuracies, is not based on personal knowledge, and is conclusory, *see* ECF No. 80 at 5, not that it is unrelated to the controversy and prejudicial. Thus, Rule 12(f) provides no basis for the Heritage Foundation's motion to strike.

> The Heritage Foundation also mentions that
>
> [i]n the summary judgment context, a motion to strike is permissible when a declaration fails to comply with Federal Rule of Civil Procedure 56(c)(4), which states: "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."

ECF No. 80 at 6 (quoting Fed. R. Civ. P. 56(c)(4)). Leaving aside the fact that the affidavit the Heritage Foundation seeks to strike here was not filed "[i]n the summary judgment context" but in support of a fee petition, the authority for that premise seems to have been significantly undermined. To be sure, at one time numerous courts had held that, to challenge a summary judgment affidavit on the basis that it was, for example, not made on personal knowledge, a litigant must file a motion to strike the affidavit or else it forfeited the challenge. *See Humane Soc'y of*

*the U.S. v. Babbitt*, 46 F.3d 93, 96 n.5 (D.C. Cir. 1995) ("We agree with . . . our sister circuits . . . that 'Rule 56(e) [now Rule 56(c)] defects are waived where, as here, no motion to strike is directed to them below.'" (quoting *DeCintio v. Westchester Cnty. Med. Ctr.*, 821 F.2d 111, 114 (2d Cir. 1987))).  But the 2010 amendments to Rule 56 did away with that requirement: "There is no need to make a separate motion to strike" when objecting to the admissibility of an affidavit or other evidence at the summary judgment stage and failure to do so "does not forfeit the right to challenge admissibility" on appeal.  Rule 56(c)(2), advisory committee's note to 2010 amendment.

In any case, the undersigned need not decide whether the Heritage Foundation has moved under Rule 56(c) or, if it has, whether such a motion is procedurally appropriate because, as discussed below in Section II.B.1, the declaration does not violate Rule 56(c)(4), and therefore that Rule provides no basis for the declaration to be stricken.  Accordingly, the motion to strike the Breyan Declaration will be denied.

## B.    Motion for Discovery

The Heritage Foundation acknowledges that the decision whether to allow discovery is within the court's "broad discretion" and that "discovery is the exception, not the rule, in FOIA cases."  ECF No. 80 at 7 (first citing *Landmark Legal Found. v. EPA*, 959 F. Supp. 2d 175, 183 (D.D.C. 2013); and then citing *People for the Ethical Treatment of Animals v. USDA*, 918 F.3d 151, 159 (D.C. Cir. 2019)).  More, the Supreme Court has repeatedly cautioned against allowing a dispute over attorney's fees to become "a second major litigation."[8]  *Lackey v. Stinnie*, 604 U.S.

---

[8] One D.C. Circuit judge, in arguing that the catalyst theory is incompatible with the language of the statute, which "requires only correlation not causation," has suggested that application of the catalyst theory may "elevate the attorneys' fee litigation to a 'second major litigation'" because it requires a plaintiff to show a "causal connection between its lawsuit and the government's capitulation," which could "most plausibl[y]" be shown by "tak[ing] depositions and seek[ing] documents from FOIA officers and other government employees."  *Grand Canyon Tr.*, 947 F.3d at 100 (Randolph, J., concurring in the judgment).  Be that as it may, the majority opinion in *Grand Canyon Trust*, continued to apply the catalyst theory, which requires a showing of causation.  *See* 947 F.3d at 96–97; *see, e.g.*, *Informed Consent Action Network v. NIH*, Nos. 23-cv-3674, 24-cv-813, 2025 WL 3484885, at *3 n.3 (D.D.C. Dec. 4, 2025) (noting "binding D.C. Circuit precedent holding that the 2007 Open Government Act established 'that the

192, 204 (2025) (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983)); *accord Los Padres ForestWatch v. U.S. Forest Serv.*, 775 F. Supp. 3d 353, 370 (D.D.C. 2025); *see also, e.g., Baylor v. Mitchell Rubenstein & Assocs., P.C.*, 857 F.3d 939, 960 (D.C. Cir. 2017) (Henderson, J., concurring) ("[F]ee litigation [is] one of the last things lawyers and judges should be spending their time on." (citation modified)); . Indeed, some cases note a "presumption against discovery for attorney's fees motions." *United States v. Fox Run Apartments*, No. 23-cv-2096, 2024 WL 3226096, at *6 (D. Kan. June 28, 2024). It is unsurprising, then that neither party is aware of any case granting discovery in a FOIA fee dispute. *See* ECF No. 83 at 10 ("Few FOIA plaintiffs have ever sought discovery at the attorney's fees stage, but those that have found their motions denied."); ECF No. 84 at 19 ("[W]e are not aware of any cases granting discovery in a fee dispute."). The Heritage Foundation thus has set itself a high bar here.

To meet that significant challenge, the Heritage Foundation contends that the Breyan Declaration "is the poster-child for an impermissible bad faith declaration," which "require[es]" the undersigned to allow it to engage in discovery. ECF No. 80 at 5. In support, it makes two closely related, overarching arguments. It broadly challenges the Breyan Declaration because (1) Breyan, as a "first level FOIA supervisor" in the Office of Information Policy, "has nothing to do with the leadership of the Department [of Justice]" or "knowledge of the intricacies of decision-making concerning matters such as Congressional oversight," and does not have personal knowledge as to the reasons the recordings were released to the Heritage Foundation, *id.*; and (2) the "relaxed" requirements of personal knowledge and hearsay applicable in FOIA cases do not

---

catalyst theory applies in FOIA cases.'" (citation modified) (quoting *Davis v. U.S. Dep't of Just.*, 610 F.3d 750, 752 (D.C. Cir. 2010))); *see also First Look Inst.*, No. 24-5257, 2025 WL 1840647, at *1 (D.C. Cir. July 2, 2025) (per curiam) (noting, post-*Grand Canyon Trust*, that "the catalyst theory in FOIA cases is the law of this circuit"). Accordingly, both the catalyst theory and the principles that discovery in FOIA cases should be granted rarely and that fee litigation should not be allowed to balloon into major litigation are applicable in this jurisdiction.

14

apply where, as here, there are "specific concerns about the seeming lack of connection between the information and the declarant's ordinary official duties," *id.* at 9 (quoting *Emuwa v. U.S. Dep't of Homeland Sec.*, 113 F.4th 1009, 1016 (D.C. Cir. 2024)).  Thereafter, it challenges the veracity of individual paragraphs in the declaration.  *See id.* at 12–20.  Again, this is a tall order.  Under controlling precedent, agency declarations are entitled to "a presumption of good faith," *see, e.g.*, *SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991), and "there is a presumption of legitimacy accorded to the Government's official conduct" that can be displaced only by "clear evidence" to the contrary, *Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 174–75 (2004).  *See also People for the Ethical Treatment of Animals*, 918 F.3d at 157 (noting that the presumption of legitimacy "to which the Supreme Court has referred in the FOIA context" can only be overcome by "clear evidence to the contrary" (quoting *Favish*, 541 U.S. at 174); *Democracy Forward Found. v. U.S. Dep't of Just.*, No. 17-cv-1877, 2022 WL 17177497, at *5 (D.D.C. Nov. 23, 2022) ("[T]here is significant caselaw suggesting that 'in the absence of clear evidence to the contrary, courts presume that government officials have properly discharged their official duties.  [Additionally,] FOIA declarations 'are accorded a presumption of good faith' regardless of the underlying government conduct." (citation modified) (citations omitted) (first quoting *United States v. Chem. Found., Inc.*, 272 U.S. 1, 14–15 (1926); and then quoting *SafeCard Servs.*, 926 F.2d at 1200)).[9]  Ultimately, the Heritage Foundation fails to show that it is entitled to discovery due to alleged bad faith on the part of the Department of Justice.

---

[9] In *Favish*, the Supreme Court stated that, where the issue is whether documents requested under FOIA should be disclosed, a "less stringent standard"—"evidence that would warrant a belief by a reasonable person" that government officials have not properly discharged their duties—applies.  541 U.S. at 174; *cf. Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1117 (D.C. Cir. 2007) (noting that "[a]gencies are entitled to a presumption that they complied with the obligation to disclose" material under FOIA but that the "quantum of evidence required to overcome that presumption" might be "clear evidence to the contrary" or might be "evidence that would warrant a belief by a reasonable person" (first quoting *Chem. Found.*, 272 U.S. at 14–15; and then quoting *Favish*, 541 U.S. at 174)).  Here, the issue is not whether documents should be disclosed under FOIA, but, rather, whether the action filed by the Heritage Foundation

1.    Personal Knowledge and Hearsay

The Breyan Declaration begins with the following two paragraphs, which explain his position at DOJ and the basis for his knowledge:

> 1.    I am a Senior Supervisory Attorney in the Office of Information Policy (OIP), United States Department of Justice (DOJ or the Department).  In this capacity, I am responsible for supervising the handling of the Freedom of Information Act (FOIA) requests subject to litigation processed by the Initial Request Staff (IR Staff) of OIP – a role in which I have served since 2019.  Prior to becoming a Senior Supervisory Attorney, I served as an Attorney-Advisor on the Appeals Staff at OIP from 2013-2019.  The IR Staff of OIP is responsible for processing FOIA requests seeking records from within OIP and from six senior leadership offices of the DOJ, specifically, the Offices of the Attorney General (OAG), Deputy Attorney General (ODAG), Associate Attorney General (OASG), Legal Policy (OLP), Legislative Affairs (OLA), and Public Affairs (PAO).  Additionally, the IR Staff is responsible for processing FOIA requests seeking records from within the Special Counsel's Office (SCO).
>
> 2.    The statements made in this declaration are based on my personal knowledge as well as information obtained and reviewed in the course of my official duties, including conversations I had with Department leadership and officials elsewhere in Department.

ECF No. 76-1, ¶¶ 1–2.  Breyan also avers under penalty of perjury that the content of the declaration is "true and correct."  *Id.*, ¶ 23.

"[I]t is well settled that 'FOIA declarants may include statements in their declarations based on information they have obtained in the course of their official duties.'"  *Hainey v. U.S. Dep't of the Interior*, 925 F. Supp. 2d 34, 41 (D.D.C. 2013) (quoting *Barnard v. Dep't of Homeland Sec.*, 598 F. Supp. 2d 1, 19 (D.D.C. 2009)).  That obviously includes information obtained through intra-agency consultation.  *See, e.g.*, *Wilderness Workshop v. U.S. Dep't of Agric.*, No. 21-cv-2108, 2023 WL 5672578, at *5 n.8 (D.D.C. Sept. 1, 2023) (finding objections to declarations charging lack of personal knowledge and hearsay "unavailing" where the "declarants aver[red] that the

---

was the catalyst for disclosure that has already occurred.  The undersigned sees no reason that the lower standard from *Favish* should apply here, nor does either party cite that standard or otherwise suggest it is appropriate.

statements in their declarations are based on information acquired through the performance of official duties," including "discussions with colleagues"); *ACLU v. Fed. Bureau of Prisons*, No. 20-cv-2320, 2022 WL 1262112, at *3–4 (D.D.C. Apr. 28, 2022) (finding that an agency declarant had "the requisite personal knowledge to support [her] assertions" in a FOIA case based on, among other things participation in conversations and information provided to her by other agency employees); *Barnard v. Dep't of Homeland Sec.*, 598 F. Supp. 2d 1, 19 (D.D.C. 2009) (finding it appropriate in a FOIA case for declarants to rely on information they were told in the course of their duties). Indeed, it even includes "information obtained through *inter-agency* consultation." *Emuwa v. U.S. Dep't of Homeland Sec.*, No. 20-cv-1756, 2021 WL 2255305, at *6 (D.D.C. June 3, 2021) (emphasis added) (quoting *Humane Soc'y v. Animal & Plant Health Inspection Serv.*, 386 F. Supp. 3d 34, 44 (D.D.C. 2019)), *remanded on other grounds*, 2021 WL 8875652 (D.C. Cir. Nov. 12, 2021), *adhered to on remand*, 2022 WL 1451430 (D.D.C. May 9, 2020), *aff'd* 113 F.4th 1009; *see also, e.g.*, *Jud. Watch, Inc. v. U.S. Dep't of Health & Hum. Servs.*, No. 22-CV-3051, 2024 WL 3924563, at *3 (D.D.C. Aug. 23, 2024) ("Courts routinely hold that 'declarants in FOIA cases can rely on information obtained through inter-agency consultations without running afoul of hearsay rules.'" (quoting *Majuc v. Dep't of Just.*, 18-cv-566, 2022 WL 266700, at *3 (D.D.C. Jan. 28, 2022)), *aff'd*, No. 24-5241, 2025 WL 1122340 (D.C. Cir. Apr. 14, 2025); *Bolze v. Exec. Off. for U.S. Att'ys*, No. 17-cv-2858, 2021 WL 5564633, at *5 (D.D.C. Nov. 29, 2021) (Pan, D.J.) ("[I]t is suitable for an affiant to submit information from third parties acquired in the course of performing official duties"); *Leopold v. U.S. Dep't of Just.*, No. 19-cv-3192, 2021 WL 124489, at *4 (D.D.C. Jan. 13, 2021) ("FOIA declarants may rely on information obtained through inter-agency consultation." (quoting *Humane Soc'y*, 386 F. Supp. 3d at 44).[10] Thus, many cases have

---

[10] Because it is well-established that declarants may rely on information garnered from either intra- or inter-agency consultation, the undersigned rejects the Heritage Foundation's contention that a declarant may rely only on

found averments materially identical to those made by Breyan here sufficient to establish that declarations were based on personal knowledge. *See, e.g.*, *Emuwa*, 113 F.4th at 1016 (finding a declaration in a FOIA case was based on personal knowledge where the declarant asserted it was "based on my personal knowledge, my review of the relevant documents kept by USCIS in the course of ordinary business, and upon information provided to me by other USCIS employees in the course of my official duties." (quoting the record)); *Inst. for Energy Rsch. v. FERC*, No. 22-cv-3420, 2024 WL 551651, at *4 (D.D.C. Feb. 12, 2024) (accepting a declaration based on "information provided to [the declarant] by employees under her supervision, information provided by FERC staff in other offices, and information obtained by her in performance of her official duties" (citation modified) (quoting the record)); *Sabra v. U.S. Customs & Border Prot.*, 590 F. Supp. 3d 351, 358–59 (D.D.C. 2022) (finding a declaration asserting it was based on "information furnished to me in my official capacity and the statements I make in this declaration are based on my personal knowledge, which includes knowledge acquired through, and agency files reviewed in, the course of my official duties" was based on personal knowledge (quoting the record)).[11]

In its reply, the Heritage Foundation insists that what it calls the "relax[ed] personal knowledge and hearsay rules" apply only when "the content of the records and the procedures used to identify them—*i.e.*, the search—are the points in issue." ECF No. 84 at 6. To be sure, questions

---

information received from those over whom he or she has "supervisory authority." ECF No. 80 at 10; ECF No. 84 at 6.

[11] The Heritage Foundation also complains because the Breyan Declaration does not identify the officials from whom he received information or when he received it. *See* ECF No. 80 at 9. Similar objections to similar declarations have been overruled. *See, e.g.*, *Barnard*, 598 F. Supp. 2d at 19 n.13 ("Plaintiff asserts that, 'for all Plaintiff or this Court know, the source of the information set forth in these declarations may have been a conversation overheard at the water cooler in Defendant's Office of Investigations.' Because both declarants explain that they received information while 'performing their official duties,' Plaintiff's concerns in this regard are misguided." (citation modified)); *cf. Bolze*, 2021 WL 5564633, at *5 (rejecting an argument that a declaration was insufficiently specific where it asserted that it was based on personal knowledge and information provided in intra- and inter-agency consultations).

as to the sufficiency of an agency's declarations in a FOIA case will often arise in the context of a challenge to the agency's search. But courts have allowed a declarant to rely on information learned from other agency personnel in the course of official duties in other contexts, as well. Then-Chief Judge Howell's decisions in *Ecological Rights Foundation vs. U.S. EPA* are instructive here. There, the EPA had withheld from FOIA requester Ecological Rights Foundation the names of the individuals on the Administrator's personal security detail ("PSD") under FOIA Exemption 7(C), which "shields from disclosure 'records or information compiled for law enforcement purposes, but only to the extent' that disclosure 'could reasonably be expected to constitute an unwarranted invasion of personal privacy.'" *Ecological Rts. Found. v. U.S. EPA*, No. 19-cv-980, 2021 WL 535725, at *26 (D.D.C. Feb. 13, 2021) (quoting 5 U.S.C. § 552(b)(7)(C)), *vacated in part on reconsideration*, 541 F. Supp. 3d 34 (D.D.C. 2021). The court found the redactions improper, reasoning that the agency "appears to routinely release the names" of such agents "for public relations purposes" and had not "identif[ied] any particularized risk of threat or harassment to PSD agents assigned to protect [the] Administrator." *Id.* at 29. Seeking reconsideration of that aspect of the district court's decision, the EPA "submitted a supplemental declaration with previously undisclosed information by Claude Walker, the Deputy Director, Legal Counsel Division, of EPA's Office of Criminal Enforcement, Forensics and Training ('OCEFT')," that elucidated the agency's "policies with respect to identifying agents and rationale for protecting the identities of rank-and-file agents." *Ecological Rts. Found.*, 541 F. Supp. 3d at 44. The requestor argued that, because portions of the declaration were "based on 'information contained in EPA records or information supplied to [Walker] by employees under his supervision or employees in other EPA offices,'" the declaration was not based on his personal knowledge. *Id.* at 46–47 (citation modified) (quoting the declaration). It further contended that the declaration relied on

19

inadmissible hearsay in the form of information supplied to Walker by other individuals. *See id.* at 49. The court rejected both arguments.

As to the personal knowledge objection, the court dismissed the EPA's position that a declarant's assertion in a FOIA case that he has personal knowledge of the procedures used in handling FOIA requests and is familiar with the documents in question, satisfies a "unique" personal knowledge standard that is "universally controlling for any declaration introduced by an agency in the FOIA context." *Id.* at 47. The court disclaimed the existence of a separate standard for personal knowledge in FOIA cases, reasoning instead that "the personal-knowledge requirement for FOIA declarants is not a distinct personal-knowledge standard, but instead a refined articulation of the generally applicable standard for personal knowledge," which allows a declarant to testify to "personal knowledge of information acquired in his official capacity." *Id.* at 48. Walker attested that his declaration was based on his personal knowledge, information found in agency records, and information supplied to him by agency personnel; that his declaration was true and correct under penalty of perjury; that he was a first-line supervisor in OCEFT and provided legal advice about personal security details; and that he was familiar with the FOIA request at issue. *See id.* at 49. That was sufficient for the court to find that he had personal knowledge as to the substance of the declaration, which addressed the agency's policies on releasing the names of personal security detail agents. *See id.*

Regarding the hearsay objection, the court rejected both the EPA's assertion that hearsay is always permissible in a FOIA declaration and the requestor's contention—much like the Heritage Foundation's here—that hearsay is allowed only when addressing the adequacy of an agency's search. *See id.* at 49–50. Acknowledging that "courts have declined to adopt a permissive approach to hearsay in all aspects of FOIA cases," such as when an agency invokes

20

"FOIA exceptions reliant on out-of-court statements by private third parties," the court nevertheless found that "[h]earsay evidence in testimony by agency declarants based upon information gleaned from personal familiarity with agency practices or from information relayed by other agency personnel . . . presents a different case." *Id.* Relying on the D.C. Circuit's decision in *Londrigan v. FBI*, where that court "recognized that statements by agency declarants who are knowledgeable insiders as to the agency practices and procedures on which they testify and who acquire knowledge from examination of agency records constituting public records and reports are admissible," Judge Howell found that "the *Londrigan* rule encompasses all information obtained by a declarant in the course of official duties, whether through conversation with other agency employees or review of documents." *Id.* at 50 (citing *Londrigan v. FBI*, 670 F.2d 1164, 1174–75 (D.C. Cir. 1981)); *see also id.* (stating, "Relying on *Londrigan*'s reasoning, in this Circuit, agency declarants' testimony based on information obtained in the course of their official duties or from review of agency records is routinely considered when evaluating an agency's invocation of FOIA exemptions," and collecting cases).

*Ecological Rights Foundation* and the other cases discussed or noted above establish that in this jurisdiction a declaration based on personal knowledge and information obtained from documents or other agency personnel in the course of official duties by an agency declarant familiar with the relevant subject matter will generally pass muster in a FOIA case.[12] The Breyan

---

[12] Quoting *Protect Public Trust v. U.S. Department of Energy*, the Heritage Foundation asserts that "[t]he relaxed personal knowledge standard . . . has been held not to apply to hearsay 'when it is offered to justify withholding records based on an exemption.'" ECF No. 80 at 10 (quoting *Protect Pub. Tr. v. U.S. Dep't of Energy*, No. 21-cv-2486, 2024 WL 1344454, at *3 (D.D.C. Mar. 30, 2024)). Leaving aside the question of whether there is a "relaxed" standard for FOIA cases, this Court notes that the Heritage Foundation overstates the comment in *Protect Public Trust*. That opinion stated merely that "courts have *not always* found hearsay to be sufficient when it is offered to justify withholding records based on an exemption." 2024 WL 1344454, at *3 (emphasis added). More, the declaration that court relied on to determine the appropriateness of the withholdings in that case asserted, much like in this case and the cases cited above, that "[t]he statements contained in this declaration are based upon my personal knowledge, upon *information provided to me in my official capacity*, and upon conclusions and determinations reached and made in accordance therewith," Decl. of Susan Beard, ¶ 5 (emphasis added), *Protect Pub. Tr.*, 2024 WL 1344454, ECF No.

21

Declaration fulfills those requirements. Breyan asserts that (1) he is a senior supervising attorney in the office responsible for processing FOIA requests seeking material from the Offices of the Attorney General, Deputy Attorney General, Associate Attorney General, Legal Policy, Legislative Affairs, Public Affairs, and Special Counsel, *see* ECF No. 76-1, ¶ 1; (2) the statements in his declaration are based on his "personal knowledge as well as information obtained and reviewed in the course of [his] official duties, including conversations [he] had with Department leadership and officials elsewhere in [the] Department," *id.*, ¶ 2; (3) he is familiar with the FOIA request at issue, *id.*, ¶ 3; and (4) that the statements in his declaration are "true and correct" under penalty of perjury, *id.*, ¶ 23.

The Heritage Foundation's refrain is that the decision to reverse or waive President Biden's claim of executive privilege and to release the recording to Congress had to involve "President [Trump] himself," as well as "the White House Counsel's Office and the highest levels of the Department [of Justice]." ECF No. 80 at 7–8. Accordingly, it maintains that Breyan is not a proper declarant because his "responsibilities have nothing to do with speaking with the senior-most Department officials or the White House Counsel—let alone analyzing the basis for decision making at the highest level." *Id.* at 8–9; *see also, e.g.*, *id.* at 8 ("Breyan has nothing to do with the leadership of the Department—or *any* knowledge of the intricacies of decision-making concerning matters such as Congressional oversight putatively at play."), 11 ("A first-level supervisor in the FOIA Office simply has no authority or role in high-level Departmental decision making let alone

---

22-5, indicating that the court did not follow those cases declining to apply a different standard as to personal knowledge and/or hearsay when FOIA exemptions are at issue  And other cases have noted that consideration of hearsay based on information learned from agency personnel is "routinely considered when evaluating an agency's invocation of FOIA exemptions." *Ecological Rts. Found.*, 541 F. Supp. 3d at 50. Finally, even if a stricter rule were to apply in the context of exemptions supporting the withholding of information given FOIA's "prodisclosure purpose," *Favish*, 541 U.S. at 174, this is not a dispute over DOJ's withholding of material. The recordings at issue have been disclosed to the Heritage Foundation and the parties are now sparring over the collateral issue of attorney's fees.

communications with White House Counsel's Office or the President of the United States himself. Breyan exists in an entirely different world untold levels below who made the decisions at issue here."), 15 (similar), 17 (similar), 18 (similar).

A similar argument has been rebuffed by a court in this district. In *Buzzfeed, Inc. v. FBI*, the issue was the withholding of the FBI's file on the supplemental background investigation of then-Supreme Court nominee Brett Kavanaugh, an investigation that was requested by the White House Counsel's Office under a Memorandum of Understanding "between the President and the Department of Justice governing procedures for the President to task the FBI to perform background investigations" related to an appointee's suitability for federal service. 613 F. Supp. 3d 453, 458–59 (D.D.C. 2020). The file had been withheld under Exemption 5 based on the presidential communications privilege and was supported by a "declaration from David M. Hardy, the Section Chief of the Record/Information Dissemination Section within the FBI's Information Management Division," who "manage[d] responses to requests for access to FBI records and information pursuant to the FOIA." *Id.* at 460, 468 n.5. The plaintiffs challenged that declaration as insufficient because it was made by a mere "FBI employee and no White House official submitted an affidavit regarding invocation of th[e] privilege." *Id.* at 468 n.5. The court rejected that challenge. It reasoned that "[i]n FOIA cases, an agency declarant need not have been personally involved in the events reflected in, or preparation of, the records at issue but merely have personally been advised about or reviewed those records to meet the [applicable] standard." *Id.* at 468 n.5 (collecting cases). Because "the records at issue [were] created and retained by the FBI and subject to the 2010 MOU, to which the FBI is a party," a declaration from an FBI employee "with knowledge of the facts relevant to evaluating application of FOIA Exemption 5"—such as one who "manage[s] responses to requests for access to FBI records and information

23

pursuant to the FOIA"—was an appropriate declarant. *Id.* That is, the court found a declaration from a supervisor in the bureau's FOIA office who was familiar with the request and material at issue could properly testify as to a claim of privilege emanating from the White House. Again, that is much like the Breyan Declaration now before the Court.[13] Like the declarant in *Buzzfeed*, Breyan (1) supervised FOIA requests to the "six senior [DOJ] leadership offices," as well as the Special Counsel's Office, that are the subject of litigation, ECF No. 76-1 at 2, and so is (2) familiar with the request for the records, which were created by DOJ personnel, and the exemptions at issue and, although not (3) "personally involved" in the events leading to DOJ's decision to release the records, was (4) "personally . . . advised about" that decision. *Id.* at 468 n.5.

Finally, the Heritage Foundation seems to have a flawed conception of what is at issue in the fee petition in general and in the Breyan Declaration specifically. Recall that a litigant is

---

[13] The Heritage Foundation relies on *Emuwa* for its assertion that "the D.C. Circuit has repeatedly held [FOIA's relaxed personal knowledge requirements] do[] not apply in cases that 'turned on specific concerns about the seeming lack of connection between the information and the declarant's ordinary official duties.'" ECF No. 80 at 9–10 (quoting *Emuwa*, 119 F.4th at 1016). To be clear, the *Emuwa* court stated that the D.C. Circuit has "*sometimes* . . . demanded further detail on how the declarant learned the relevant information" where there were "specific concerns about the seeming lack of connection between the information and the declarant's ordinary official duties," *Emuwa*, 119 F.4th at 1016 (emphasis added) (citing *Londrigan*, 670 F.2d at 1168, 1174–75; *Campbell v. Dep't of Just.*, 164 F.3d 20, 35 (D.C. Cir. 1998); and *Shaw v. FBI*, 749 F.2d 58, 63 n.2 (D.C. Cir. 1984)), and the cases it cites as support are illustrative of the situations in which "further detail" might be appropriate. In *Londrigan*, the question was whether certain individuals had provided information to the FBI under implied promises of confidentiality. 670 F.2d at 1166–67. The court held that an official from the bureau's FOIA/Privacy Act branch was competent to testify as to relevant information he learned in the course of his regular duties on the issue, including bureau-wide "difficulties the FBI would encounter were promises of confidentiality not implied" but that he could not "possibly have personal knowledge of any assumptions made by persons interviewed by other FBI agents" 20 years earlier whom he had not interviewed. *Id.* at 1167, 1168, 1174–75. In *Campbell*, the FBI similarly withheld information on the basis that it had been provided to law enforcement 30 years prior from sources under an express or implied assurance of confidentiality. 164 F.3d at 34–35. The court disapproved of a declaration that "simply assert[ed] that various sources received express assurances of confidentiality without providing any basis for the declarant's knowledge of this alleged fact" and found that because "the declarant presumably lack[ed] personal knowledge of the particular events that occurred more than 30 years ago, more information is needed before the court [could] conclude" that the information was properly withheld. *Id.* The court in *Shaw* did *not* "demand[] further detail on how the declarant learned the relevant information." *Emuwa*, 119 F.4th at 1016. It did, however, find that a supervisor in the bureau's FOIA section who did not participate in an investigation could not testify as to the subjective intent of the investigators. *Shaw*, 749 F.2d at 63 n.2. Importantly, none of those cases holds that a declarant who "supervis[es] the handling of [FOIA] requests subject to litigation," ECF No. 76-1, ¶ 1, cannot testify as to information learned by speaking to agency leadership on an issue related to a FOIA case.

eligible for an award of attorney's fees under the catalyst theory if "its lawsuit 'substantially caused the government to release the requested documents before final judgment.'" *Grand Canyon Tr.*, 947 F.3d at 96 (quoting *Brayton*, 641 F.3d at 524–25). Here, there are four related events that preceded the ultimate release of the recording: (1) a decision to reverse or waive the claim of executive privilege after President Trump was inaugurated, (2) a decision to release a recording to Congress in response to its subpoena, (3) a decision to release that recording to the public because it had been released to Congress; and (4) a decision that the recording should be released to the public independently of any congressional subpoena. The Heritage Foundation's arguments focus on Breyan's alleged incompetence to testify as to the first two decisions. But the declaration has little or nothing to say about them; properly read, it focuses on the third decision made within DOJ after the release to Congress had been decided.

As the government points out, "the Breyan Declaration nowhere mentions the White House Counsel's Office or President Trump." ECF No. 83 at 5. Similarly, it does not mention the reversal or waiver of the claim of executive privilege. As there is nothing about that decision in the declaration, it is unclear how Breyan's alleged incompetence to testify about that decision is relevant to whether the declaration is "the poster-child for an impermissible bad faith declaration" because it relies on hearsay and is not based on personal knowledge. ECF No. 80 at 5. The Heritage Foundation asserts that this argument—which it characterizes as "bizarre"—"merely proves [the] Heritage [Foundation's] point":

> The White House Counsel's Office and President Donald J. Trump *had* to be involved in the decision to release the tapes because that decision required the reversal of President Biden's claim of Executive Privilege. That the Breyan Declaration doesn't speak to this issue simply proves how far removed the first level FOIA supervisor is from the relevant decisions.

ECF No. 84 at 10.  The undersigned has no problem assuming that the White House Counsel's Office and the President were involved in the decision *to reverse or waive the claim of executive privilege*; indeed, there does not seem to be a dispute about that.  However, that does not mean that they were involved in the ultimate decision *to release the tapes to the public*—which, as the Heritage Foundation acknowledges, is "what matters."  ECF No. 79 at 7.  The reversal or waiver of the claim of executive privilege was a necessary, but not sufficient, condition to their release. As noted above, DOJ also relied on bases other than executive privilege for withholding the recordings—it also asserted (and apparently continues to believe) that the release would infringe on significant privacy interests and interfere with ongoing law enforcement proceedings.[14]  *See* ECF No. 34-2 at 12–13; *see also* ECF No. 76-1, ¶ 21 (Breyan Declaration asserting that, "even though the audio recordings were exempt from disclosure pursuant to the FOIA," DOJ determined that they should be released to the public).  The Heritage Foundation does not suggest that the exercise of the discretion to forego reliance on those exemptions was the province of decisionmakers so far above Breyan's pay grade that he could not have learned of them in the course of his official duties.  To put it another way, the fact that the Breyan Declaration does not address the reversal or waiver of the claim of executive privilege does not show that he was too "far removed . . . from the relevant decisions," ECF No. 84 at 10, to offer evidence here because it appears that relevant decisions—decisions of particular relevance to the release of the recordings *to the public*—were not made in the rarefied atmosphere of "the White House Counsel's Office and the highest levels of the Department [of Justice]," ECF No. 80 at 8, but rather by "Department leadership and officials elsewhere in [the] Department" with whom Breyan consulted, ECF No. 76-1, ¶ 2.  And, in any case, the notion that Breyan is too junior to testify about decisions made in

---

[14] The government may also still believe that the recordings are exempt from disclosure on the basis of executive privilege and merely have waived the claim of privilege rather than reversed it.

26

the White House or by DOJ leadership is rejected for the reasons stated above—specifically, because Breyan was responsible for FOIA requests to the offices of senior leadership at DOJ, including that of the Special Counsel, and is competent to testify about information he received from other government representatives in the course of performing those duties. *See, e.g.*, *Jud. Watch*, 2024 WL 3924563, at *3 ("Courts routinely hold that 'declarants in FOIA cases can rely on information obtained through inter-agency consultations without running afoul of hearsay rules.'" (quoting *Majuc*, 2022 WL 266700, at *3); *Wilderness Workshop*, 2023 WL 5672578, at *5 n.8 (finding objections to declarations charging lack of personal knowledge and hearsay "unavailing" where the "declarants aver[red] that the statements in their declarations are based on information acquired through the performance of official duties," including "discussions with colleagues"); *Buzzfeed*, 613 F. Supp. 3d at 468 n.5 (finding a declaration from a supervisor in the bureau's FOIA office who was familiar with the request and material at issue could properly testify as to a claim of privilege emanating from the White House).

As to Breyan's connection to decisions regarding congressional oversight, he does not testify about the underlying reasons for DOJ's decision to comply with the renewed subpoena, but only to the fact, which cannot seriously be disputed, that sometime after the 2025 inauguration, the department made such a decision and released a recording of the Biden-Hur Interview to Congress. *See* ECF No. 76-1, ¶¶ 17–18.  And, significantly, the Heritage Foundation itself argues that the decision to comply with the subpoena is immaterial to its motion for attorney's fees: "[T]he Executive Branch produces records to Congress all the time without making them public. . . .  [R]elease to Congress is not *public disclosure . . . .*  Simply put, disclosure to Congress is irrelevant to this Motion—what matters is public disclosure."  ECF No. 79 at 7.  Accordingly, it is difficult to understand why Breyan's alleged incompetence to testify as to "Congressional

oversight," *see, e.g.*, ECF No. 80 at 8, 15; *see also id.* at 17, should be objectionable. *Cf., e.g.*, *Emuwa*, 113 F.4th at 1017 (finding that an alleged error on an issue "irrelevant" to the pertinent question "does not undermine the overall credibility of the declaration"); *Citizens for Responsibility and Ethics in Wash. v. Nat'l Indian Gaming Comm'n*, 467 F. Supp. 2d 40, 56 (D.D.C. 2006) (finding "alleged deficiencies in the agency affidavits" that were of not "legally significant" provided no reason to question the agency's good faith). The thrust of the Breyan Declaration on "what matters," ECF No. 79 at 7, is that, after the reversal or waiver of the claim of executive privilege and the decision to comply with the congressional subpoena, DOJ personnel determined that the recordings should be released to the public "as a matter of discretion," ECF No. 76-1, ¶¶ 20, 21. Although the Heritage Foundation makes assertions like, "A first level FOIA supervisor simply does not have as part of their duties speaking for the entire Department on matters of great import such as in the sweeping pronouncement that 'whether or not this lawsuit was filed pursuant to FOIA requests for the audio recordings, the Department still would have released the audio recordings to the public as a matter of discretion,'" ECF No. 80 at 18 (quoting ECF No. 76-1, ¶ 20), it nowhere explains why that decision is not something Breyan could learn about in the course of his official duties through reviewing information and speaking to DOJ leadership and other personnel. *See id.*, ¶ 2. After all, requests for attorney's fees, including under the catalyst theory, are common in FOIA litigation and responding to them after consultation with other agency personnel would appear to be within the "ordinary official duties," *Emuwa*, 113 F.4th at 1016, of one who supervises responses to FOIA requests directed at the leadership offices of DOJ, including the Special Counsel's office—or, at least, the Heritage Foundation has provided no evidence that responding to requests for fees after consultation with relevant officials is not.[15]

---

[15] The closest the Heritage Foundation comes are assertions that (1) it made clear to "the Office of the Attorney General itself that [it] expected the declarant to be a high-level official and that a declaration from someone such as Breyan

In sum, the undersigned rejects the Heritage Foundation's argument that it is entitled to discovery because the Breyan Declaration is not based on personal knowledge and includes inadmissible hearsay.

### 2.      Targeted Challenges

In an effort to undermine the Breyan Declaration—which, as noted in the Report and Recommendation also issued today of the pending fee petitions in this case, is powerful evidence that this litigation was not a catalyst for the release of the recording of the Biden-Hur Interview— and gain leave to take discovery, the Heritage Foundation takes issue with the veracity of all or part of six paragraphs in the Breyan Declaration, some on multiple grounds.  According to the Heritage Foundation, its challenges establish not only that the Breyan Declaration was made in bad faith and should be ignored, but also that discovery is necessary to set the record straight.  *See* ECF No. 80 at 13, 16, 17, 21 (citing *Am. Small Bus. League v. U.S. Dep't of Def.*, No. 18-cv-1979, 2019 WL 4416613, at *2–3 (N.D. Cal. Sep. 9, 2019), and *Pulliam v. EPA*, 292 F. Supp. 3d 255, 260 (D.D.C. 2018), for the proposition that a declaration's internal inconsistencies or

---

would be 'manifestly deficient as a matter of law,'" ECF No. 80 at 20 (quoting ECF No. 81, ¶ 9); (2) in connection with the Department's motion for summary judgment defending its withholding of the recordings, it "impliedly recognized that only the highest-ranking officials would have the requisite personal knowledge and responsibilities . . . to authoritatively speak to such issues and provided a . . . declaration on personal knowledge from an Associate Deputy Attorney General handpicked by the Attorney General himself to handle the matters related to the Biden-Hur audio," *id.* at 8; and (3) high-level DOJ personnel engaged in settlement discussions in this matter, *id.* at 12.  None is convincing.  First, as the government points out, a FOIA requestor "may not demand that the Department provide a declaration from a 'high-level official.'"  ECF No. 83 at 5 (quoting ECF No. 80 at 20).  Second, the undersigned does not see why the fact that the government offered a declaration from an Assistant Deputy Attorney General to defend its decision to withhold the material at issue in a motion for summary judgment means that "only" such an official would be competent to testify as to the subject of the Breyan Declaration on the motion for attorney's fees that underlies this motion, nor does the Heritage Foundation offer any support for that proposition. Third, and similarly, the pending motion for attorney's fees is unlike settlement discussions, where different concerns of efficiency and settlement authority apply.

29

inconsistencies with other record evidence supports a finding of bad faith and leave to engage in discovery).  As will be seen in the discussion below, no challenge succeeds.

a.    Paragraph 16

The dispute here centers on the timing of the government's decision to withhold the audio recordings at issue, which, according to paragraph 16 of the Breyan Declaration, was made after DOJ granted Judicial Watch's request for expedited processing of its FOIA request on February 13, 2024, but before April 3, 2024, when the Heritage Foundation filed its lawsuit.  Paragraph 16 states:

> In compliance with the FOIA's statutory requirements and consistent with the expedited processing determination issued to Judicial Watch on February 13, 2024, Judicial Watch's FOIA request for the audio recordings at issue in this case was evaluated after the request was received.  So at the time the FOIA requests for the same audio recordings were submitted by Heritage and the Press Coalition and the subsequent lawsuits were filed, a FOIA request for those audio recordings was already being evaluated pursuant to the FOIA. Additionally, the Department's determination to withhold the audio recordings was made before the lawsuits were filed by Heritage and by the Press Coalition. Therefore, those lawsuits neither accelerated or otherwise impacted in any way the Department's evaluation of the FOIA requests for the audio recordings at issue in this case, nor the Department's determination to withhold them.

ECF No. 76-1, ¶ 16; *see also* ECF No. 76-9 (letter granting Judicial Watch's request to expedite dated February 13, 2024); Complaint, *Heritage Found. v. U.S. Dep't of Just.*, No. 24-cv-960 (D.D.C. Apr. 3, 2024), ECF No. 1  The Heritage Foundation contends the statement in that paragraph that DOJ decided the audio recordings were exempt from disclosure prior to the filing of the Heritage Foundation's lawsuit on April 3, 2024, cannot be true because on April 18, 2024, the Department represented to the Heritage Foundation that it "had not yet formulated a position on the production issue" and "as late as April 23, 2024, the Department pointedly refused to state

to Plaintiff Judicial Watch whether it would produce the audio recordings or withhold them." ECF No. 80 at 12–13 (quoting ECF No. 81-1 at 3) (citing ECF No. 9, ¶ 7[16]).

As an initial matter, the undersigned sees little relevance to the precise timing of DOJ's decision to *withhold* the recordings. The issue in the fee petitions is whether this litigation caused DOJ to change position and *release* the recordings. To be sure, the date when DOJ began to evaluate whether it would withhold or release might have some relevance, because there is caselaw finding that if a lawsuit caused the agency to identify and evaluate records that it thereafter released, the requestor may be eligible for a fee award under the catalyst theory. *See Church of Scientology of Cal. v. Harris*, 653 F.2d 584, 589 (D.C. Cir. 1981) ("The initiation and prosecution of this litigation . . . was in our opinion the direct cause of the[] [records'] disclosure, for absent this litigation, . . . the General Counsel's files would never have been searched, the 31 documents would never have been identified as falling within the scope of Scientology's FOIA request, and the documents would never have been evaluated to determine whether they should or could be released . . . ."). However, the Heritage Foundation does not challenge Breyan's statement that the *evaluation* of the recordings predated the Heritage Foundation's complaint, only that the *decision* to withhold did. The undersigned thus finds no reason to question the agency's good faith based on a statement that appears to be irrelevant to any material issue in the Heritage Foundation's fee petition.[17] *See, e.g.*, *Emuwa*, 113 F.4th at 1017 (finding that an alleged error on an issue

---

[16] The Heritage Foundation cites ECF No. 8, ¶ 7, apparently erroneously. Paragraph 7 of ECF No. 8, which is the government's motion for an extension of time to file a proposed briefing schedule, says nothing about the government's position on production of the audio. *See* ECF No. 8, ¶ 7. However, in paragraph 7 of ECF No. 9, Judicial Watch states that the government "has not and will not state" whether it will produce the material sought. ECF No. 9, ¶ 7.

[17] Apparently recognizing that the materiality of an alleged inaccurate statement is relevant to the bad faith inquiry, the Heritage Foundation asserts "the matter clearly is material as Defendant relies upon it to argue against fee eligibility." ECF No. 80 at 13 (citing ECF No. 76 at 15). But in opposing the Heritage Foundation's fee petition, DOJ does not rely on Breyan's statement that the agency's "determination to withhold the audio recordings was made before the lawsuits were filed," ECF No. 76-1, ¶ 16; rather it states only that the FOIA requests and lawsuits of the

"irrelevant" to the pertinent question "does not undermine the overall credibility of the declaration"); *Citizens for Responsibility and Ethics in Wash.*, 467 F. Supp. 2d at 56 (finding "alleged deficiencies in the agency affidavits" that were not "legally significant" provided no reason to question the agency's good faith).

In any case, examining the statements made in their context (which requires some detail about the procedural posture of the case at that time), the undersigned sees no contradiction between the challenged representation made in paragraph 16 of the Breyan Declaration and those the Heritage Foundation identifies. On April 22, 2024, while DOJ's motion to consolidate the Judicial Watch, Heritage Foundation, and CNN cases seeking release of the recordings under FOIA, the government filed in the (first-filed) Judicial Watch case a motion to extend the April 30, 2024, deadline for the parties to propose a briefing schedule. *See* ECF No. 8. In its April 23, 2024, opposition to that extension motion, Judicial Watch stated that the government "for whatever reason, has not and will not state whether it will produce the . . . recordings" at issue. ECF No. 9, ¶ 7. But the government did *not* say to Judicial Watch or to the Court, as the Heritage Foundation would have it, that it "had not made a determination" as to disclosure. ECF No. 80 at 13. Rather, Judicial Watch reported to the Court that counsel for the government had not told counsel for Judicial Watch whether the recordings would be produced. *See* ECF No. 9, ¶ 7. Indeed, the government made no representations about the state of its decision-making in its own filing with the Court seeking an extension of time.[18] *See* ECF No. 8. The government's refusal to disclose

---

Heritage Foundation and the Press Coalition "'neither accelerated or otherwise impacted' the Department's *evaluation of* the audio recordings." ECF No. 76 at 15 (emphasis added) (quoting ECF No. 76-1, ¶ 16)). Again, the Heritage Foundation does not challenge Breyan's statement that evaluation of the recordings began before the Heritage Foundation filed its FOIA action.

[18] The Heritage Foundation also asserts that Judge Kelly "relied upon the fact that the Department represented it had not made a determination" in his April 25, 2024, Minute Order denying the motion for an extension of time. ECF No. 80 at 13; *see also* Minute Order (Apr. 25, 2024). However, there was no such representation made by the government, so the government could not have "misled the Court." ECF No. 80 at 13.

its ultimate position on production to a party that had recently filed a FOIA action against it is not inconsistent with Breyan's statement that a decision had already been made to withhold the recordings. Put another way, refusing to tell a party opponent whether you will produce something is not the same as stating that a decision has not been made whether to produce it. A statement allegedly made on April 18, 2024, by the government to counsel for the Heritage Foundation that the DOJ "had not yet formulated a position on the production issue"—although a closer call—also does not directly contradict the Breyan Declaration. ECF No. 81-1 at 3. As the government explains, at that point it had not yet finalized the exemptions on which it would rely, *see* ECF No. 83 at 7–8, decisions which would comfortably fall within the "formulat[ion]" of its "position" concerning the production of the recordings at issue. Thus, the Heritage Foundation has failed to point to the type of "clear evidence to the contrary" that is necessary to rebut the "presumption of legitimacy accorded to the Government's official conduct." *People for the Ethical Treatment of Animals*, 918 F.3d at 157 (quoting *Favish*, 541 U.S. at 174).

Finding no contradiction between Breyan's testimony that DOJ determined not to release the audio recordings prior to the filing of the Heritage Foundation's action and DOJ's actual statements cited by the Heritage Foundation, the undersigned will not order discovery on this ground.

b.      Paragraphs 17 and 18

Paragraph 17 of the Breyan Declaration states, "After January 20, 2025, the Department [of Justice] determined that it would comply with the renewed [c]ongressional subpoena of January 6, 2025. The Department accordingly began to process the audio recordings for release to Congress." ECF No. 76-1, ¶ 17. Paragraph 18 states, "On May 19, 2025, the Department released to the House of Representatives Committee on the Judiciary the audio recordings requested by the

33

renewed subpoena." ECF No. 76-1, ¶ 18. The Heritage Foundation challenges the veracity of these statements on numerous grounds.

The Heritage Foundation contends that the Department "did not actually 'comply with the renewed [c]ongressional subpoena'" because, although it produced the audio of the Hur-Biden Interview to Congress, it did not "produce[] the audio of the Hur-Zwonitzer interview . . . despite it being demanded in the House Judiciary Committee's subpoena." *Id.* at 15 (quoting ECF No. 76-1, ¶ 17). But, whether recordings of the *Hur-Zwonitzer Interview* were released *to Congress* is beside the point. This case is about the release *to the public* of the recordings of the *Biden-Hur Interview*, which were—consistent with Breyan Declaration—also released to Congress. *See* ECF No. 76-1, ¶ 18. To the extent there is some imprecision in Breyan's declaration about what recordings were released to Congress, it is immaterial. *See Emuwa*, 114 F.4th at 1017 (finding that minor errors "do[] not undermine the overall credibility of the declaration).

The Heritage Foundation further asserts that DOJ could not have made the decision to release the recording of the Biden-Hur Interview to Congress because only the President, having invoked executive privilege, "could authorize production" to Congress. ECF No. 80 at 13–14. Again, that contention blurs the distinction between different decisions: the decision to withdraw or waive the claim of executive privilege and the decision to comply with the congressional subpoena—a decision the Heritage Foundation itself insists is not "what matters." ECF No. 79 at 7. The Heritage Foundation then asserts that, "at best" the paragraphs at issue "omit[] highly material facts in a misleading manner by leaving out the fact that President Trump reversed President Biden's Executive Privilege claim prior to the Department making the determination to comply with the subpoena." ECF No. 80 at 14. But there is no real dispute that the claim of

34

executive privilege was reversed or waived, and it is unclear why omitting that obvious fact is "misleading."

Next, the Heritage Foundation contends that the Breyan Declaration suffers from "a fatal lack of specificity" because it does not identify who made the decision to comply with the congressional subpoena or when it was made. ECF No. 80 at 15. It argues that, "if the decision was made prior to February 16, 2025"—which is the day the government sought (with the Heritage Foundation's support) an extension of time to inform the Court whether it had changed its position as to the release of the audio recordings to the public "[i]n light of the recent change in administration," Minute Order (Feb. 12, 2025); *see also* ECF No. 59—"the Government's Motion for an Extension of time to consider its position under the new Administration is at best highly misleading in that the Executive Privilege claim would have already been reversed by President Trump." ECF No. 80 at 15. Again, the Heritage Foundation conflates distinct decisions. The reversal or waiver of the claim of executive privilege is not the same as the decision to comply with the congressional subpoena or to release the recordings to the public. More, the Breyan Declaration says nothing about the reversal or waiver of the claim of executive privilege in paragraphs 17, 18, or elsewhere. Similarly, the motion for an extension of time the government filed on February 16, 2025, sought additional time to inform the Court of its position *in this case*, which does not concern compliance with the subpoena or the reasons the government sought an extension of time, but, rather, whether the recordings were properly withheld from dissemination under one or more FOIA exemptions. *See* Minute Order (Feb. 12, 2025) (ordering the government to inform the Court whether it had changed the positions reflected in the summary judgment briefing); ECF No. 59 (seeking an extension of the deadline to "confirm[] that its position in its Motion for Summary Judgment and Memorandum in Opposition remained unchanged").

Finally, the Heritage Foundation complains that the Breyan Declaration is "invalid[]" because it fails to "grapple with" evidence that "senior Department political appointees negotiated at length" with the Heritage Foundation "concerning production of the Biden-Hur audio in response to *this* case." ECF No. 80 at 16. As support, it cites parts of two declarations by its counsel Samuel Everett Dewey, one in support of its motion for attorney's fees, one in support of this motion to strike and for discovery. *See id.* (citing ECF No. 75, ¶¶ 3–13 ("Second Dewey Declaration"); ECF No. 81, ¶¶ 3–9 ("Third Dewey Declaration")). The paragraphs cited concern communications between counsel for the Heritage Foundation and various DOJ or White House between mid-February 2025 (when Judge Kelly asked whether DOJ had changed its position on release of the recordings under the new Administration) and mid-May 2025 (when the recordings were released to the public). Those paragraphs include assertions that Dewey spoke to DOJ officials about bases to reverse President Biden's assertion of executive privilege (which had to occur before the recordings could be released to the public); that in several communications between February 12, 2025, and April 14, 2025, DOJ officials failed to mentioned to Dewey that the agency was considering a release of the recordings to Congress and a discretionary release to the public; that DOJ informed Dewey on May 9, 2025, that it planned to release the recordings on May 20, 2025; and that a DOJ official "made clear" to Dewey at that time that "the contemplated production" of the audio "was in response to [the Heritage Foundation's] lawsuit" by "ask[ing] if [the Heritage Foundation] had any objection to release—in this case—on the Department's website." *See* ECF No. 75, ¶¶ 5, 10(b), 13(b); ECF No. 81, ¶¶ 3–8. As support for that last point, Dewey points to an email he sent to that DOJ official on May 14, 2025, asserting that he had spoken to the Heritage Foundation "regarding the preferred 'form' of release of the Biden-Hur

36

audio at issue in 24-cv-700 (DDC)" and his client "ha[d] no objection to release by public link." ECF No. 75-2 at 3.

The Court finds this is not "clear evidence" of DOJ's bad faith. *See People for the Ethical Treatment of Animals*, 918 F.3d at 157 (quoting *Favish*, 541 U.S. at 174). For example, the Heritage Foundation fails to explain why it should expect government attorneys to discuss a decision to release the audio to Congress—a decision the Heritage Foundation again insists is irrelevant—when discussing the Heritage Foundation's various FOIA cases seeking production of information related to the Special Counsel's investigation; the government might well choose to keep such a decision confidential and not reveal it to counsel opposing it in litigation over the public release of the same material. In any case, the undersigned does not see that the Breyan Declaration's factual assertions in paragraphs 17 and 18 that, at some point after the inauguration, DOJ "determined that it would comply with the renewed [c]ongressional subpoena of January 6, 2025," and then did so, *see* ECF No. 76-1, ¶¶ 17–18, is contradicted by the evidence the Heritage Foundation offers. Those paragraphs say nothing about release to the public and the factual assertions they *do* make are obviously true as it is a matter of public record that the recording of the Biden-Hur Interview was released to Congress. The Heritage Foundation has not provided the Court with clear evidence of bad faith on the part of the government or its declarant as to these paragraphs.[19]

### d.    Paragraph 19

Paragraph 19 relates that on the same day the recordings were released to Congress, they were posted "online in OIP's FOIA Library" and the plaintiffs in this case were so informed. ECF

---

[19] The Heritage Foundation also returns to its refrain that Breyan cannot have had personal knowledge of high-level decision making about congressional oversight. That argument has been addressed and rejected in Section II.B.1, *supra*.

No. 76-1, ¶ 19. The Heritage Foundation complains that this assertion ignores the settlement negotiations and alleged "indicat[ions]" made by government attorneys that "the expected production would be in response to this specific case." ECF No. 80 at 17 (emphasis omitted). Again, there is no real dispute that the statement made by Breyan is accurate. The undersigned does not find any evidence of bad faith as to this assertion by the government.

e.      Paragraphs 20 and 21

These paragraphs are the heart of the matter—testimony from DOJ's declarant that this action did not cause the release of the recordings to the public. In paragraph 20, Breyan asserts that before any release was made to Congress or the public, and "notwithstanding the FOIA requests submitted by [the Heritage Foundation] or the subsequent lawsuits," the Department "determined that because it would release the audio recordings to Congress, the Department should also release the audio recordings to the public as a matter of discretion." ECF No. 76-1, ¶ 20. In paragraph 21, he states that DOJ "independently determined that the audio recordings should be released to the public as a matter of discretion," notwithstanding the congressional subpoena. *Id.*, ¶ 21. Breyan goes on to list some other records that Trump Administration released as a matter of discretion. *See id.* The Heritage Foundation challenges these paragraphs on multiple grounds, many of which have been addressed above.

The Heritage Foundation asserts "that, again, the Department lacked power to release the recordings unless and until President Trump reversed President Biden's claim of Executive Privilege. The Breyan Declaration's statement to the contrary blinks reality and lays bare the complete lack of nexus between Breyan's job description and the subject matter at hand." ECF No. 80 at 18. But again, the Breyan Declaration makes no claim as to the reversal or waiver of executive privilege here or elsewhere—that is, there is no "statement to the contrary" in the

38

declaration. And, again, the undersigned has found that Breyan is competent to testify as to "the subject matter at hand." While the Heritage Foundation complains that the decisions testified to do not come within Breyan's job description, "[i]n FOIA cases, an agency declarant need not have been personally involved in the events reflected in, or preparation of, the records at issue but merely have personally been advised about or reviewed those records to meet the [applicable] standard." *Buzzfeed*, 613 F. Supp. 3d at 468 n.5 (collecting cases).

Similarly unavailing is the Heritage Foundation's contention that the Breyan Declaration is flawed because it does not identify when the decision to release the audio recording was made. It reasons that "if the decision was made prior to February 16, 2025, the Department misle[d] the Court and the parties" when it filed its motion for an extension of time to inform the Court whether it had changed its position under the new Administration. ECF No. 80 at 18–19. The undersigned notes that the Heritage Foundation offers no evidence that DOJ made the decision before February 16, 2025, or that DOJ misled the Court, it merely speculates that DOJ might have. And, to the extent that the evidence (noted above in Section II.B.2.b) of DOJ's silence on the issue of release of the recordings between February 12, 2025, and April 14, 2025, indicates anything, *see* ECF No. 81, ¶¶ 3–7, it suggests that the decision was made sometime in late April or early May 2025. More fundamentally, the foundational question at issue in the fee petitions is whether the Heritage Foundation (or the Press Coalition) can show "that its lawsuit 'substantially caused the government to release the requested documents before final judgment.'" *Grand Canyon Tr.*, 947 F.3d at 96 (quoting *Brayton*, 641 F.3d at 524–25). It is unclear to the undersigned why representations made or implied in a motion for an extension of time that reveal nothing about the government's motivation for the release of the audio recordings could be material to that issue, whether they were misleading or not. Nor is it clear why the possibility that the government made misleading

39

representations in that motion is material to whether the Breyan Declaration was made in bad faith. The Heritage Foundation has the burden to show it is entitled to discovery concerning its fee motion in this FOIA case.  *See Bernegger v. Exec. Off. for U.S. Att'ys*, 334 F. Supp. 3d 74, 95 (D.D.C. 2018) ("Courts may permit discovery in FOIA cases 'where a plaintiff has made a sufficient showing that the agency acted in bad faith[.]'" (quoting *Justice v. IRS*, 798 F. Supp. 2d 43, 47 (D.D.C. 2011))); *Landmark Legal Found.*, 959 F. Supp. 2d at 184 (noting that discovery may be permitted in a FOIA case where the plaintiff has raised a sufficient question as to the agency's good faith).  This argument fails to shoulder that burden.

The Heritage Foundation points again to the evidence outlined above that DOJ officials engaged in settlement discussions in this case and indicated to counsel for the Heritage Foundation that the release would be in connection with this litigation.  *See* ECF No. 80 at 19.  The government responds that the communications between DOJ personnel and counsel for the Heritage Foundation "establish only that the Department was willing to listen to [the Heritage Foundation's] concerns" and that the email about the form of release of the audio "says nothing about what motivated the release in the first place."  ECF No. 83 at 8.

Here—unlike with the Heritage Foundation's failed attempt to connect this evidence to the testimony in paragraph 17 that sometime after the January 2025 inauguration, DOJ determined that it would comply with the congressional subpoena and began to process the audio for release to Congress, *see* ECF No. 76-1, ¶ 17; *see also* Section II.B.2.b, *supra*—the evidence appears to be germane to the Breyan Declaration's assertion that this litigation did not substantially cause the release of the audio.  The evidence is, however, no slam dunk.  The Second Dewey Declaration, submitted as support for the Heritage Foundation's motion for attorney's fees, makes no explicit representation that personnel authorized to speak on behalf of the government on the issue asserted

that the release of the audio (to Congress or otherwise) was motivated in whole or in part by this litigation. *See* ECF No. 75. The closest it comes is a statement that, during an hour-long videoconference on May 9, 2025, government attorneys asserted that the recording would be released on May 20, 2025. *Id.*, ¶ 13(b). The Third Dewey Declaration relies on an email of May 14, 2025, in which Dewey asserted that the Heritage Foundation did not object to release of the audio "by public link," ECF No. 75-2 at 3, but that email does not directly support his assertion that DOJ personnel indicated that this litigation caused the release of the audio.

There may be, as the Heritage Foundation seems to acknowledge, a "factual dispute . . . to be resolved" here. ECF No. 84 at 14. But the existence of a factual dispute in this context is not clear evidence that government officials have acted in bad faith, which is generally required before discovery will be ordered in a FOIA case. The undersigned acknowledges that one case the Heritage Foundation cites appears to bless limited discovery even in the absence of a finding of bad faith. *See Pulliam v. U.S. EPA*, 292 F. Supp. 3d 255, 260–61 (D.D.C. 2018) (recognizing that agency declarations are entitled to a presumption of good faith but allowing a 90-minute deposition of an agency witness where discrepancies between two agency declarations "g[ave] rise to a question of fact that is best resolved by discovery"). However, that case was in a different procedural posture than this one. There, the court was ruling on cross-motions for summary judgment, which cannot be granted if there is a genuine issue of material fact. *See, e.g.*, *Pulliam v. U.S. EPA*, 235 F. Supp. 3d 179, 185 (D.D.C. 2017) ("Summary judgment is appropriate 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" (quoting Fed. R. Civ. P. 56(a))). No party argues that standard applies to the question of whether the Heritage Foundation is eligible for attorney's fees, which is the focus of the Breyan Declaration. Rather, "questions of fact in the context of deciding whether

41

to award attorney's fees (as opposed to deciding whether to grant summary judgment) are committed to the district court judge." *Degussa Admixtures, Inc. v. Burnett*, 277 F. App'x 530, 536 (6th Cir. 2008); *see also id.* ("The judge, as the factfinder in the attorney-fee context, is not required to draw all inferences in favor of the non-moving party but instead is permitted to make factual findings in accordance with his or her own view of the evidence."). Accordingly, *Pulliam* does not support the Heritage Foundation's suggestion that the mere fact that the parties have submitted conflicting evidence clearly indicates bad faith on the part of the government or merits a grant of leave to engage in discovery regarding an attorney's fees dispute in a FOIA case.[20]

Finally, the Heritage Foundation takes the Breyan Declaration to task for "fail[ing] to explain the Axios incident which undercut[s] transparency in this case" and, "on the broader topic of transparency," for failing to "deal with the general fact well accepted in the media that the current Administration has a transparency *problem*," citing the fact that the government has withheld material related to the Special Counsel's investigation that is the subject of other FOIA actions. ECF No. 80 at 19. The undersigned will assume for the sake of argument that those concerns may be related to the core issue the declaration tackles, which is what caused the government to release the audio to the public, but nevertheless finds Breyan's failure to address

---

[20] More, the cases the Heritage Foundation cites as support for its assertion that "[m]aterial conflicts with agency declarations or failure to account for conflicting information also justifies discovery," ECF No. 80 at 21, rely on inconsistencies in the government's own evidence, not factual issues raised by the parties' conflicting evidence. *See Am. Small Bus. League*, 2019 WL 4416613, at *3 (finding that a declaration (submitted by a defendant-intervenor in support of the government's withholding of certain of its records allegedly containing trade secrets) that asserted the defendant-intervenor "simultaneously keeps private its supplier names to protect against poaching and freely discloses its 'exemplary' suppliers to attract more suppliers" was sufficient evidence of bad faith or untrustworthiness to merit limited discovery); *Pulliam*, 292 F. Supp. 3d at 260–61 (allowing limited discovery where two agency declarations by the same declarant contradicted each other); *CREW v. Nat'l Indian Gaming Comm'n*, 467 F. Supp. 2d 40, 56 (D.D.C. 2006) (stating that where there is "a material conflict in agency affidavits" limited discovery has been allowed, but not ordering discovery on that basis); *Long v. U.S. Dep't of Just.*, 10 F. Supp. 2d 205, 210 (N.D.N.Y. 1998) (questioning the good faith of the agency and allowing discovery where statements in the affidavits of three agency employees was "in direct conflict" with statements in affidavits from two others). That makes good sense, as contradictions in the agency's own submissions is more likely to be evidence of bad faith on the part of the agency than the fact that an opposing litigant has submitted evidence that creates an issue of fact.

42

how Axios acquired the recording from which it published excerpts or the media's perception of the Trump Administration's transparency is not a basis to find bad faith on the part of the government in this case or to grant leave to engage in discovery.

*     *     *     *     *

The Heritage Foundation's challenges to specific statements in the Breyan Declaration focus largely on immaterial assertions, insubstantial imprecisions, and imagined contradictions. The most it has done is suggest an issue of fact that might be material to the underlying fee petition. That is far from the "clear evidence" required to question the legitimacy or good faith of a government declaration, *People for the Ethical Treatment of Animals*, 918 F.3d at 157 (quoting *Favish*, 541 U.S. at 174), and fails to clear the high hurdle to grant discovery in a FOIA case—let alone discovery on a fee petition in a FOIA case.

3.    Specific Discovery Sought

Even had the Heritage Foundation shown clear evidence of bad faith on the part of the government as to this fee dispute, *but see In re Clinton*, 973 F.3d 106, 115 (D.C. Cir. 2020) ("[A] bad-faith inquiry in a FOIA context is only relevant as it goes to the actions of the individuals who conducted the search."), its specific requests for discovery are deficient.  It seeks to depose

> the following Department officials who have *actual* knowledge of the facts because they are the senior officials who would *actually* be involved in making the high-level decisions regarding reversing an Executive Privilege claim and releasing a critical piece of information to the public. Namely: (1) Chad Mizzelle, Chief of Staff [for] the Attorney General & Acting Associate Attorney General; (2) Paul Perkins, Associate Deputy Attorney General with responsibility for Hur related matters; (3) Brian Nieves, Deputy Chief of Staff & Senior Policy Counsel for the Deputy Attorney General, with responsibility for advising on Hill related matters; (4) Elizabeth Shapiro, the Deputy Director of Federal Programs with first level responsibility for this case[]; and (5) Jonathan M. Breyan. Alternatively, should the Department prefer to settle the matter at the highest level so there is no doubt,

43

Heritage Plaintiffs would accept in the alternative the deposition of the Deputy Attorney General of the United States.[21]

ECF No. 80 at 5–6.

In the rare instance that discovery is allowed in a FOIA case, it is "[t]ypically . . . 'limited to the scope of the agency's search and its indexing and classification procedures.'" *Cole v. FEMA*, 340 F.R.D. 485, 487 (D.D.C. 2022) (quoting *Heily v. U.S. Dep't of Com.*, 69 F. App'x 171, 174 (4th Cir. 2003)).  More, its scope is carefully circumscribed and must satisfy the dictates of Rule 26(b)(1) of the Federal Rules of Civil Procedure, which allows inquiry into matters that are relevant to a claim or defense and proportional to the needs of the case.  *See, e.g.*, *In re Clinton*, 973 F.3d at 113–14 (noting that discovery in FOIA cases is "limited" and must satisfy the relevancy requirements of Rule 26(b)(2)).  The Heritage Foundation has not shown that its request to depose five government officials (or in the alternative, the Deputy Attorney General) on the collateral matter of attorney's fees meets those requirements.  *Cf., e.g.*, *Pulliam*, 292 F. Supp. 3d at 261 (permitting a 90-minute telephonic deposition about the adequacy of the agency's search for documents).

More, "[t]here is substantial case law standing for the proposition that high ranking government officials are generally not subject to depositions unless they have some personal knowledge about the matter and the party seeking the deposition makes a showing that the information cannot be obtained elsewhere."  *Alexander v. FBI*, 186 F.R.D. 1, 4 (D.D.C. 1998) (emphasis omitted).  The Heritage Foundation admits that "three of the requested deponents are

---

[21] It is not clear whether the individuals the Heritage Foundation identifies still occupy those positions.  Because no party has alerted the Court otherwise, the undersigned will assume that they do.

44

high-officials," ECF No. 84 at 20—although it does not identify which those are[22]—but its showing on the issues noted in *Alexander*, which comes largely in its reply brief, is sparse. It asserts it needs to depose the three high officials—whoever they are—"because the actual decision had to have been made at the highest level" and therefore "[t]here is no other place to get the needed evidence."[23] ECF No. 84 at 20. Even if the undersigned were to ignore the precept that "[i]n FOIA cases, an agency declarant need not have been personally involved in the events reflected in, or preparation of, the records at issue but merely have personally been advised about or reviewed those records to meet the [applicable] standard," *Buzzfeed*, 613 F. Supp. 3d at 468 n.5 (collecting cases), the offered explanation is so general as to be useless.

Even when it offers a bit more specificity, the Heritage Foundation falters. For example, it maintains that the Chief of Staff for the Attorney General & Acting Associate Attorney General "would have authority over this litigation as Acting Associate and as the Chief of Staff to the Attorney General would be one of the few officials directly in the room when decisions were made concerning Executive Privilege. That is how the Department works." ECF No. 84 at 20. It states that Nieves, Deputy Chief of Staff & Senior Policy Counsel for the Deputy Attorney General, was "formerly employed on the Judiciary Committee and has Capitol Hill in his portfolio. Under standard Department practice he would be involved in responding to Hill Oversight issues and

---

[22] In its opposition, DOJ characterized "at least" four of the officials as high ranking: "the Deputy Attorney General, the Acting Associate Attorney General, the Deputy Chief of Staff & Senior Policy Counsel for the Deputy Attorney General, and an Associate Deputy Attorney General." ECF No. 83 at 10.

[23] The Supreme Court's decision in *United States v Morgan*, 313 U.S. 409 (1941), "establishes 'that those legally responsible for a decision must in fact make it, but that their method of doing so is largely beyond judicial scrutiny.'" *Murphy v. FBI*, 490 F. Supp. 1134, 1136 (D.D.C. 1980) (citation modified) (quoting *KFC Nat'l Mgmt. Corp. v. NLRB*, 497 F.2d 298, 304 (2d Cir. 1974)). Thus, to the extent the Heritage Foundation is seeking the "evidence" of advice offered by officials "at the highest level," ECF No. 84 at 20, it might well be privileged.

would report those issues up with in the Deputy's Office." *Id.* at 21.  This argumentative technique, which assumes factual assertions are common knowledge and therefore offers no support for them (via a request to take judicial notice or otherwise), is generally inappropriate in a submission to a federal court.   In any event, it is not persuasive.

As to the proposed deponents the undersigned assumes are not high officials—that is, Deputy Director of Federal Programs Shapiro and Breyan—the Heritage Foundation's explanation of the need for their testimony fails to establish that it is relevant to the issues at play in the attorney's fees motion.   Shapiro is purportedly "uniquely qualified to speak to . . . how the Department came to submit a manifestly incompetent Declaration—which goes to bad faith and obduracy."  ECF No. 84 at 21.  In its motion for attorney's fees, the Heritage Foundation contends that the Department "engaged in obduracy as concerns the conduct of the litigation and the withholding of the records" to support its argument that it is entitled to (as opposed to eligible for) attorney's fees.  ECF No. 73-1 at 18.  It cites cases that appear to indicate that the government's "obduracy" in opposing the release of documents it ultimately discloses can weigh in favor of a requestor's entitlement to fees.  *See id.* at 18–19.  However, none suggests that "obduracy" in opposing a *fee petition* will help a requestor establish that it is entitled to fees under the statute. That is, the Heritage Foundation has not shown that any "obduracy" it might hope to explore related to the submission of the Breyan Declaration would affect the analysis of its eligibility for or entitlement to fees.  *See In re Clinton*, 973 F.3d at 115 ("[A] bad-faith inquiry in a FOIA context is only relevant as it goes to the actions of the individuals who conducted the search.").  Regarding Breyan, the Heritage Foundation insists that "the entire point is to probe why despite being entirely divorced from the points at issue he came to be the declarant through which the Department sought

46

to launder hearsay." ECF No. 84 at 21. Not so. The "entire point" of the underlying motion is whether the Heritage Foundation is eligible for and entitled to attorney's fees.

### CONCLUSION

Whatever the importance of the Heritage Foundation's FOIA request for the audio recordings at issue here or significance of its arguments challenging the government's withholding of them, the dispute currently before the Court concerns only the collateral issue of attorney's fees. The Heritage Foundation's motion to strike and request to depose numerous DOJ officials—some of them near the top of the agency's hierarchy—threatened to turn this subsidiary dispute into a second major litigation, contravening the repeated guidance of the Supreme Court and the D.C. Circuit. Ultimately, however, the motion to strike is procedurally questionable; the challenges to the Breyan Declaration are fruitless; and the requested discovery is unnecessary and inappropriate. Accordingly, it is hereby

**ORDERED** that the Heritage Foundation's Motion to Strike the Declaration of Jonathan M. Breyan and to Take Limited Discovery, ECF No. 80, is **DENIED**.

**SO ORDERED.**

Date: March 18, 2026

_____
G. MICHAEL HARVEY
UNITED STATES MAGISTRATE JUDGE

47