**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| **JUDICIAL WATCH, *et al.*,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **No. 1:24-cv-700 (TJK/GMH)** |
| | ) | **(Consolidated Cases)** |
| **U.S. DEPARTMENT OF JUSTICE,** | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

**MAGISTRATE JUDGE'S**
**REPORT AND RECOMMENDATION**

In this consolidated case under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, Judicial Watch, Inc., the Heritage Foundation and the leader of its Oversight Project (together, the "Heritage Foundation"), and Cable News Network, Inc. ("CNN") and a number of other press outlets (together, the "Press Coalition) sought release of audio recordings of former President Joseph R. Biden, Jr.'s interview with Special Counsel Robert K. Hur (the "Biden-Hur Interview").[1] The Department of Justice ("DOJ," the "Department," or the "government") withheld the material based on a number of exemptions to disclosure, including President Biden's assertion of executive privilege over the recordings. While motions for summary judgment were pending, the presidential election occurred in November 2024 and Donald J. Trump was inaugurated as President in January 2025. In May 2025, with those motions still pending, DOJ released a recording of the interview to the public. Thereafter, the Heritage Foundation and the Press

---

[1] Judicial Watch, the Heritage Foundation, and CNN filed separate FOIA actions seeking release of the recordings. Those actions were consolidated, *see* Minute Order (May 3, 2024), after which the additional press outlets comprising the Press Coalition joined the case as Plaintiffs, *see* ECF No. 26.

Coalition (together, the "Fee Petitioners"—Judicial Watch did not seek fees) filed the motions currently before the undersigned in which they contend they are both eligible for an award of attorney's fees under the so-called "catalyst theory" because this lawsuit substantially caused the release of the recordings and entitled to attorney's fees under this Circuit's precedents.[2]  For the following reasons, the undersigned recommends denying both motions.

## I.    BACKGROUND

On January 12, 2023, then-Attorney General Merrick Garland appointed Hur as Special Counsel and authorized him to investigate "possible unauthorized removal and retention of classified documents" discovered at locations associated with President Biden.  ECF No. 76-2 at 2.  As part of that investigation, President Biden sat for an interview on October 8–9, 2023.  *See* ECF No. 34-2, ¶ 9; *see also* ECF No. 40-2 at 2, ¶ 3.  According to a declaration from DOJ Associate Deputy Attorney General Bradley Weinsheimer submitted in connection with the government's motion for summary judgment in this case (the "Weinsheimer Declaration"), the audio of that interview, which comprises "several separate digital files," was recorded by two separate devices operated by FBI personnel.  *See* ECF No. 34-2, ¶¶ 10, 12.  In early February 2024, Hur issued his report on the investigation (the "Hur Report"), finding prosecution "unwarranted" and declining to bring criminal charges in part because President Biden "would likely present himself to a jury, as he did during [the] interview . . . , as a sympathetic, well-meaning, elderly man with a poor memory," ECF No. 38-4 at 6, 11; *see also id.* at 10, 212, 213 (all mentioning President Biden's memory during the interview), a characterization the Biden Administration disputed, *see id.* at 385.

---

[2] The documents most relevant to this Memorandum Opinion and Order are: (1) the Press Coalition's motion for attorney's fees and costs and its supporting exhibits, ECF Nos. 72 through 72-7; (2) the Heritage Foundation's motion for attorney's fees and costs and its supporting exhibits, ECF Nos. 73, 73-1, 74, 74-1, and 75 through 75-9; (3) the government's opposition to those motions and its supporting exhibits, ECF Nos. 76 through 76-15; (4) the Press Coalition's reply brief, ECF No. 78; and (5) the Heritage Foundation's reply brief, ECF No. 79.  All page numbers cited herein are those assigned by the Court's CM/ECF system.

The Hur Report, with its references to President Biden's memory during the October 8–9, 2023, interview, was made public on February 8, 2024. *See* ECF No. 76-3 at 3. On February 12, 2024, the chairpersons of the House Committees on Oversight and Accountability, the Judiciary, and Ways and Means sent a letter to Garland requesting the "transcript and any other records" of the Biden-Hur Interview.[3] ECF No. 76-3 at 3–4. On February 27, 2024, the chairman of the House Committee on the Judiciary subpoenaed the same materials sought in that letter. *See* ECF No. 76-4. The transcript of the Biden-Hur Interview, which was created from the "best quality audio files" from the two recording devices, ECF No. 81-4 at 12, was released to the public on March 12, 2024, *see* Biden Interview with Special Counsel Hur, *The New York Times* (Mar. 12, 2024), https://www.nytimes.com/interactive/2024/03/12/us/biden-hur-transcript-both-days.html [https://perma.cc/989P-F8K3]; *see also* ECF No. 34-2, ¶ 17.

Meanwhile, between February 8 and February 16, 2024, Judicial Watch, the Heritage Foundation, and CNN submitted FOIA requests to DOJ seeking copies of the audio recordings of Hur's interview with President Biden. *See* ECF No. 76-8; ECF No. 76-10; ECF No. 76-13. DOJ granted Judicial Watch's request for expedited processing on February 13, 2024; the Heritage Foundation's request for expedited processing on February 26, 2024; and acknowledged CNN's FOIA request on March 15, 2024. *See* ECF No. 76-9; ECF No. 76-12; ECF No. 76-14. On March 11, 2024, Judicial Watch filed a FOIA action against DOJ alleging that the Department had constructively denied the requests by failing to respond to its FOIA request within the time limits set by the statute. *See* ECF No. 1, ¶¶ 8, 12. On April 3 and 4, 2024, the Heritage Foundation and CNN filed similar FOIA actions against DOJ. *See* Complaint, ¶¶ 21–28, *Heritage Found. v. U.S.*

---

[3] The committees also sought "documents and communications, including audio and video recordings, related to [Hur's] interview with Mark Zwonitzer," characterized as President Biden's "ghostwriter." ECF No. 76-3 at 3–4. Because only the audio recordings of Hur's interview with President Biden are at issue here, the Zwonitzer recordings are discussed no further.

*Dep't of Just.*, No. 24-cv-960 (D.D.C. Apr. 3, 2024), ECF No. 1; Complaint, ¶¶ 27–32, *Cable News Network, Inc. v. U.S. Dep't of Just.*, No. 24-cv-961 (D.D.C. Apr. 4, 2024), ECF No. 1.  The cases were eventually consolidated in this matter before Judge Kelly with the consent of the parties. Minute Order (May 3, 2024).

On May 15, 2024, Garland sent a letter to President Biden stating that in the opinion of the Attorney General and DOJ's Office of Legal Counsel the audio recordings of the Biden-Hur Interview "fall within the scope of executive privilege and that [the President] may assert privilege with respect to the recordings" because they are "related to a closed criminal investigation where disclosure is likely to damage future law enforcement efforts."  ECF No. 76-5 at 2.  The letter explained that the "law enforcement component of executive privilege" protects materials the disclosure of which "would raise an unacceptable risk of undermining the Department's ability to conduct similar high-profile criminal investigations—in particular, investigations where the voluntary cooperation of White House officials is exceedingly important."  *Id.* at 4–5.  President Biden thereafter asserted executive privilege over the audio recordings, as reflected in a May 16, 2024, letter from Assistant Attorney General Carlos Uriarte to the chairpersons of the House Committees on Oversight and Accountability and on the Judiciary.  *See* ECF No. 76-6 at 2.  On July 1, 2024, the House Committee on the Judiciary filed a civil action—assigned to Judge Jackson—seeking to compel disclosure to Congress of, as relevant here, the audio recordings of the Biden-Hur Interview.  *See* Complaint, *Comm. on the Judiciary of the House of Representatives v. Garland*, No. 24-cv-1911 (D.D.C. July 1, 2024), ECF No. 1.

The government filed its motion for summary judgment in this case on May 31, 2024, asserting that the recordings were being withheld pursuant to four separate FOIA exemptions.  *See* ECF No. 34-1 at 12–13.  DOJ maintained that the audio recordings were appropriately withheld

4

under Exemptions 6 and 7(C), which protect from disclosure, respectively, "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy" and "records or information compiled for law enforcement purposes" that "could reasonably be expected to constitute an unwarranted invasion of personal privacy," 5 U.S.C. § 552(b)(6), (7)(C), reasoning that "[s]ignificant privacy interests attach to the Special Counsel's investigatory files" and the Special Counsel's "345-page report detailing his investigation" and a written transcript of the interview at issue had already been released, ECF No. 34-1 at 12; under Exemption 7(A), which protects "records or information compiled for law enforcement purposes" that "could reasonably be expected to interfere with enforcement proceedings," 5 U.S.C. § 552 (b)(7)(A), because DOJ was "engaged in a number of ongoing law enforcement investigations in which it has determined that release of the audio recording would interfere with witness cooperation in those investigations," ECF No. 34-1 at 13; and under Exemption 5, which exempts material that is privileged in civil discovery and "incorporates the privileges available to Government agencies in civil litigation," *U.S. Fish & Wildlife Serv. v. Sierra Club, Inc.*, 592 U.S. 261, 267 (2021); *see also* 5 U.S.C. § 552(b)(5)), because the recordings were then subject to a claim of executive privilege. ECF No. 34-1 at 12. As noted, to support its motion, the government filed the Weinsheimer Declaration, which, among other things, asserted that the written transcripts of the Hur interview "are accurate transcriptions of the words of the interview contained in the audio recording," except that sometimes "filler words (such as 'uh' or 'um')" and repeated words "such as 'I, I' or 'and, and'" are not included. ECF No. 34-2, ¶ 14. Plaintiffs cross-moved for summary judgment, arguing that none of the claimed FOIA exemptions protected the recordings from disclosure. *See generally* ECF No. 36-1 (Judicial Watch); ECF No. 38-1 (the Press Coalition); ECF No. 40-1 (the Heritage Foundation). In connection with its cross-motion, the

Heritage Foundation submitted a declaration from former Attorney General Michael B. Mukasey ("the Mukasey Declaration") opining that the justification for the claim of executive privilege expressed in Garland's May 15, 2024, letter was unsupported and stretched the privilege too far. *See generally* ECF No. 40-3.

Trump's election in November 2024 ultimately changed the complexion of the disputes over the audio recordings. On January 6, 2025 (three days after the 119th Congress was sworn in), the chairman of the House Committee on the Judiciary issued a renewed subpoena for the recordings of the Biden-Hur Interview. *See* ECF No. 76-7. President Trump was inaugurated on January 20, 2025. On January 24, 2025, the House Committee on the Judiciary filed a submission in its suit concerning release of those recordings to Congress that essentially sought a stay of those proceedings to "discuss the subject matter of th[at] litigation with the new Administration to see if a mutually acceptable resolution can be reached." Notice, *Comm. on the Judiciary of the House of Representatives v. Garland*, No. 24-cv-1911 (D.D.C. Jan. 24, 2025), ECF No. 28. Judge Jackson stayed that case and ordered a status report to be filed on March 31, 2025. Minute Orders, *Comm. on the Judiciary of the House of Representatives v. Garland*, No. 24-cv-1911 (D.D.C. Jan. 27, 2025). On February 12, 2025, Judge Kelly entered a Minute Order in this case requiring the government, "in light of the recent change in administration," to file a status report within seven days "confirming that its position" taken in the summary judgment briefing "remains unchanged." Minute Order (Feb. 12, 2025). The government sought a 90-day extension of time to respond, citing counsel's need to confer with new leadership in the Department, which was in the process of being installed, and the "significant workload" the Department was experiencing, "much of which [was] time-sensitive and resource-demanding." ECF No. 59 at 2. The Court granted the motion, setting May 20, 2025, as the deadline for the status report. Minute Order (Feb. 19, 2025).

6

On March 31, 2025, in the House Judiciary Committee's case before Judge Jackson, the parties sought a 60-day extension of time to file a status report, asserting that they had conferred and "expect[ed] to be able to resolve this matter"—that is, the release of the audio tapes to Congress— "without further litigation."  Consent Motion for Extension of Time to Submit Joint Status Report at 2, *Comm. on the Judiciary of the House of Representatives v. Garland*, No. 24-cv-1911 (D.D.C. Mar. 31, 2025), ECF No. 30.  Judge Jackson granted that request and set a status report for May 30, 2025.  Minute Order, *Comm. on the Judiciary of the House of Representatives v. Garland*, No. 24-cv-1911 (D.D.C. Apr. 1, 2025).

On May 16, 2025, news website Axios published excerpts of one of the audio recordings of the Biden-Hur Interview.  *See* Marc Caputo & Alex Thompson, *Exclusive: Prosecutor's audio shows Biden's memory lapses*, Axios (May 16, 2025), https://www.axios.com/2025/05/16/biden-hur-tape-special-counsel-audio [https://perma.cc/X7KE-XHHV].  The next day, Axios published a recording of the full interview.[4]  *See* Marc Caputo & Alex Thompson, *Exclusive: Listen to the full Biden-Hur special counsel interview*, Axios (May 17, 2025), https://www.axios.com/2025/05/17/biden-hur-listen-full-interview-special-counsel [https://perma.cc/6SLF-LSD4].

In its May 20, 2025, status report in this case, the government asserted that, on May 19, 2025, DOJ "made a discretionary release" of one of the recordings of that interview (sometimes referred to herein as the "first recording") "by posting the audio files in the Office of Information Privacy's FOIA reading room."  ECF No. 66 at 1.  On May 28, 2025, the parties filed a joint status report asserting that, in light of the public release of the first recording, only "[t]wo issues

---

[4] DOJ has denied that it provided the audio to Axios but the Heritage Foundation is not convinced.  *See* ECF No. 73-1 at 20 (Heritage Foundation asserting that Axios stated the White House and DOJ gave it the audio); ECF No. 76 at 23 (the government asserting that DOJ did not provide the audio to Axios).  Although the issue is touched on in Section III.B.3, *infra,* this dispute does not need to be resolved to adjudicate the fee petition.

remain[ed] outstanding" in this case: (1) Plaintiffs had requested that the government process and release audio filed *not* used to create the transcript of the Biden-Hur Interview (sometimes referred to herein as the "second recording"), which it had agreed to do, and (2) the issue of attorney's fees, which the government did not believe Plaintiffs were entitled to.  ECF No. 67.  The government pledged to release the second recording by July 7, 2025, and the parties proposed a briefing schedule for motions for attorney's fees, which the Court granted.  *See* ECF No. 68; ECF No. 69. The second audio recording was released by July 7, 2025.  *See* ECF No. 70.

On July 25, 2025, Judicial Watch voluntarily dismissed its claim without seeking attorney's fees, *see* ECF No. 71, but the Heritage Foundation and the Press Coalition (together, the "Fee Petitioners") each filed a motion seeking an award of  fees, *see* ECF No. 72; ECF No. 73.  Each of those motions argues that the movant is eligible for an award of attorney's fees under FOIA's Section 552(a)(4)(E)(ii)(II), which permits a plaintiff that pressed a "not insubstantial" claim under the statute to recover attorney's fees if it "obtained relief through . . . a voluntary or unilateral change in position by the agency."  5 U.S.C. § 552(a)(4)(E)(ii)(II).  They further argue that the movants are entitled to such an award under the D.C. Circuit's four-factor balancing test.  *See, e.g.*, *Informed Consent Action Network v. Ctrs. for Disease Control & Prevention*, 806 F. Supp. 3d 65, 73 (D.D.C. 2025).  *See generally* ECF No. 72-1 (Press Coalition brief); ECF No. 73-1 (Heritage Foundation brief).

The government opposes both motions, arguing that neither of the Fee Petitioners is eligible for or entitled to fees.  *See generally* ECF No. 76.  In connection with its opposition, the government submitted a declaration from Jonathan M. Breyan (the "Breyan Declaration") that states, among other things, that this case "did not cause the Department to release the audio recordings at issue."  ECF No. 76-1, ¶ 22.  The Heritage Foundation sought to strike the declaration

as "manifestly incompetent for [its] purpose," ECF No. 79 at 5, and sought leave to depose several DOJ officials—including the Deputy Attorney General—primarily to probe the decision-making that led to the reversal or waiver of the claim of executive privilege and the decision to release the recordings to Congress. *See generally* ECF No. 80. The undersigned denies that motion (the "Motion to Strike") in a decision filed contemporaneously with this Report and Recommendation.

## II.    LEGAL STANDARD

As noted, this is a dispute over whether the Fee Petitioners should be awarded attorney's fees and costs under FOIA. The Supreme Court has repeatedly cautioned against allowing a dispute over attorney's fees to become "a second major litigation," *Lackey v. Stinnie*, 604 U.S. 192, 204 (2025) (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983)), an admonition the undersigned takes to heart. *See also, e.g.*, *Baylor v. Mitchell Rubenstein & Assocs., P.C.*, 857 F.3d 939, 960 (D.C. Cir. 2017) (Henderson, J., concurring) ("[F]ee litigation is one of the last things lawyers and judges should be spending their time on." (citation modified)).

A FOIA plaintiff must clear two hurdles to recover its fees and costs: it must show it is both (1) eligible for and (2) entitled to such an award. *See Brayton v. Office of the U.S. Trade Representative*, 641 F.3d 521, 524 (D.C. Cir. 2011). To be eligible, the plaintiff must have "substantially prevailed" in the litigation. 5 U.S.C. § 552(a)(4)(E)(i). As relevant here, a plaintiff may substantially prevail under the "catalyst theory" if it has "obtained relief through . . . a voluntary or unilateral change in position by the agency, if the [plaintiff's] claim is not insubstantial." *Id.* § 552(a)(4)(E)(ii)(II); *see also Brayton*, 641 F.3d at 525 ("[T]he OPEN Government Act of 2007 . . . revived the possibility of FOIA fee awards in the absence of a court decree."); *Informed Consent Action Network v. NIH*, Nos. 23-cv-3674, 24-cv-813, 2025 WL 3484885, at *3 n.3 (D.D.C. Dec. 4, 2025) ("[B]inding D.C. Circuit precedent hold[s] that the 2007

9

Open Government Act established 'that the catalyst theory applies in FOIA cases.'" (citation modified) (quoting *Davis v. U.S. Dep't of Just.*, 610 F.3d 750, 752 (D.C. Cir. 2010))). The D.C. Circuit has interpreted that provision to allow a plaintiff to "prove fee eligibility by showing that its lawsuit 'substantially caused the government to release the requested documents before final judgment.'" *Grand Canyon Tr. v. Bernhard*, 947 F.3d 94, 96 (D.C. Cir. 2020) (quoting *Brayton*, 641 F.3d at 524–25). "Courts analyze the totality of the circumstances to determine whether 'the circumstances surrounding disclosure' support finding a 'causal nexus' between the commencement of the lawsuit and an agency's disclosures." *First Look Media Works, Inc. v. U.S. Agency for Glob. Media*, No. 20-cv-3499, 2024 WL 4262773, at *2 (D.D.C. Sept. 23, 2024) (quoting *Env't Def. Fund v. U.S. EPA*, No. 17-cv-02220, 2022 WL 136792, at *4 (D.D.C. Jan. 13, 2022)), *aff'd sub nom. First Look Inst., Inc. v. U.S. Agency for Glob. Media*, No. 24-5257, 2025 WL 1840647 (D.C. Cir. July 2, 2025). "A 'plaintiff has the burden of showing that it is more probable than not that the government would not have produced the desired documents absent the lawsuit.'" *Id.* (citation modified) (quoting *Grand Canyon Tr.*, 947 F.3d at 97).

"If the requester is eligible for a fee award, a court 'proceeds to the entitlement prong and considers a variety of factors to determine whether the plaintiff *should* receive fees.'" *Elec. Privacy Info. Ctr. v. U.S. Dep't of Homeland Sec.*, 999 F. Supp. 2d 61, 66 (D.D.C. 2013) (quoting *Brayton*, 641 F.3d at 524). Those factors are: "(1) the public benefit derived from the case, (2) the commercial benefit to the requester, (3) the nature of the requester's interest in the information, and (4) the reasonableness of the agency's conduct." *Morley v. CIA*, 719 F.3d 689, 690 (D.C. Cir. 2013). "In applying this test, '[n]o one factor is dispositive.'" *Elec. Privacy Info. Ctr.*, 999 F. Supp. 2d at 67 (alteration in original) (quoting *Davy v. CIA*, 550 F. 3d 1155, 1159 (D.C. Cir.

2008)).  "The sifting of those criteria over the facts of a case is a matter of district court discretion." *Tax Analysts v. DOJ*, 965 F.2d 1092, 1094 (D.C. Cir. 1992).

Finally, if a FOIA plaintiff is both eligible for and entitled to a fees award, a court must assess the reasonableness of the requested award.  While precedent can be a helpful guide to a court in conducting its assessment, the D.C. Circuit has recognized that this analysis is "necessarily somewhat imprecise," *Nat'l Ass'n of Concerned Veterans v. Sec'y of Def.*, 675 F.2d 1319, 1323 (D.C. Cir. 1982) (per curiam), and asks that judges simply "exercise their discretion as conscientiously as possible, and state their reasons as clearly as possible," *Copeland v. Marshall*, 641 F.2d 880, 893 (D.C. Cir. 1980) (en banc).

## III.    DISCUSSION

There are two separate motions before the undersigned: the Heritage Foundation's and the Press Coalition's.  The discussion below addresses first whether either entity is eligible for a fee award and, finding only the Heritage Foundation has established eligibility, then addresses its entitlement to an award of fees.

### A.    Eligibility

The obvious place to begin is with the Breyan Declaration, DOJ's most powerful evidence that this litigation was not a substantial cause of the release of the audio recordings of Biden-Hur Interview.  That declaration, made under penalty of perjury by a "Senior Supervisory Attorney in the Office of Information Policy" at DOJ "responsible for supervising the handling of [FOIA] requests subject to litigation" is based on Breyan's "personal knowledge as well as information obtained and reviewed in the course of [his] official duties, including conversations [he] had with Department leadership and officials elsewhere in [the] Department."  ECF No. 76-1, ¶¶ 1–2, 23. It asserts, among other things, that after the 2025 inauguration DOJ "determined that it would

11

comply with the renewed Congressional subpoena of January 6, 2025" and "began to process the audio recordings for release to Congress." *Id.*, ¶ 17. Having decided that the audio of the Biden-Hur Interview should be released to Congress, DOJ determined it "should also release the audio recordings to the public as a matter of discretion." *Id.*, ¶ 20. Also "as a matter of discretion," DOJ "independently determined" that, even in the absence of a congressional subpoena, the audio should be released to the public as part of a wider release of documents that had previously been withheld. *Id.*, ¶ 21. Those decisions were made "notwithstanding the FOIA requests submitted by Plaintiffs or the subsequent lawsuits filed" and the audio would have been released to the public "whether or not this lawsuit was filed." *Id.*, ¶ 20; *see also id.*, ¶ 21 ("[E]ven if this case was never filed, the Department still would have released the audio recordings to the public as a matter of discretion."). In sum, Bryan attests that "this consolidated case did not cause the Department to release the audio recordings at issue." *Id.*, ¶ 22.

As noted, the Heritage Foundation sought to strike the Breyan Declaration as "manifestly incompetent for [its] purpose," ECF No. 79 at 5, an argument the undersigned rejects in a detailed Memorandum Opinion and Order issued today. Accordingly, the Breyan Declaration is entitled to "a presumption of good faith," *see, e.g.*, *SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991), and the actions described therein to "a presumption of legitimacy," *Democracy Forward Found. v. U.S. Dep't of Just.*, No. 17-cv-1877, 2022 WL 17177497, at *5 (D.D.C. Nov. 23, 2022). The Fee Petitioners thus have a heavy burden to establish eligibility. Ultimately, the undersigned finds that the Heritage Foundation has established only that it substantially caused the release of the second recording of the Biden-Hur Interview, but not the first recording; the Press Coalition, on the other hand, has not established eligibility on any basis that it has put forward.

1.      The Heritage Foundation

The Heritage Foundation contends that it substantially prevailed in this litigation in three ways: (1) it "caused the reversal of President Biden's claim of Executive Privilege"; (2) it "caused the release of both recordings of the interview";[5] and (3) "release of the Declaration of Bradley Weinsheimer to defend the withholdings revealed the highly newsworthy information that the transcripts of the Biden-Hur audio were not complete."  ECF No. 73-1 at 9–10.  The remainder of this subsection considers all three claims, although not in that order.

a.      *Weinsheimer Declaration*

The undersigned addresses the last argument first, as it merits little analysis.  According to the Heritage Foundation, it is entitled to attorney's fees because "this litigation compelled the Department to make significant disclosures that were matters of intense public interest," ECF No. 73-1 at 13—specifically, the Weinsheimer Declaration's assertion that "filler words (such as 'um' or 'uh')" and repeated words "such as 'I, I' or 'and, and'" were not included in the transcript of the interview that was released to the public, ECF No. 34-2, ¶ 14—which allegedly "collapsed a key component of the [Biden] Administration's press narrative" that "the transcript accurately reflected what was said in the interview," ECF No. 79 at 13.

As noted, to be eligible for attorney's fees, the plaintiff must have "substantially prevailed" in the litigation, a requirement that can be met where it "*obtained relief* through . . . a voluntary or unilateral change in position by the agency, if the [plaintiff's] claim is not insubstantial."  5 U.S.C. § 552(a)(4)(E)(i), (ii)(II) (emphasis added).  That is, a FOIA requester substantially prevails when it receives "the relief on the merits that [it] sought."  *Campaign for Responsible*

---

[5] The Heritage Foundation's briefing makes clear that this argument focuses on the release of the so-called "second recording" of the interview, *see* ECF No. 73-1 at 12–13; ECF No. 79 at 11–12, which, as discussed below in Section III.A.1.c, consists of the audio files not used to create the transcripts of the interview.

*Transplantation v. FDA*, 511 F.3d 187, 195–96 (D.C. Cir. 2007); *see also* Relief, Black's Law Dictionary (12th ed. 2024) (defining "relief" as "[t]he redress or remedy . . . that a party asks of a court"). As courts in this Circuit have repeatedly recognized, that generally requires the litigation to have caused the release of the *documents requested*. *See Morley*, 810 F.3d 841, 844 (D.C. Cir. 2016) (stating that a "requester cannot be said to have substantially prevailed" unless "the litigation has caused the release of requested documents"); *Animal Partisan v. FBI*, No. 23-cv-1990, 2025 WL 1795039, at *5 (D.D.C. June 30, 2025) (same); *see also Grand Canyon Tr.*, 947 F.3d at 98 ("In order to establish eligibility for attorney's fees, a FOIA plaintiff must show that its lawsuit caused a change in the agency's position regarding the *production of requested documents*." (emphasis added)); *Brayton*, 641 F.3d at 524–25 (noting that under the catalyst theory, "a plaintiff 'substantially prevail[s]' . . . when he substantially cause[s] the government to *release the requested documents* before final judgment"); *Campaign for Responsible Transplantation*, 511 F.3d at 195–96 (noting that a plaintiff substantially prevails under FOIA when it causes "the release of documents" it requested). In its complaint, the Heritage Foundation did not seek as relief the dissemination of the Weinsheimer Declaration (nor could it, as that declaration did not yet exist) or the "collapse[]" of a "press narrative"; it asked for an order requiring DOJ to process its request for "[a]ll recordings . . . of the interview of President Joseph R. Biden, Jr. referenced in" the Hur Report on an expedited basis, to search for records responsive to that request, and to produce all non-exempt responsive records (along with an explanation justifying any withholding). Complaint at 5, 13, *Heritage Foundation v. U.S. Dep't of Just.*, No. 24-cv-960 (D.D.C. Apr. 3, 2024), ECF No. 1. Because the Weinsheimer Declaration was not a "benefit" that the Heritage Foundation "had sought from the Court," *Protect the Public's Trust v. IRS*, 2024 WL 663427, at *4 (citation modified), it is not a basis on which to find the Heritage Foundation eligible for fees.

                *b.*        *Executive Privilege and the May 19, 2025, Release of One Audio Recording*

The meat of the Heritage Foundation's argument concerns its claim that this litigation—and, specifically, the Heritage Foundation's contributions to it—caused the reversal or waiver of Biden's claim of executive privilege over the recordings, which led to the May 19, 2025, release of one full recording of the interview to the public. It bears repeating that the Heritage Foundation must establish "that it is more probable than not that the government would not have performed the desired act absent the lawsuit." *Grand Canyon Tr.*, 947 F.3d at 97 (quoting *Pub. Health Rsch. Grp. v. Young*, 909 F.2d 546, 550 (D.C. Cir. 1990)). The undersigned discerns four strands of argument the Heritage Foundation has advanced to shoulder that burden: (1) this litigation, which challenged President Biden's assertion of executive privilege over the audio of his interview with Hur, was necessary to the release of the because it was the only "meaningful way to procure the[ir] release," ECF No. 73-1 at 10; (2) the substantive arguments the Heritage Foundation made to challenge the assertion of executive privilege caused the government to reverse course on that issue, *see id.* at 11–12; (3) government counsel's February 2025 request for an extension of time in this case to confer with DOJ leadership about a potential change in position in this case indicates that this litigation was the catalyst for the release of the audio recording; and (4) the timing of the release—one day before the government was due to report to Judge Kelly whether it stood by its argument that the audio was protected by the FOIA exemptions claimed in the summary judgment briefing—and the litigation conduct leading up to it establishes that this litigation substantially caused that release, *see id.* at 12. The undersigned addresses each of those arguments in turn.

At the outset it is worth noting that, at times, the Heritage Foundation appears to merge the reversal or waiver of President Biden's claim of executive privilege over the Biden-Hur audio recordings with the release of the recordings to the public, as if the former inevitably led to the

15

latter.  But (as also explained in the undersigned's opinion denying the Motion to Strike) the decision to forgo executive privilege was a necessary, but not sufficient, condition to the release because DOJ also asserted other bases for withholding the audio recordings—bases the agency continues to maintain have merit, although it has decided in its discretion no longer to rely on them.  *See, e.g.*, ECF No. 34-1 at 25–48 (DOJ's motion for summary judgment arguing that the recordings were properly withheld under Exemptions 6, 7(A), and 7(C)); ECF No. 76-1, ¶ 21 (Breyan Declaration asserting that, "even though the audio recordings were exempt from disclosure pursuant to the FOIA," DOJ determined that they should be released to the public).  And, indeed, the Breyan Declaration indicates that there were a series of decisions that led to release: presumably, the reversal or waiver of executive privilege, which the Breyan Declaration does not address; the decision made within DOJ to release the audio to Congress, *see* ECF No. 76-1, ¶ 20; the decision that release to Congress justified release to the public, *see id.*; and the decision that, even if they were not the target of a congressional subpoena, the audio should be released to the public, *see id.*, ¶ 21.  As such, the reversal or waiver of executive privilege is a single part of more complex story.

In any event, asserting that the invocation of executive privilege over the recordings "could only be overcome by a judicial order or a personal decision by President Trump to reverse his predecessor's assertion of privilege," the Heritage Foundation contends, first, that because this litigation "attempted to lift the improper invocation of Executive Privilege" by judicial order and "provided several declarations to overcome the Executive Privilege invocation," including the Mukasey Declaration, "the litigation was reasonably necessary to secure the[] release" of the audio.  ECF No. 73-1 at 10–11.  That is, this branch of the Heritage Foundation's argument appears to be that, because its "authoritative" challenge (a challenge purportedly more "exten[sive]" and

16

"authoritative" than any other party's challenge), *see id.* at 10, could have resulted in a judicial decision finding the assertion of executive privilege faulty, there is a sufficient "'causal nexus' between . . . the lawsuit and [the] agency's disclosures," *First Look Media Works*, 2024 WL 4262773, at *2 (quoting *Env't Def. Fund*, 2022 WL 136792, at *4), to determine that this suit caused that disclosure. But this litigation did not result in such a judicial determination and (even if the Breyan Declaration did not directly refute such a claim) the Heritage Foundation would be hard-pressed to establish that "the threat of an adverse court order" regarding executive privilege in this litigation caused release of the material at issue. *Church of Scientology of Cal. v. Harris*, 653 F.2d 584, 588 (D.C. Cir. 1981) (quoting *Cox v. U.S. Dep't of Just.*, 601 F.2d 1, 6 (D.C. Cir. 1979)). As the Heritage Foundation notes, under the Biden Administration, DOJ "fought tooth and nail to oppose disclosure" in this litigation, ECF No. 73-1 at 5; moved for summary judgment in May 2024, *see* ECF No. 34; and did not retreat from those arguments during the eight months before Inauguration Day 2025. That is, there was no change in position in 2024 that the pendency of this litigation could have substantially caused. *See Env't Integrity Project v. U.S. EPA*, 316 F. Supp. 3d 320, 326 (D.D.C. 2018) ("To substantially prevail and receive attorneys' fees, [the plaintiff] must prove that it caused a voluntary or unilateral change in [the agency's] position by filing its complaint." (internal quotation marks omitted)). When the Administration changed, President Trump reversed or waived the invocation of executive privilege, and there is nothing in the record to indicate he did so to forestall a decision in this case reversing the claim made by his predecessor. Indeed, the Heritage Foundation itself argues that "transparency as shown by public releases of information" involves "a complicated calculus influenced most by politics" and, more, that the release of the recordings of the Biden-Hur Interview was "an issue central to the 2024 Presidential Election." ECF No. 79 at 6, 17–18. That is, the Heritage Foundation posits that

17

politics—and not concern that President Biden's claim of executive privilege would be overruled in this case—caused the release of the first recording. The Department of Justice suggests the same, stating that "it should come as no surprise that the release of documents withheld by the [Biden] [A]dministration would be a priority" of the Trump Administration.[6] ECF No. 76 at 9. Additionally, as indicated above, such a determination would not, on its own, have resulted in disclosure of the recordings, because DOJ relied on exemptions not dependent on the invocation of executive privilege to withhold the material. Therefore, this argument (which is focused on the issue of executive privilege) does not carry the Heritage Foundation's burden to show "that it is more probable than not that the government would not have [produced] the desired [material] absent the lawsuit." *Grand Canyon Tr.*, 947 F.3d at 97 (quoting *Pub. Citizen Health Res. Grp.*, 909 F.2d at 550).

Second, "recognizing that President Trump could himself reverse the claim of Executive Privilege and authorize the release of the tapes," the Heritage Foundation claims that the evidence shows this litigation substantially caused that reversal. ECF No. 73-1 at 11–12. Again, the Heritage Foundation's focus on the reversal or waiver of the claim of executive privilege ignores that, although it was a necessary step if the recordings were to be released to the public, it was not in itself sufficient to allow that release. Officials also needed to determine that DOJ would disavow or waive the protection of the other exemptions on which they relied. And, again, the Breyan Declaration asserts that decision was made "independently" and was not affected by this litigation. *See* ECF No. 76-1, ¶¶ 20–21. Even assuming for the sake of argument that establishing that this

---

[6] It is worth noting that the Trump campaign had criticized President Biden's invocation of executive privilege over the recordings in the run-up to the presidential election. *See* Josh Gerstein & Jordain Carney, *White House to Republicans: You're not getting audio of Biden's interview with Hur*, Politico (May 16, 2024), https://www.politico.com/news/2024/05/16/biden-moves-to-block-house-from-getting-his-classified-docs-interview-tapes-00158323 [https://perma.cc/2Z4D-7UN3] (noting that a Trump campaign spokesperson accused President Biden of politicizing executive privilege to use it for political cover).

lawsuit caused the reversal or waiver of the executive privilege claim would be sufficient to find that the action substantially caused the release of the recordings (a proposition that the undersigned takes no position on), the Heritage Foundation's evidence that happened is unconvincing. It cites a declaration from its attorney asserting that (1) in mid-February 2025—soon after Judge Kelly ordered the government to inform the Court whether it would continue to rely on the FOIA exemptions it had cited to withhold the audio recordings, *see* Minute Order (Feb. 12, 2025)—the attorney had a conversation with a DOJ official and offered the Mukasey Declaration as "a reasoned external basis for the Department to reverse Attorney General Merrick Garland's Opinion on Executive Privilege"; (2) in mid-April 2025, he had a similar conversation with an attorney in the White House Counsel's Office; and (3) on May 9, 2025, he participated in a one-hour long videoconference with DOJ officials discussing settlement of "all Hur related cases,"[7] during which those officials "made clear that the Department anticipated producing the Hur recordings on May 20, 2025." ECF No. 75, ¶¶ 5, 10(b), 13, *cited in* ECF No. 73-1 at 11–12. On that scant evidence, a finding that those communications caused President Trump to reverse or waive President Biden's claim of executive privilege over the recordings of the interview would be based on mere speculation.[8]

Third, the Heritage Foundation points to the fact that, when on February 12, 2025, Judge Kelly gave the government one week to update the Court as to the new Administration's position on whether the recordings could be disclosed to the public, counsel for DOJ sought a 90-day

---

[7] It appears that the Heritage Foundation alone filed at least five additional actions seeking release of material related to the Hur investigation: *Heritage Foundation v. U.S. DOJ*, 24-cv-645; *Heritage Foundation v. U.S. DOJ*, 24-cv-952; *Heritage Foundation v. U.S. DOJ*, 24-cv-957; *Heritage Foundation v. U.S. DOJ*, 24-cv-958; and *Heritage Foundation v. U.S. DOJ*, 24-cv-959.

[8] The purported settlement discussions are discussed in more detail later in this section when the undersigned addresses the Heritage Foundation's argument not that this litigation caused the reversal or waiver of the claim of executive privilege, but that it caused the release of the audio.

extension of time to respond in order to "confer with new leadership within the Department," which was "still in the process of being installed" and was experiencing a "significant workload . . . , much of which [was] time-sensitive and resource-demanding." ECF No. 73-1 at 11 (quoting ECF No. 59 at 2). According to the Heritage Foundation, the fact that the government asked for more time *in this case* necessarily means that the release of the audio was *caused by this case. See id.* ("It would be passing strange for the Government to assert a need for additional time to review this matter and yet claim that the release of the audio was somehow entirely divorced from it."). But that conclusion does not follow from the premise. Just because new DOJ leadership—which was "still in the process of being installed," *see* ECF No. 59 at 2—had not, a mere month into the nascent Trump Administration, formulated its position on disclosure of the recordings and therefore could not timely respond to Judge Kelly's order does not mean that this litigation was a substantial cause of the decision to release them. Put another way, DOJ's request for additional time is not inconsistent with a finding that DOJ made the decision to release the audio recording—a key piece of what the Heritage Foundation calls a "political scandal" that "engrossed" President Trump's predecessor, ECF No. 73-1 at 15—independently of this litigation. Putting aside that the release makes sense as a political move, that is precisely what the Breyan Declaration says: "notwithstanding the FOIA requests submitted by Plaintiffs or the subsequent lawsuits filed," which "did not cause the . . . release of the audio recordings at issue," DOJ determined that disclosure of the audio was justified. ECF No. 76-1, ¶¶ 20, 22. Thus, the Heritage Foundation's argument does little to support a finding that "the government would not have performed the desired act absent the lawsuit." *Grand Canyon Tr.*, 947 F.3d at 97 (quoting *Pub. Citizen Health Res. Grp.*, 909 F.2d at 550).

20

Fourth, and finally, the Heritage Foundation relies on the timing of the release of the first recording, which occurred on May 19, 2025, the day before Judge Kelly's deadline for the government to file a status report in this case stating whether it would continue to withhold the recordings and after discussions among counsel for the Heritage Foundation and senior DOJ officials concerning settlement of this case. *See* ECF No. 73-1 at 11–12; ECF No. 79 at 7–10. The timing might be more persuasive evidence that this litigation was a substantial cause of the decision to release the recordings if Judge Kelly's order required something more than a mere update on DOJ's position by May 20, 2025.[9] That is, Judge Kelly's order did not mandate that, if DOJ changed its position, it release the recordings on or before May 20, 2025; indeed, an Order issued on May 17, 2025, establishes that, in the event of a DOJ about-face, the recordings would be released at some point *after* the status report was due. Minute Order (May 17, 2025) ("Defendant has been ordered to file a status report as to its position on May 20. If Defendant reports that its position has changed, and that it no longer seeks to withhold the audio, the Court will expect Defendant to produce it to Heritage Plaintiffs without delay."). The Heritage Foundation calls it "[n]otabl[e]" that the "May 19 production occurred prior to the May 30 deadline for the Department to file a Status Report in the case filed by the House Judiciary Committee" concerning disclosure to Congress. ECF No. 79 at 8. The undersigned garners little from the temporal relationship between the release of the first audio recording and a deadline in a different case (albeit one concerning the same recordings at issue here) with a different plaintiff, different issues, and a different defense team—especially when the Heritage Foundation insists that "disclosure to

---

[9] The Press Coalition contends that the timing supports a finding that "the recordings would not have been released online *when they were* but for this FOIA litigation." ECF No. 78 at 4 (emphasis added). There is a line of cases finding that an acceleration of the release of documents can sometimes be evidence of causation. The undersigned does not read the Heritage Foundations briefs to make that argument, so it is addressed only below in the discussion of the Press Coalition's eligibility. *See* Section III.A.2, *infra*.

Congress is irrelevant" to its motion for attorney's fees. ECF No. 79 at 7. If it were clear that one of the two cases—this one or the House Judiciary Committee action before Judge Jackson—substantially caused the release of the audio, that chronology might have more traction. But the salient question here is if this case substantially caused the release or if that decision was independent of this litigation. The circumstantial timing evidence the Heritage Foundation offers is no match for the testimony in the Breyan Declaration that this action did not cause the release. *See* ECF No. 76-1, ¶¶ 21–23.

Marginally more compelling—at least at first glance—is the Heritage Foundation's assertion that after Judge Kelly's February 12, 2025, Order requiring the government to file a status report as to the new Administration's position regarding the audio recordings at issue, its counsel engaged in settlement negotiations with Trump Administration officials about the release of the recordings. *See, e.g.*, ECF No. 73-1 at 13 (noting "several negotiations with political leaders" at DOJ and citing ECF No. 75, ¶¶ 5, 10(b)). The evidence cited, however, states only that counsel for the Heritage Foundation had a conversation on February 13, 2025, with a DOJ attorney uninvolved in this case in which "the specifics of any legal issues in the case" were not discussed, although scheduling matters were, ECF No. 75, ¶ 5; and a conversation on April 14, 2025, with an attorney in the White House Counsel's office in which that official asserted "it was not unusual for parties to have settlement negotiations" and stated that the Heritage Foundation's counsel "should contact him if [he] had not heard from the Department in several weeks concerning possible settlement," *id.*, ¶ 10(b). Those communications do not seem to be settlement discussions. But the evidence does show a remote meeting regarding "Case Discussion" was scheduled for May 9, 2025, for 4:00 p.m. to 4:30 p.m. ECF No. 75-3. Counsel for the Heritage Foundation asserts that meeting was a one-hour long "settlement negotiation[] as to all Hur related cases" in which

the government stated that production of the audio recordings would occur on May 20, 2025. ECF No. 75, ¶ 13(b). Nonetheless, in the face of the Breyan Declaration's categorical statements that this litigation did not cause the release of the recordings, the fact that there was an hour-long meeting in which the government announced the recordings would be released on a date certain is weak evidence of causation. Indeed, it suggests that the decision had been made not because of the negotiation, but separate from it. In another declaration *not* filed as support for the Heritage Foundation's fees motion, but rather in connection with its Motion to Strike, counsel for the Heritage Foundation avers that in the May 9, 2025, meeting, DOJ officials "made clear that the contemplated production was in response to [this] lawsuit." ECF No. 81, ¶ 8. Oddly, given the purported clarity of DOJ's position in that call, counsel for the Heritage Foundation made no such claim where one would expect to find it, in his prior declaration filed to support the fee petition. More, the evidence he relies on—a May 14, 2025, email from him to DOJ officials stating that his "client has no objection to release [of the recordings] by public link," *see* ECF No. 75-2 at 3, offers meager support for the vague assertion that DOJ "made clear" that the contemplated production would be "in response to [this] lawsuit," ECF No. 81, ¶ 8. What is more clear is that less than three weeks after the May 9, 2025, meeting at which counsel for the Heritage Foundation asserts agency officials asserted *to him* that this litigation *caused* the May 19, 2025, release of the audio, DOJ asserted *to the Court* that the Heritage Foundation was "not eligible" for attorney's fees— meaning that, in agency's view, this litigation *did not cause* the release. *See* ECF No. 67 at 2 (May 28, 2025, status report). Even more revealing, in a June 27, 2025, status report, the Heritage Foundation stated that, although it "reserve[d] all rights," it "[took] no position" on the issue of whether it was eligible for and entitled to fees and costs because it was "not fully apprised of all relevant facts," ECF No. 68 at 2—apparently notwithstanding that DOJ officials had "made clear"

23

that the release of the recording would be in response to this action.[10]    Thus, the Heritage Foundation's argument is further undermined by the record.

In a somewhat related argument (insofar as it relies on timing), the Heritage Foundation contends in its reply brief that DOJ's "release after aggressively litigating against disclosure is powerful (and . . . sufficient) evidence of causation." ECF No. 79 at 10.  Cases have found that an agency's unexplained change in position made after litigation is filed can be enough to establish a plaintiff's eligibility for attorney's fees in a FOIA case.  For example, in *Dorsen v. U.S. SEC*, the agency had "withheld all documents responsive to the plaintiff's [FOIA] request based solely on the agency's assertion that the documents were exempt from disclosure." 15 F. Supp. 3d 112, 119 (D.D.C. 2014).  Then, three months after the plaintiff filed an administrative appeal, eight days after he filed the lawsuit, and one day after the agency received the complaint, it released responsive documents.  *Id.*  The court, relying on the "close proximity in timing between the filing of the lawsuit and the release of responsive records," found that the action substantially caused the release.  *See id.* at 120.  The circumstances of *Dorsen* are far removed from those here, where (1) the gap between the filing of the lawsuit and the release of the audio recordings was over one year, (2) the agency filed a declaration explicitly denying that the litigation caused the release of the recordings, and (3) there is an obvious explanation for the reversal: the change in presidential Administrations.  Indeed, as the Department of Justice asserts, "it should come as no surprise that the release of documents withheld by the [Biden] [A]dministration would be a priority" for the Trump Administration.  ECF No. 76 at 9.

---

[10] Interestingly, that was a change of position from the May 28, 2025, status report, in which the Heritage Foundation asserted it was eligible for and entitled to fees.  *See* ECF No. 67 at 3.  The Heritage Foundation fails to explain why it would change its position if it had already been assured that the release of the first recording was caused by this litigation.

To be sure, sometimes a change in policy from one Administration to the next that results in release of material will not render a FOIA plaintiff ineligible for fees. In *ACLU v. U.S. Department of Homeland Security*, after the agency had ostensibly finished producing responsive documents during the pendency of litigation, it released additional documents, some because of a re-review of material in response to "new [FOIA] guidelines implemented by President Obama and Attorney General Eric Holder." *See* 810 F. Supp. 2d 267, 275–76 (D.D.C. 2011). The agency argued that those documents were released "as a result of" that policy change, "and not as a result of th[e] litigation." *Id.* at 276. The court rejected that argument. It first discussed *Church of Scientology of California*, in which the D.C. Circuit found that new guidelines for FOIA releases issued after commencement of the relevant litigation may have been "a cause" for the release of material, but the "direct cause" of the release was the litigation because "without the litigation, the documents would not have been identified or evaluated to determine whether they should be released under the new guidelines." *ACLU*, 810 F. Supp. 2d at 276 (citing *Church of Scientology of Cal.*, 653 F.2d at 589). The *ACLU* court, noting that the Obama Administration guidelines explicitly applied to litigation pending on the date of their issuance, found that "the plaintiff's FOIA request was eligible for review because it was already in litigation at the time [of] the policy change"; therefore, the release of those records "was substantially caused by the litigation." *Id.* The Heritage Foundation maintains that *ACLU* is "apposite" and supports its position. ECF No. 79 at 10. The undersigned disagrees. Here, there is no evidence that this litigation had anything to do with the discovery or identification of the audio recording. Indeed, when this litigation was filed, DOJ was already evaluating whether the recordings should be released. *See* ECF No.76-1, ¶ 16 (Breyan Declaration stating that DOJ began evaluating the recordings in mid-February 2024, in connection with Judicial Watch's FOIA request). More, the new Administration's change in

position as to release did not come about because this litigation *mandated* rethinking the decision made by the former Administration.  Rather, as the Heritage Foundation acknowledges, the decision to be "transparen[t]" and release the audio involved "a complicated calculus influenced most by politics" on "an issue central to the 2024 Presidential Election."  ECF No. 79 at 6, 17–18 And, of course, according to the Breyan Declaration, the decision to release the audio on May 19, 2025, to the public was made independently of this litigation.  *See* ECF No. 76-1, ¶¶ 20–22.

In sum, no doubt there is conflicting evidence regarding whether the Heritage Foundation's litigation substantially caused the release of the audio recording on May 19, 2025.  The Heritage Foundation's argument that the timing of the release suggests causation is not outlandish and its counsel has asserted under penalty of perjury that during a meeting on May 9, 2025, it was "made clear" to him that by DOJ officials that the release was "in response to [the Heritage Foundation's] lawsuit," ECF No. 81, ¶ 8.  However, "it is [the fee petitioner's] burden to show that it is more likely than not that [its] litigation caused the release of documents, not [the agency's] burden to prove otherwise," *Am. Wild Horse Campaign v. U.S. Bureau of Land Mgmt.*, No 22-cv-3061, 2024 WL 3967256, at *3 (D.D.C. Aug. 26, 2024) (quoting *Zynovieva v. U.S. Dep't of State*, No. 19-cv-3445, 2023 WL 2755599, at *5 (D.D.C. Mar. 31, 2023), *aff'd*, No. 23-5120, 2024 WL 1946592 (D.C. Cir. Apr. 30, 2024)) and, considering the Breyan Declaration and the other evidence described here, the undersigned finds that burden unmet.

*c.     Release of the Second Recording*

The release of the second audio recording is a different story.  As noted, two separate devices each recorded the entire Biden-Hur Interview.  *See* ECF No. 34-2, ¶ 12.  Those recordings comprise "several separate digital files."  *Id.*  The transcripts of the interview—one transcript for each day—were made using "the best quality audio files from each day."  ECF No. 81-4 at 12.

26

The files used to create the transcript were released to Congress and to the public on May 19, 2025. ECF No. 76-1, ¶¶ 18–19. It is undisputed that the digital files not used to create the transcript—which the parties refer to as the "second recording"—were not released to the public on May 19, 2025.[11] *See, e.g.*, ECF No. 81-4 at 12. Rather, the evidence shows that on May 15, 2025—after DOJ informed counsel for the Heritage Foundation that it planned to release the audio recordings of the Biden-Hur Interview—counsel for the Heritage Foundation emailed DOJ personnel stating that, "[t]echnically, there are two tapes and we argued both should be released. Wanted to flag and see where you were on that." ECF No. 75-2 at 2. Counsel for DOJ reported to Plaintiffs' counsel on May 22, 2025, the information noted above about the creation of the transcript and the release of the audio files and asserted that, even though "the content from each recording device was the same," the agency was "[n]evertheless . . . willing to process the original audio files that ha[d] not already been posted." ECF No. 81-4 at 12. Counsel for DOJ asked that Plaintiffs' counsel "let [him] know prior to the next status report if [they] would like [the agency] to go forward" with the processing of those files, which could take several weeks. *Id.* On May 27, 2025, the day before a status report was due, counsel for the Heritage Foundation asked that DOJ process the files for release.[12] *See id.* at 11. In the May 28, 2025, status report, the parties reported that

---

[11] According to the Breyan Declaration, the recording that was released to the public is the same as the recording that was released to Congress. *See* ECF No. 76-1, ¶¶ 18–19 (asserting that DOJ released the audio recording to Congress on May 19, 2025, and later that same day "released to the public the same audio recordings that had been released to Congress").

[12] After the Heritage Foundation asked for the second recording to be processed and released, Judicial Watch sent an email stating that it "assume[d] that it will be processed for all plaintiffs and will be posted on DOJ's website when complete," ECF No. 81-4 at 10; and the Press Coalition stated that it was "operating under the same assumption as Judicial Watch," *id.* at 9. The undersigned does not address whether the Press Coalition's email might make it eligible for fees in connection with the release of the second recording because the Press Coalition argues only that it was the catalyst for the release of the first recording on May 19, 2025. *See* ECF No. 72-1 at 10 (*"Here, the timing of DOJ's release—just days before it was required to tell the Court and the public whether it stood by its patently infirm arguments for withholding these records—demonstrates that 'it is more probable than not' that, but for this litigation, DOJ would never have produced these audio recordings." (quoting *Grand Canyon Tr.*, 947 F.3d at 97)); ECF No. 78 at 2 ("[T]he sequence of events demonstrates that the Press Coalition's FOIA lawsuit was indeed a catalyst in DOJ's

"[t]wo issues remain[ed] outstanding" in "this Freedom of Information Act . . . case": the "[p]rocessing of additional audio files of the [Biden-Hur] interview," which DOJ had agreed to do, and attorney's fees. ECF No. 67 at 1–2.

DOJ contends that "the causes of th[e] release [of the second recording] are the same as the causes of the initial release of the audio recordings: the Congressional subpoena and the Department's discretionary decision to release previously withheld records." ECF No. 76 at 18. But the circumstances of the release of the second recording in July 2025 are materially different from the circumstances surrounding the May 19, 2025, release of the first recording. It appears from an email from counsel for the government to counsel for Plaintiffs that DOJ had no intention of releasing the second recording, reasoning that its content is the same as the content of the first recording and so its release was unnecessary. *See* ECF No. 81-4 at 12. Though DOJ appeared open to its public release, it was the request of the Heritage Foundation that caused DOJ to process the second recording and release it. *See id.* ("[W]e are willing to process the original audio files that have not already been posted. . . . Please let us know prior to the next status report if you would like us to go forward with that processing."); *id.* at 11 ("Heritage Plaintiffs request this processing."). And, in the May 27, 2025, status report to the Court, the parties noted that the processing and release of the unreleased audio files, which the Heritage Foundation "requested" and DOJ "agreed to do," was one of two issues that "remain[ed] outstanding" in this case. ECF No. 67 at 1–2. It is difficult to see how those facts could be spun to establish that the Heritage

---

decision to release the audio recordings when it did, because the timing of DOJ's release of the audio recordings correlated with DOJ's deadline to report to the Court in this matter . . . . (emphasis omitted)).

28

Foundation *did not* cause the release of the second recording, and indeed, DOJ does not make that argument based on the timeline of what occurred.[13]

Instead, DOJ makes a legal argument that the release of the second recording was *de minimis* and is therefore insufficient to establish eligibility for fees, citing *Mobley v. Department of Homeland Security*, 908 F. Supp. 2d 42 (D.D.C. 2012). *See* ECF No. 76 at 19. *Mobley* addressed a situation in which "the plaintiff sought, but never received, any records responsive to its request, but the plaintiff's lawsuit nevertheless succeeded in causing the defendant to process a request that the agency had previously refused to process." 908 F. Supp. 2d at 44. Noting that the statute makes a plaintiff eligible for fees only if it "substantially prevailed," the court denied the fee request, reasoning that "the fact that the plaintiffs received no documents, despite the fact that the defendant processed their request, militates against a conclusion that the plaintiffs substantially prevailed," because "if a plaintiff obtains only one small piece of the relief it seeks in its complaint, . . . calling such prevalence 'substantial' is clearly incorrect." *Id.* at 48. Here, however, DOJ did provide the Heritage Foundation substantive relief in the form of release of the second recording of the Biden-Hur Interview. *See Am. Oversight v. U.S. DOJ*, 375 F. Supp. 3d 50, 63 n.2 (D.D.C. 2019) (indicating that *Mobley*'s reasoning does not apply where the agency's change in position results in the production of material sought). And, while a fair argument can be made that

---

[13] The undersigned does not consider the Breyan Declaration to be a barrier to this finding. First, when Breyan speaks of DOJ's determination that the "audio recordings" should be released to the public, he clearly refers to the audio recording that was released to Congress in May 2025—that is the digital files that were used to create the transcript of the Biden-Hur Interview. For example, he asserts that DOJ "determined that it would comply with the renewed Congressional subpoena of January 6, 2025," and "accordingly began to process the audio recordings for release to Congress." ECF No. 76-1, ¶ 17. Those "audio recordings" were "released to the House of Representatives Committee on the Judiciary" on May 19, 2025, and, thereafter, "the same audio recordings" were released to the public. *Id.*, ¶¶ 18–19. Similarly, DOJ determined that "because it would release the audio recordings to Congress, [it] should also release the audio recordings to the public." *Id.*, ¶ 20. That is, the "audio recordings" that Breyan discusses are those that were released on May 19, 2025, not those released on July 7, 2025. More, although DOJ may have determined that all recordings of the Biden-Hur Interview should be released to the public, as discussed above, it was not until the Heritage Foundation asked that it be processed that DOJ thereafter released the second recording.

the release of the second recording added little to what had already been released, courts in this Circuit and elsewhere have held that "the degree of plaintiff's success is relevant to the size of reasonable fees, not to its eligibility for a fee award." *People for the Ethical Treatment of Animals v. NIH*, 130 F. Supp. 3d 156, 163 (D.D.C. 2015)); *see also, e.g.*, *Wilson v. FBI*, 20-cv-10324, 2022 WL 21828495, at *5 (S.D.N.Y. Oct. 14, 2022) (stating that "[t]he fact that the information obtained by Plaintiff after filing his lawsuit was *de minimis* is of no moment" to the eligibility analysis), *report and recommendation adopted*, Order, *Wilson v. FBI*, No. 20-cv -10324 (S.D.N.Y. Nov. 28, 2022), *aff'd*, 91 F.4th 595 (2d Cir. 2024).

Finally, the government maintains that, because Judicial Watch's action seeking release of the records was filed first, the Fee Petitioners "'cannot piggy back off' Judicial Watch's lawsuit and claim . . . that it was their own lawsuit instead that caused the recordings' release." ECF No. 76 at 15 (quoting *Elec. Privacy Info. Ctr. v. U.S. Dep't of Homeland Sec.*, 218 F. Supp. 3d 27, 51 (D.D.C. 2016)). The undersigned rejects that argument for three independent reasons. First, as the Heritage Foundation notes, *Electronic Privacy Information Center* "had nothing to do with a 'first to file' theory," but "concerned a plaintiff seeking to 'piggy back' off a prior successful phase in litigation to obtain fees for a later phase of the litigation i[t] decisively lost." ECF No. 79 at 11. That is, DOJ has provided no legal support for its argument. Second, as the Press Coalition points out, a fee petitioner should be allowed the opportunity to establish that the arguments it made in a FOIA action caused the release of material under the catalyst theory even if another action seeking the same material was filed first. *See* ECF No. 78 at 7. Third, here, although Judicial Watch filed its litigation before the Heritage Foundation did, it was the Heritage Foundation that requested processing and release of the second recording, *see* ECF No. 81-4 at 11, which is the basis for its eligibility for an award of attorney's fees.

In sum, the undersigned recommends finding the Heritage Foundation eligible for a fee award because this lawsuit substantially caused the release of the second recording of the Biden-Hur Interview.

> 2.    The Press Coalition

The Press Coalition focuses exclusively on the release of the first recording to establish its eligibility for fees. *See* note 12, *supra*. Its opening brief is short on argument, asserting:

> The Press Coalition requested copies of audio recordings of Special Counsel Hur's interviews of President Biden; DOJ withheld the records on invalid grounds; and the government released the requested records to the public as a result of this litigation. In these circumstances, the Press Coalition's eligibility for and entitlement to an award of attorneys' fees and costs is beyond dispute.

ECF No. 72-1 at 8. And:

> the timing of DOJ's release—just days before it was required to tell the Court and the public whether it stood by its patently infirm arguments for withholding these records—demonstrates that "it is more probable than not" that, but for this litigation, DOJ would never have produced these audio recordings.

*Id.* at 6 (quoting *Grand Canyon Tr.*, 947 F.3d at 97).[14] That is merely a less detailed version of the Heritage Foundation's timing argument that the undersigned has already rejected in Section III.A.1.b, *supra*.

Perhaps in response to the Breyan Declaration, with its categorical statements that this litigation "did not cause the Department to release the audio recordings at issue," ECF No. 76-1,

---

[14] The Press Coalition asserts that it "is also eligible for fees under 5 U.S.C. § 552(a)(4)(E)(ii)(II) as Judge Randolph interpreted that provision in his concurring opinion in *Bernhardt*, which noted that the plain text 'requires only correlation not causation' between the plaintiff obtaining the relief requested and the government agency's change in position." ECF No. 72-1 at 10 n.3. The majority opinion in *Grand Canyon Trust*, however, continued to apply the catalyst theory, which requires a showing of causation. *See* 947 F.3d at 96–97. Judge Randolph's interpretation in his concurrence-in-the-judgment did not, therefore, win the day and set a new standard for eligibility under Section 552(a)(4)(E)(ii)(II). *See, e.g.*, *Informed Consent Action Network v. NIH*, Nos. 23-cv-3674, 24-cv-813, 2025 WL 3484885, at *3 n.3 (D.D.C. Dec. 4, 2025) (noting "binding D.C. Circuit precedent holding that the 2007 Open Government Act established 'that the catalyst theory applies in FOIA cases.'" (citation modified) (quoting *Davis v. U.S. Dep't of Just.*, 610 F.3d 750, 752 (D.C. Cir. 2010))); *see also First Look Inst.*, No. 24-5257, 2025 WL 1840647, at *1 (per curiam) (noting, post-*Grand Canyon Trust*, that "the catalyst theory in FOIA cases is the law of this circuit").

31

¶ 22 (which the Press Coalition does not address head-on), the Press Coalition expands somewhat

on its timing argument in its reply and subtly changes the position it took in its opening brief.  In

its reply, it states that

> DOJ's public release of the audio recordings did not take place in January 2025, when the new administration allegedly decided it would comply with the House subpoena,[15] nor did it take place concurrently with the May 30 joint status report deadline in the House Subpoena Suit.  Rather, the audio recordings were released eleven days earlier—on May 19, 2025—which was just *one day* before DOJ's deadline to file a status report in *this* case.  Notably, DOJ informed counsel for the Press Coalition and other plaintiffs in this case the day they posted the recordings online, but DOJ did not provide *any* publicly docketed notice to Judge Amy Berman Jackson, who was presiding over the House Subpoena Suit.  Even if DOJ provided the audio recordings to the House Judiciary Committee moments before publishing them online and notifying the Press Coalition, . . . the only reasonable conclusion from this timeline is that the recordings would not have been released online *when they were* but for this FOIA litigation.

ECF No. 78 at 4–5 (internal citations omitted) (emphasis added).  That is, unlike its opening brief,

which claimed that "but for this litigation, DOJ would *never* have produced these audio

recordings," ECF No. 72-1 at 10 (emphasis added), its reply asserts that "the recordings would not

have been released online *when they were* but for this FOIA litigation," ECF No. 78 at 5.  The

D.C. Circuit has not decided whether a FOIA plaintiff is eligible for fees under the catalyst theory

if it shows that the litigation affected the timing of release, rather than release *vel non*.  *See, e.g.*,

*First Look Inst.*, 2025 WL 1840647, at *1 ("We . . . 'need not decide whether a sudden acceleration

of production can, of itself, represent a change in position within the meaning of the statute.'"

(quoting *Grand Canyon Tr.*, 947 F.3d at 97–98)).  Judges in this district, however, have found that

"[a]n 'agency's sudden acceleration in processing a FOIA request may lead to the conclusion that

the lawsuit substantially caused the agency's compliance with FOIA.'"  *First Look Media Works*,

---

[15] The Breyan Declaration does not in fact assert that the decision to comply with the renewed congressional subpoena occurred in January 2025; rather, it is silent on precisely when that decision was made, stating only that it was "[a]fter" Inauguration Day.  ECF No. 76-1, ¶ 17.

2024 WL 4262773, at *3 (quoting *Elec. Privacy Info. Ctr.*, 218 F. Supp. 3d at 41).  And in *Grand Canyon Trust*, the D.C. Circuit entertained the theory, albeit without approving it, that "a 'sudden acceleration' of production can, of itself, represent a 'change in position' within the meaning of the statute."  947 F.3d at 97–98.

Even assuming the theory is viable as a matter of law, the undersigned finds that the Press Coalition has not demonstrated what it requires.  To succeed on the theory, the plaintiff must show first that the delay in production is unexplained and second that "the agency did in fact accelerate its response to the FOIA request because of the lawsuit."  *First Look Media Works*, 2024 WL 4262773, at *4.  The Press Coalition satisfies neither requirement.

First, the delay in production is hardly "unexplained."  The record shows several explanations for the timing of the decision here.  For example, the presidential Administration changed in January 2025; President Biden's claim of executive privilege had to be reversed or waived; DOJ had to determine whether to continue to rely on exemptions not dependent on executive privilege at a time when its leadership was being installed and it was facing a significant time-sensitive workload; and the recordings had to be "process[ed]," ECF No. 76-1, ¶ 17, which apparently can take "several weeks," ECF No. 67 at 2.   The Press Coalition fails to address any of those plausible "alternative explanation[s]," *First Look Media Works*, 2024 WL 4262773, at *4; it merely sets out a chronology and asserts that "the only reasonable conclusion from this timeline is that the recordings would not have been released online when they were but for this FOIA litigation."  ECF No. 78 at 4–5.  That is insufficient.

Second, the Press Coalition must show that DOJ "did in fact" release the first audio recording on May 19, 2025, "because of this lawsuit."  *See, e.g.*, *First Look Media Works*, 2024 WL 4262772, at *4.  It argues that the D.C. Circuit's decision in *Public Citizen Health Research*

33

*Group v. Young* supports its causation argument, which is based exclusively on timing. *See* ECF No. 78 at 5–6. That case sought, among other things, to compel the FDA to mandate warning labels on aspirin. *Pub. Citizen Health Rsch. Grp.*, 909 F.2d at 547. While cross-motions for summary judgment were pending, the FDA reversed course and promulgated a regulation requiring such warnings. *See id.* at 550. Addressing the plaintiff's motion for attorney's fees pursuant to the Equal Access to Justice Act, the district court found that the plaintiff had prevailed in the case under a catalyst theory because its litigation had caused the agency to switch positions. *See id.* at 549–50. The D.C. Circuit upheld that finding. *Id.* at 551. It noted that the FDA's reversal came only "after oral argument on the cross-motions for summary judgment, an oral argument in which the district court gave Public Citizen's view a very hospitable reception." *Id.* at 550. In the face of the "highly suggestive" chronology, it was not clearly erroneous for the district court to reject the FDA's argument that "pressure[] from Congress to move more quickly" caused it to issue the regulation, where "[t]he legislative action was hardly overpowering," consisting "only of a subcommittee hearing . . . and the introduction of [two] bills . . . that would have required warning labels." *Id.* at 551.

The Press Coalition urges the undersigned to "likewise reject DOJ's dubious explanation for releasing the audio recordings." ECF No. 78 at 6. The undersigned finds little in *Public Citizen Health Research Group* to support the Press Coalition's causation argument. As noted, that case turned in part on the "highly suggestive" chronology that the agency's change in position occurred after an oral argument where the district court apparently indicated it was likely to rule in the plaintiff's favor. *Pub. Citizen Health Rsch. Grp.*, 909 F.2d at 551. There was no such indication from Judge Kelly here and the chronology, as has been explained above, is not so suggestive. May 20, 2025, was a deadline for a status report—Judge Kelly did not require production by that date.

34

The Press Coalition's only evidence is that the release coincided—not exactly, but admittedly closely—with a related deadline in this case. But—again as discussed above in Section III.A.1.b—that fact alone does not show that this litigation caused the release.

The Press Coalition adds one detail not relied on by the Heritage Foundation, calling it "[n]otabl[e]" that "DOJ informed counsel for the Press Coalition and other plaintiffs in this case the day they posted the recordings online, but DOJ did not provide *any* publicly docketed notice to Judge Amy Berman Jackson, who was presiding over the House Subpoena Suit." ECF No. 78 at 4 (citing ECF No. 72-3 (email timestamped May 19, 2025 7:01 PM from counsel for the government to counsel for Plaintiffs stating that DOJ had posted the recording in the Office of Information Policy's FOIA reading room). According to the Press Coalition, "[e]ven if DOJ provided the audio recordings to the House Judiciary Committee moments before publishing them online and notifying the Press Coalition, . . . the only reasonable conclusion from this timeline is that the recordings would not have been released online when they were but for this FOIA litigation." *Id.* The Press Coalition puts more weight on this timeline than it can bear. The undersigned is unconvinced that the timing by which the government provided notice of the release of the recording to various litigants says much, if anything, about causation. More, it is a flawed argument on its own terms. It is not surprising that the government failed to provide a "publicly docketed notice" in Judge Jackson's case on May 19, 2025, because a status report was not due in that case until May 30, 2025. *See* Minute Order, *Comm. on the Judiciary of the House of Representatives v. Garland*, No. 24-cv-1911 (D.D.C. Apr. 1, 2025). More, at the time government counsel informed Plaintiffs' counsel of the release (at 7:01 p.m. on May 19, 2025), Judge Jackson had already entered a minute order (at 11:50 a.m. on May 19, 2025) requiring the parties to show cause by May 21, 2025, why the case should not be dismissed as moot "[i]n light of the public

release of the audio recording."   Minute Order, *Comm. on the Judiciary of the House of Representatives v. Garland*, No. 24-cv-1911 (D.D.C. May 19, 2025).  The parties then dismissed the case on May 21, 2025.  Stipulation of Dismissal, *Comm. on the Judiciary of the House of Representatives v. Garland*, No. 24-cv-1911 (D.D.C. May 21, 2025), ECF No. 31.  Thus, the lack of a "publicly docketed notice" about the release in that case prior to the government's communication with Plaintiffs' counsel about the release is easily explained: such a submission was unnecessary.  Finally, although the Press Coalition recognizes that its burden here is to show that it, rather than another plaintiff, "catalyzed release of the records," ECF No. 78 at 7 ("DOJ [cannot] maintain that no one plaintiff can prove that it catalyzed release of the records because more than one plaintiff sought them."), it makes no effort to do so here.

Accordingly, examining the "totality of the circumstances" surrounding the May 19, 2025, disclosure of the first recording, *First Look Media Works*, 2024 WL 4262773, at *2, the undersigned finds that the Press Coalition has not met its burden to show that its litigation caused the release of the first recording on May 19, 2025.

### B.     Entitlement

Having found that only the Heritage Foundation is eligible for fees and only as to the release of the second audio recording, the undersigned turns to its entitlement to any such fees. FOIA's fee provision "was not enacted to provide a reward for any litigant who successfully forces the government to disclose information it wished to withhold," *Davy*, 550 F.3d at 1158 (quoting *Nationwide Bldg. Maint., Inc. v. Sampson,* 559 F.2d 704, 711 (D.C. Cir. 1977)); rather, "it serves the 'more limited purpose' of 'removing the incentive for administrative resistance to disclosure requests based not on the merits of exemption claims, but on the knowledge that many FOIA plaintiffs do not have the financial resources or economic incentives to pursue their requests

36

through expensive litigation.'" *WP Co. v. U.S. Small Bus. Admin.*, 514 F. Supp. 3d 267, 271 (D.D.C. 2021) (citation modified) (quoting *Davy*, 550 F.3d at 1158).  As noted, courts in this Circuit look to four factors when determining entitlement: "(1) the public benefit derived from the case, (2) the commercial benefit to the requester, (3) the nature of the requester's interest in the information, and (4) the reasonableness of the agency's conduct."  *Morley*, 719 F.3d at 690. "While the burden of proving entitlement generally rests with the requestor, the agency bears the burden of showing that any withholding was reasonable."  *Louise Trauma Ctr. LLC v. U.S. Dep't of Homeland Sec.*, No. 21-cv-2371, 2024 WL 3251225, at *2 (D.D.C. July 1, 2024) (citations omitted).  "The sifting of those criteria over the facts of a case is a matter of district court discretion . . . ."  *Tax Analysts*, 965 F.2d at 1094.

### 1. Public Benefit

"The 'public benefit' factor turns on an *ex ante* assessment of: (1) 'the effect of the litigation for which fees are requested,' and (2) 'the potential public value of the information sought.'"  *Informed Consent Action Network*, 806 F. Supp. 3d at 73 (quoting *Davy*, 550 F.3d at 1159).  The effect of the litigation prong "is properly understood as asking simply whether the litigation has caused the release of requested documents," which merely "'presents a variation on' the question whether the plaintiff has 'substantially prevailed.'"  *Morley*, 810 F.3d at 844 (citation modified) (quoting *Davy*, 550 F.3d at 1159).  The undersigned has already recommended finding that the Heritage Foundation substantially prevailed with respect to release of the second recording.  *See* Section III.A.1.c, *supra*; *see also Informed Consent Action Network*, 806 F. Supp. 3d at 73 (finding that the effect of the litigation inquiry favored the plaintiff because the litigation "resulted in the release of several pages of records responsive to its request").

The potential public value prong focuses not on "whether any documents supplied prove to advance the public interest," *Morley*, 810 F.3d at 844, but, rather, whether "it's plausible *ex ante*" that the request has "at least a modest probability of generating useful new information about a matter of public concern." *Informed Consent Action Network*, 806 F. Supp. 3d at 73. The D.C. Circuit has explained that the purpose of FOIA's fee provision is ""to remove the incentive for administrative resistance to disclosure requests based not on the merits of exemption claims, but on the knowledge that many FOIA plaintiffs do not have the financial resources or economic incentives to pursue their requests through expensive litigation." *Morley*, 810 F.3d at 844 (quoting *Davy*, 550 F.3d at 1158). A focus on the *potential* value of the information sought rather than any benefit realized by the release of material serves that purpose because "few people would stake their financial resources on litigation when they can know nothing about the documents or their contents prior to their release." *Id.* (citation modified) (quoting *Davy*, 550 F.3d at 1162 n.3). As such, DOJ's contention that "[t]here is no 'public benefit' to the release of the duplicate set of the audio recordings" is unhelpful. ECF No. 76 at 24. The question is whether the Heritage Foundation's request for the recordings of the Biden-Hur Interview, if successful, would have "generat[ed] useful new information about a matter of public concern." *Morley*, 810 F.3d at 844; *see also, e.g.*, *Reyes v. U.S. Nat'l Archives & Recs. Admin.*, 356 F. Supp. 3d 155, 164–65 (D.D.C. 2018) ("[T]he D.C. Circuit has explained that a court should assess *the potential public value of the information sought*, not the public value of the information which was actually disclosed through the FOIA litigation." (emphasis added)). As to that question, although DOJ does "not conced[e]" that the request passes that test, ECF No. 76 at 21, it offers no argument in response to the Heritage Foundation's contention that the audio recordings of the Biden-Hur Interview were "likely to add to the fund of public information that citizens may use in making vital political

choices." ECF No. 73-1 at 14 (emphasis omitted) (quoting *Elec. Privacy Info. Ctr. v. FBI*, 72 F. Supp. 3d 338, 346 (D.D.C. 2014)).  In any case, any attempt to do so would be unsuccessful, given the significant public interest in the release of the recordings as evidenced by news reporting.  *See, e.g.*, Giselle Ruhiyyih Ewing & Ali Bianco, Audio of Hur interview reveals Biden's apparent memory stumbles, sparking renewed scrutiny, Politico (May 17, 2025), https://www.politico.com/news/2025/05/17/audio-of-hur-interview-reveals-bidens-apparent-memory-stumbles-sparking-renewed-scrutiny-00355478; Brett Samuels, et al., DOJ releases full Biden-Hur interview audio, The Hill (May 19, 2025), https://thehill.com/homenews/campaign/5308563-doj-releases-biden-hur-interview-audio/.

Accordingly, this factor favors the Heritage Foundation.

### 2.    Commercial Benefit and Nature of Requester's Interest

The "commercial benefit" factor "considers whether [the] plaintiff derived a commercial benefit from obtaining the records" and the "nature of interest" factor "looks at the nature of [the] plaintiff's interest in the requested records." *Informed Consent Action Network*, 806 F. Supp. 3d at 74–75.  These "closely related" factors are "often considered together." *Id.* (quoting *Nat'l Sec. Archive v. Dep't of Def.*, 530 F. Supp. 2d 198, 201 (D.D.C. 2008)).  The commercial benefit factor usually favors entitlement to fees where the plaintiff is a "nonprofit public interest group." *Id.* (quoting *Fenster v. Brown*, 617 F.2d 740, 742 n.2 (D.C. Cir. 1979)).  Similarly, courts considering the "nature of interest" factor will generally find it weighs in favor of fees where the plaintiff's "interest in the information sought was scholarly or journalistic or public-interest oriented." *Id.* (quoting *Fenster*, 617 F.2d at 742 n.2).  That is, these two factors "generally tip in favor of organizations that 'aim to ferret out and make public worthwhile, previously unknown government information.'" *WP*, 514 F. Supp. 3d at 272 (quoting *Davy*, 550 F.3d at 1160).

39

Here, the Heritage Foundation asserts it is "a non-profit educational institution that derived no commercial benefit from its FOIA request or lawsuit" and the purpose of the subdivision of the foundation most involved in the litigation—the Oversight Project (which has since been spun off)—"is to publicly disseminate information gathered through FOIA requests and litigation." ECF No. 73-1 at 16. DOJ does not challenge those statements. *See* ECF No. 76 at 21, 24. In the absence of any opposition by DOJ, the undersigned finds these two factors also favor the Heritage Foundation.

### 3. Reasonableness of the Agency's Conduct

The fourth factor considers whether the agency "had a reasonable basis in law" for withholding the records sought and whether it was "recalcitrant in its opposition to a valid claim or otherwise engaged in obdurate behavior." *Davy*, 550 F.3d at 1162 (first quoting *Tax Analysts*, 965 F.2d at 1096; and then quoting *LaSalle Extension Univ. v. FTC*, 627 F.2d 481, 486 (D.C. Cir. 1980)); *accord AquAlliance v. Nat'l Oceanic & Atmospheric Admin.*, No. 17-cv-2108, 2019 WL 2451687, at *5 (D.D.C. June 12, 2019). If the agency's decision to withhold the records was "correct as a matter of law, that will be dispositive"; if the agency's position "is founded on a colorable basis in law, that will be weighed along with other relevant considerations in the entitlement calculus." *Davy*, 550 F.3d at 1162 (quoting *Chesapeake Bay Found. v. U.S. Dep't of Agric.*, 11 F.3d 211, 216 (D.C. Cir. 1993)). The agency's position will have a colorable basis as long as it "reasonably (even if incorrectly) withheld documents." *Morley v. CIA*, 894 F.3d 389, 393 (D.C. Cir. 2018). "The relevant agency opposition is not limited to an agency's litigation posture, but rather factors 'whether the agency has shown that it had any colorable or reasonable basis for not disclosing the material . . . .'" *Poitras v. Dep't of Homeland Sec.*, No. 15-cv-1091, 2019 WL 1569561, at *9 (D.D.C. Apr. 11, 2019) (quoting *Davy*, 550 F.3d at 1163).

As to the legal basis of DOJ's withholding, the parties point to arguments in their summary judgment briefing. *See* ECF No. 73-1 at 17 (Heritage Foundation citing summary judgment briefing); ECF No. 76 at 21–22 (DOJ doing the same). Among the positions DOJ advanced there was that

> Exemption 5 allows the government to withhold a record if it is subject to a civil litigation privilege. Executive privilege is a privilege available to government agencies, and the President has formally asserted executive privilege with respect to the audio recording. Accordingly, the Department properly withheld the record pursuant to Exemption 5. That uncomplicated analysis resolves this case.

ECF No. 46 at 13 (internal citations omitted). The Heritage Foundation contested that syllogism in the merits briefing, *see* ECF No. 49 at 6–10; however, in its briefing related to its request for fees (including the briefing on the Motion to Strike), it makes assertions that lead inexorably to the conclusion that, before the claim of executive privilege was reversed or waived, DOJ was *required* to withhold the documents. Over and over, the Heritage Foundation asserts that only the President could order disclosure of the recordings:

- "[T]he release here was not discretionary; it required President Donald J. Trump to personally reverse President Joseph R. Biden's claim of Executive Privilege." ECF No. 73-1 at 5.

- "[T]he previous administration invoked Executive Privilege to prevent the release of the Biden-Hur interview tapes. That invocation could only be overcome by a judicial order or a personal decision by President Trump to reverse his predecessor's assertion of privilege. So long as President Biden's privilege assertion remained it was an *absolute* bar to disclosure by the Executive Branch." ECF No. 73-1 at 10.

- "President Trump could himself reverse the claim of Executive Privilege and authorize the release of the tapes . . . ." ECF No. 73-1 at 11.

- "In order for the Department to produce the tape, during that time it would have to consider whether President Donald J. Trump should overrule President Biden's claim of Executive Privilege. Put differently, discretionary release was not possible." ECF No. 79 at 8.

- "The President had invoked Executive Privilege and thus only the President could authorize production." ECF No. 80 at 13–14; *accord* ECF No. 84 at 12.

41

- "Simply put, the President had to personally authorize release of the Biden-Hur audio." ECF No. 80 at 14.

- "[T]he Department lacked power to release the recordings unless and until President Trump reversed President Biden's claim of Executive Privilege." ECF No. 80 at 18; *accord* ECF No. 84 at 17.

- Asserting that it is "inaccurate" to say that "the Department somehow had power to decide whether to release a recording covered by Executive Privilege." ECF No. 80 at 20.

- "The White House Counsel's Office and President Donald J. Trump *had* to be involved in the decision to release the tapes because that decision required the reversal of President Biden's claim of Executive Privilege." ECF No. 84 at 10.

The Heritage Foundation does not concede either that executive privilege was appropriately invoked or DOJ's claim that an invocation of executive privilege by the President cannot be overcome in a FOIA action[16]—far from it—but it makes a convincing argument DOJ *was legally required* to withhold the recordings during the pendency of this litigation until the President reversed or waived the claim of executive privilege. And it is an argument supported by binding precedent. The D.C. Circuit has stated that the decision to invoke or waive executive privilege belongs to "the President alone." *Nixon v. Sirica*, 487 F.2d 700, 755 (D.C. Cir. 1973); *see also, e.g.*, *Public Citizen v. Burke*, 843 F.2d 1473, 1479 (D.C. Cir. 1988) (noting that an incumbent President may reverse a former President's claim of executive privilege). And, although "a strong showing of need by another institution of government" may override a President's invocation of executive privilege, that is a decision for a court to make, not an administrative agency. *Trump v. Thompson*, 20 F.4th 10, 26 (D.C. Cir. 2021) (quoting *Senate Select Comm. on Presidential v. Nixon*, 498 F.2d 725, 730 (D.C. Cir. 1974)); *see also, e.g.*, *Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367, 389 (2004) ("Once executive privilege is asserted, coequal branches of the Government

---

[16] The undersigned takes no position on either of those propositions.

42

are set on a collision course. The Judiciary is forced into the difficult task of balancing the need for information in a judicial proceeding and the Executive's Article II prerogatives."). That is, even if *President Biden*'s invocation of executive privilege was hopelessly flawed (again, a proposition the undersigned takes no position on), *DOJ*'s hands were tied; it could not act to release the recordings.[17] And, once executive privilege no longer stood in the way, DOJ exercised its discretion to release the recordings to the public. In the undersigned's view, that establishes that the agency was "correct as a matter of law" to withhold the recordings when it did, therefore mandating a finding that the Heritage Foundation (and the Press Coalition, for that matter) cannot be entitled to fees. *Davy*, 550 F.3d at 1162 (quoting *Chesapeake Bay Found.*, 11 F.3d at 216). Such a finding also complies with the purpose of FOIA's fee provision, which is not to provide a reward to a successful litigant, but instead merely to "remove the incentive" for agencies to

---

[17] This dispute is different, therefore, from a case in which a FOIA plaintiff seeks fees after an agency discloses material over which it had claimed, for example, attorney-client privilege or deliberative process privilege. In those cases, the agency is free to revisit its assertion of privilege and, if appropriate, reverse it. Here, as the Heritage Foundation acknowledges, DOJ could not itself reverse the President's claim of privilege and disclose the relevant records. Rather, the Heritage Foundation says that decision was in the hands of the President exclusively.

This situation is also different from what faced the court in *Brayton v. Office of the U.S. Trade Representative*. In that case, the agency withheld an agreement between the United States and the European Union negotiated under the auspices of the World Trade Organization ("WTO") pursuant to Exemption 1, which "authorizes the nondisclosure of any records that are '(A) specifically authorized under criteria established by an Executive Order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive Order.'" *Brayton v. Office of the U.S. Trade Representative*, 657 F. Supp. 2d 138, 140, 142 (D.D.C. 2009) (quoting 5 U.S.C. § 552(b)(1)), *aff'd*, 641 F.3d 521 (D.C. Cir. 2011). Specifically, the agency contended that "WTO rules prohibited the defendant from unilaterally disclosing" the agreement. *Id.* at 142. The plaintiff sued, asserting that the document was not properly classified. *See Brayton*, 641 F.3d at 523. While summary judgment motions were pending, the agreement was declassified pursuant to an agreement between the European Union and the United States and thereafter produced to the plaintiff. *Id.* at 523. The plaintiff filed a motion for attorney's fees that the district court denied, finding that he was not entitled to such fees because the agency's decision to withhold the agreement was "correct as a matter of law" under Exemption 1. *See Brayton*, 657 F. Supp. 2d at 145. The court did not do so merely on the ground that the agency's hands were tied because the agreement was classified pursuant to WTO rules, but, rather, analyzed whether it had been "properly classified," as required by Exemption 1. *See id.* at 143–45. That is, in *Brayton*, the agency that made the classification decision did so by interpreting both an executive order and WTO rules and, if it found its interpretation to be wrong, the agency could reverse it. *See id.* That is not the case here because DOJ was unable to reverse the claim of executive privilege.

wrongfully withhold records because they imagine plaintiffs will not be able to afford to pursue disclosure in litigation. *See id.* at 1158 (quoting *Nationwide Bldg. Maint.*, 559 F.2d at 711).

Even if the fact that DOJ could not release the recordings during the pendency of this litigation (until the President reversed or waived the claim of executive privilege) does not establish that the agency was correct as a matter of law to refuse to do so, it is certainly a colorable basis for the withholding. *See Davy*, 550 F.3d at 1162. More, the undersigned has reviewed DOJ's merits briefs, which made complex arguments about, for example, separation of powers, *see, e.g.*, ECF No. 34-1 at 18–25, that "raised serious legal questions and issues that did not lend themselves to immediate or obvious resolution." *WP*, 514 F. Supp 3d at 273 (citation modified) (quoting *WP Co. v. U.S. Small Bus. Admin.*, No. 20-cv-1240, 2020 WL 6887623, at *2 (D.D.C. Nov. 24, 2020)). Indeed, the Heritage Foundation has claimed that opposing the government's initial decision to withhold the documents in this case required it to incur over $400,000 in attorney's fees and engage an appellate firm with "extraordinary and sought after . . . expertise." ECF Nol 73-1 at 22. That is a further reason to find that DOJ's position "had at least a 'colorable or reasonable basis'" to withhold the records. *WP*, 514 F. Supp 3d at 273 (quoting *Davy*, 550 F.3d at 1163)).

The Heritage Foundation also contends that DOJ engaged in "obdurate" litigation behavior by (1) "deliberate[ly] delay[ing] for obvious political advantage" and (2) failing to be forthcoming about the circumstances surrounding the publications of the recordings of the Biden-Hur Interview on Axios. ECF No. 79 at 15–17. The undersigned disagrees.

The Heritage Foundation maintains that DOJ was obdurate "when this case was commenced" because it refused to "confer until it had both answered [the Heritage Foundation's] compl[ai]nt and was also ordered to meet and confer by the Court." ECF No. 79 at 15. The Heritage Foundation contends that "[i]t is definitionally obdurate to refuse to confer on a matter

whatsoever without a *court order* to do so." *Id.* Here is what actually happened: The day after DOJ filed its answer, Judge Kelly entered the following minute order: "Before the Court in this FOIA case is a complaint and an answer. It is hereby ORDERED that the parties shall meet, confer, and file, by April 30, 2024, a joint proposed schedule for briefing or disclosure." Minute Order (Apr. 16, 2024). It is standard procedure for district court judges to order parties to meet and confer on a schedule after the defendant has responded to a FOIA complaint.[18] The Heritage Foundation's insistence that the court's order is somehow evidence of DOJ's obduracy is not well-taken.

The Heritage Foundation also blames DOJ for twice refusing to agree to an expedited schedule, asserting that the agency "reversed position." *Id.* at 16. It does a poor job of explaining its reasoning:

> At the outset the Government refused to agree to a highly expedited schedule designed to ensure that the Government would have time for emergency stay litigation as concerned any order of disclosure. But then as time went on, the Government cited the time needed to obtain appellate review as ground to deny Plaintiffs' Motion to Expedite. *See* ECF No. 55 at 1. The Government cannot have it both ways and that reveals the Government's true intent: Delay at any cost to avoid damaging the Democratic ticket. That is not a permissible rationale for delay.

ECF No. 73-1 at 19. That is the mere ghost of an argument. The fact that DOJ failed to agree to expedited schedules urged by the Heritage Foundation is feeble evidence that the Agency was engaging in a stratagem to help then-Vice President Kamala Harris win the presidency. More, even if the White House was inappropriately obdurate in its refusal to release the recordings (a point on which the undersigned takes no position), DOJ was not—as discussed above, it could not itself release them unless and until the claim of executive privilege was reversed or waived.

---

[18] Under this Court's Local Civil Rules, FOIA cases are exempt from LCvR 16.3 and Rule 26(f) of the Federal Rules of Civil Procedure, which require the parties to meet and confer on a schedule. More, the undersigned is aware of no rule that mandates that parties meet and confer prior to the defendant appearing in the case by responding to the complaint.

Next, the Heritage Foundation complains about DOJ's conduct in relation to the publication of the recording of the Biden-Hur audio on Axios, asserting that DOJ officials knew by May 15, 2025, that Axios had a recording of the audio of the interview and intended to publish it, yet did not inform counsel for the Heritage Foundation or the Court of that fact.  ECF No. 79 at 17.  It also accuses DOJ and/or the White House of leaking the recording and then lying about it. *See id.*  It is not clear why counsel for the Heritage Foundation thinks he was entitled to information in DOJ's possession regarding the Axios leak but, in any case, the Heritage Foundation itself acknowledges that a DOJ official tried to contact counsel for the Heritage Foundation about the Axios issue on May 15, 2025.  *See* ECF No. 75, ¶¶ 14(a), 15(d).  More, Judge Kelly had the bulk of this information before him on May 17, 2025, when the Heritage Foundation filed a motion for a temporary restraining order and a supplement to that motion seeking an order requiring DOJ to release the recordings of the Biden-Hur Interview.  *See* ECF Nos. 64–65; *see also* Minute Order (May 17, 2025) ("At 1:00 a.m. today, Heritage Plaintiffs filed their . . . Emergency Motion, in which they seek 'a temporary restraining order directing Defendant to produce all recordings of former President Joseph R. Biden's Interview with Special Counsel Robert K. Hur . . . .'").  Judge Kelly denied that motion on multiple grounds and observed, "Surely, Heritage Plaintiffs are interested in knowing whether Defendant plans to continue to withhold the audio from them in its entirety, especially given what they report about the appearance of at least some of it in the public domain.  They will not have to wait long, given that Defendant has been ordered to file a status report as to its position on May 20."  Minute Order (May 17, 2025).  Judge Kelly did not suggest DOJ was being obdurate or engaged in misconduct at that time.  Nor does the undersigned now.

In sum, the undersigned finds that this factor mandates denial of fees to the Heritage Foundation because DOJ's refusal to release recordings that were subject to a claim of executive

46

privilege that DOJ could not override was correct as a matter of law. Alternatively, DOJ's decision to withhold was entirely appropriate in light of the claim of executive privilege, which (again) DOJ could not itself reverse or disavow. Accordingly, if this factor is not dispositive, it nevertheless factor weighs heavily against awarding fees.

            3.      Balancing the Factors

Here, the first three factors weigh in favor of the Heritage Foundation's entitlement to fees and the fourth factor weighs against it, heavily in the undersigned's view. "[W]hen the first three factors favor the plaintiff, but the fourth does not, a district court retains very broad discretion under the four-factor test about how to balance the factors and whether to award attorney's fees." *Morley*, 894 F.3d at 397. Here, where the fourth factor weighs heavily against awarding fees and such an award is not necessary to fulfill the "limited purpose" of disincentivizing the agency from withholding records without a reasonable basis, *Davy*, 550 F.3d at 1158, the undersigned recommends finding that the Heritage Foundation is not entitled to fees. *See, e.g.*, *Morley*, 894 F.3d at 396 (affirming the district court's decision not to award fees where the first three factors favored the plaintiff but the fourth "heavily favored" the agency).

### C.      Reasonable Fees

Even if the Heritage Foundation were entitled to an award of fees under the four-factor test discussed above, the fee award should be zero.

"The Supreme Court has made clear that 'where the plaintiff achieved only limited success, the district court should award only that amount of fees that is reasonable in relation to the results obtained.'" *Wash. All. of Tech. Workers v. U.S. Dep't of Homeland Sec.*, 202 F. Supp. 3d 20, 27 (D.D.C. 2016) (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 440 (1983)). Where a litigant seeking fees is successful on a claim or issue that is segregable from a claim or issue on which the litigant

was unsuccessful, "no fee may be awarded for services on the unsuccessful claim." *Nat'l Sec. Archive v. U.S. Dep't of Def.*, 530 F. Supp. 2d 198, 204 (D.D.C. 2008) (quoting *Judicial Watch v. U.S. Dep't of Com.*, 470 F.3d 363, 369 (D.C. Cir. 2006)).

Here, the Heritage Foundation enjoyed meager success: it caused only the release of the second recording. Recall that the transcript of the Hur-Biden Interview was transcribed from the "best quality audio files" from the two recording devices, ECF No. 81-4 at 12, and those audio files were released to the public on May 19, 2025, independent of this litigation, *see* ECF No. 76-1, ¶¶ 18–21. That is, the Heritage Foundation succeeded in causing the release of lesser-quality recordings of an interview for which the best-quality recording had already been released. The Heritage Foundation argues that "there is considerable value to *non-forensically identical* recordings of the same interview" because "forensic analysis of *both* audio recordings could potentially reveal" the content of President Biden's answers that are described as "indiscernible" in the transcript of the interview. ECF No. 79 at 11–12. It points to a declaration from a digital forensic analyst asserting that "forensic audio experts" can "often make . . . 'indiscernible words' discernible." ECF No. 40-4, ¶ 6. But forensic analysis of the first recording—the better quality one—to make indiscernible words discernible would have otherwise been possible and did not require release of the second recording. And, in any case, the "value" the Heritage Foundation heralds is entirely speculative.

More, the Heritage Foundation is eligible for an award of attorney's fees only because it caused the release of the second recording of the Biden-Hur Interview. That release had nothing to do with the legal arguments the Heritage Foundation made regarding the exemptions claimed by DOJ—the Breyan Declaration makes that clear; rather, the recording was released because the Heritage Foundation asked for it. *See* Section III.A.1.c, *supra*. Discussion about the release of the

48

second recording appears to have begun on May 15, 2025. *See* ECF No. 75-2 at 2 (counsel for the Heritage Foundation stating to DOJ personnel on May 15, 2025, "[t]echnically, there are two tapes and we argued both should be released. Wanted to flag and see where you were on that."). Thus, the work that led to the release of the second recording can be easily segregated from the work performed in the attempt to release the first recording, making this one of the perhaps rare cases in which "issue-by-issue compartmentalization" between compensable work and non-compensable work is possible. *See Wash. All.of Tech. Workers*, 202 F. Supp. 3d at 29.

The Heritage Foundation seeks fees for work performed from early April 2024 (when the action was filed) to August 1, 2024 (when its reply brief in further support of its cross-motion for summary judgment was filed). *See* ECF No. 74-1 (time records). That is, it does not seek fees for the work that led to release of the second recording, which the undersigned finds is the only compensable work. Accordingly, if the Court were to find the Heritage Foundation entitled to fees, the undersigned would nevertheless recommend denying the fee petition.

### D.    Costs

The Heritage Foundation asserts it seeks "costs," as well. *See* ECF No. 73-1 at 24; ECF No. 79 at 23. However, the total award it seeks—$422,147.54—is all attributable to attorney's fees. *See* ECF No. 74-1 at 18 (seeking $422,147.54 in attorney's fees). More, it does not appear to have submitted any proof of costs. Accordingly, its request for costs should be denied.[19]

### IV.    CONCLUSION

For the foregoing reasons, the undersigned recommends denying the motions of both Fee Petitioners—the Press Coalition, ECF No. 72, which is neither eligible for nor entitled to fees; and

---

[19] The Heritage Foundation's request for "fees on fees" should also be denied, as they are compensable only to the extent that the party seeking them prevailed in its underlying fee request. *See, e.g.*, *Comm'r, INS v. Jean*, 496 U.S. 154, 163 n.10 (1990). The undersigned has recommended denying the Heritage Foundation's request for attorney's fees so its request for fees on fees should also be denied.

the Heritage Foundation, ECF No. 73, which, although it is eligible for fees as it caused the release of the second recording of the Biden-Hur Interview, it is not entitled to fees because (1) DOJ could not release the recordings while they were subject to a claim of executive privilege and (2) the fees the Heritage Foundation seeks are not compensable and it has not sought recovery of costs.

*     *     *     *     *

The parties are hereby advised that under the provisions of Local Rule 72.3(b) of the United States District Court for the District of Columbia, any party who objects to a Report and Recommendation must file a written objection thereto with the Clerk of this Court within 14 days of the party's receipt of the Report and Recommendation. The written objections must specifically identify the portion of the report and/or recommendation to which objection is made and the basis for such objections. The parties are further advised that failure to file timely objections to the findings and recommendations set forth in this report may waive their right of appeal from an order of the District Court that adopts such findings and recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985).

Date: March 18, 2026

                                     _____

                                     G. MICHAEL HARVEY
                                     UNITED STATES MAGISTRATE JUDGE